FILED
7/18/22 4:26 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                        .     Case No. 22-20823(GLT)
                              .
U LOCK INC.,                  .
                              .     5414 U.S. Steel Tower
                              .     600 Grant Street
                              .     Pittsburgh, PA 15219
                              .
          Debtor.             .
                              .     July 6, 2022
. . . . . . . . . . . . . ..         11:03 a.m.

TRANSCRIPT OF #14 CONTINUED EXPEDITED MOTION TO DISMISS CASE,
IN ADDITION TO MOTION FOR SANCTIONS AGAINST PETITIONING
CREDITOR, OR IN THE ALTERNATIVE, MOTION FOR RELIEF FROM STAY
FEE AMOUNT, OR IN THE ALTERNATIVE, MOTION TO ABANDON THE
MOVANT'S PROPERTY; #43 ORDER TO SHOW CAUSE
BEFORE HONORABLE GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Law Office of J. Allen Roth
                         By:  J. ALLEN ROTH, ESQ.
                         805 S. Alexandria Street
                         Latrobe, PA  15650

For Christine Biros:     Bernstein-Burkley, P.C.
                         By:  JAMES M. BERENT, ESQ.
                         707 Grant Street
                         Suite 2200, Gulf Tower
                         Pittsburgh, PA  15219

Audio Operator:          Connie Ulysse

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609) 587-3599**

```
TELEPHONIC APPEARANCES:

For Christine Biros:        Bernstein-Burkley, P.C.
                            By:  SARAH ELIZABETH WENRICH, ESQ.
                            707 Grant Street
                            Suite 2200, Gulf Tower
                            Pittsburgh, PA  15219

                            The Law Firm of William E. Otto
                            By:  WILLIAM E. OTTO, ESQ.
                            4027 Old William Penn Highway
                            Murrysville, PA  15668

For the Chapter 7           Mahady & Mahady
Trustee for U LOCK          By:  ROBERT H. SLONE, ESQ.
Inc.:                       223 South Maple Avenue
                            Greensburg, PA  15601

Chapter 7 Trustee for       Zebley, Mehalov & White, P.C.
Shanni Snyder:              By:  CHARLES O. ZEBLEY, JR., ESQ.
                            18 Mill Street Square
                            P.O. Box 2124
                            Uniontown, PA  15401

For Petitioning             SHANNI SNYDER, Pro Se
Creditor:                   14390 Route 30, Unit H
                            North Huntingdon, PA  15642


                            - - -
```

3

# **I N D E X**

**PAGE**

**WITNESS**

GEORGE SNYDER

   Direct Examination by Mr. Roth          12

   Examination by the Court          19

   Cross Examination by Mr. Otto          27

| **EXHIBITS** | **ID.** | **EVD.** |
|---|---|---|
| Exhibit A, 1-5   Five photos | 13 | 19 |

4

1          LAW CLERK:  All rise.

2          THE COURT:  Good morning, everyone.  Please be

3  seated.

4          ECRO:  Court is now in session.

5          THE COURT:  All right, good morning.  This is the

6  United States Bankruptcy Court for the Western District of

7  Pennsylvania and this is the time set for the hearing on Case

8  Number 22-20823, U LOCK Inc.

9          I'll begin by taking appearances, please.  Over here.

10          MR. ROTH:  Allen Roth on behalf of U LOCK.

11          THE COURT:  All right, good morning.

12          Is that Mr. Snyder?

13          MR. ROTH:  Yes.

14          THE COURT:  Okay.

15          All right.

16          MS. SNYDER:  Shanni Snyder, Your Honor.

17          THE COURT:  Okay, good morning.

18          And do I have appearances on Zoom?

19          MS. WENRICH:  Good morning, Your Honor.  Sarah

20  Wenrich here on behalf of the movant Ms. Biros.  My colleague,

21  James Berent, I believe he's also in person with Ms. Biros as

22  well.  Mr. William Otto is appearing via Zoom with me, as well.

23  He is the state court counsel for Ms. Biros.  And then last but

24  not least we also have Izumi Presberry.  He is a summer law

25  clerk for our firm so he is attending via Zoom, as well, and he

1   will be observing today.

2            THE COURT:  All right, thank you.

3            MR. SLONE:  Robert Slone, the Chapter 7 Trustee for U

4   LOCK.

5            THE COURT:  All right, good morning.

6            All right, anyone else wish to enter an appearance?

7            MR. ZEBLEY:  Yeah.  Your Honor, excuse me.  This is

8   Charles Zebley.  I was the Chapter 7 Trustee for Shanni Snyder

9   who was the petitioning creditor here.  As the Court may

10  recall, Ms. Snyder conceded she had not listed the claim which

11  led to the petition on her schedules.  So, you know, that case

12  had closed.  I have filed a petition to reopen the case and no

13  one has opposed it and Ms. Snyder has said she would consent to

14  it.  We'll be filing our CNO on that case today.  It's a Judge

15  Bohm case.

16           THE COURT:  Okay, very well.  So you are aware of

17  this and have taken action to look into it then.  Very well.

18  All right, thank you.

19           All right, we are here on two matters.  One is a

20  continued hearing on the expedited motion to dismiss the case

21  or for sanctions that was filed by Christine Biros against both

22  the petitioning creditor and with respect to this case as a

23  whole but I also have a hearing on an order to show cause that

24  was set if the debtor did not complete the petition on or

25  before July 5th.  It appears to me that the debtor attempted to

1  complete the petition by July 5th and then that carried over

2  into the early morning hours of today.  However, I do note that

3  the petition is still not complete at this point.  There is a

4  declaration of electronic filing that is required and so that

5  will need to be completed today.  You do have that?

6          MR. ROTH:  Yes.

7          THE COURT:  All right, very well.  All right, so with

8  that, let's see where we are with respect to the motion to

9  dismiss.  Attorney Wenrich?

10         MS. WENRICH:  Thank you, Your Honor.  I still think

11  at this point dismissal would be appropriate particularly

12  considering that Ms. Snyder still has -- there's been no

13  indication that she has a valid or a disputed claim against the

14  debtor.  However, it's very important to my client that she be

15  able to obtain possession of the property for numerous reasons.

16  So for that reason I think it's perhaps more prudent today to

17  focus on the relief from stay as well as potential abandonment

18  of the property if relief from stay is not granted or if Your

19  Honor is not inclined to grant that at this time.

20         THE COURT:  Let me ask you at this point with respect

21  to dismissal.  Does the calculus not change in the fact that

22  the debtor did not contest the involuntary petition?

23         MS. WENRICH:  Well, I think it -- I still think that

24  while the debtor has not contested the involuntary petition,

25  the debtor now over a month later is seeking to convert the

1  case to a Chapter 11.  Regardless of their failure to contest

2  or their unwillingness to contest the involuntary petition,

3  that doesn't change the fact that the petition was commenced

4  with a claim that was an invalid claim such that the

5  involuntary bankruptcy was improper.

6        Again, I do recognize though that the debtor is

7  attempting to move forward, attempting to convert to a Chapter

8  11 which is part of the reason why I think for my client's

9  benefit, it's probably best for us to proceed on the relief

10  from stay as well as potential abandonment at this time because

11  clearly the debtor does intend to proceed in bankruptcy.  If it

12  were dismissed, they could refile and we understand that.

13        THE COURT:  All right.  Well, let me ask you where

14  things stand from your perspective with respect to my order

15  that granted limited stay relief on June 3rd.  There were a

16  number of items and requirements that were set forth.  It also

17  had a mechanism for the parties to provide me with a notice of

18  non-compliance if anyone was not abiding by those directives

19  and I did not receive anything.  So what is your client's

20  perspective of what's happened since we were last together I

21  guess on June 2nd?

22        MS. WENRICH:  Your Honor, I know that our client did

23  provide notice, 48 hours notice to try to get onto the property

24  and begin some remediation efforts.  They also had someone who

25  was willing to provide some clean dirt to dump, particularly on

1  the one area I believe with regard to what we'll refer to as

2  the garbage truck incident where some of the soil was

3  contaminated.  After we provided the notice to Mr. Roth, he

4  wanted more information which I'm not sure it was warranted but

5  admittedly that information was not provided but then it was

6  determined that where the incident occurred there was a

7  trailer.

8        I do have photos of this trailer.  I did not file

9  them.  I can file it in a supplement if Your Honor would like.

10 The trailer was parked right on top of that location and it

11 looked like spray painted that said no dumping, presumably

12 referring to the dumping of dirt which had not yet happened.

13 And so there certainly has been some action taken to prevent or

14 inhibit my client from proceeding with some of those issues.

15       We did not file a notice of non-compliance.  I know

16 now that a Trustee is in place, our intention is to try to work

17 with the Trustee and try to get that figured out.

18       THE COURT:  All right.  Anything further in support

19 of the stay relief motion at this point?

20       MS. WENRICH:  I think one thing that's really big and

21 really important is that part of the reason, at least what I

22 took from the last hearing, was Your Honor was concerned about

23 displacing parties who paid to have their personal property

24 stored in that property from that location.  However, since the

25 last hearing some trailers have been moved, some of the storage

1   trailers.  However, some of those trailers with, presumably,

2   property owned by these alleged renters have been emptied on my

3   client's property before being moved so there is actually

4   personal property and furniture, old furniture that has now

5   been just dumped on the property.

6           So I think to the extent that Your Honor was

7   concerned about issues that these other alleged renters would

8   have, I think that's only continued and I think at this point

9   there's really nothing preventing Your Honor from entering the

10  appropriate order granting relief from stay because it doesn't

11  appear that the debtor is taking appropriate action to prevent

12  any claims against itself from these alleged renters.

13          THE COURT:  Okay, all right, anything else at this

14  point?

15          MS. WENRICH:  Mr. Otto, do you have anything?  That's

16  what I have.  And I'm not sure if you have anything to add.

17          MR. OTTO:  Mr. Snyder has apparently disposed of a

18  number of the matters from these trailers and possessions on

19  the property that restrict or inhibit the trucks from bringing

20  the soil in from offsite.  So while Ms. Biros is not yet ready

21  to bring it on, we're very close.  And continuing to allow Mr.

22  Snyder or U LOCK to continue activities on the site just

23  doesn't seem to be productive.  We now have a list of renters

24  that's available.  We're happy to work with the Trustee to

25  identify and help the Trustee collect back rent from those

10

1  renters to the extent he needs assistance.

2          But in the meantime, especially if you go back and

3  look at the documents that were filed by the debtor last night,

4  it appears that the debtor simply wants to re-litigate the

5  issue of title to this property.  It seems that the best way to

6  move would be to allow Ms. Biros to have possession and move on

7  with the property and allow U LOCK to go its separate ways.

8          THE COURT:  All right, thank you.

9          Let me hear from Mr. Slone.  Trustee Slone, you were

10  appointed on June 17th so I'm interested in hearing what you've

11  learned in that brief period of time and whether you've been

12  able to get up to speed at all on what's been occurring in this

13  case.

14          MR. SLONE:  Your Honor, I've reviewed the documents

15  that have been filed including some that were filed last night.

16  That was the first time I had any indication of what was

17  actually there.  I got the list of renters this morning and we

18  can go through and I'll work with Mr. Otto or whoever to try to

19  collect that money.  Also, there are some assets that they have

20  listed that can be liquidated.  Really, I haven't been able to

21  do too much.  I just got information within the last day, Your

22  Honor.

23          I did get calls and e-mails from both Mr. Otto and

24  Mr. Roth regarding the remediation issues and the blockage.

25  Hopefully the parties can work that out without me getting too

1 much involved with that.  That's where we stand.  Also, I noted

2 that they have filed to convert the case to a Chapter 11 case.

3 I don't want to get too far ahead of myself here.  I don't know

4 exactly what to do at this moment.

5          THE COURT:  All right.  Well, I'll hear from the

6 parties and then I'll give you my preliminary thoughts of where

7 I think this is headed at this point.

8          All right, let me hear from the debtors, please.  Mr.

9 Roth?

10          MR. ROTH:  Your Honor?

11          THE COURT:  If you could just bring in that

12 microphone closer to you so we can make sure you're on the

13 record.

14          MR. ROTH:  My client has responses to some of the

15 things they said.  Could I have him testify or would you prefer

16 I do it all myself?

17          THE COURT:  If you wish to have him testify, you can

18 have him testify.  I'm not going to turn that down.

19          MR. ROTH:  All right, very good.

20          THE COURT:  All right, Mr. Snyder, if you'd like to

21 come forward to the witness stand to be sworn.  All right, if

22 you could please raise your right hand.

23                    GEORGE SNYDER, WITNESS, SWORN

24          THE COURT:  You can be seated.

25                         DIRECT EXAMINATION

Snyder - Direct/Roth                                    12

1  BY MR. ROTH:

2  Q    Could you state your name, please?

3  A    George Snyder.

4  Q    And, George, where do you live?

5  A    20204 Alabama Lane, North Huntingdon, PA  15642.

6  Q    And is that address where you live, is that near this

7  site?

8  A    Yes, about a quarter mile.

9  Q    Did you bring with you some pictures today showing that

10 the site is readily available and there's not any problems?

11 A    Yes.  I took pictures.  I brought pictures today of the

12 mess they're claiming.  It's all cleaned up.  There's nothing

13 there.  Also, that tractor trailer they're mentioning was not

14 in the way.  We moved it anyway.  We moved it a couple of

15 hundred feet away and we took pictures of that, as well.  We

16 also took pictures of when they claimed it was in the way and

17 it was not in the way.

18           MR. ROTH:  Your Honor, can I have these pictures

19 marked?

20           THE COURT:  Actually, if you can pre-mark them and

21 then hand them up.

22 Q    These pictures that I'm handing you right now, are these

23 pictures taken with your cell?

24 A    Yes.

25           THE COURT:  Why don't you mark them yourself?

Snyder - Direct/Roth                                    13

1          THE WITNESS:  Okay.

2          THE COURT:  Do you have a --

3          THE WITNESS:  Can you get my pen, please?

4          THE COURT:  Do you have exhibits stickers in there?

5    Normally, that's how -- I'd require the exhibits to be done in

6    advance.

7          MR. ROTH:  We'll do the whole pack as Exhibit 1.

8          THE COURT:  All right.

9    Q    Tell us what these pictures show.

10   A    Okay, the date that they were claiming the trailer was

11   blocking we put white nylon ropes down each side of the area

12   where the garbage truck was so it shows that the trailer is not

13   in that area.  The next picture is a triangle.  We put a

14   reflective triangle where their environmental person came out

15   and he dug a little hole and took a sample.  That shows that

16   it's probably 50 feet away from the trailer so there's plenty

17   of room to get a tractor trailer, a dump truck, a tri-axle on

18   all sides of that area.

19          Then the next picture shows, even though I don't feel

20   that trailer was in the way, to be cooperative, we moved it

21   anyway, so we moved that tractor trailer across the parking lot

22   and made sure we didn't block any entrances.  You could get all

23   the way around it.  And that has been moved.  If it said no

24   dumping on it, that was like vandalism or something.  I think

25   that was on that trailer for 20 years.  So we didn't spray

Snyder - Direct/Roth                                    14

1  anything that said no dumping.

2         The next picture just shows that the tractor trailer

3  is moved and the stuff was cleaned up.  That's just from the

4  other side facing, you know, if you're looking west towards

5  Pittsburgh.

6         The fourth photo was taken this morning in the

7  cleanup effort, some of which they requested.  You know,

8  there's a little bit of furniture and things out in the parking

9  lot and, you know, if you take things out of perspective or

10 want to be manipulative, you take a picture at the worst time.

11 We made sure we took a picture from both directions.  The

12 fourth picture is the one direction facing west.  The next

13 picture is facing east.  And that shows that all the furniture,

14 all the debris, everything that they may show you a picture of

15 has been cleaned up and disposed of or moved, you know, on a

16 pallet and has been taken out of there.

17        And also, there was scrap cars in the area.  These

18 scrap cars have been mentioned in several hearings for the past

19 couple of years and they would say they wanted us to take them

20 out, then they didn't want us to take them out.  So then we

21 were taking them out and they approached the tow truck driver

22 and put a camera in his face, videotaped him and told him they

23 don't want him taking any of those cars out of there.  He said

24 he was told to clean up, that he was contracted to do that, to

25 please not stick a camera in his face.  And they continued to

Snyder - Direct/Roth                                    15

1  harass him, say that they're the owner and they own the

2  corporation, they're coming in with contractors and they're

3  going to build all this stuff there, we're not going to be

4  there anymore and not to touch the cars.  So that's what those

5  five pictures show.

6          That's just the front.  The property is 21 acres.

7  That's just the front area, maybe the first two or three acres

8  or so.

9  Q    Do you visit this site every day?

10 A    Yes.

11 Q    Okay.  Ms. Biros is claiming she's doing remediation

12 efforts.  What have you seen her do in terms of remediation?

13 A    Well, since the last hearing they've done zero other than

14 they sit across the parking lot and videotape and they come in

15 and they harass people there.  They circle around, they pull

16 in.  They've done no remediation whatsoever.  So the times I've

17 seen them there, they've done nothing.  The father comes, her

18 father is the guy in charge, he comes down with the grandson

19 and they drive around and he also approached the tow truck

20 driver, asked him what he's doing.  He said they're building a

21 construction project, they want to start building, bring in

22 dirt and stuff.

23         And like I said, you can see from the pictures it's

24 not dirt.  It's asphalt millings.  It's like a parking lot.  So

25 you wouldn't just dump dirt there.  If there were any type of

1  contaminations, you'd remove the contaminated millings and put

2  more millings down but they've done nothing, nothing with the

3  tires, nothing with anything they mentioned was an emergency

4  concern last month was done this month.

5  Q    What was the claim in the emergency petition that Ms.

6  Biros filed initially?  What was her claim was the emergency?

7  A    Well, they claimed some major from the United States

8  military witnessed I thought they said me dumping contaminated

9  soil or something.  Then it turns out the police report that we

10 have -- the incident that really happened, there were a dozen

11 policemen and firemen there.  It was a garbage truck, just a

12 random waste disposal company driving down the road that had a

13 load caught on fire.  When they dumped it, they said that's our

14 protocol to dump it in the -- find a spot to dump it.  It was

15 only cardboard.

16         And if they're saying there's any contaminants, the

17 only thing I can think is the firemen may have used foam or

18 something to put out the fire.  Other than that, there was

19 nothing in that garbage truck that would have been considered

20 an environmental hazard that I know of.

21 Q    Has that been cleaned up, whatever happened from that

22 truck?

23 A    Yeah.  It looks good as new.  It's all been cleaned up.

24 It looks fine.  If there's some test that says otherwise, but

25 they cleaned it up immediately within an hour or so.

Snyder - Direct/Roth                          17

1  Q    Do your pictures indicate that it's all been cleaned up?

2  A    Yeah.  You wouldn't be able to tell from these pictures I

3  have that there was every any incident there at all.

4            MR. ROTH:  Judge, we would ask that those pictures be

5  introduced into evidence, please.

6            THE COURT:  All right, why don't you hand them up and

7  I will show them on the camera.  Thank you.  Just be careful.

8            There's a request to show the following exhibits.

9  I'm going to put this on the Zoom camera so that those that are

10 participating by Zoom can see them.  This is the first picture.

11 And I'll let Ms. Biros see them after --

12           MS. BIROS:  Thank you.

13           THE COURT:  -- I'm done showing them.  This is Number

14 2.  This is Number 3.  This is Number 4.  And this is Number 5.

15           Mr. Shelton, if you could show these to Ms. Biros?

16           Do you have any other questions, Mr. Roth?

17           MR. ROTH:  Yes.

18 Q    You have caused a Chapter 11 petition to be filed, is that

19 correct?

20 A    Yes.

21 Q    And in the schedules in that petition do you intend to

22 file an adversary proceeding --

23 A    Yes.

24 Q    -- with regard to the results that are going to happen in

25 this case?

Snyder - Direct/Roth                        18

1   A    I would like to, yes.

2   Q    It's your intention to do that?

3   A    Yes.

4   Q    Do you currently have financing available so Ms. Biros

5   could be paid off what she is owed in this matter?

6   A    Yes, along with all the other money owed to other parties.

7   Q    And can you tell us what the source of the funds would be

8   in order to pay her off?

9   A    Yeah, it's Usage Corporation.

10  Q    Say that again, please.

11  A    Usage.

12  Q    And are those funds available immediately?

13  A    Yes.

14  Q    Would you like to see that happen to her to be paid off?

15  A    Yes, I'd love to be able to pay everybody off.  There's

16  plenty of money to do it.

17          MR. ROTH:  I have no further questions, Your Honor.

18          THE COURT:  All right, thank you.

19          All right, Ms. Biros, have you had an opportunity to

20  see those pictures?

21          MS. BIROS:  I'm sorry, Your Honor?

22          THE COURT:  Have you had an opportunity to review

23  those pictures?

24          MS. BIROS:  (No audible response).

25          THE COURT:  Okay, you can hand those back, please.

Snyder - Court                              19

1          All right.  Well, this is an unusual situation for me

2     to take testimony and exhibit over Zoom so I've got counsel

3     asking to move for the admission of these pictures.

4          Is there any objection from the other parties to the

5     admission of these photographs that I've shown?

6                          (No audible response)

7          THE COURT:  All right, I'm not hearing any objections

8     so they'll be admitted into the record as Exhibit 1 Parts --

9     well, actually, I'm going to call it Exhibit A Parts 1 through

10    5.

11         THE COURT:  All right, Attorney Wenrich, do you have

12    any questions for the witness?

13         MS. WENRICH:  Your Honor, I think we dispute the

14    testimony but we don't have any questions.

15         THE COURT:  All right, thank you.

16         I actually have some questions based on what's been

17    filed and what's been submitted so far.

18                          EXAMINATION

19    BY THE COURT:

20    Q    So as I understand it from the statement of financial

21    affairs, the business generates gross revenues of no more than

22    $13,000 annually?

23    A    This past year, yes, somewhere around there.

24    Q    And it was 12,000 in 2020?

25    A    Yes.

Snyder - Court                                                    20

1  Q    So we're talking about roughly $1,000 a month of gross

2  revenue?

3  A    Yes.

4  Q    There was a suggestion in the statement of financial

5  affairs that, quote, the business only made a small amount per

6  month, under $2,000.  And so am I to understand that the real

7  value here of the business is in any claimed interest that you

8  have in the land?

9  A    It's the -- there's a lot of assets listed in there also.

10 But the intention of the land, we bought that to develop it and

11 this has been holding up the development.

12 Q    So what you're telling me and based on the schedules is

13 that U LOCK was formed for the purpose of developing that

14 property as opposed to running a storage unit on there?

15 A    Yeah, that was the initial purpose.

16 Q    So the storage business is, you know, just somewhat

17 immaterial to the overall enterprise value?

18 A    By comparison, it's a lot less but there's still enough --

19 you see there's a lot of collectibles and things that people

20 haven't been paid this whole litigation and legal fees over the

21 past couple of years sort of hindered all that.  But the

22 storage facility is plenty lucrative to sustain that property

23 with all this.

24 Q    Well, what's the monthly expenses that the business

25 incurs?

Snyder - Court                                    21

1  A    There's not a whole lot of monthly expenses.  There's no

2  utilities there right now because it's just a storage place.

3  So we have electric there.  There's no gas, there's no water,

4  there's no sewage, there's no real big bills.  We had some

5  equipment there before that had some bills, you know, the

6  excavator.  And then, other than that, it would be just labor.

7  Q    Okay, and how many employees do you have?

8  A    None right now.

9  Q    What would your labor expense be though on a monthly

10 basis?

11 A    Well, right now it would be minimal to handle the

12 collections and things like that but if it were going to remain

13 a storage place, I would have to have staff and a full-time

14 person, a manager and it would be a little different but it

15 would be proportional to how many buildings were built or

16 storage units were built or something like that.

17 Q    So the debtor has disclosed two bank accounts at Citizens

18 Bank?

19 A    Yes.

20 Q    There are no other bank accounts in any other financial

21 institution or other facility?  And what's the status of the

22 debtor's tax returns?

23 A    They haven't been filed.

24 Q    When was the last time it filed a tax return?

25 A    I'm not sure.  I don't think they ever filed.  I'd talk to

1 my brother, Kash, is the one who handled that in previous years

2 but I don't think they've been filed yet.

3 Q    Well, do you know if the corporation has ever filed a tax

4 return?

5 A    When we first did this, we were -- Biros and us were

6 partners and they told me not to file the returns because they

7 were indicted by the Attorney General's Office and they wanted

8 to wait 'til that investigation was over.

9 Q    All right, so as I understand it, the corporation was

10 formed in, is it 2015?

11 A    Yes.

12 Q    So it didn't file a tax return in 2015?

13 A    No.  I met with Christine Biros who was kind of in charge

14 every Wednesday for about a year or two and she told me not to

15 file them.  They wanted to wait 'til their charges were, you

16 know, 'til it was final.  They were charged with --

17 Q    Well, that was another thing you said in here.  You met

18 weekly with -- it says from the purchase of the property in

19 July 2015 through mid 2017 weekly, quote, board-type, end

20 quote, meetings occurred between George Snyder and Christine

21 Snyder.  Is that Christine --

22 A    Christine Biros, yes.

23 Q    Okay.  All right, so you didn't file a tax return in 2015.

24 Did you file a tax return in 2016?

25 A    I don't think we ever filed one that I know of.

Snyder - Court                                              23

1  Q    Okay.  Is there any insurance in place for the debtor's

2  operations on the site?

3  A    I don't believe so.  We could get insurance.  We got a

4  quote for that.  It's relatively inexpensive.  It's about $100

5  a month I got a quote.

6  Q    Is there a reason why the debtor doesn't have insurance?

7  A    Like I said, we've been strapped financially up until this

8  point because of all this litigation and legal fees and things

9  and even just the time it's consuming.  But if that's a

10 requirement, we could certainly get the insurance in place.

11 They already have it quoted and ready to go if need be.  That's

12 through Verrico Agency.

13 Q    So your Schedule G lists about roughly 25, 26 persons or

14 entities that have leases --

15 A    Yes.

16 Q    -- or units or personalty on the site, is that correct?

17 And how often do these lessees or, actually, I'm sorry.

18 Approximately how often do the lessees come onto the property?

19 A    There are some that come every day.  There are some people

20 like say they have a business, a landscaping company or

21 something, they come every single morning, grab their trailer,

22 lawnmowers, tools and they go.  There are other customers.  I

23 think there's a United Steel Workers that's been there for

24 seven years.  I've never seen them.  They've never -- I've been

25 in communication with them.  I don't think they've ever been to

Snyder - Court                          24

1  the site but that's rare.  The majority of the people come

2  there -- I'd say half of them come there daily to do whatever

3  they do.  The other half maybe come once a month or once every

4  couple of weeks to drop something off or pick something up.  I

5  see them in there just randomly, you know, or occasionally

6  popping in and out.

7  Q    And is there anyone else coming onto the site other than

8  these lessees?

9  A    No.  As far as like trespassers or what do you mean?

10 Q    No, just anyone else who would have reason to be on the

11 site other than lessees.

12 A    No.  There's relatively few people come on the site.  I

13 don't think anybody -- we don't ever see any real solicitors.

14 We don't see any trespassers.  We don't see anything other than

15 just the people who rent there.

16 Q    You mentioned this financing source.  What's the amount of

17 the financing that you are contemplating?

18 A    Well, whatever we decide to do, there would be well

19 upwards of a million or $2 million.  I have multiple sources.

20 We just listed that one but there's another guy that he's been

21 interested for a long time since the beginning of this but they

22 just -- we offered to pay them in the beginning.  They just

23 won't accept the money.

24 Q    So you're alleging that what, this Usage --

25 A    Yes.

Snyder - Court                          25

1   Q    Is it called Usage Corp?  Who's the principal of Usage

2   Corp?

3   A    I'm not sure.  Could I grab my folder?  I'm sorry.  It's

4   called Usage Systems.

5   Q    Well, you're going to have to come over here because you

6   need to be in front of the microphone.  It's called Usage

7   Systems?

8   A    Yeah.  It's Usage Systems.  I don't have the name of the

9   principal agent here.

10  Q    Well, who have you been talking to there?

11  A    But we'd provide that at the, you know, if were converted

12  to Chapter 11.  I was talking to that Crystal -- I'm sorry?

13  Q    What's the name of your contact?

14  A    My brother is the one who was talking to that person from

15  there.  The one I talked to is Crystal.

16  Q    And you're indicating that Usage System is able to provide

17  up to $1 million of financing immediately?

18  A    Yeah.  It would be well over -- he'd be up to two million

19  for sure immediately.  They're available now.

20  Q    And what would the collateral be for the financing?

21  A    Well, if we went to Chapter 11 and that could be clawed

22  back, then the property would be otherwise -- I'm not really

23  sure what plan he would have.

24  Q    How does the requested remediation efforts impact the

25  business operations of U LOCK?

Snyder - Court                                                    26

1  A    I can't imagine it would affect us at all.

2  Q    Okay.

3  A    We'd be cooperative in any way possible.  If there were an

4  incident like with -- something -- if there were something

5  truly in the way like a truck or something, we could certainly

6  move that if they give us 48 hours notice.  They sort of gave

7  us a blanket notice.  They said on a particular date they said

8  here's your 48 hours notice, we'll be there from 6 a.m. on

9  forward.  So I went down at 6 a.m. to make sure I could

10 cooperate or help in any way and I stood there all day and no

11 one ever showed up and then it went on day after day after day

12 and then we just left it open.

13        I unlocked the gate.  There's a gate that has a

14 padlock on it.  We unlocked that so that they could do whatever

15 they needed to do under there.  So we don't even have to be

16 there.  They could go down and remediate and do whatever they

17 want to do.  It won't interfere with us at all, I don't think.

18 Q    Okay.  And so you understand at this point that U LOCK did

19 not contest the involuntary petition, correct?

20 A    Yes.

21 Q    All right, so you understand that Mr. Slone has been

22 appointed as the Chapter 7 Trustee here?

23 A    Yes.

24 Q    And do you understand that as a Chapter 7 Trustee, he

25 exercises dominion over the debtor's assets at this point?

Snyder - Cross/Otto                        27

1  A    Yes.

2  Q    So he is the one who is now vested with the authority to

3  control the assets of the U LOCK Corporation at this point?

4  A    Yes.

5  Q    And so he steps into the shoes of U LOCK.

6  A    Okay.

7  Q    And until such time as I hear the motion to convert, it

8  will remain that way, do you understand?

9  A    Yes, I understand.

10 Q    All right.  So he is the one who will be calling the shots

11 from this point forward, do you understand?

12 A    Yup.

13         THE COURT:  All right, I'm finished with my

14 questions.  Let me ask Mr. Roth, do you have any additional

15 questions for the witness based on anything that I've asked?

16         MR. ROTH:  Nothing further, Your Honor.

17         THE COURT:  All right, does any other party have any

18 additional questions for the witness?

19         MR. OTTO:  Your Honor, I have a couple of comments to

20 refute what Mr. Snyder has stated.

21         THE COURT:  All right, but you have no questions?

22         MR. OTTO:  Well, let me ask this question.

23                    CROSS EXAMINATION

24 BY MR. OTTO:

25 Q    Mr. Snyder, isn't it true that during the course of the

1  state court proceeding Judge Smail stayed proceedings in order

2  to allow you to negotiate a purchase of the property?

3  A    Yes.  We made an offer with interest and you guys turned

4  it down.

5  Q    I'm sorry, what?  I don't remember any offer.  What was

6  the amount?

7  A    I think it was the 390,000.  We offered the full amount

8  that they paid for the property taxes, anything they had in it

9  plus six percent interest and they said they wanted an

10 additional $150,000 for legal fees or something and then that

11 was it.  They refused to negotiate.

12 Q    Is Mr. Roth willing to confirm that statement?

13 A    Pardon me?

14 Q    Is Mr. Roth --

15        THE COURT:  We can ask that question after we're done

16 with the testimony.  I'm just asking for questions --

17        MR. OTTO:  All right.

18        THE COURT:  -- of the witness at this point.

19        MR. OTTO:  Yes.

20 Q    And next question.  Mr. Snyder, isn't it true that you

21 testified during the trial that the reason you hadn't filed

22 taxes is because your accountant told you not to do that?  And

23 when you were asked were you or your brother, Kash Snyder, was

24 asked who your accountant was, you couldn't identify your

25 accountant?

1  A    Yeah.  I'd like to explain that.

2  Q    Please note that I have the transcript --

3  A    Okay, yes.

4  Q    -- if I need to present that.

5  A    Yes, I understand.  It's been a while since that trial.

6  It's been several years.  But the way I remember it, I don't

7  believe I said anything like that.  I don't think I was ever

8  asked anything like that.  My brother, I watched him on the

9  stand and he answered your question and I think he kind of -- I

10 didn't understand what he meant.  I asked him when we got home.

11         He asked his accountant which was -- his name will

12 come to me in a second.  But he asked his accountant and his

13 accountant told him -- he told him -- when Biros told him not

14 to file because of their organized crime indictment, he was

15 concerned and worried so he went to his accountant for advice

16 and he said what if we don't file.  He didn't want to be in

17 trouble.  And he said well, the penalty for not filing is a

18 percentage of your income and he said your income is zero so

19 there wouldn't be a real penalty if you filed.

20         So my brother, I think, interpreted that and maybe

21 said that on the stand and said oh, my accountant told me not

22 to file.  That wasn't -- I wouldn't have said it that way.  The

23 accountant didn't say hey, don't file.  The accountant said if

24 you listen to what they say and you don't file, there will be

25 no financial penalty because it's a percentage of zero income

1 which would be no financial penalty.  So that's the best to my

2 recollection what happened that day in court that you're

3 referring to.

4 Q    I can tell you that the transcript reflects none of that.

5 The only thing the transcript reflects is that I asked the

6 question of who told you or your brother not to file and your

7 response never, never mentioned either Christine Biros or John

8 Biros.  It only mentioned an accountant whose name you did not

9 identify.

10 A    I know that.  I didn't testify.

11 Q    Do you disagree with that?

12 A    My brother -- well, I disagree that I ever said anything

13 like that.  I was never asked like that.  My brother, you did

14 ask him why he didn't file and he said the accountant said not

15 to.  You asked his name.  And I think he gave the nickname.

16 They call him Little Trump because he invests in real estate

17 and stuff.  He's from White Oak.  And I apologize, I just can't

18 recall his name right now but he's right on Main Street there

19 in White Oak on Lincoln Way and they call him Little Trump.

20 I'm sorry, I can't remember the name.

21 Q    Isn't it true that your brother has a degree from Duquesne

22 Law School?

23 A    He has something from -- I don't think Duquesne but I

24 think he has some type of law degree from Pitt but he's not a

25 lawyer.

1  Q    So if an accountant told him he didn't have to file a tax

2  return, he would at least know he should question that,

3  wouldn't you think?

4  A    Well, I can't speak for my brother but I questioned it

5  when the hearing was over.  I said something to him and that

6  was the explanation he gave me.  He said well, he said we

7  didn't have to if --

8          THE COURT:  All right, I'm going to direct counsel to

9  move on from this inquiry because, quite frankly --

10          MR. OTTO:  Yes, Your Honor.

11          THE COURT:  -- to me, the important point to me --

12          MR. OTTO:  I do have --

13          THE COURT:  -- is that tax returns are not filed.

14  The reason for them not being filed is irrelevant.  I've got,

15  you know, five to seven years worth of tax returns that are

16  unfiled based on the testimony at this point.

17          MR. OTTO:  Let me hit my next points very quickly if

18  I may, Your Honor?

19          THE COURT:  You may.

20  Q    Mr. Snyder?

21  A    Yes?

22  Q    You said that you had to pay legal fees, is that correct?

23  A    Since two thousand I guess fourteen or fifteen, whatever

24  the onset of this was, everything, everything included in this

25  has been burdensome, even just to drive down here, the parking,

Snyder - Cross/Otto                                    32

1  getting pictures printed out, legal fees, paying for copies of

2  transcripts, everything.  I can't think of all the expenses

3  right now but yeah, I'm just saying this whole legal process

4  has been extremely burdensome on us.  That's not the biggest

5  part.  It's the part we can't move forward with this property

6  or project.  We haven't known from 2015 from one day to the

7  next if we have this property.

8  Q    Just a moment, Mr. Snyder.

9  A    Pardon me?

10  Q    Mr. Snyder, just a moment.  I asked specifically about

11  legal fees.

12  A    Yes.

13  Q    During the year 2019 did you pay Mr. Roth legal fees?

14  A    I can't remember exactly what fees were paid in which

15  years and what, you know, from time to time.  Mr. Roth has done

16  I think even now this pre -- until we move forward to -- if we

17  move forward to the next step, he's done a lot of things pro

18  bono for us.  But there were a lot of expenses involved along -

19  -

20  Q    Well, Mr. Roth filed a bankruptcy in 2019 and at that time

21  he reported that for the prior 12-month period he had only made

22  $13,000.

23  A    Yeah.

24  Q    Now, in that period of time we had our trial in state

25  court --

Snyder - Cross/Otto                    33

1  A    Yes.

2  Q    -- and there were appeals filed as well as motions for

3  post-trial relief.  So there was an extensive amount of legal

4  work and either you paid Mr. Roth or you didn't pay Mr. Roth.

5  So my question is did you make any payments to Mr. Roth?

6  A    I don't know.  Like I said, he did a lot of things pro

7  bono for us.  That particular year and time I'd have to see

8  what went on there but I don't know that I paid him anything in

9  2019.  And as far as his bankruptcy and things, this is the

10 first I heard of that.  I'm not aware of any of his personal

11 business.

12 Q    The next question is have you made any payments whatsoever

13 to Christine Biros?  Has U LOCK ever made a payment to

14 Christine Biros?

15 A    We tried and in the beginning they didn't want to because

16 they were partners and then after that, then they said they

17 wanted to take over and they wouldn't accept any payments.  We

18 tried to give them, like I said, the full 325,000 plus six

19 percent interest.  They wouldn't take it.  They would always

20 say they just want their money, they just want their money.

21 Christine did that.  She showed up on the property with the

22 Commissioner of the Township yelling that she wants her money.

23 I said we have your money available and then she said never

24 mind, it's too late, we want to develop the property.  So yeah,

25 they will not accept any payments.  They haven't this whole --

34

1 for the past seven years.

2        MR. OTTO:  Your Honor, I'll defer to Ms. Wenrich for

3 the rest of this but it's my understanding you didn't intend

4 this to be an evidentiary hearing.  I will tell you that if put

5 on the stand, Ms. Biros will disclaim substantially on all of

6 Mr. Snyder's testimony.  If you decide to have an evidentiary

7 hearing, we can proceed, but I don't know that that's the point

8 of this this morning.

9        THE COURT:  No, it's not.  Thank you very much.

10        All right, Mr. Roth, any additional questions of the

11 witness at this point?

12        MR. ROTH:  Nothing further.

13        THE COURT:  All right, thank you.

14        All right, Mr. Snyder, you may be excused.

15        THE WITNESS:  Okay, thank you, Your Honor.

16        THE COURT:  All right, anything further from the

17 parties at this point?

18        Mr. Roth, you were in the midst of your response and

19 you wanted to have Mr. Snyder testify.  Any further argument

20 from you?

21        MR. ROTH:  Nothing further, Your Honor, except that

22 we don't believe this truly is an emergency situation.  We

23 think the present order addresses the concerns of Ms. Biros and

24 we will work with the Trustee to try to resolve all these

25 issues and hopefully we can resolve this whole case by paying

35

1  Ms. Biros the money that we are suggesting we can pay now.

2          THE COURT:  All right, thank you.

3          All right, any further comments from the moving

4  party?  Attorney Wenrich?

5          MS. WENRICH:  Yes, Your Honor.  Thank you.  I think

6  with regard to the emergency relief, our client did intend to

7  remediate the property and start doing some work but it's

8  difficult for her to want to invest funds when she was seeing

9  that the property continued to be damaged and in her opinion,

10 trashed.  So while U LOCK remains in possession or on that

11 property, it's difficult for her to want to expend more money

12 than she's already spent.  The property has already been

13 determined to be hers, I think.  The debtor's argument that

14 it's not is disingenuous and I think this is nothing more than

15 another attempt to have the issue re-litigated.

16         I'm happy to work with the Trustee, figure something

17 out, make sure that any of the parties who rent units on the

18 property are taken care of but at this point the debtor has no

19 interest in the property.  It's only burdensome to them.  They

20 haven't paid taxes on it.  There are outstanding taxes.  Those

21 are only going to continue to accrue and as they've noted, they

22 haven't paid any funds to my client for the use of that

23 property during that time.  So her claim will continue to rise

24 as well.  We think relief from stay or abandonment of the

25 property is necessary and appropriate at this time.

1        THE COURT:  All right, thank you.

2        I neglected to ask Ms. Snyder if you had anything

3  else you wanted to raise.

4        MS. SNYDER:  Yes, I do have one comment about the

5  possession.  It's really their thing but not to re-litigate,

6  going back to state court, the Superior Court did rule that the

7  deeds go to U LOCK.  So the deeds were supposed to go to U

8  LOCK.  The reason for the ex parte -- I'm just trying to build

9  up to what I'm going to say about the emergency possession.

10       So the reason for the ex parte meeting with the judge

11 in state court was to assure -- he was trying to get them

12 possession of the property because my judgment was there and

13 they're trying to gain preference over me.  I feel that's what

14 the real emergency is, to get possession, and then they just

15 plowed over the judgment that did exist because they have no

16 real emergency you hear everybody saying.  It's been a whole

17 month.  All they did was take pictures and then it was coming

18 close to the Court hearing so they hurried up and said they had

19 to dump the dirt there.  It was a such an emergency.  It would

20 have remediated.  So I think it's just to gain the preference

21 and I myself will be filing an adversary as well.

22       THE COURT:  Well, keep in mind.  I mean I've given

23 you the opportunity to say something here but I think as I

24 reflected at the last hearing, I don't know that you

25 necessarily have standing in this case.  I think it's Mr.

1  Zebley who has standing on your behalf as the Chapter 7 Trustee

2  who holds the claim.

3          MS. SNYDER:  Yes.

4          THE COURT:  So I'm cautioning you that if you are

5  contemplating an adversary, to think carefully about whether

6  you do that and whether you do have the standing to proceed on

7  your own without Mr. Zebley acting on that claim.

8          MS. SNYDER:  Yes.  So we just started into our

9  discussions --

10          THE COURT:  Okay.

11          MS. SNYDER:  -- together.  Thank you.

12          THE COURT:  All right, anything further from Mr.

13 Zebley?

14                  (No audible response)

15          THE COURT:  I think you just put yourself on mute.  I

16 think you were off mute and now you put yourself on mute.

17          MR. ZEBLEY:  Your Honor, I'm waiting for schedules --

18          THE COURT:  Okay.

19          MR. ZEBLEY:  -- from Ms. Snyder.

20          THE COURT:  Very well.  I want to make it clear for

21 the record --

22          MR. ZEBLEY:  I understand what you're saying.

23          THE COURT:  -- at this point though that at this

24 point -- well, I mean you're coming into this late but Ms.

25 Snyder is here.

38

1        I just want to be clear to you at this point that

2  while I'm giving you an opportunity speak --

3        MS. SNYDER:  Okay.

4        THE COURT:  -- it's Mr. Zebley that has the standing

5  at this point.

6        MS. SNYDER:  Yes.

7        THE COURT:  So I'm going to be hearing from him.  And

8  if he decides there's nothing there, then that's his

9  prerogative --

10        MS. SNYDER:  Okay.

11        THE COURT:  -- to do that.  But, you know,  it's his

12  call to make.  That's what I'm saying at this point.

13        MS. SNYDER:  Okay.

14        THE COURT:  All right, okay, anything further from

15  anyone else before I conclude?

16        MS. WENRICH:  Your Honor, may I respond to one point

17  brought up by Ms. Snyder?

18        THE COURT:  You may.

19        MS. WENRICH:  So with regard to property and her

20  attempted lien on the property, Ms. Snyder actually in May, I

21  think it was May 17th, following her filing of this involuntary

22  petition actually filed an appeal in the state court action

23  against the debtor, against my client, and that Court then

24  submitted an opinion in an order explaining that if Ms. Snyder

25  does have any kind of judgment against the debtor and our

39

1  client owns the property, any kind of judgment doesn't affect

2  my client's ownership of the property.  So I think that that is

3  a non-issue and a red herring, if anything.

4       THE COURT:  Well, I mean I guess it depends on a

5  number of factors as far as when the title was conveyed and the

6  fact that whether Judge Smail's order has a retroactive effect

7  and so forth but that's not an issue for me today.

8       Nevertheless, let me cut to the chase here.  I mean

9  pending in front of me is a motion to dismiss.  The lion's

10  share of the argument is in favor of dismissal are based on the

11  propriety of the involuntary petition that was filed by Ms.

12  Snyder.  And while I do agree that there were some issues with

13  respect to that, more to the point, the ones that I raised

14  myself which was that questioning whether Ms. Snyder had the

15  ability to actually commence the involuntary herself given that

16  she was predicating it upon a claim that was really the

17  property of her bankruptcy estate.

18       But nevertheless, the fact that the debtor did not

19  controvert or contest the involuntary petition, I do think it

20  puts a different gloss on this and seemingly allows the case to

21  proceed in this current posture.  Although I am a little

22  troubled in the revelation now that I'm seeing that this is not

23  really a business to speak of, certainly not a material

24  business if we're talking about gross revenues of approximately

25  $1,000 to $2,000 a month without a real knowledge of what any

1  commensurate expenses are given that the debtor has not filed

2  any tax returns, does not have insurance and is unclear as to

3  what labor costs would be necessary to maintain the premises.

4      I also note that the debtor does seem to be in no

5  rush to revive the business given that debtor did not respond

6  to the involuntary petition and has filed a motion to convert

7  on a regular track.  So at this point I'm operating under the

8  assumption that the business is no longer in operation as would

9  be customary for a Chapter 7 and the Chapter 7 Trustee is now

10 taking possession of the assets and will proceed to liquidate

11 them.  And certainly related to that, the Trustee would go in

12 and investigate all the assets and the claims and see if there

13 are anything here for the benefit of creditors.

14      So while I do have a motion to convert, and I will

15 take that up at the appropriate time, I just thought it would

16 be helpful for the parties to get some preliminary thoughts

17 from me and I do that just so that you can prepare yourselves

18 appropriately for that hearing.  So it doesn't mean that this

19 is my ultimate outcome but this is where I'm at at this point

20 having read the record, having heard from the parties and

21 having seen the schedules that were filed.  And that is that I

22 am inclined right now based on what I've heard to keep this in

23 a Chapter 7 to let an independent Trustee investigate the

24 assets and the claims and come to his own conclusions as to

25 what needs to be done here in terms of if there is an adversary

41

1 that needs to be commenced, the Trustee can do that and if

2 there are assets that need to be liquidated, he can do that as

3 well.

4        As to conversion to an 11, I am right now a little

5 dubious as to what business purpose would exist to convert

6 unless it is simply to use it as a mechanism to effectuate a

7 financing and buyout of Ms. Biros' claims to the property or

8 her ownership of the property.  And again, let me be clear on

9 something that I said at the prior hearing.  Right now the

10 Court, based on the decisions that were made in the state

11 courts, Ms. Biros is the owner of the property and that was a

12 decision that was made through the Court of Common Pleas,

13 Westmoreland County, taken up on appeal in the Superior Court

14 and the Supreme Court of Pennsylvania took no action on it.

15        So if there is some other claim somehow to divest her

16 of the property title, then that remains to be seen.  But right

17 now I'm going on the record that exists at this point.  I

18 understand there's an argument as to a preference or

19 preferential transfer but, again, let me be clear on one thing.

20 Right now that claim belongs to Mr. Slone as the Chapter 7

21 Trustee.  He's the one who is vested with the authority to do

22 that.

23        So that claim only goes to U LOCK to proceed if I

24 convert this to a Chapter 11 case.  And right now I'm not

25 seeing a lot of revenue that would support a reorganization and

1  I would really have to understand two things with respect to

2  the financing source, whether or not this is real and viable.

3  $2 million of financing based on what I'm seeing here seems to

4  be somewhat fanciful, to tell you the truth.

5          I mean I'm happy to be convinced otherwise, but I'm

6  not necessarily sure what the collateral package would be that

7  would support a financing of that magnitude and certainly too

8  understanding the revenue source that would service such a

9  loan.  And that's irrespective of the fact of whether Ms. Biros

10 would actually accept a buyout or some other resolution of this

11 matter.  Now, certainly I think it's probably in the best

12 interest of all parties to make a clean break and get a result

13 that allows everybody to walk away with something, but until

14 I'm convinced that that's a reality, I'm just not there at this

15 point.

16         Secondly, even if I were to consider converting this

17 to a Chapter 11, I can tell you right now that based on what

18 I'm seeing, I'm inclined that if I did convert to an 11, of

19 keeping a Trustee in place.  I'm starting off with the fact

20 that I've got some, you know, shenanigans in terms of how this

21 case was started with Shanni Snyder's petition.  I've got

22 obviously a lot of deep, contentious back and forth between the

23 parties, given the history that's gone on over the years and

24 I've got allegations of wrongdoing by both sides against the

25 other.

43

1          And so based on that, I think from the Court's
2    perspective and my prior dealings with other cases, I would
3    think that having an independent Trustee in there to focus
4    solely on what's in the best interest of the bankruptcy estate
5    is where I might end up.

6          So, again, not a final decision.  I just want to give
7    you a preview of where my head is right now and certainly if
8    you want to provide a record and evidence to convince me
9    otherwise, I will do that.  But more importantly, I'm concerned
10   the immediate danger and concern to the estate which is the
11   lack of insurance which would be a basis for me to consider
12   dismissing the case right now, but given that I don't have a
13   Trustee that's really been able to get into the weeds yet to
14   understand what's there, I'm not inclined to do that at this
15   point.

16         So with that said, I'm going to deny the motion to
17   dismiss to the extent it seeks to dismiss the case at this
18   stage.  That'll be without prejudice to raising that later on
19   in the case if it's clear that this is not going anywhere where
20   there are no significant assets upon which a creditor recovery
21   can be had.

22         As for the stay relief portion and abandonment, I'm
23   not quite there yet either.  I think at this point I've entered
24   an order that provided limited stay relief.  And now that the
25   Trustee is in control, to the extent that there needs to be

44

1  arrangements made to allow remediation to continue to occur on

2  the property -- I shouldn't say continue to occur, I guess what

3  I'm hearing is it hadn't occurred yet -- but to the extent

4  there is a need to do remediation over the next couple of

5  weeks, those items can be run through the Trustee and the

6  Trustee will issue the directives.

7          And if the Trustee issues a directive to allow

8  something to occur on site, then, Mr. Snyder, you will allow it

9  to occur.  Otherwise, that's impairing the estate and the

10  administration of the estate.  You're aware of that?

11          MR. SNYDER:  I understand, yes.

12          THE COURT:  All right.  So then if there's a

13  determination after Trustee Slone does his investigation that

14  there is nothing here, at least with respect to the real

15  property, then I would entertain a consent order that would

16  grant an expanded stay relief to allow Ms. Biros to do

17  something further with respect to the property if it didn't

18  impair the liquidation of the estate.  But Mr. Slone needs to

19  have an opportunity to review that.  He needs an opportunity to

20  review the schedules.  I think he needs an opportunity to

21  conduct a 341 meeting.

22          And until that occurs, I'm not ready to expand the

23  stay relief request at this point.  So from that standpoint,

24  I'm prepared to either deny the request for further stay relief

25  at this point without prejudice or, at the movant's election, I

1 can continue that out for another 45 days and we'll see where

2 we are at that point.

3         Is there a preference from the moving party on which

4 way I go with respect to that?  Ms. Wenrich?

5         MS. WENRICH:  Thank you, Your Honor.  I think we

6 would like to continue it and keep it on there and we can try

7 to work with Mr. Slone once he is familiarized with some of the

8 issues and see what we can figure out for the Court.

9         THE COURT:  All right, very well.  So at this point

10 I'll continue this hearing out another 45 days.  But in the

11 meantime the existing order is in place and it allows

12 remediation activities to occur.  I think that original order

13 indicated that so long as it did not impair the business

14 operations of U LOCK, but at this point, as I indicated, with

15 the appointment of the Trustee and not seeing a lot in the way

16 of business operations to speak of anyway, I'm not sure that

17 that is as much of a concern for me now.

18         But, nevertheless, the Trustee is still in the best

19 position to make that call.  So to the extent the parties can

20 work within the existing stay order framework, they're

21 encouraged to do so.  And to the extent that they cannot, then

22 they can certainly ask for an expanded order but I will want to

23 hear from the Trustee with respect to that.

24         Mr. Slone, based on that, any further direction or

25 information you require from the Court at this point?

1        MR. SLONE:  Not at this point, Your Honor.  I'll look

2   into it, see who the creditors are, see what's out there and

3   I'll move from there.  I'd like to get some insurance out there

4   anyway.

5        THE COURT:  Well, I think the insurance needs to be

6   the top priority at this point and certainly too, you know, I

7   see there's a little bit of cash and certainly the Trustee will

8   need to be able to access the revenues that are coming in at

9   this point so that there is some funding to work from at this

10  point.

11       All right, anything else from any of the other

12  parties?

13       MS. WENRICH:  No, thank you, Your Honor.

14       THE COURT:  If not, then --

15       MR. OTTO:  Your Honor?

16       THE COURT:  Yes?

17       MR. OTTO:  Excuse me.  Just one last comment and this

18  is really for the benefit of the Trustee.  The Schedule G filed

19  by Mr. Snyder does not identify any of the rental amounts or

20  any of the renters.  I think if Your Honor can require Mr.

21  Snyder to provide that and also maybe a statement as to what he

22  has collected in the last period since the bankruptcy was

23  filed, I think that would be very helpful to the Trustee.  I'm

24  not sure he would know to ask for it at this hearing but I

25  think that would be beneficial if you could direct Mr. Snyder

1  to file that.

2          THE COURT:  All right.  Well, I definitely think the

3  Trustee needs to have an understanding of all the revenues that

4  exist and what has been received to date and including with

5  that are copies of the bank statements that exist with respect

6  to the accounts that the debtor has maintained at Citizens

7  Bank.  So I mean is there a rent roll that you maintain, Mr.

8  Snyder?

9          MR. SNYDER:  I think that came in this morning.  I

10  think you have that.  And then we also brought the checks today

11  and some cash that, if you can get that with Mr. Roth or Mr. --

12          THE COURT:  Well, how are the lease payments being

13  made?  Are they being made to a bank account?  Are they checks

14  that are being sent in?

15          MR. SNYDER:  Yes, I brought some checks with me and

16  some cash because I didn't know --

17          THE COURT:  All right, so it sounds like the first

18  order of business is that the Trustee needs to be sending a

19  letter to all of the lessees indicating that all further rent

20  payments should be going to him.  But in the meantime, you'll

21  need to turn over all cash and other revenues that have been

22  received to the Trustee.

23          MR. SNYDER:  Okay.

24          THE COURT:  But there should be something that is

25  produced that shows the terms of the leases and what the

1 monthly and annual revenues are.

2          MR. SNYDER:  Okay, we'll get whatever he needs.

3          THE COURT:  All right.  Okay, well, that covers a lot

4 of ground from today then so based on that, I will enter an

5 order, as I indicated, denying the motion to dismiss without

6 prejudice, deferring the related request for relief on the

7 remaining elements of stay relief and I'll reset the hearing

8 for 45 days.  I'll require the debtor to immediately turn over

9 to the Trustee all funds that have been received, all revenues

10 that have been received and provide an updated statement of the

11 leases including all monthly and annual lease payments that are

12 due as well as bank statements for the last six months of U

13 Lock's accounts.

14          And then lastly but not least, I will require the

15 debtor to file that declaration of electronic filing by the end

16 of today.  And I think that covers it.  So with that, we will

17 enter an appropriate order and I expect the parties to work

18 through the Trustee from here on out until we get together on

19 the motion to convert.  In fact, what I will do is I'll -- what

20 is the date of that motion to convert?  I thought it was in

21 August.

22          MR. SLONE:  August 9th, Your Honor.

23          THE COURT:  Okay.  Well then I'm going to set the

24 continued stay relief motion as a status conference for August

25 9th.  Very well, anything else before we close things out for

49

1    today?

2                        (No audible response)

3           THE COURT:  All right, thank you, everyone, for your

4    participation today.  That concludes the matters that are

5    presently set before the Court at this time.  Court will now

6    stand adjourned and we'll close the record.  Thank you.  Have a

7    good day.

8           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9           ALL ATTORNEYS:  Thank you, Your Honor.

10                         *  *  *  *  *

11              **C E R T I F I C A T I O N**

12           I, MARY POLITO, court approved transcriber, certify

13   that the foregoing is a correct transcript from the official

14   electronic sound recording of the proceedings in the

15   above-entitled matter, and to the best of my ability.

16

17

18   /s/ Mary Polito

19   MARY POLITO

20   J&J COURT TRANSCRIBERS, INC.        DATE:  July 18, 2022

21

22

23

24

25