FILED
12/28/22 10:39 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-20823-GLT |
| | . | |
| | . | |
| U LOCK INC, | . | 5414 U.S. Steel Tower |
| | . | 600 Grant Street |
| | . | Pittsburgh, PA 15219 |
| Debtor. | . | |
| | . | December 15, 2022 |
| . . . . . . . . . . . . .. | | 10:04 a.m. |

TRANSCRIPT OF [#217] EVIDENTIARY HEARING ON AMENDED MOTION TO
SELL PROPERTY FREE AND CLEAR OF LIENS UNDER SECTION 363(f).
RE: TANGIBLE AND INTANGIBLE PERSONAL PROPERTY OF THE ESTATE
BEFORE HONORABLE GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Law Office of J. Allen Roth
                           By:  J. ALLEN ROTH, ESQ.
                           805 S Alexandria Street
                           Latrobe, PA 15650

For Christine Biros:       Bernstein-Burkley, P.C.
                           By:  SARAH ELIZABETH WENRICH, ESQ.
                                ROBERT S. BERNSTEIN, ESQ.
                           601 Grant Street, 9th Floor
                           Pittsburgh, PA 15219

For Christine Biros,       The Law Firm of William E. Otto
Lead Counsel in the        By:  WILLIAM E. OTTO, ESQ.
State Court Action:        4027 Old William Penn Highway
                           P.O. Box 701
                           Murrysville, PA 15668

ECRO:                      Hayley Smith

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

```
APPEARANCES (Cont'd):

For Shanni Snyder,          Grenen & Birsic, P.C.
Petitioning Creditor:       By:  JOHN B. JOYCE, ESQ.
                                 JEREMY J. KOBESKI, ESQ.
                            One Gateway Center, Suite 9W
                            Pittsburgh, PA 15222


TELEPHONIC APPEARANCE:

Chapter 7 Trustee:          Mahady & Mahady
                            By:  ROBERT H. SLONE, ESQ.
                            223 South Maple Avenue
                            Greensburg, PA 15601


                      - - -
```

3

1          THE COURT:  All right, good morning everyone.  This

2  is the United States Bankruptcy Court for the Western District

3  of Pennsylvania, and this is the time set for the hearing on

4  Case Number 22-20823, U LOCK INC.  I'll begin by taking

5  appearances first from the Chapter 7 Trustee.

6          MR. SLONE:  Robert Slone, Chapter 7 Trustee, Your

7  Honor.

8          THE COURT:  All right, good morning.  I'll take

9  appearances for the debtor, please?

10          MR. ROTH:  Allen Roth on behalf of U LOCK.

11          THE COURT:  All right, good morning.

12          MR. SNYDER:  George Snyder.

13          THE COURT:  All right, Mr. Snyder.  Take appearances

14  --

15          MR. JOYCE:  Good morning.  May it please the court,

16  John Joyce on behalf of Ms. Shanni Snyder.

17          THE COURT:  All right.

18          MR. KOBESKI:  And, Your Honor, Jeremy Kobeski also on

19  behalf of Ms. Snyder.

20          THE COURT:  Good morning.

21          MR. JOYCE:  And Ms. Snyder is present in the

22  courtroom, Your Honor.

23          THE COURT:  All right, good morning to you all.  All

24  right, and over here?

25          MS. WENRICH:  Good morning, Your Honor, Sarah Wenrich

4

1 and Bob Bernstein, as well as William Otto on behalf of

2 Christine Biros.  Ms. Biros is here, as well.

3 　　　　　THE COURT:  All right, good morning.  All right,

4 anyone else who wishes to enter an appearance in this case?

5 　　　　　　　　　(No audible response)

6 　　　　　THE COURT:  All right.  We are here on the Continued

7 Sale Hearing involving the Trustee's Motion to Sell Tangible

8 and Intangible Property of the Estate.  And, as I said, we've

9 had two prior Sale Hearings and then, more recently, a site

10 visit that occurred, which I think has been very helpful in

11 sorting through some of these issues, but let me get some

12 updates from everybody before we begin.  And I'll start first

13 with the Chapter 7 Trustee.

14 　　　　　MR. SLONE:  Your Honor, we did go for the site visit

15 on December 2nd.  Glenn Mowry, after that time, came to my

16 office with his attorney, Larry Burns, and he gave us the list

17 of items that he thought he owned.  Also there were some titles

18 and other items that proved his ownership.  I have shared that

19 with all the parties, Your Honor, that were interested in

20 purchasing.

21 　　　　　That would be -- it went to Mr. Joyce.  It went to

22 Mr. Bernstein, Sarah Wenrich, and Mr. Otto.  They're all aware

23 of what Mr. Mowry's claiming, Your Honor.  That's for the

24 Personal Property, for the Tangible Property.  As to the other

25 property, Mr. Joyce has prepared an Order that I have reviewed

1  regarding the Sale, depending on what happens today, Your

2  Honor.

3          THE COURT:  Okay.  All right.  Anything else,

4  housekeeping items from any of the parties before we get

5  started?

6          MR. ROTH:  Nothing further.

7          THE COURT:  No?

8          MR. JOYCE:  I just -- I guess the only thing I would

9  add is as to the items provided by Mr. Slone to me and the

10 other counsel, I don't believe -- there were a couple titles in

11 there, but it didn't cover all the property, at least for the

12 proof or backup that is listed on the Schedules of this Chapter

13 7 Debtor.

14         So there were a -- Mr. Mowry's submission had a

15 couple titles that showed, and if the Court will recall, there

16 was List A and List B.  List A were the items that were on the

17 Schedules and List B were items that go back to an August 8th

18 Declaration by Mr. Snyder that he wanted to put on the

19 Schedules, but I don't know if they were ever put there.

20         So, there were a few vehicles there, one or two, that

21 Mr. Mowry provided a title to.  There were other items he's

22 just claiming an ownership interest in, without any backup or

23 support.

24         THE COURT:  All right, but what I want to make sure

25 we're clear on, because I think the site visit, at least in my

6

1  mind sorted through these issues, is that there should be no

2  dispute now, what we're talking about in terms of assets and

3  where they're located at this point.  And, if Mr. Mowry has

4  claims against those, then this is an as-is/where-is sale is

5  subject to those claims, but I would note that Mr. Mowry has

6  been given notice of these proceedings, and, at this point, has

7  not inserted himself into these proceedings or otherwise filed

8  any pleading asserting an interest.

9          So, that is what it is at this point.  So, any other

10  questions on the Tangible Assets before we move forward?

11          MS. WENRICH:  I guess, Your Honor, not with regard to

12  specifically the Tangible Assets, but just a couple of

13  questions about the proceedings today, if that's okay?

14          THE COURT:  Mm-mm.

15          MS. WENRICH:  First, I want to confirm that there's

16  no need to repeat the arguments or discussions that were put on

17  the record two weeks ago, is that accurate?

18          THE COURT:  Yes.

19          MS. WENRICH:  Okay.

20          THE COURT:  The record is what the record is at this

21  point.  My sense is that -- to give the parties an overview of

22  what I intend to do, is I've heard the objections of the

23  parties.  I'm prepared to issue rulings with respect to some of

24  these objections.  I'm also prepared to move forward with

25  soliciting bids today.

1        Bottom line is, this is the third Sale Hearing on

2  these assets.  The total scheduled value of these assets is

3  less than $25,000 for the Tangible Property and approximate

4  value of 104,000 for the Causes of Action that are listed.

5        It makes no sense for us to have any further Sale

6  Hearings after this.  We've had attorney time and expense from

7  all parties, additional resources, and we need to keep sight of

8  what the value of the Estate is here.

9        And so, that's why we're going to move forward with

10  taking bids today.  I just want to make sure that there's

11  clarifications at this point, so everyone is on the same page

12  going forward before we begin that process.

13        MR. JOYCE:  May I just --

14        MR. BERNSTEIN:  Your Honor, just to follow up on --

15        THE COURT:  Well, let me finish over here and then

16  we'll go.

17        MR. BERNSTEIN:  And I apologize for what may be back

18  and forth since Ms. Wenrich was not able to be here at the last

19  Hearing and some of this discussion happened at the last

20  Hearing.  The only point that I'd like to just protect for

21  discussion is the question of possession that I raised last

22  time as that the Intangible Sale should not transfer any right

23  of possession to the Intangible Buyer, especially if there is

24  Tangible Property still on the premises and the Trustee has to

25  administer it.  So, I'd like an opportunity to argue that if

1    the Court hasn't already decided it.

2         The second thing with regard to Tangibles and

3    Intangibles is that the Proposed Order, and I know we're not

4    there yet, the Proposed Order that Mr. Joyce has submitted, in

5    our view, confuses the Intangibles and the Tangibles and

6    changes the lots that were in the original Motion.  Very

7    simply, the original Offer and the original Motion included in

8    the Tangible Property shipping containers that were -- that are

9    across the street, apparently on Mr. Snyder's property.  Those

10   are in the Tangible Property in our offer.

11        The way we read Mr. Joyce's Proposed Order, the right

12   to recover those specific items would be transferred with the

13   Intangibles, and we'd just like clarification on that.  So,

14   those are the only two points that I wanted to raise, Your

15   Honor.

16        THE COURT:  So let me get clarification on the Order

17   that we're talking about.  Is that the Order that was uploaded

18   this morning, or is this a different Order?

19        MR. JOYCE:  Yes, Your Honor.  That was the Order that

20   was uploaded this morning that we shared with Mr. Slone and he

21   was fine with.  And Mr. Bernstein and I talked in an effort to

22   try to resolve the issues that he's articulating.  Now, Mr.

23   Bernstein and I talked last evening and he did not have an

24   opportunity until this morning because we crafted the language

25   to try to address the concerns that he's raising, because I

9

1  think we're not -- I don't think we're talking -- I think we're

2  -- we could -- we can resolve this because we're not really

3  opposed.  It's just clarification.

4       So, let me explain.  The current possession, if Ms.

5  Snyder was successful in bidding today, she would not have

6  current possession.  So, to the extent that there's items still

7  left on the property, that's the Trustee's.

8       The language we included clarifies because -- that

9  we're purchasing, if she were to succeed, Claims of the Trustee

10 to the extent that the Trustee has them, relating to the real

11 property, which would include title and any possessory rights

12 that the Estate had up to the point of the sale.  So, for

13 example, if there was a possessory right that the Estate had up

14 to today, and there's a Claim that the Trustee could bring

15 against a party for some violation of the stay, for instance,

16 during the Trustee's possessory interest, then that would be a

17 claim purchased by Shanni Snyder.  So, it's not -- we're not

18 asking --

19      THE COURT:  Okay, well, we're not doing that.  I

20 mean, to the extent that there's stay violations, I'm still

21 handling that as part of the Estate.

22      MR. JOYCE:  Yes, you would, Your Honor.  You would.

23      THE COURT:  And that's not being included in the

24 sale.

25      MR. JOYCE:  Okay.  The -- so we're asking -- yeah,

1 but there could be other -- I mean, to the extent there's a --

2 that we're purchasing the General Intangibles, which includes

3 whatever rights the Trustee's -- whatever claims the Trustee

4 may have related to the property up -- and not -- up and to the

5 sale and then to the extent in the future if they're successful

6 in any of their litigation.

7        THE COURT:  How I want to frame it is that the Cause

8 of Action -- the main Cause of Action is the right to avoid the

9 transfer of the real property or the deed, okay --

10        MR. JOYCE:  That's one.

11        THE COURT:  -- and any possessory rights that flow

12 from that.  But, the Trustee's current possessory right, to the

13 extent the Estate has one, is not being included in the sale.

14        MR. JOYCE:  Okay, that's our -- you know, we would

15 object to that and I'll note that for the record.  I understand

16 the Court's position on that.  We believe that we're entitled

17 to purchase all the general Intangible Claim rights of the

18 Trustee, and to the extent there was one -- and I'm not -- if

19 any, and I noted that in my language, if any.

20        So, we're not asking for actual possession, so

21 there's no issue, as Mr. Bernstein indicates, that, you know,

22 we're -- the Trustee currently has possession.  There are

23 items, not many, there, but they're there, and he's going to

24 have that tomorrow.  We're not trying to assert a current

25 actual possessory right at this moment.  We're just asking for

1  a clarification that to the extent actions occur, we're hearing

2  about environmental things that occurred, during the time that

3  that's a big issue here.

4       So, we have this issue of did some environmental

5  activities occur that could impair the property.  And we

6  learned that in September Biros did something to impact the

7  environmental aspect of this property, and there's -- and that

8  was when the Trustee had a possessory interest.  To the extent

9  that there's a cause of action or claim, Ms. Snyder would be

10 purchasing that.

11      And that's all we're asking the Court, is to make

12 sure that our general Intangible Rights of Claims includes

13 that, what I'll call, pre-sale possessory right -- possessory

14 interest, if any, that the Trustee had, because if they did

15 something to impair the property and she buys the claims, I

16 think she should be able to pursue that, and I don't want to

17 hear later on, well, you only bought prospectively you didn't

18 buy --

19      THE COURT:  Well, I mean, that's the way this was

20 teed up by the Trustee, is that this was any Claims Causes of

21 Action or assets that belong to the Estate as of the petition

22 date.  Any post-petition Causes of Action are a separate

23 matter.  I didn't understand the sale to include that, and I

24 wouldn't expect that to be the case.  That would be something

25 that the Trustee has the ability to pursue if he wishes to do

12

1  so.  Mr. Slone, let me --

2           MR. JOYCE:  I read the order to be --

3           THE COURT:  -- let me ask if there's any further

4  clarification that you want to provide to me on that, as far as

5  what you are structuring as part of this sale?

6           MR. JOYCE:  On that issue?

7           THE COURT:  I want to hear from Mr. Slone on that.

8           MR. JOYCE:  Oh, I'm sorry.

9           MR. SLONE:  No -- excuse me, Your Honor.  No.  I was

10 just selling any right that I would have had at the time of a

11 Filing, Your Honor.

12          THE COURT:  Okay.  So, that's what's being sold here.

13          MR. JOYCE:  Yeah, I'm reading -- I'm looking at the

14 Order -- or the Motion, or at least an extract to the Motion.

15 I'm reading it as all rights, claims, demands, actions,

16 including -- I don't see as of the time of the Petition but --

17          THE COURT:  Well, we're clarifying that for the

18 record now.

19          MR. JOYCE:  Yeah, and that's important, Your Honor.

20 That's something I would need to make sure I confer with my

21 client on because that's something I think --

22          THE COURT:  Okay.

23          MR. JOYCE:  -- she would need to understand.

24          THE COURT:  Sure.

25          MR. JOYCE:  The only other thing, just while we're on

1  this before I have a moment, if the Court would allow me, is

2  the -- Ms. Snyder, if she bids, may want to elect to bid on the

3  Tangibles, and I don't know if there's anybody else here, but

4  probably not.  I have a question, in light of the fact that the

5  lion's share of the equipment, if you will, is on the Biros'

6  property and was moved by the Biros under some impression that,

7  according to the Affidavit, that they were doing something for

8  the benefit of the Trustee.  How does a buyer, who is not a

9  Biros buyer, get that equipment and avoid issues there because

10 that's --

11          THE COURT:  Well, that will be part of the Court

12 Order that would authorize the buyer to have the same period of

13 time to remove the equipment from that location that it would

14 be from the U LOCK property.

15          MR. JOYCE:  Yeah, I mean, we objected because of the

16 fact that when we went there, there was nothing there, and then

17 we have to go all do a site visit, and we were in court, what,

18 November 17th and no one on the Biros family told us that they

19 moved it.

20          THE COURT:  No, I'm treating it as if that property

21 was still located on the U LOCK property.  I mean, that's an

22 issue for another day to understand why it was moved and, you

23 know, the Court will look into that later on.  That's not a

24 matter for today.

25          But I'm treating it that that is U LOCK property.  We

1  will treat it the same as if it was located on the Route 30

2  property, and so any successful bidder for the asset would have

3  the same rights to remove it from that property as they would

4  if it was located off of Route 30.  Okay?

5          MR. BERNSTEIN:  Your Honor, our understanding is that

6  the Biros' bid that was made that teed up this sale would

7  comply with what the Court has said with respect to timing, and

8  so we have no problem with that.

9          As far as access to the property to -- for another

10 buyer who buys the property, that's fine as long as it works

11 with all three locations, including the shipping containers

12 which are specifically called out as part of the personal --

13 Tangible Personal Property in our offer.

14          THE COURT:  Okay.

15          MR. BERNSTEIN:  Thank you.

16          THE COURT:  All right.  Yes?

17          MR. ROTH:  I would point out the shipping containers

18 were property that belonged to George Snyder and not to U LOCK.

19          MS. WENRICH:  Is there any proof of that?

20          MR. SNYDER:  Those are my personal --

21          MR. JOYCE:  I don't think the land and sea containers

22 are even in the current Motion for Sale.  Yeah, maybe --

23          MS. WENRICH:  represented (indiscernible).

24          MR. BERNSTEIN:  They absolutely are --

25          MR. JOYCE:  Oh, okay.  Are they on Exhibit B then?

1          MS. WENRICH:  They're in the Motion, Paragraph

2    5.c.ii.

3          MR. JOYCE:  Okay.  Just because I just want to make

4    clarification whether they are or aren't.  I mean, so I'm not

5    concerned about them --

6          MS. WENRICH:  They're there.

7          MR. JOYCE:  I'm just making clarification.

8          THE COURT:  And, Mr. Slone, do you want to confirm

9    the Trustee's position with respect to the shipping containers?

10          MR. SLONE:  Your Honor, they were in the original

11    offer in the original Motion.

12          THE COURT:  They were?

13          MR. SLONE:  Yes, whatever interest -- again, whatever

14    interest I had.

15          THE COURT:  Okay.

16          MR. JOYCE:  I see, Your Honor.  They were moved into

17    the catch-all, so they were itemized in the earlier Sale Motion

18    as a separate item and then moved into the catch-all.  Yeah,

19    but they are there.

20          THE COURT:  All right, so it is similar to the Glenn

21    Mowry issue, which is, you know, purchaser acquires that,

22    subject to whatever ownership claims that someone else may

23    have, but we have the record as to who has made claims at this

24    point and we'll go from there.

25          All right.  I've heard from everyone.  Any other

1  preliminary comments at this point?

2                    (No audible response)

3        THE COURT:  So, what I have right now are two bids.

4  I have the Snyder bid for 63,500, which is just for the

5  Intangible.  I think at the part -- at the last hearing, there

6  was no interest in bidding on the Tangible because you had not

7  had an opportunity to see all of the assets at this point.  Mr.

8  Joyce, is Ms. Snyder offering a comprehensive bid, or is she

9  making a bid for just the Intangibles?

10        MR. JOYCE:  Can I have a moment --

11        THE COURT:  You may.

12        MR. JOYCE:  -- with her, Your Honor?  And, just for

13  one other clarification, and Mr. Slone can maybe answer this,

14  but I'll raise it with the Court, in my discussion with Mr.

15  Slone on the order yesterday and he said if nobody buys the

16  Tangibles, he was contemplating, and I'm not committing him,

17  but I'm asking if that's his -- he would abandon the Tangibles,

18  but I don't know if that's something he's committed to, but I'm

19  just -- he may want to respond.  If he would do -- if there was

20  no buyer for those.

21        May I have a moment, Your Honor?

22        THE COURT:  You may.

23                    (Pause)

24        MR. JOYCE:  Your Honor, we've had an opportunity --

25  if the Court's ready, I don't -- I didn't want to interrupt

1  Your Honor.  I saw you --

2          THE COURT:  I didn't see you come back in.  I'm

3  sorry.

4          MR. JOYCE:  Well, and I -- and you looked very, you

5  know, engrossed in what you were reading, and I didn't want to

6  interrupt you.  Okay.  So, is the Court going to allow separate

7  bid lots on the lots?  I mean, that's important for us to know.

8          THE COURT:  My preference would be no.  My preference

9  would be to do a comprehensive bid, but I want to -- I want to

10  hear what -- you know, is your client willing to provide a bid

11  for both the Tangibles and Intangibles?

12          MR. JOYCE:  Well, she is prepared to stay with her

13  bid on the general Intangibles, but if the Court is going to

14  require both then -- then she's going to have to bid on both,

15  but she prefers to just bid on the general Intangibles because

16  there's a lot of associated costs with moving the Tangibles,

17  and getting them off the Biros property, and given the history

18  of the parties, we don't want them claiming rent claims and

19  things like that.  So, she prefers to bid on the general

20  Intangibles with reserving the right to bid on both.

21          THE COURT:  Okay.

22          MR. JOYCE:  And if the Court's going to compel us to

23  stay within, you know, both -- inclusive of both, then I'll

24  have to -- we'll have to work from there.

25          THE COURT:  All right, well, let me -- let me ask

1  this question.  The property where -- that we went to first on

2  the site visit, the McKeesport property, is that a Biros

3  controlled property, or is that the property that belongs to

4  the salvage yard?

5       MS. WENRICH:  Your Honor, that's a Biros controlled

6  property.

7       THE COURT:  It is?  All right.  For clarification

8  though, we've already clarified on the record that any

9  successful bidder can remove the items from that property, so

10 long as they do so within the time frame set forth in my order.

11      I'm also operating under the -- the understanding

12 that since these should have been on the U LOCK property, there

13 is no rent charge or other charge to be assessed for the

14 removal of them from that site, if Ms. Biros is not the

15 successful bidder.  So, I think that should clarify two of your

16 concerns with respect to that.

17      MR. JOYCE:  One other extra clarification in the

18 purchase of her rights.  If she were the successful bidder,

19 would that include the Trustee's right to abandon the

20 Tangibles?

21      THE COURT:  No.  I mean, the Trustee has the right to

22 abandon, and if you choose to acquire the assets, then they're

23 you're assets, too.

24      MR. JOYCE:  Yeah.  I'm thinking under the general

25 Intangible acquisition, did that include the abandonment, is

1  the question.

2         THE COURT:  Well, I mean, I think my -- my bid

3  procedures order provided that if they were not removed within

4  a timely fashion, they were deemed to be abandoned, but it

5  still doesn't eliminate anything else that would result from

6  that for, you know, someone with title of those assets just

7  leaving them there on that third-party property, so that's --

8  that's not an issue for me to sort through, but that's how I'm

9  looking at it right now, which is if you buy the assets, you're

10  buying the assets.  You have that time frame to remove them,

11  and if you don't, they're deemed abandoned.  What comes from

12  that is up to the property owner and the buyer.

13         MR. JOYCE:  One more moment, Your Honor.

14                      (Pause)

15         MR. JOYCE:  Your Honor, she's prepared to amend her

16  bid to just include both lots, if you will.

17         THE COURT:  Okay.  So, we're talking about apples to

18  apples in terms --

19         MR. JOYCE:  Correct.

20   THE COURT:  -- of what's being conveyed.  Okay, so just to be

21   clear, we have the -- whatever rights the Estate has in the

22   assets that are listed on the Trustee's Notice of Sale, and

23   that includes any Intangible causes of action, but those are

24  causes of action that existed as of the petition date.  It does

25   not include any possessory rights separate from those that

1  would exist under the avoidance action, so the Estate's current

2  possessory interest remains with the Estate.  All other terms

3  of the sale would apply based on those that I've identified in

4  my November 15th order, which provided some clarity to what the

5  Trustee already included in his amended Sale Motion.  Again,

6  this is an as-is/where-is sale, and there are no

7  representations or warranties of any kind, but I have two

8  interested bidders who are going to make bids for both the

9  Tangible and Intangible Assets, as we've referred to them, and

10  so I guess we are prepared to begin.

11  Any questions from the Biros attorneys before we get started

12  with the bidding?

13  MS. WENRICH:  Yes, Your Honor.  My question is with regard to

14  the administrative claim of Ms. Biros being used as a credit

15  bid, and we want to just get a hold of that, and an idea of --

16  THE COURT:  Sure.  Well --

17  MS. WENRICH:  -- and that issue, and I'm happy to make an

18  argument --

19  THE COURT:  Here's where I am on the bidding and the non-cash

20  consideration.  I am placing the greatest emphasis on cash

21  offers.  That -- that is the old saying, cash is king.  As I

22  indicated at the last hearing, I didn't probably go into it in

23  detail, but the bond obligation for the remediation, at this

24  point I'm not finding that there is a need for that given that

25  this appears to be an environmental obligation, if any, that

1    would be an unsecured claim since it occurred during the gap

2    period and was not incurred in the ordinary course of business,

3        so I am not attributing any value to that in terms of

4                        evaluating the bids.

5    With respect to the administrative claim waiver, I do think

6     that there is certainly an expectation that there would be a

7      rent component for the Trustee's use and possession of the

8     property during this time period, and I believe it has been

9      listed as a $10,000 amount, which over the course of seven

10   months would be roughly $1500 a month, which I'm going to take

11      judicial notice, is a reasonable commercial lease amount.

12   MS. WENRICH:  Your Honor, may I clarify that waiver?  So, the

13        $10,000 amount was just a waiver of the first $10,000 of

14                distribution that Ms. Biros would receive.

15   THE COURT:  All right.  Well, this is the saying that "pigs get

16      fat and hogs get slaughtered."  I will give you a $10,000

17    credit.  If you choose to ask for more, then I'm not prepared

18     to do that on the record today, and if you want to present

19   additional evidence on that, you can, but I just -- I don't see

20            that as being a useful exercise at this point.

21    MS. WENRICH:  We would like to pursue that and be given the

22      opportunity, if you're willing to listen, as to why there

23      should be a higher amount provided for an admin claim that

24                        could be credit bid?

25   MR. JOYCE:  Your Honor, may I -- I'm going to object.  This is

1  premature.  We don't have a motion filed or proper opportunity

2  for notice for the parties to object as to the benefit of that

3  claim.  There's all kinds of questions about whether there were

4   environmental things done and who did what.  I -- I object to

5   any, on behalf of my client, to any allowance of that.  It's

6                              premature.

7  If they have a valid claim and they can prove a benefit to the

8  Estate, after this hearing they can come in and present it, and

9  if there's cash from this proceeding, if it's their own cash or

10 my client's cash, it's going to kind of flow right down to them

11 as a top priority administrative claim, and so money would come

12                   back to them if they were allowed.

13 I object to -- you know, I'm noting my objection to any of that

14  as premature at this point.  I'm even -- don't know what terms

15   they're arguing, other than some sort of right to allow the

16   Trustee general possession, so I object.  That's my point on

17                          that, Your Honor.

18   THE COURT:  All right.  Well, at this point, I'm willing to

19 provide a credit of $10,000 as an acknowledgment of what is the

20 reasonable rent for the waiver.  Beyond that, I -- I don't have

21   enough information at this point.  And, again, I think the

22  thing that everyone is losing sight of here is the true nature

23  of the value of this Estate.  I mean, you are litigating this

24  thing like this is <u>Enron</u>, and this is not <u>Enron</u>.  This is a --

25   basically, a half storage unit, half scrap yard area in North

1   Huntington.  And so, I know that there's animosity between

2   these parties, but that's what's generating these issues.  This

3   is not based on any cognizable appreciation of what the value

4   is of these assets.  This is just merely being done out of

5   spite to go back and forth, and so I'm trying to cut through

6   the nonsense.  I've got a Trustee who's in the middle of this,

7   and I think some common sense needs to prevail with respect to

8   this.  Unfortunately, there's a lack of common sense at this

9                              point.

10  So, right now what I have is, I have two bids.  I have a Biros

11          bid for $31,000 in cash, and a $10,000 credit for

12  administrative rent.  I have the Snyder bid that was originally

13  63,000 for Intangibles, and I understand you are amending that

14          bid to now include the Tangibles, as well.

15              MR. JOYCE:  Correct, Your Honor.

16          THE COURT:  All right, and are you modifying the --

17              MR. SLONE:  Sixty-three five --

18          MR. JOYCE:  Sixty-three thousand five --

19  THE COURT:  Are you modifying the dollar amount to include the

20                            Tangibles?

21      MR. JOYCE:  I'm sorry, Your Honor.  Have we  allocated?

22  THE COURT:  Are you modifying the dollar amount, or is it still

23                            63,500?

24              MR. JOYCE:  No, $63,500 for --

25              THE COURT:  Everything?

1    MR. JOYCE:   -- two -- yeah, both lots.   Everything.

2    THE COURT:   All right.   So, as I sit here now, I have the Biros

3    bid which I'm valuing at $41,000, and I have the amended Snyder

4    bid, which is being valued at 63,500.   So, I'm prepared to take

5        higher and better bids from this point on.   Any further

6    clarifications before we proceed?   Again, all other sale terms

7                    as previously explained.

8      THE COURT:   Okay. So, with that, the highest bid that I have

9                        right now is --

10                   MS. WENRICH:   Oh --

11     MR. BERNSTEIN:   I'm sorry, Your Honor.   Were you asking for

12                  more bids or clarification?

13       THE COURT:   I was asking if anyone wanted any other

14                      clarification?

15    All right, so at this point, the high bid is from Ms. Shanni

16    Snyder at 63,500.   Does the Biros team wish to make a higher or

17                 better offer for the assets?

18    MS. WENRICH:   Yes, Your Honor.   Ms. Biros would like to bid

19    65,000, which would be the 55,000 cash, plus the $10,000 admin.

20     THE COURT:   Okay.   So, the current bid from Ms. Biros is

21    65,000, which includes 55,000 in cash.   Does Ms. Snyder wish to

22        make a higher or better offer for the assets?

23         MR. JOYCE:   Yes, Your Honor, $70,000.

24             THE COURT:   Seven zero?

25             MR. JOYCE:   Seven zero.

1    THE COURT:  The current offer from Ms. Snyder is $70,000 for

2    the assets.  Does Ms. Biros wish to make a higher or better

3                              offer?

4     MS. WENRICH:  One moment, Your Honor.  No further bids.

5    THE COURT:  No further bids?  Okay.  So right now the high bid

6     that I have is from Ms. Snyder is the amount of $70,000 for

7    both the Intangible and Tangible Assets.  Do you wish to have

8        Ms. Biros' bid of 65,000, 55,000 in cash and a $10,000

9          administrative claim waiver list as the backup bid?

10                    MS. WENRICH:  Yes, Your Honor.

11   THE COURT:  All right.  Okay.  So, I find that the highest and

12    best bid, after competitive bidding, is Shanni Snyder in the

13    amount of $70,000.  I will register that as the highest bid,

14    and the backup bid of Ms. Biros at 65,000 as the backup bid.

15   In the event that the closing cannot occur on the Snyder's bid,

16     then the Trustee is authorized to proceed -- provided to go

17                    forward with the backup bid.

18   All right, so then going forward we have the sale order, unless

19    there's any other questions or issues that the parties wish to

20                raise with respect to the bidding?

21                    (No audible response)

22        THE COURT:  Okay.  So, I now have the Sale Order,

23   which I have not had an opportunity to review, but I understand

24   there are some issues with respect to that.  So, let me come

25   back first to the Trustee.  Mr. Slone?

1            MR. SLONE:  Your Honor, a new sale order will have to

2   be prepared.  The sale order that Mr. Joyce had prepared did

3   not include the Tangible Assets.

4            THE COURT:  Okay.

5            MR. SLONE:  We'll have to provide a new sale order,

6   Your Honor.

7            THE COURT:  All right, very good.  But, any other

8   issues with the order that's been provided that I need to

9   address now to head off any potential issues going forward?

10           MR. JOYCE:  Your Honor, I would just note, in light

11  of the Court's further ruling, and we've noted our objection,

12  but we're not -- you know, we're beyond that.  But, I just --

13  for clarification, Mr. Bernstein, on behalf of the Biros, I

14  believe Item 5.c would have to be modified, at least the first

15  sentence may be modified or taken out.  The latter part of that

16  sentence, which states the order in no way limits or prejudices

17  the purchaser from asserting claims, causes of action regarding

18  future ownership or possessory rights of the real property, and

19  so on and so forth, I think is what the intent was as I heard

20  the Court earlier.  That's the litigation, if you will, Your

21  Honor, on the avoidance claims.

22           Otherwise, the language in the order substantially

23  follows what Mr. Slone had filed two -- two motions ago.  From

24  a historical perspective, the prior -- two motions ago for

25  sale, there was an order, it had a lot of the same language in

1  it.  For whatever reason, when Mr. Slone filed the most recent

2  Motion for Sale, he used the -- the form, general form, I think

3  he conveyed to me from some other sale, and -- because he had

4  read the Court's amended order that said -- I think your order

5  said the parties can work a sale order out afterwards.  He then

6  asked me if I had any comments to a proposed order, and I said,

7  well, let's go back and start with what you had two times ago

8  and then work it.  Of course we were working from an Intangible

9  standpoint.

10        So, I -- I mean, I don't -- we -- we had raised

11  objections to that sale order in our objection to the sale and

12  I believe, other than what we've just discussed about the

13  possessory interest after -- during the Trustee's whole time,

14  we would submit that with some tweaking this language should

15  remain.  Most importantly, 5.b.

16        THE COURT:  All right.  Well, you've already heard my

17  thoughts with respect to defining the cause of actions being

18  transferred and my thoughts on possessory rights.  But, I do --

19  and so you can incorporate those into the order based on the

20  events of today.  My expectation would be though that you would

21  provide me with a sale order no later than the close of

22  business tomorrow.

23        MR. JOYCE:  That's fine, Your Honor.

24        THE COURT:  Does that work?

25        MS. WENRICH:  Your Honor, we have a concern with the

1  Paragraph 3 in the proposed order with the good faith finding.

2  I believe Your Honor needs to make a finding of good faith and

3  I'm not sure -- in fact, I would assert that the verified

4  disclosure did not disclose much of anything, and that there is

5  not any kind of record of good faith as to Ms. Snyder in

6  bidding and participating in the sale.

7       THE COURT:  Is there an allegation that Ms. Snyder

8  has acted in bad faith with respect to the sale process?

9       MS. WENRICH:  Yes, Your Honor, and as a straw party,

10 in particular and potential collusion with other parties, as

11 well, who may have otherwise been here to bid on the assets.

12      THE COURT:  Well, I -- I've not had anyone present me

13 with anything in the record that would suggest that she has not

14 been a good faith purchaser at this point.  If we -- if we need

15 to get into that, I'll spend some time getting into it, but let

16 me hear from the Trustee first about his dealings with Ms.

17 Snyder.

18      MR. SLONE:  Your Honor, she did file -- she did file

19 her Affidavit.  The money is being held by Mr. Joyce in his law

20 firm.  I haven't put any allegations of bad faith at this

21 point, Your Honor.  If that happens, then we'll have to deal

22 with it.

23      THE COURT:  What -- what allegations are you raising

24 as to how that impacted the sale process, or the auction and

25 bidding?

1            MS. WENRICH:  So, Your Honor, with respect to the

2    auction, I think it has been verified or it's in her Affidavit

3    that the money is coming from a loan from USAAG, who was

4    originally a bidder, and had they not been working together

5    now, it's our position that perhaps Ms. Snyder and USAAG could

6    have bid against each other further than my client was willing

7    to bid, which would leave more money for the Estate, and also

8    provide a higher recovery to all admin claims, and perhaps a

9    higher recovery to general -- or any recovery to general

10   unsecured creditors, which based on the sale right now, is not

11   occurring.

12           THE COURT:  Okay.  Well, there's no -- there's no

13   prohibition from parties working together on a bid.

14           MS. WENRICH:  There's not a prohibition, but I think

15   in this case, given the relationship and given the fact that we

16   have not been given a full disclosure, I'm not sure that the

17   evidence on the record establishes any finding of good faith.

18   In fact, I think it questions a lot of the circumstances and

19   would indicate, at least a potential, a high potential of bad

20   faith or lack of good faith for 363(m) purposes.

21           THE COURT:  So, are you prepared to put on evidence

22   of how Ms. Snyder has not acted in good faith in this

23   proceeding here, with respect to the bid?

24           MS. WENRICH:  Yes, I'm -- I'm ready to call her and

25   examine her as to how she obtained the funds and the

1  circumstances surrounding her relationship with USAAG.

2           MR. JOYCE:  And I will note, Your Honor, that she --
3  we're responding -- Ms. Snyder is actually -- the ultimate sale
4  was proffered by them.  Although, USAAG at one time was
5  interested, the ultimate sale that we're responding to and we
6  outbid is the Biros' bid, so they set the terms and the process
7  here, and she's just bidding on funds that she's been loaned.

8           I don't see how there's any bad faith.  She didn't
9  set this up and try to structure it in any way that, you know,
10 slants it.  In fact, if anything, we felt the terms were
11 slanted against her and anybody else, and we raised those
12 objections.  But, I think her -- her Statement and Declaration,
13 under penalty of perjury and Affidavit, addresses very clearly
14 who she's getting the money from, and that it's a loan and, you
15 know, we can -- I mean, it's -- there's -- there's nothing more
16 to it than that.

17          THE COURT:  All right.  Well, here's what I'm going
18 to do first.  I want to give some clarification of where I am
19 on this.  I mean, I'm not sure that the parties are aware, but
20 I have a pretty high sensitivity to any funny business that
21 goes on in my 363 sales.  And as you may have seen, I wrote an
22 opinion on it about a year or two ago in the Primel case where
23 I found that a bidder did not act in good faith, and I actually
24 sanctioned that bidder for their actions.  So, I take that
25 seriously and I -- I certainly will delete a good faith finding

1  where I think it's appropriate.  But I can tell you, as I sit

2  here right now, I'm not seeing a colorable allegation that she

3  has acted in bad faith with respect to the auction process.

4         Again, I think this is coming back to trying to

5  litigate this case like it's a multi-million dollar enterprise

6  and this is, you know, raising issues and creating problems

7  that aren't there.  So, as I've gone through this process and

8  we've had three sale hearings and, you know, I've had my own

9  observations about, you know, Ms. Snyder's motivations by

10 commencing this case and what she's done with her own Chapter 7

11 case.

12        So, I mean, you know, I've made no bones about what

13 my thoughts are on some of those things.  But, as we are

14 dealing with the bidding process itself, I have not seen

15 anything to date that would suggest that she was not acting in

16 good faith in bidding for the asset or working with another

17 entity to obtain the funding to make that bid.  So, I'm not

18 really inclined to go down this road unless there is a there

19 there, because again we are wasting gobs of attorney time and

20 expense going through these issues for assets that have nominal

21 value here.  So --

22        MR. OTTO:  Your Honor?

23        THE COURT:  Yes?

24        MR. OTTO:  Pardon me.  Will you indulge me for a

25 moment?  I --

1          THE COURT:  I will, and I'll note for the record,

2     this is now a third attorney from Ms. Biros that has spoken at

3     this hearing today, which again underscores my problem with the

4     fact that this is being over lawyered and overmanaged.

5          MR. OTTO:  I understand that, Your Honor, and I

6     apologize for that, but if I -- if you'll indulge me for a

7     moment, I just want to bring a couple things to your attention.

8     First of all, in Ms. Snyder's 341 Hearing for her own

9     Bankruptcy Court, she has no assets, no hard assets.  She has

10    claims to different -- but she has no hard assets.  She has no

11    income.  She has no visible means of support.

12         She now has a 63,500 -- presumably she's going to get

13    enough money to close on the loan.  She has no way to pay that

14    loan, and so she would be in immediate default and USAAG would

15    have the right to come in and take it over.  Your order

16    required a full disclosure of all parties associated with it.

17    Nobody from USAAG is here.  Their mailing address is a drop box

18    in a small town in Connecticut.  We have not been able to find

19    them as an incorporated entity in any of the 50 states.

20    They're not authorized to do business in the Commonwealth of

21    Pennsylvania.

22         So, we have every reason to believe that the real

23    bidder here is not Shanni Snyder, but rather USAAG, and while

24    you can certainly make a decision to award it to Shanni Snyder,

25    what's going on is not necessarily a sale to Shanni Snyder,

1  ultimately.

2        And, in addition, Mr. Joyce has done a very good job

3  of dancing around the facts, but in point of fact, I've been

4  dealing with the Snyder family for five years in this case.  It

5  has not been a pleasant experience.  My client has expended a

6  tremendous amount in both my fees and Mr. Bernstein's firm's

7  fees.  The long and the short of it is, Mr. Roth has admitted

8  in open court that he hasn't been paid a dime for his service

9  to U LOCK.  If Shanni Snyder has no way to pay Mr. Joyce, then

10 he's either working for free, or he's being paid by somebody

11 else.  He doesn't have to disclose who he is being paid for,

12 and that's not a requirement, but the long and the short of it

13 is, this whole exercise is an exercise intended to force Ms.

14 Biros to continue to defend her property, and that makes this

15 bad faith, if not -- if not in strict construct to the

16 Bankruptcy Code, certainly in terms of reality.

17        MR. JOYCE:  Your Honor, may I reply?

18        MR. OTTO:  Thank you for your patience, Your Honor.

19        THE COURT:  Just a second.  I want to pull up the

20 verification.

21                    (Pause)

22        THE COURT:  All right.  Mr. Joyce?

23        MR. JOYCE:  Mr. Otto's statement on conjecture, the

24 funds are in my escrow account at my firm to consummate this

25 sale.  She has a loan with USAAG.  It has -- we have a note and

1  she has terms of that -- of that note that she's got to deal

2  with, but that's her private business, but you know if the

3  Court wanted more information on that, we could give the Court

4  more information on that, but --

5           THE COURT:  Well, who is USAAG?

6           MR. JOYCE:  USAAG is an investment company.  They are

7  -- I can -- I have -- I have a verified, certified under

8  penalty of perjury, certified statement from them if necessary

9  for the Court that I can provide the Court about them.  I can

10  summarize.  Mr. Rick Bowen is the Chief Financial Officer of

11  USAAG.  They maintain offices in Connecticut.  They have no

12  ownership interest in U LOCK.  They don't own stock in U LOCK,

13  and they don't -- they're not a creditor of U LOCK.  They don't

14  have any business activity with U LOCK other than, as the Court

15  knows, at one point they were interested in financing the

16  Chapter 11 and have an interest in developing the property, but

17  they don't have any relationship or affiliation with Ms.

18  Snyder, other than now Debtor-Creditor, or any of the other

19  parties here.

20           And then, you know, they learned about this property

21  back in 2008 from another -- 2018, I'm sorry.  I mean, I can

22  provide this to the Court, but it -- it addresses who they are,

23  and we also have a copy of the redacted note.  I don't want to

24  put the dollar amount in there because I don't want anybody to

25  know how much he had available for bidding, but I mean I think

1  we're -- this goes back to the Court's initial comment, there's

2  nothing colorable here.  This is Mr. Otto raising conjecture,

3  and he has no evidence to the other.  I feel like I'm defending

4  against something that he hasn't, you know, attacked with any

5  concrete evidence.  I'm defending a negative.

6          MR. OTTO:  Your Honor, just advise Your Honor --

7          MR. JOYCE:  I can provide to the Court, Your Honor,

8  under, you know, penalty of perjury, Mr. Rick Bowen, the CFO's

9  statement, for the record.

10         THE COURT:  All right.  Mr. Otto?

11         MR. OTTO:  Your Honor, Mr. Joyce has said they're an

12  investment company.  Where are they?  Number one, why -- are

13  they incorporated anywhere?  Is it a fictitious name?  Are they

14  --

15         THE COURT:  What difference does it make?

16         MR. OTTO:  Because, Your Honor, this is a sham for

17  them not to show up in Court.  We don't know who USAAG is and

18  the fact of the matter is --

19         THE COURT:  Well --

20         MR. OTTO:  -- the way it's set up --

21         THE COURT:  -- if she got the money, though, from a

22  family member, it would be the same question I would have, is

23  what difference does it make?  How is it altering the bidding

24  process here?

25         MR. OTTO:  It would be nice to know who the real

1  parties in interest are, Your Honor, your order requires it.

2          MR. JOYCE:  The real party in interest is Ms. Shanni

3  Snyder, sitting right here, Your Honor.  And lenders, I

4  believe, don't even have to register in the State of

5  Pennsylvania if they're going to do lending.  I've dealt with

6  that issue in the past.  It's not -- I think Mr. Otto may be a

7  little bit off on that, but --

8          THE COURT:  I mean, the bottom line is, again, I have

9  concerns about how the involuntary petition was orchestrated

10 from the beginning, but as to this auction process, it's been

11 exposed to full and fair bidding.  We had the opportunity to

12 have other parties come in.  Your client had the opportunity to

13 bid.  Ms. Snyder had the opportunity to bid.  We exposed the

14 property.  I'm not seeing any collusion or something else that

15 would render this to be a not a good faith bidder based on

16 what's being proposed at this point.  You know, this is -- this

17 is an issue of understanding better more of where the funding

18 is coming from.  I've got disclosures on that, but a lot of

19 that's an issue for her case, as well.  So, I just -- I

20 struggle to see a there there, again.  So, anything else that

21 the parties want to raise at this point?

22                    (No audible response)

23         THE COURT:  All right.  I'm going to make some

24 additional findings for the record here.  First is -- I have an

25 objection from U LOCK that I indicated before that I wanted to

1   address, and I am finding that U LOCK does not have standing to

2   object to the sale process.

3          Standing in bankruptcy cases is narrower than an

4   Article III standing, and to have standing to object to a

5   Court's order a person must have, quote, a pecuniary interest

6   in the outcome of the bankruptcy proceedings; end quote.

7   That's from In re Cult Awareness Network, Inc. 151 F.3d 605,

8   Page 607 (7th Cir. 1998).  Quote, only if a Chapter 7 Debtor's

9   assets are greater than necessary to pay the claims of

10  Creditors so that a Debtor has a reasonable chance of being

11  paid the surplus, will the Debtor have standing to object to

12  the State's administration?  That's from In re Adams, 424 B.R.

13  434, Page 436, a Bankruptcy decision from the Northern District

14  of Illinois in 2010; also In re 60 East 80th Street Equities,

15  Inc., 218 F.3rd 109, Pages 115 to 16, which is a 2nd Circuit

16  Decision from 2000.

17         To qualify, a Debtor's pecuniary interest in a

18  potential surplus must be non-speculative, non-contingent, and

19  a direct benefit.  That's from Friedberg v. Neier, 634 F. App'x

20  333, at Page 335, a 2nd Circuit decision from 2016.

21         In the present case there were substantial claims

22  against the Debtor.  The Debtor has scheduled claims totaling

23  approximately $912,060, and to date claims totaling $787,742

24  have been filed.  Included in this amount is a secured claim

25  asserted by Shanni Snyder in the amount of $263,100.

1   The Government claims bar date will not expire or

2   -- I'm sorry -- just expired yesterday, and administrative

3   claims are also accruing.  And to the extent that Biros is the

4   owner of property, she arguably has some claim for rent, as

5   well.  In contrast, the Debtor's assets appear to be minimal.

6   Debtor scheduled about $1800 in cash, which the Court

7   understands has increased insubstantially from some post-

8   petition rental payments, and the Debtor scheduled equipment

9   with an estimated value of roughly $20,000.  The ownership of

10  which has been disputed.

11  And, as an aside, I know yet again that Glenn Mowry

12  received notice of the sale with the exhibit identifying the

13  Trustee's intent to sell the disputed equipment, and has not

14  filed an objection or otherwise appeared in this Court.

15  Other Tangible Assets were simply given a de minimis

16  scrap value estimate, and the Intangible Assets have been

17  exposed to the market, and have generated two bids from already

18  interested parties far below the claims filed in this case.

19  So, this is true regardless of how the Court ultimately values

20  the various non-cash aspects of the bids.

21  So, based on those numbers, the Estate is willfully

22  insolvent, and to the extent that U LOCK asserts that the sale

23  price for the Intangible Assets is insufficient.  The Debtor's

24  argument appears premised on its belief that the development

25  rights to the real Estate, which the Debtor does not presently

1  own, is worth approximately 1.9 million.  And in order to

2  realize that benefit, an avoidance action would need to be

3  successfully brought against Ms. Biros, but the Estate lacks

4  funding to enable the Trustee to pursue this claim, and the

5  Debtor would have the same problem if granted derivative

6  standing.  And, even if there was, the claim appears

7  speculative, so there's no guarantee of any recovery for the

8  Estate.

9       Ultimately, we'll see what happens, but so far the

10  bids for this cause of action are not particularly high, which

11  is perhaps telling.  And assuming the property could be

12  recovered, there would still be sizeable impediments to

13  realizing the full developmental value.

14       First off, the Estate would suffer the administrative

15  cost of bringing the action to a final judgment, and the Court

16  is dubious of the Debtor's assertion that it could be done on

17  summary judgment, and it seems likely that whatever the outcome

18  the parties would insist on exhausting all appeals before the

19  judgment would become final.

20       And, second, a consequence of bringing real property

21  into the Estate would be that the pre-petition environmental

22  claims against U LOCK would become secured priority claims that

23  would need to be paid in full.  Again, there is no money in the

24  Estate to perform that remediation.  It is difficult to imagine

25  the Estate could receive a full developmental value when there

1 are presently environmental liabilities totaling over

2 $400,000, and according to the Debtor, the book value of the

3 property is only $325,000, which again is far below the

4 outstanding claims in the case.  So, in sum, I find that the

5 Debtor lacks standing to object to the sale.

6        With respect to the buyer's request for a $100,000

7 credit against the remediation bond, it was argued by Ms.

8 Snyder that those assumption of liabilities have no value to

9 the Estate and in support she supports -- she points to the

10 American Geoscience, Inc. Report, attached to Biros' proof of

11 claim Number 4, which is dated January 24, 2020, indicating

12 prior releases of hazardous substances or petroleum products

13 with a remediation cost estimate of $414,500.

14        A second report dated September 23rd, 2022 listing

15 the cost to remediate the soil contamination attributable to a

16 May 23rd, 2022 garbage truck fire is between 250 and $300,000.

17 Shanni Snyder thus contends that the environmental conditions

18 referenced in the second report were already in existence prior

19 to the June 17, 2022 order for relief, and as such they are

20 pre-petition claims.  Even liabilities from the May 23rd, 2022

21 garbage truck fire would seem to be a gap claim incurred not in

22 the ordinary course of business.

23        So, the Court finds that those observations are

24 compelling and support the reason for excluding the assumption

25 of the environmental liabilities and remediation bond is not

1  providing any actual value to the Estate and therefore no

2  attribution was given to that in the computation of the bids.

3        With respect to the waiver of the $10,000 rent claim,

4  I'll add onto the comments I made in Court earlier.  While it's

5  true that there is no written lease setting forth an amount for

6  the rent, it is equally true that the Estate has possession of

7  the property for the last seven months, and there's no question

8  that the Debtor's assets have remained on the property.

9  Admittedly, Biros has granted limited stay relief to begin

10 certain environmental remediation efforts and to secure the

11 property, but she has been repeatedly denied unfettered

12 control.

13       As such, Biros would be entitled to administrative

14 expense for her contribution to the preservation of the Estate,

15 and with that in mind, $10,000 credit would work out to, as I

16 indicated before, about $1500 a month, and for that purposes of

17 that estimation, I have no trouble concluding that the rent

18 waiver component of Biros' bid has some value, but anything

19 beyond that is difficult to quantify without a detailed record,

20 and already exceeds the scope of what we are looking at here

21 today in terms of the bid increments.

22       I think that covers the supplemental findings I'm

23 going to make at this point.  I will take another look at the

24 sale order once it's submitted and be prepared to view that by

25 the end of business tomorrow.  The expectation would be still

1  that closing would occur within ten days as indicated by the

2  Court's prior order scheduling the bid procedures in the

3  initial sale hearing.  With that, is there anything else the

4  parties wish to raise at this point?

5         MS. WENRICH:  Your Honor, I have a question just with

6  regard to procedure with the sale order.  Is that something

7  that you want us involved in, or is that reserved for --

8         THE COURT:  I would like the Trustee to circulate the

9  sale order to both bidders.  To the extent that there is a

10  consensus on the sale order, you can submit it.  I'm not going

11  to hold my breath.  And, so we will deal with what we did

12  before, which is if the parties can submit to me the order that

13  contains all the language that they agree to and then provide a

14  supplement of those provisions that are being challenged, and

15  then I will make a decision based on reviewing both the point,

16  counterpoint to which provisions I find are necessary to

17  include in the sale order.  So, again, similar to what I did

18  before when I granted the initial stay relief at the beginning

19  of the case.

20         MS. WENRICH:  Understood.  Thank you, Your Honor.

21         THE COURT:  All right, anything else?

22                (No audible response)

23         THE COURT:  Okay.  Well, then I think that concludes

24  the matters presently set before the Court today.  The Court

25  will stand adjourned, and I will wait to receive the proposed

1 sale order, and we will move on from there.  Thank you.

2             MR. JOYCE:  Your Honor, thank you.

3             UNIDENTIFIED SPEAKER:  Thank you, Judge.

4                        * * * * *

5             **C E R T I F I C A T I O N**

6             I, WENDY ANTOSIEWICZ, court approved transcribers,

7 certify that the foregoing is a correct transcript from the

8 official electronic sound recording of the proceedings in the

9 above-entitled matter, and to the best of our ability.

10

11 /s/ Wendy Antosiewicz

12 WENDY ANTOSIEWICZ

13 J&J COURT TRANSCRIBERS, INC.        DATE:  December 28, 2022

14

15

16

17

18

19

20

21

22

23

24

25