FILED
2/1/23 4:24 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .     Case No. 22-20823-GLT
                                .
                                .
U LOCK INC,                     .     5414 U.S. Steel Tower
                                .     600 Grant Street
                                .     Pittsburgh, PA 15219
            Debtor.             .
                                .     January 27, 2023
. . . . . . . . . . . . ..            10:00 a.m.


TRANSCRIPT OF #249 AND #278 HEARING ON ORDER TO SHOW CAUSE:
# 230 - AFFIDAVIT FILED BY SHANNI SNYDER; #231 - AFFIDAVIT
FILED BY CHRISTINE BIROS; #233 - DECLARATION OF GEORGE SNYDER;
#234 - SUPPLEMENTAL DECLARATION OF GEORGE SNYDER; #235 -
DECLARATION OF GEORGE SNYDER; #236 – STATUS REPORT FILED BY
CHRISTINE BIROS; #294 HEARING ON ORDER TO SHOW CAUSE: #258
APPLICATION FOR ADMINISTRATIVE EXPENSES FILED BY
CREDITOR CHRISTINE BIROS; #228 STIPULATION BY SHANNI SNYDER AND
BETWEEN CHARLES O. ZEBLEY, JR., CHAPTER 7 TRUSTEE, AND
ROBERT H. SLONE, CHAPTER 7 TRUSTEE; #255 MOTION FOR RELIEF FROM
STAY FILED BY CHRISTINE BIROS; #274 MOTION TO ENFORCE ORDER
CONFIRMING SALE OF TANGIBLE AND INTANGIBLE PERSONAL PROPERTY OF
THE ESTATE UNDER 11 U.S.C. SECTION 363(F) FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES FILED BY SHANNI SNYDER
BEFORE HONORABLE GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          Law Office of J. Allen Roth
                         By:  J. ALLEN ROTH, ESQ.
                         805 S Alexandria Street
                         Latrobe, PA 15650



ECRO:                    Hayley Smith


 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609) 586-2311      Fax No. (609) 587-3599

APPEARANCES (Cont'd):

For Shanni Snyder,          Grenen & Birsic, P.C.
Petitioning Creditor:       By:  JOHN B. JOYCE, ESQ.
                                 JEREMY J. KOBESKI, ESQ.
                            One Gateway Center, Suite 9W
                            Pittsburgh, PA 15222

For Christine Biros:        Bernstein-Burkley, P.C.
                            By:  ROBERT S. BERNSTEIN, ESQ.
                                 LARA S. MARTIN, ESQ.
                            601 Grant Street, 9th Floor
                            Pittsburgh, PA 15219

For Christine Biros,        The Law Firm of William E. Otto
Lead Counsel in the         By:  WILLIAM E. OTTO, ESQ.
State Court Action:         4027 Old William Penn Highway
                            P.O. Box 701
                            Murrysville, PA 15668

TELEPHONIC APPEARANCES:

Chapter 7 Trustee:          Mahady & Mahady
                            By:  ROBERT H. SLONE, ESQ.
                            223 South Maple Avenue
                            Greensburg, PA 15601

Chapter 7 Trustee in        Zebley Mehalov & White, P.C.
Shanni Snyder case:         By:  CHARLES O. ZEBLEY, ESQ.
                            18 Mill Street Square
                            P.O. Box 2124
                            Uniontown, PA 15401


                            - - -

# I N D E X

| | PAGE |
|---|---|
| **WITNESS STATEMENTS** | |
| GEORGE SNYDER | 73 |
| ROBERT SLONE | 75 |
| WILLIAM OTTO | 82 |
| CHRISTINE BIROS | 84 |

| **EXHIBITS** | **ID.** | **EVD.** |
|---|---|---|
| 1 through 7 | 89 | 92 |

**WWW.JJCOURT.COM**

1          ECRO:  The Court may now come to order.  The

2     Honorable Gregory L. Taddonio presiding.

3          THE COURT:  All right.  Good morning, again,

4     everyone.  This is the United States Bankruptcy Court for the

5     Western District of Pennsylvania, and this is the time set for

6     the hearing on Case Number 22-20823, U LOCK INC.

7          I'll begin by taking appearances here in the

8     courtroom.  Start over here.

9          MR. ROTH:  Allen Roth on behalf of U LOCK.

10         THE COURT:  All right.  Good morning.

11         MR. SNYDER:  George Snyder.

12         THE COURT:  All right.  Good morning.

13         MR. JOYCE:  Good morning, Your Honor, John Joyce on

14    behalf of Ms. Shanni Snyder, and Ms. Snyder is present here in

15    the courtroom today.

16         MR. KOBESKI:  And good morning, Your Honor.  Jeremy

17    Kobeski as co-counsel with Mr. Joyce.

18         THE COURT:  All right.  Good morning.

19         MR. BERNSTEIN:  Good morning, Your Honor.  Robert

20    Bernstein, Bernstein-Burkley, on behalf of Christine Biros.

21    With me, attorney Martin.

22         THE COURT:  Okay.  Good morning.

23         MR. OTTO:  William Otto, counsel for Christine Biros.

24         THE COURT:  All right.  Good morning.

25         MR. BERNSTEIN:  And, Your Honor, Christine Biros is

1 | here in the courtroom.

2 |    THE COURT:  All right.  Good morning.

3 |    All right.  That covers all the appearances here in

4 | the courtroom.  I'll take any additional appearances by Zoom.

5 |    MR. SLONE:  Robert Slone for the Chapter 7 Trustee,

6 | Your Honor.

7 |    THE COURT:  All right.  Good morning.

8 |    MR. ZEBLEY:  Charles Zebley.  I'm Trustee in the

9 | Shanni Snyder case.  Your Honor, I'm having trouble getting my

10 | video to work.  I don't know if it's working for you, but I may

11 | leave and re-enter the meeting.

12 |    THE COURT:  All right.  Well, I'll note your

13 | appearance, and if you want to sort that out, you can do so

14 | during the context of the hearing.

15 |    All right.  Any other appearances?

16 |       (No audible response)

17 |    THE COURT:  All right.  We have several matters set

18 | for the Court today.  I've got two Orders to Show Cause.  I

19 | have a Proposed Stipulation between Shanni Snyder and the two

20 | Chapter 7 Trustees involved in these cases.  I have a Motion

21 | for Stay Relief filed by Christine Biros, and I have a Motion

22 | to Enforce Sale Order filed by Shanni Snyder.

23 |    Before I begin, I thought it would be helpful to add

24 | some preliminary comments for the parties and give you a road

25 | map of where I intend to proceed and how I intend to proceed

6

1  here today.  As you are all aware, sale of substantially all of

2  the Debtor's assets occurred, and it was reported to me that

3  that sale closed on December 28th, and the Bankruptcy Estate

4  received approximately $70,000 from that sale.

5       So, we are now entering a new phase for this case,

6  and so I want to set the table at this point as to what my

7  expectations are going forward so there can be no question and

8  no doubt in anyone's mind of what the expectations are going

9  forward.  At the outset of this case, it was apparent that

10 after years of State Court litigation, all of you had built an

11 extreme level of animosity and bitterness towards each other

12 and, unfortunately, that continued to spill over in this

13 bankruptcy case.

14      And a pattern has developed where consensus,

15 reasonableness and perspective was lost, and every minute issue

16 or detail was vigorously contested.  Each party claiming to be

17 the victim of the other party's actions and some of it was

18 justified, some of it seemingly not.  And during this time, it

19 seems that each side has been trying to play the -- trying to

20 game the system with what the Court has perceived as "gotcha,"

21 legal arguments and strategies that may have crossed the line

22 over permissive conduct.

23      And while it is expected that sometimes the parties

24 will be emotionally carried away with their cases, it is up to

25 the attorneys to be the tempering and calming influence,

1  zealously representing their clients, but mindful as their role

2  as officers of the Court and subject to the rules of this Court

3  and the rules of professional conduct, they are held to a high

4  standard of conduct and doing so within the bounds of

5  professionalism, civility and the rule of law.  And despite the

6  Court's repeated admonitions and warnings, this activity has

7  not stopped, and to the contrary the litigation has

8  proliferated, and the arguments are becoming far more

9  irrelevant and tenuous.

10         And as I reflect back on the past six months of this

11 case, I question how we reached this point.  And as a judge, I

12 think you've found that I am not an excitable person,

13 and though through trying cases and hearings, and believe me

14 this one does qualify under that category, I try to maintain my

15 temperament with the parties.  And I'm not one to yell, scream

16 or raise my voice, but perhaps in not doing so, the parties

17 have gotten the wrong message, and, well, we are clearing that

18 up today.

19         I trust that you've all seen my Memorandum Opinion

20 from last week.  And the takeaway I'd like you to all have is

21 that my patience with this case has been exhausted.  And

22 Bankruptcy Rule 9011 is very much in play going forward.  And,

23 put simply, I'm done with the animosity.  I'm done with the

24 senseless vitriol, I'm done with the irrational tactics and I'm

25 done with the vexatious litigation.  And lest there be any

1  confusion, I'm talking to all parties here.  No one is being

2  singled out.  In the Court's view, there are no white hats in

3  this case, and make no mistake about it, I am completely done

4  with this nonsense.  Done.  And there will be consequences.

5          All right.  There are several matters pending before

6  the Court this morning.  And, historically, as you're all

7  well-aware, this case has had hearings that have been

8  needlessly long for three reasons.  First, a substantial part

9  of every hearing has been spent bickering about matters that

10  are tangential to what is before the Court.  And, indeed, even

11  today a number of the objections raised seemingly have little

12  to do with the actual relief requested.  And oral arguments

13  tend to devolve into nothing more than alternating accusations

14  and aspersions, and the parties are so wrapped up in their own

15  perspective that they hear what they want to hear instead of

16  listening to the Court.

17          So, to avoid these problems, I am adopting a

18  different tact for this hearing.  And rather than starting with

19  oral arguments for each matter, I am going to inform the

20  parties of my view, and indicate what I'm inclined to rule and

21  why.  And afterward, the relevant parties will have an

22  opportunity to respond to the Court's comments.  And if you

23  agree with my comments, I caution you to quit while you're

24  ahead, simply state your agreement and sit down.  And if the

25  arguments go in irrelevant directions, you can expect I'm going

1  to shut it down.  I'm going to ask you to move on, or sit down.

2  And the Court will assume that any perceived attacks are

3  disputed, and discourage parties from rising to answer them.

4        So, those are our ground rules for today.  Everyone

5  understand?

6        MS. MARTIN:  Yes, sir.

7        MR. BERNSTEIN:  Yes, Your Honor.

8        MR. OTTO:  Yes.

9        THE COURT:  All right.  The first matter we have is

10  the Stipulation between Shanni Snyder, Trustee Slone and

11  Trustee Zebley.  And this is filed at Docket Number 228.  And

12  the background is that Trustee Zebley has reached an

13  arrangement that was filed in Shanni Snyder's personal

14  bankruptcy case in which he will receive the first 32,500 from

15  the U LOCK Estate distributions and convey standing to Shanni

16  Snyder to pursue any claims that the Estate might have against

17  U LOCK, her personal Estate.

18        The Stipulation, while filed in the case before Judge

19  Bohm is under consideration here because Trustee Slone entered

20  into it for the purpose of binding the U LOCK Estate, and it

21  contains representations addressing the treatment of Shanni

22  Snyder's claim, Claim Number 1-1.  And for the purposes of this

23  Estate, I do note a couple of provisions from there.  Quote,

24  Snyder acknowledges that the judgment claim she filed in the

25  U LOCK case is not secured in tangible and intangible assets of

1 U LOCK.  That's at Paragraphs 16 and 30.  And she did not

2 assert a lien on the assets being sold.

3         So, based on that, what I gather from the Stipulation

4 and the operation that we've used going through the sale

5 process is that Shanni Snyder has an unsecured claim, and that

6 was an alleged claim under Section 28 U.S.C. 3201.  At that

7 time the judgment was filed, U LOCK did not have title to the

8 real property.  And the sole response and objection to the

9 Stipulation I received was from Christine Biros.  She contends

10 that Shanni's claim against U LOCK is fraudulent and avoidable.

11 But I would note that in the eight plus months or so that this

12 case is active, no one has sought to object to Shanni Snyder's

13 claim.

14         And so as the parties are aware, I'm not sure --

15 well, the lawyers are aware, I'm not sure the parties are

16 aware, that under Section 502(a), the Court's hands are tied.

17 A claim is deemed allowed unless a party in interest objects.

18 So, as to the claim itself, the Court has not been shy about

19 expressing its concerns about the nature of the claim, but at

20 this point, no one has filed an objection to it.  So, that's

21 where we are at this point.

22         So, I am prepared, given that this Stipulation

23 cleared the way for some of the issues that were potentially

24 going to arise in the Sale Hearing, to approve the Stipulation

25 with a reservation of rights.  First off, that it makes no

1  findings here that are binding on Judge Bohm or Shanni Snyder's

2  personal bankruptcy estate.  And, as an aside, I just want to

3  tell the parties, I am considering whether I should ask Judge

4  Bohm to transfer that case to me rather than have another Judge

5  get up to speed on the facts and circumstances of this case.

6        But, secondly, that approving the Stipulation would

7  not make any findings as to the propriety of Shanni's claim

8  against U LOCK, other than notwithstanding its designation as

9  secure that the claim will be treated as a general unsecured

10 claim in this bankruptcy case.  And, further, approval of a

11 Stipulation is without prejudice to any other rights, claims or

12 defenses to the Shanni Snyder claim.

13       So, based on that, I'll start with the objecting

14 party, Christine Biros, and ask if there is any issue with the

15 Court approving the Stipulation with those reservations?

16       MR. BERNSTEIN:  Thank you, Your Honor.  It's

17 important to us that this does not determine the validity of

18 the claim.  And I heard -- I'm pretty sure I heard Your Honor

19 say there's no finding as to the propriety of the claim.  Just

20 note for the Court that we have wanted to file an objection,

21 and we've hesitated because it's alleged that that claim is

22 property of the Shanni Snyder Estate.

23       We have a Motion pending before Judge Bohm to lift

24 the Stay to the extent the Stay would apply to that and allow

25 us to object to that claim here.  We expect before the hearing,

12

1   the continued hearing on that on February 22nd, to have a

2   Stipulation with Trustee Zebley or an agreement with Trustee

3   Zebley that will allow that to go forward.  But that's an

4   explanation as to why, although we've maintained since the

5   beginning that the claim shouldn't be here, we have not filed

6   an objection because we didn't want to risk creating another

7   argument about the Stay.

8           THE COURT:  Okay.

9           MR. BERNSTEIN:  With the Court's comments then, we

10  would have no objection to the approval of the Stipulation.

11          THE COURT:  All right.  Thank you.

12          All right, Mr. Joyce, anything further from you?

13          MR. JOYCE:  Just a scrivener's error, Your Honor,

14  that I want to point out in the Stipulation so that everybody

15  is aware.  Beginning in Paragraph 24, the Stipulation that was

16  reached with Mr. Zebley when we cut and pasted over into here,

17  the word "Debtor" in Paragraph 24, the capitalized term Debtor,

18  I don't want that to be confused with the U LOCK Debtor.

19  That's the Snyder Debtor in her bankruptcy and that --

20  unfortunately, that scrivener's error carries over into

21  Paragraphs 26, 27, 28 and 29.

22          So, with that notation, I would just note that for

23  the record, and however the Court wants to handle that.  We

24  would be open to addressing it whatever way you feel is

25  appropriate.

1          THE COURT:  I'm satisfied with allowing the colloquy

2   on the Court record to stand as clarification of that.  But

3   that's certainly how I read the Stipulation, was that even

4   though it used the word Debtor it was referring to Shanni

5   Snyder as being the Debtor in her personal bankruptcy case, as

6   opposed to U LOCK.

7          Any issues with that, Mr Bernstein?

8          MR. BERNSTEIN:  No, Your Honor.

9          THE COURT:  All right.  Anything further from the two

10  Trustees with respect to the Stipulation?

11         MR. ZEBLEY:  Your Honor, Charles Zebley.  Nothing to

12  add.  I'm agreeable with what you proposed.

13         MR. SLONE:  Robert Slone.  I'm agreeable, Your Honor.

14         THE COURT:  All right.  Thank you.

15         All right.  Then I will approve the Stipulation with

16  those caveats.

17         All right.  The next matter on the agenda is the

18  Motion for Stay Relief.  And this is the Motion for Relief from

19  the Automatic Stay filed by Ms. Biros at Docket Number 255, and

20  I have objections filed by Shanni Snyder and George Snyder at

21  Docket -- it's Number 284 and 292.

22         So, my preliminary findings with respect to that

23  Motion is as follows.  While some of the allegations of the

24  Motion are questionable, particularly the Estate's continued

25  usage, is causing trash to accumulate or the real estate to

14

depreciate in value which, by the way would seemingly cut
against claims made in other Motions.  Ms. Biros's entitlement
to Stay Relief would seem to be an easy call.

The Estate has remained in possession of the property
inasmuch as the tangible assets were, or they should have been
stored there pending their sale.  The Trustee also continued to
minimally operate the storage facility by collecting storage
fees and at this point the tangible assets have been sold and
are no longer the Estate's concern.  And the tenants have been
instructed to remove their property.

Moreover, Biros has not received any rental or
adequate protection payments from the Estate, and given its
limited resources, it does not have the financial wherewithal
to pay taxes or maintain insurance.  Accordingly, there is
cause for Stay Relief under 362(d)(1).  And, in addition, the
Court recognizes and acknowledges the State Court Orders which
determine that Biros is the owner of the real property.
Accordingly, U LOCK has no equity in the property, and given
that this is a Chapter 7 case, it is not necessary for a
reorganization.  So, relief under Section 362(d)(2) would also
seem to be appropriate.

Put simply, the Estate no longer has any need of the
property so there's no reason to prevent Ms. Biros from taking
full exclusive possession consistent with her rights as its
owner.

1        As far as the objections, they seemingly ignore the

2  Estate's current lack of interest in or need for the property

3  and, instead, raise grievances about Ms. Biros's past conduct

4  and what she may do in the future.  And whether Ms. Biros has

5  violated Stay, or this Court's Orders, in the past has nothing

6  to do with whether Stay Relief should be granted today.  Nor

7  does granting Stay Relief prevent this Court or Judge Bohm from

8  addressing those matters in an appropriate procedural posture.

9  And to the extent that there is any question on that, I will

10  make that part of my findings here today.

11        Furthermore, granting Stay Relief does not

12  resuscitate the State Court's June 28, 2022 Order -- I'm sorry

13  -- the May 2022 Order which I previously found to have been

14  entered while the Stay was in effect.  Any amorphous concerns

15  about inappropriate actions Ms. Biros might undertake in the

16  future is not a basis to deny her Stay Relief today.

17  Similarly, if and when those concerns materialize into

18  something concrete that is within the Court's jurisdiction,

19  then it can be addressed through the appropriate procedural

20  mechanism.

21        Rest assured, while the Court is anxious to conclude

22  the administration of this Estate, it will retain jurisdiction

23  to address some of the conduct which has occurred in this case.

24  So, although the Court will expand upon this point later in the

25  context of the Motion to Enforce the Sale Order, Ms. Snyder's

16

1   acquisition of the Estate's rights to bring speculative

2   avoidance actions, which have yet to be filed, is not a basis

3   to prevent Ms. Biros from taking any and all actions consistent

4   with her rights as the property's owner.  Nor does the grant of

5   Stay Relief to Biros cut off Bankruptcy Court jurisdiction for

6   any claims Ms. Snyder allegedly acquired from the U LOCK

7   Estate.

8        To the extent that Ms. Snyder (sic) raises concerns

9   about the destruction or conversion of -- I'm sorry -- to the

10  extent George Snyder raises concerns about destruction or

11  conversion of his personal property, that would appear to be a

12  third-party dispute that can be resolved in another forum.

13       And, in addition, Shanni Snyder purchased whatever

14  rights U LOCK had to the assets on the property, and at 30 days

15  following the sale to remove them from their current locations.

16  And to the extent tenants have a Cause of Action against Biros

17  for restricting them from the property, that remains an option

18  in a viable forum, but it does not justify a denial of Stay

19  Relief under these circumstances.

20       To the extent Mr. Snyder asserts that there are

21  U LOCK business records at the property, those do need to be

22  turned over to the Trustee, and that shouldn't be complicated

23  to arrange.  Either Ms. Biros can collect them and turn them

24  over to Mr. Slone, or Mr. Slone can go there and get them

25  himself.

1          But, in short, the Estate's use of the property is

2    not indefinite, and the time has now passed.  And so, for these

3    reasons, the Court is inclined to grant Stay Relief to Ms.

4    Biros subject to the release of the Debtor's business records

5    to Trustee Slone for the purpose of completing the Estate's tax

6    returns.

7          So, with that, I'll turn to the objecting parties to

8    tell me why that is not an appropriate finding with respect to

9    the Motion for Stay Relief.  So, I'll start with Mr. Joyce.

10          MR. JOYCE:  Kobeski will cover this.

11          THE COURT:  Kobeski.

12          MR. KOBESKI:  Your Honor, we're in agreement with

13   Your Honor's findings.  And we have no objection to what you've

14   proposed in regards to ruling on that Motion.

15          THE COURT:  Okay.  Thank you.

16          Mr. Snyder, you filed a response?

17          MR. SNYDER:  Yes.  A couple things.  I agree with you

18   for the most part.  My objection was some of the tenants that

19   needed to get their things.  One tenant is current still and

20   another tenant was only given nine days to get out.

21          The other thing I wanted to point out with the

22   business records there, there may not be a need for the

23   transfer.  I had access while they were working there.  The

24   place that the business records were, there was some -- we

25   recovered two boxes.  There was four boxes of flashdrives and

1 some files missing.  In the event, once we leave, they would

2 find something there that we overlooked, then if those could be

3 returned to us.

4          THE COURT:  Okay.  Thank you.

5          Mr. Bernstein, the business records -- you and your

6 client are consenting to turn those over to the extent that

7 they are still on the property at this point?

8          MR. BERNSTEIN:  Yes, Your Honor.  We have no

9 knowledge of business records, but we'll certainly cooperate

10 with the Trustee.  Our understanding is that at the end of the

11 day today, there is no reason for anybody, other than the

12 Trustee, to be on that property.  I'm a little bit concerned

13 that Mr. Snyder has talked about he took some records, but he

14 didn't take all the records.  It's confusing, but we will

15 cooperate with the Trustee.  When we go to the property later

16 today, presumably after the Court enters its Order, we will

17 explore whether we find any records, but we will certainly

18 cooperate with the Trustee if he wants to come and look for

19 records.

20          THE COURT:  All right.  Thank you.

21          MR. SNYDER:  I can maybe clear that up.

22          THE COURT:  What's that?

23          MR. SNYDER:  I can maybe clear that up.

24          THE COURT:  All right.

25          MR. SNYDER:  I don't believe there are any more

1  records there.  I don't think I have any need to get back on

2  the property.

3          THE COURT:  All right.  So, there are no further

4  records?  You have what you need to prepare the tax returns

5  then?

6          MR. SNYDER:  Well, there are some missing, but the

7  file drawers are empty, so I don't feel that they're anywhere

8  else on the property.

9          THE COURT:  Okay.  All right.  And, Mr. Slone, is

10  there anything further you wanted to address with respect to

11  the records or anything related to the Stay Relief Motion?

12          MR. SLONE:  No, sir.  I think it should be entered.

13          THE COURT:  All right.  Thank you.

14          All right.  Well, then, with the statements made on

15  the record and incorporating the Court's findings that I

16  indicated on a tentative basis, I will incorporate that into a

17  final ruling and grant Stay Relief for the reasons I've stated

18  on the record here today.

19          MR. BERNSTEIN:  I'm sorry, Your Honor, one question.

20  Does the Court have an intention with respect to when that is

21  effective because we are coming into the weekend and we want to

22  make sure that we begin to protect the property, get insurance

23  et cetera?

24          THE COURT:  I know that there was a request to waive

25  the 14-day period.  I didn't see anyone in the objections raise

1  an issue specifically to that, but given the passage of time

2  and also mindful of the fact that this Stay Relief Motion was

3  scheduled for a hearing last week and I pushed it to this week

4  to make it consistent, I have no issue waiving the 14-day Stay

5  and having the Order effective when it's entered today.

6          MR. JOYCE:  Your Honor, just for clarification, if I

7  may.  Ms. Snyder, under the Court's prior Order approving the

8  sale, has through today to remove all property, and she has

9  removed substantially everything she's purchased.  The only

10 thing she has is some dumpsters that she had to rent to put on

11 the site.  So, they're there today.  So, I just would note for

12 the Court, I believe she's permitted, pursuant to the Court's

13 prior Order, to complete her removal activities through today.

14         THE COURT:  Okay.

15         MR. BERNSTEIN:  No objection at all to that, Your

16 Honor, through today.

17         THE COURT:  All right.  Thank you.

18         MR. SNYDER:  Am I allowed to remove my -- I left two

19 trailers down there I was going to remove today.

20         THE COURT:  That's a separate issue between you and

21 Ms. Biros as to your personal property at this point.  As I

22 told you before, I'm concerned about where we are with the

23 Estate assets at this point.  Okay?

24         MR. SNYDER:  Because I could have those out by five

25 o'clock today if you would allow.

21

1          THE COURT:  Well, again, I indicated before, Ms.

2   Snyder ostensibly bought whatever rights and interest the

3   Estate had in the property.  If that's inclusive of what you

4   might make a claim for, then that can be resolved that way.

5          But let me ask a clarifying question.  So, the

6   property that was on the third-party site in McKeesport, has

7   that been removed?

8          MS. SNYDER:  That's been removed.

9          MR. JACKSON:  There's one excavator I have to move

10  today.

11         THE COURT:  I'm sorry, is that --

12         MR. JOYCE:  Sir, if you may?  That's fine.  That is

13  Mr. Nicholas Jackson.  He was a contractor that Ms. Snyder

14  engaged to remove the property from both locations?

15         MS. SNYDER:  Yes.

16         MR. JOYCE:  Both locations, as well as another

17  contractor.  Mr. Jackson was able to do that, his part of the

18  job, but we were advised this morning that the one excavator

19  that had the tracks removed, if the Court remembers, down on

20  the McKeesport property, that is still on the Biros property.

21  So, Mr. Jackson is indicating that that's still there, but will

22  be removed today?

23         MR. JACKSON:  Yes.

24         MR. JOYCE:  So, yes.  The Court's question, I think,

25  was, is everything removed from the Biros/McKeesport property?

22

1  And the answer is, yes, all but what I just said.

2             THE COURT:  All right.

3             MR. BERNSTEIN:  And, Your Honor, we have no objection

4  to that effort continuing through today.  We also have no

5  objection to Ms. Snyder taking whatever she thinks she bought

6  off of the U LOCK property.  And we would hope that, perhaps,

7  she and Mr. Snyder could cooperate, and if there are things

8  there that he claims, we don't really care about them.  We

9  would just as soon Ms. Snyder use her purchasing power to

10 remove them for Mr. Snyder today.

11            THE COURT:  Okay.  Does that give you sufficient

12 clarity, Mr. Snyder?

13            MR. SNYDER:  Sounds fair, Your Honor.

14            THE COURT:  All right.  So, today's the day to remove

15 whatever remaining assets exist, and then we move on from

16 there.  So, I think that's a clarification that nothing from

17 the Court's entry of this Stay Relief Order should impede the

18 continuation of the process of removing the assets today, and

19 then tomorrow it's a new set of circumstances.

20            THE COURT:  All right.  Very good.  Let's move

21 forward to the next item, then.  That is Shanni Snyder's Motion

22 to Enforce the Sale Order, which is at Docket Number 274.

23            This is her Motion to Enforce the Order that I

24 entered in December confirming the sale of the tangible and

25 intangible personal property of the Estate under 11 U.S.C.

23

1 Section 363(f), free and clear of all liens, claims and
2 encumbrances.

3       I have a pending objection to that filed by Ms. Biros
4 and, basically, this Motion was triggered by Ms. Biros filing
5 an Action to Quiet Title against Shanni Snyder in the Court of
6 Common Pleas of Westmoreland County.  The State Court action
7 seeks to strike a Lis Pendens filed against the property by Ms.
8 Snyder in April of 2022, and enjoin Ms. Snyder from claiming
9 any adverse right to the property.

10      Ms. Snyder subsequently removed the action to the
11 Bankruptcy Court, and I note that the matter has been docketed
12 as being related to the U LOCK Chapter 7, but I do have a query
13 whether it's more appropriately related to Ms. Snyder's Chapter
14 7 case.  But, again, if both matters are brought before this
15 Court, I don't know that that's a distinction with much of a
16 difference, other than how it's categorized and processed
17 moving forward.  But I'd also note that yesterday, Ms. Biros
18 has moved for entry of a default based on Ms. Snyder's failure
19 to answer or defend.

20      In any event, through the Motion, Ms. Snyder seeks an
21 Order enjoining Ms. Biros from asking for relief against her
22 relating to the property in the State Court.  And in broad
23 strokes, Ms. Biros denies that the Action to Quiet Title
24 violated the Stay and the Sale Order, and objects to the
25 breadth of relief Ms. Snyder requests.  She also contends that

1 this is yet another example of Ms. Snyder's vexatious

2 litigation practices.

3        In the Court's view, the Lis Pendens should be

4 withdrawn with consent.  The initial question is, what rights

5 did Shanni Snyder have as against the property as of April of

6 2022?  And to the extent the State Court ruled that U LOCK

7 never owned the property, Ms. Snyder's judgment against U LOCK

8 could not have attached to the property.  At best, she could

9 have attached to U LOCK's potential right to seek recovery of

10 the property, a right she now owns, but Shanni herself did not

11 acquire such rights until December of 2022.

12        Critically, however, Ms. Snyder acknowledged in

13 Paragraph 30 of the Stipulation that her judgment is not

14 secured by either the tangible or intangible assets of U LOCK,

15 and without any such security, there is no basis for the Lis

16 Pendens.

17        So, for those reasons, I'm inclined to strike that,

18 or authorize that to occur.  Although, procedurally, it's not

19 set before me, but I think in the spirit of turning over a new

20 leaf, that is one area where I think there should be

21 concessions made by the parties to narrow issues.

22        Beyond that, the Court is not yet convinced at this

23 time that Ms. Biros violated the Sale Order or Automatic Stay

24 with respect to the Quiet Title Action.  From the outset,

25 whether Ms. Biros violated Ms. Snyder's Automatic Stay would

1  seem to be an issue for Judge Bohm, but, notably, Ms. Snyder

2  has been discharged, and the case was closed, albeit there is

3  an issue of the undisclosed asset and the reopening of the

4  case.  So, those are issues that would be set before Judge

5  Bohm.

6           With respect to the Sale Order, the fact that Ms.

7  Snyder can, potentially, bring an Avoidance Action against Ms.

8  Biros in this Court would not in and of itself bar Ms. Biros

9  from taking all actions against Ms. Snyder in the State Courts.

10 Although the Court cannot say for certain that Ms. Snyder's

11 Avoidance Action could be brought in the State Courts,

12 primarily because no one has articulated the basis for such a

13 claim with any specificity.

14          Ms. Biros is correct that the permissive language of

15 the Sale Order which says, quote, shall be permitted to bring,

16 end quote, neither bars litigation in any other Court, nor

17 deprives the State Courts of their jurisdiction to hear any

18 other matters.

19          To the extent that the action to Quiet Title fell

20 within the Bankruptcy Court's retained jurisdiction, it was

21 appropriately removed, and Ms. Snyder was not harmed.

22 Ultimately, like many other arguments today, the Motion

23 prioritizes a sideshow rather than advancing the main event.

24          Put differently, why hasn't the alleged Avoidance

25 Action been filed and, frankly, how can Ms. Biros interfere

1  with rights that Ms. Snyder has not yet asserted, and may never

2  assert?  In fairness, the Court appreciates that Ms. Snyder's

3  concern that Ms. Biros would seek to undermine the rights that

4  she acquired from the Estate.

5       The Action to Quiet Title arguably sought to press

6  the issue in a different forum which, in a best case scenario,

7  does nothing but to multiply the litigation.  And although the

8  Court does not think much of the Lis Pendens, the timing of Ms.

9  Biros's Action to Quiet Title so soon after the sale of the

10  intangible assets is not lost on the Court.  But Ms. Snyder can

11  protect herself from these potential issues by commencing her

12  Avoidance Action, and once filed there will be little question

13  about what is before the Court and what actions inappropriately

14  interfered with it.

15       So, for all those reasons, the Court is inclined to

16  deny the Motion to Enforce the Sale Order.  Nevertheless, I do

17  have a question regarding the Quiet Title Action and its

18  reference to a June 28, 2022 State Court Order issued by the

19  Court of Common Pleas that held that, quote, all title held by

20  U LOCK had been in trust for the benefit of Christine Biros.

21       I'm not aware of when that Order was issued.  I'm not

22  aware of whether that Order has ever been referenced in these

23  proceedings.  In my review for today's proceedings, it appeared

24  to be something new, and that leads me to questions as to how

25  it came about and what prompted it.

1           MR. OTTO:  Your Honor --

2           THE COURT:  Well, I'll give you an opportunity.

3   That's ancillary to the Motion at hand on the Motion to Enforce

4   the Sale.

5           So, to the extent I deny this Motion to Enforce the

6   Sale Order, I would do so without prejudice.  And that the

7   Court would inquire further into the circumstances leading to

8   the State Court's entry of the June 28, 2022 Order.

9           So, let's get an explanation on that Order first and

10  then --

11          MR. BERNSTEIN:  Mr. Otto will do it.

12          MR. OTTO:  Your Honor, I have to confess, first of

13  all, I have not gone back and checked all the dates and all the

14  circumstances but, for your information, after the petition was

15  filed, both Shanni Snyder -- Ms. Snyder, and Mark Mycka entered

16  their appearances in the Biros versus U LOCK matter that had

17  already been decided by the Pennsylvania Supreme Court and was

18  back down before Judge Smail in Westmoreland County Court of

19  Common Pleas.  They then filed appeals to Superior Court, and

20  in Response to that Judge Smail issued a 1925 Order, or

21  Opinion, in which he said Ms. Shanni's -- or Ms. Biros's title

22  goes all the way back to 2015 in trust.  I don't have a copy of

23  the Order.  I'd be happy to provide it, but that was issued --

24          THE COURT:  Well, Judge Smail was aware of the

25  bankruptcy.

28

1          MR. OTTO:  I'm sorry?

2          THE COURT:  Judge Smail was aware of the bankruptcy.

3          MR. OTTO:  Oh, yes, sir.

4          THE COURT:  And yet this Order was still issued and

5  it was prompted by the parties?

6          MR. OTTO:  It was prompted by the filing of both Mark

7  Mycka and Shanni Snyder post-petition.  They filed appeals to

8  Superior Court post-petition.

9          THE COURT:  Why did no one alert Judge Smail of the

10  fact that the Stay impacted that proceeding?

11          MR. OTTO:  First of all, Your Honor, he --

12          THE COURT:  That should have been put on ice.

13          MR. OTTO:  He knew about the bankruptcy, but he was

14  required by Superior Court to issue the Order.

15          THE COURT:  I want to give you a preview of coming

16  attractions here.  And maybe this is moot because I see that

17  there was the consent to entry of a final Order by Ms. Biros to

18  the removed action, but given what's happened in the State

19  Court, and I'm not -- don't take this as casting dispersions on

20  Judge Smail, but somewhere along the line there is a complete

21  misperception of how the Stay works, and I don't know what has

22  prompted that, but that gives me all the more reason for

23  wanting to have a lot of those issues resolved here than in

24  State Court.

25          I mean, that has not given me any confidence of

1   what's going on there and, quite frankly, it seems that the

2   decisions were already made well before this -- the decisions

3   that this Court needs to rely on in order to determine the

4   substantive State Court rights of the parties have already been

5   determined before this involuntary petition was even filed.

6        Mr. Otto?

7        MR. OTTO:  Just so you understand, I want to make it

8   very clear to the Court, the appearances that were entered by

9   both Ms. Snyder and Mr. Mycka, we never -- once this case

10  started, we did not object, or oppose, or take any action with

11  request of their entry.  They did not receive permission from

12  Judge Smail to enter the case, and we did not file anything

13  with respect to their appeals to Superior Court.  We've taken

14  no action with respect to that.  So, whatever has happened is

15  with Ms. Snyder, Mr. Mycka and the action of Superior Court and

16  Judge Smail, but we've had nothing to do with it, Your Honor.

17       THE COURT:  All right.  Well, again, this is an issue

18  that I need to delve into more deeply.  I don't want to spend

19  more time on it at this point given that it is extraneous to

20  the Motion at hand.  But with that said, I'm going to want a

21  copy filed, Mr. Otto, of the State Court docket of any entries

22  that occurred after April 27, 2022 when the involuntary

23  petition was filed and the Stay went into effect, and copies of

24  any pleadings that were filed.

25       In addition, I want each of the parties to provide me

1  with an affidavit, certified under penalty of perjury,

2  identifying any and all communications that they may have had

3  with the State Court after April 27, 2022.  That includes

4  letters, e-mails, phone calls, whatever.  That's from either

5  attorney, staff members, whatever and I want those within 14

6  days.  Because from my view, there's way too much activity that

7  occurred in State Court.

8        And, furthermore, we had a long discussion about this

9  on June 2nd or 3rd -- I can't remember the date where I raised

10 these concerns.  I indicated that I thought the May 2022 Order

11 was void and I issued an Order to that effect subsequently.

12 But there's no basis that I am aware of at this point, and I'm

13 happy to be corrected on how the State Court could have

14 proceeded on this and, quite frankly, given my experience with

15 how other Courts deal with Stay issues, it would seem to me

16 that that would have only occurred if there was some prompting

17 or urging by any party.

18        So, 14 days for all parties to file an affidavit of

19 any communications that they had with the State Court after

20 April 27, 2022, and then I'm requiring Mr. Otto to also file a

21 copy of the State Court docket and any papers that were filed

22 in the State Court after April 27th.

23        MR. BERNSTEIN:  Your Honor, two clarifying questions

24 on the notice or the affidavit.  If there were no

25 communications, do you still want an affidavit?

31

1          THE COURT:  I want an affidavit saying there were no
2  communications.

3          MR. BERNSTEIN:  And I assume that you're talking
4  about communications with regard to the U LOCK matter that was
5  before that --

6          THE COURT:  Yes.  I'm sorry that I did not clarify
7  that, but that is specific, yes.  Any communications with the
8  State Court as to the U LOCK matter.  Obviously, lawyers
9  probably have many other cases.

10          All right.  Any questions on that before I turn back
11  to the Motion to Enforce the Sale Order?

12                    (No audible response)

13          THE COURT:  Okay.  So, then, given the way I am in my
14  predetermination to deny the Motion to Enforce the Sale Order
15  and since that's filed by Shanni Snyder, Mr. Joyce or Mr.
16  Kobeski, wish to address that?

17          MR. KOBESKI:  Yes, Your Honor.  We have listened to
18  what Your Honor has indicated it's your position and your
19  suggestion regarding potential agreement to withdraw the Lis
20  Pendens which is something we will discuss with Ms. Snyder.
21  It's not something that we had considered prior to today.

22          And, you know, relative to Your Honor's statement
23  regarding the State Court Orders, you know, since any
24  determination of the Motion to Enforce would take those rulings
25  into account or potential resolutions, we understand Your

32

1  Honor's position on the Motion.  Our major concern was the

2  language included in the Quiet Title Action that sought to

3  permanently enjoin Ms. Snyder from asserting any claim against

4  the property.

5         And then the fact that a ruling to that effect could

6  somehow impact what she had purchased pursuant to the Trustee

7  sale in this case.  It's our understanding that Ms. Snyder

8  intends to proceed with pursuing the actions she purchased but

9  we don't have a timeline in terms of when that may be initiated

10  but we understand --

11         THE COURT:  Well, I mean, why isn't there a timeline?

12  I mean, you purchased the assets.  I'm not inclined to sit and

13  wait for this thing forever.  And while I indicated the

14  Bankruptcy Court would retain jurisdiction, that's not an open

15  book.  In fact, I'm thinking that I'm in a position that if you

16  want to use Bankruptcy Court jurisdiction to bring the

17  Avoidance Action, I'll give you 30 days to file it.  And if

18  it's not filed within 30 days, I'm going to turn to just having

19  Mr. Slone close up the Estate, close up this case and if you

20  have an Avoidance Action, you can bring it in State Court.

21         MR. KOBESKI:  Understood, Your Honor.  And I believe

22  that timeline would be sufficient based upon Ms. Snyder's

23  intentions.  And certainly she did take action to remove the

24  State Court case to the Bankruptcy Court and we've only been

25  monitoring that from the sidelines.  It was her position that

1  the Automatic Stay in her individual case, potentially, applies

2  to any action which -- and that matter is till before Judge

3  Bohm.

4          There's a pending Motion for Relief filed by Ms.

5  Biros which won't be determined for some time -- for several

6  weeks.  But in the meantime, we will discuss with Ms. Snyder

7  the potential for agreeing to release that Lis Pendens, you

8  know, based upon actions she plans to take in terms of filing

9  the Avoidance Action in this case.

10         THE COURT:  Well, let me ask this question.  Is there

11  any objection to granting Ms. Biros Stay Relief in the Shanni

12  Snyder personal case for the purpose of bringing the claim

13  objection in this case?  I mean, there would be no attempt to

14  enforce.  It would not be collection of assets.  It would

15  merely be a determination on the validity of the claim.

16         MR. KOBESKI:  Our only issue with Ms. Biros's filings

17  in the individual action are the fact that she is not a

18  creditor in that case.  She hasn't filed a proof of claim.

19  It's a no asset -- or it was -- it is an asset case.  The

20  claims bar date has passed.  Ms. Biros participated in that

21  action at length but has failed to file a proof of claim.

22         THE COURT:  Okay.  But the question though is she is

23  seeking -- she is seeking Stay Relief in order to file a claim

24  objection in this case, so whether she is a creditor or not in

25  that case wouldn't she be entitled to ask for Stay Relief for

1    that purpose?  And if not, are you willing to concede that it

2    would not be a Stay violation for her to file a claim objection

3    in this case?

4          MR. KOBESKI:  Academically speaking, I mean, it's our

5    position that in this case I think Ms. Biros is entitled to

6    anything she is entitled to under the Code and the Rules of

7    Court.  However, there is still the potential issue that that

8    claim, that judgment itself is Estate property in the

9    individual Shanni Snyder case.  So, that does, I think,

10   implicate the need for Stay Relief in that regard because that

11   Estate does still have an interest up to 32,500 --

12         THE COURT:  Okay.  Well, I understand that.  But, I

13   mean, Trustee Zebley has delegated authority to pursue the

14   claims of your client, and has made an arrangement under the

15   Stipulation to accept the first 32,000 and change from that.

16   So, there are, you know, obviously in order to effectuate any

17   distribution in this Estate I have to have a claims allowance

18   process.  There has been stated intent that there is a desire

19   to object to the claim.  So, why are we dealing with procedural

20   hurdles here?  Why can't we just get to the merits and have a

21   claim objection?

22         MR. KOBESKI:  And eventually I think that would be

23   the end result, so, I mean, in that regard --

24         THE COURT:  Well, eventually -- this is what I'm

25   trying to say from the beginning of the case.  Let's cut

1  through these things that are wasting time, effort, and causing

2  additional fees.

3          So, what I come back to is why not either consent to

4  Stay Relief or admit that pursuing the claim objection in this

5  case does not violate the Stay in her personal bankruptcy case?

6          MR. KOBESKI:  And I think those are things we could

7  discuss with our client.

8          THE COURT:  Where is the prejudice?  Where is the

9  prejudice?  That's what I want to know.

10         MR. KOBESKI:  We can discuss that with Ms. Snyder and

11  see if she would be in agreement with reaching those agreements

12  with Ms. Biros.  But those are not things we did discuss prior

13  to this morning.

14         THE COURT:  All right.  Well, I'm going to give you

15  time to discuss that, but I am going to want an answer on that

16  before we conclude the hearings today.

17         MR. ZEBLEY:  Your Honor, this is Trustee Zebley in

18  the Snyder case.  If I could weigh in?

19         THE COURT:  Go ahead.

20         MR. ZEBLEY:  I have no objection to the lifting of

21  the Stay.  I think what you observed is we have -- because I'm

22  going to get the -- whatever money that's going to come in,

23  which I'm dubious.  But we can't get any money into the Snyder

24  Estate until Mr. Slone can wrap up his Estate.  And holding

25  that hostage doesn't make any sense whatsoever.  I don't think

1  there's anything to talk about, frankly.  Anyway, that's my

2  position.

3        THE COURT:  Thank you.  If you need time to discuss

4  it I will give you time to do that, but let me just circle back

5  on where we are first.  So, as I understand it you have no

6  objection to the Court denying the Motion to Enforce the Sale

7  Order provided that you are given 30 days to bring the

8  Avoidance Action or to have it in jurisdiction in the

9  Bankruptcy Court.

10        You're going to also discuss with your client the

11  consensual withdrawal of the Lis Pendens, and the understanding

12  is that notwithstanding -- and I'm going to come back to Ms.

13  Biros's counsel on this.  But from my viewpoint it would seem

14  that whatever relief Ms. Biros is seeking in the State Court

15  may bar Ms. Snyder as to whatever positions she had against the

16  property before the bankruptcy was filed, but it should not

17  impact any rights that she accrued from U LOCK in the sale or

18  the right to pursue the Avoidance Action per se.  So, I will

19  start with you on that.

20        MR. KOBESKI:  Your Honor, with that description of

21  the position, that certainly does provide some relief to the

22  concerns we had, which was the basis for the Motion, and the

23  time line suggested by Your Honor should be acceptable, and

24  allow Ms. Snyder to proceed, which would -- you know, once that

25  action is filed it -- this whole concern is rendered moot, so I

1  think that's a proper way to proceed.

2         THE COURT:  All right.  Thank you.  Mr. Bernstein?

3         MR. BERNSTEIN:  Your Honor, that was a very important

4  point, the time line on what rights Ms. Snyder is asserting and

5  when.  The Lis Pendens is a pre U LOCK petition claim of Ms.

6  Snyder's that has nothing to do with U LOCK.  And it's separate

7  from whatever rights she purchased from the Estate.  So, we

8  appreciate the Court putting some limits on that.

9         In terms of streamlining we also appreciate the

10 Court's suggestion on the Lis Pendens.  I am unclear, and I

11 need to ask with respect to the removal, because the removal is

12 related to the Lis Pendens, which was apparently -- which was

13 the basis for the Quiet Title, which was the basis for the

14 Motion that counsel filed on behalf of Ms. Snyder.  Are they --

15 this may be a professionalism in ethics question.  I don't know

16 if they are counsel for Ms. Snyder in the removal, or just

17 enforcing her rights here in the main case.  It's unclear, and

18 it is a meaningful question for future reference.

19        THE COURT:  Okay.  Well, I think that's a valid

20 point.  Ms. Snyder is here.  So, I indicated I would give

21 counsel an opportunity to consult with her.  So, what I am

22 expecting is that after you consult here I will get an answer

23 that pertains to not only whatever matters you are representing

24 her on as counsel, but also anything that she might be

25 proceeding on pro se.  Is that understood?

1            MR. KOBESKI:  Yes.

2            THE COURT:  Okay.  All right.  How much time do you

3  need to address that?

4            MR. KOBESKI:  Like ten -- I was going to say five,

5  but ten minutes would be safer.  More than five, just to step

6  outside and talk with her.

7            THE COURT:  All right.  Why don't we take a ten

8  minute recess.  We'll come back on the record at five after 11.

9            MR. KOBESKI:  Thank you, Your Honor.

10           THE COURT:  Thank you.  All right.  The Court will

11  stand in recess, and we'll reconvene at 11:05.

12                          (Off the record)

13           ECRO:  All rise.

14           THE COURT:  Thank you.

15                          (Pause)

16           MR. KOBESKI:  Your Honor, could we have a few more

17  minutes, like five?

18           THE COURT:  Yes.  Please.

19                          (Off the record)

20           THE COURT:  All right.  Let's go back on the record

21  on Case Number 22-20823, U LOCK Incorporated.  We had a short

22  recess to allow counsel to discuss with Shanni Snyder some of

23  the comments the Court raised with respect to the Motion to

24  Enforce.

25           I had one other thing that I thought about as I went

1  back into chambers, and that is I also question whether or not

2  in the <u>Shanni Snyder</u> bankruptcy whether there would be a Stay

3  issue implicated given that this is an action where Shanni

4  Snyder is the claimant, and therefore the plaintiff.

5          So, with that said, Mr. Kobeski, have you had an

6  opportunity to review and --

7          MR. KOBESKI:  Yes, Your Honor.  And initially --

8          THE COURT:  -- tell me where you are on this?

9          MR. KOBESKI:  -- thank you for the time to allow us

10  to address these issues with Ms. Snyder.  We discussed the Lis

11  Pendens, which we learned also goes along with th Writ of

12  Summons that was filed in Westmoreland County, which we had not

13  been aware of.  But we are comfortable, and Ms. Snyder is

14  comfortable with agreeing to voluntarily withdraw the Lis

15  Pendens and the Writ of Summons after 30 days, which would

16  coincide with or follow her filing of her intended avoidance

17  claim in this case -- in this Court.

18          And that would then, in our position resolve the

19  pending Quiet Title Action, which has been removed to this

20  case, as well.  So, I don't know if Your Honor would consider

21  staying that pending action for 30 days to allow the time for

22  Ms. Snyder to proceed in bringing those avoidance actions,

23  which would then in essence resolve that pending litigation, in

24  our opinion.

25          And in terms of the Stay Relief that Ms. Biros

40

1  asserts that she needs to pursue or file an objection to Ms.

2  Snyder's claim, we have no problem consenting to relief insofar

3  as that would allow them to proceed in that regard.

4          Currently, there's two matters pending in Judge

5  Bohm's courtroom in the individual case, which is the Motion

6  for Relief and also the Motion to Settle involving Trustee

7  Zebley.  Ms. Snyder would like nothing more than to resolve

8  both of those amicably, and she currently is in the process of

9  potentially retaining counsel in that regard.

10         But if Ms. Biros is also interested in resolving

11  those without the necessity to proceed with litigation, Ms.

12  Snyder is certainly interested in doing that.  So I don't know

13  if there's other outstanding issues that Your Honor --

14         THE COURT:  Well, related to that, I mean, if the Lis

15  Pendens has no basis at this point why are we waiting 30 days

16  for it to be withdrawn?

17         MR. KOBESKI:  Well, Ms. Snyder apparently has filed a

18  Writ of Summons --

19         THE COURT:  Right.

20         MR. KOBESKI:  -- in the context of a Declaratory

21  Judgment Action, concurrent with the Lis Pendens.  So the Lis

22  Pendens --

23         THE COURT:  But the Lis Pendens has --

24         MR. KOBESKI:  -- relates to that --

25         THE COURT:  -- no foundational legal support, from

41

1  what I gather.  So, how can that support a Writ of Summons?

2         MR. KOBESKI:  The legal basis, Your Honor, just, you

3  know, in a summary, is that there is a judgment lien that was

4  entered in the Western District --

5         THE COURT:  Right.

6         MR. KOBESKI:  -- but also in the State Court in

7  Westmoreland County, and then subsequent to that judgment lien

8  there was a mortgage entered against the property by Ms. Biros,

9  and I believe a life insurance trust, or something along those

10 lines.  So, there is -- there remains a question as to the lien

11 priority regarding that judgment lien --

12        THE COURT:  Okay.  Well, let's just be clear again.

13 Let's not get down a slippery slope.  U LOCK, based on State

14 Court Orders, did not have title to the property when the Lis

15 Pendens was filed.  You have already stipulated in this case

16 that she does not have a secure claim and did not have a lien

17 on the assets.  So why are we even having this argument on the

18 Lis Pendens at this point?

19        MR. KOBESKI:  Your Honor, when the judgment was

20 entered in the Western District title to the property was in U

21 LOCK's name, and the State Court Orders transferred title of

22 that property subject to any liens and subject to any mortgages

23 or judgments.  So, arguably Ms. Snyder's judgment lien remains

24 in place and it's valid.

25        There's also -- I mean, there's also a question of

1   there's duplicate deeds that were recorded from the original

2   prior owner.  Some of those deeds remain of record.  The State

3   Court action only struck one set of deeds.  So there's an

4   extraneous set of deeds to U LOCK that remains in place, you

5   know, on the title in Westmoreland County, and the transfer of

6   that property pursuant to the constructive trust by Judge

7   Smail's own Order was subject to liens and encumbrances.  So

8   arguably Ms. Snyder's lien has not been stricken from the

9   property.  At the time it was entered U LOCK was the title

10  record owner of that real estate.

11          MR. BERNSTEIN:  Your Honor, just for the record, we

12  dispute those facts.  With respect to when the judgment was

13  entered the title was not in the name of U LOCK at the time.

14  There was no lien by Ms. Snyder against U LOCK, whether in

15  Federal Court or State Court, and if they are trying to layer

16  on top of this Lis Pendens the whole argument about whether the

17  deeds were valid, I don't know what we're going to get to

18  today.

19          THE COURT:  Yes.  I --

20          MR. BERNSTEIN:  Again, it raises a question of who is

21  representing -- I mean, who is making this argument?  Is it Ms.

22  Snyder?  Is it her counsel?

23          THE COURT:  Okay.  Here is what I am going back to.

24  Two issues.  One is, first, there's an agreement to withdraw

25  the Lis Pendens subject only to the commencement of the

1  avoidance action.  I don't know that that changes anything, so

2  why don't we just cut to the chase and you have -- it's a

3  metric that's within your control.  You can file the avoidance

4  action in 30 days.  You can file the avoidance action tomorrow.

5       So, with that said, while I have all the parties

6  here, and while everyone has committed the time and resources,

7  let's just make the determination now on the Lis Pendens and be

8  done with it?  If we start to go down as to the merits of the

9  Lis Pendens I can tell you again I'm going to hold parties to

10 the standards here, and what's already in my record.  The

11 question of whether or not U LOCK had title to the property on

12 the one hand, or alternatively a Stipulation that Ms. Snyder

13 does not have a secured claim in this case, and no lien against

14 U LOCK.  So, those are disconcerting.

15      So, let's not put form over substance here.  Let's

16 just deal with what we're dealing with.  And so, if there is no

17 issue to go forward with the Lis Pendens in 30 days there's no

18 reason to go forward with the Lis Pendens now.  I have already

19 indicated that I am going to protect Ms. Snyder's right to

20 bring the avoidance action if she wishes to do so in that 30-

21 day period, but let's not overreach.

22      MR. KOBESKI:  Your Honor, Ms. Snyder will concede to

23 volunteering to withdraw the Lis Pendens.

24      THE COURT:  Okay.  All right.  Very good.  Then on

25 that basis what I am going to do is a couple of things.  And --

44

1  I lost my place with my notes.  But -- so what I understand is

2  we have got consent to 30 days to bring the avoidance actions

3  if you wish to bring them in the Bankruptcy Court, a consent to

4  release of the Lis Pendens, and furthermore consent that, you

5  know, that resolves the Quiet Title Action to the extent that

6  Ms. Snyder was claiming an interest in the property in her own

7  name separate and apart from whatever right she accrued from U

8  LOCK.  Nothing will impact her ability to bring the avoidance

9  action against U LOCK based on this ruling.

10         And third, there is consent to whatever stay relief

11  is necessary to allow an objection to the Shanni Snyder claim

12  to proceed in this U LOCK bankruptcy case.  All right?  Is that

13  the understanding?

14         MR. KOBESKI:  Yes, Your Honor.  And once again, I

15  would just reiterate for the benefit of the Court and Ms.

16  Biros, Ms. Shanni Snyder would be interested in settling all

17  the matters pending in Judge Bohm's courtroom.

18         THE COURT:  Okay.  Well, actually, I'll circle back

19  on that in just a minute.

20         MR. KOBESKI:  Thank you.

21         THE COURT:  But you agree to that?

22         MR. KOBESKI:  Yes, Your Honor.

23         THE COURT:  All right.  Ms. Snyder, you personally

24  agree to that, as well?

25         MS. SNYDER:  Yes.

1          THE COURT:  All right.  So, returning to Ms. Biros.

2     So, on the first aspect any issue with what I have set forth

3     there?

4          MR. BERNSTEIN:  No, Your Honor.  That's the 30-day

5     issue?

6          THE COURT:  Well, 30 days to bring the avoidance

7     action if they wish to pursue it in Bankruptcy Court.  It will

8     resolve the removal action by the release of the Lis Pendens,

9     and that there is no further rights that Ms. Snyder has as to

10    the property that accrued to her personally before she acquired

11    the rights from U LOCK.  And third, consent to stay relief to

12    any claim objection that would be necessary in this case.

13         MR. BERNSTEIN:  No objection, Your Honor.  And to

14    clarify, if Ms. Snyder withdraws the Lis Pendens and terminates

15    the Writ of Summons, there is no reason for the Quiet Title

16    Action to exist.

17         THE COURT:  Okay.

18         MR. BERNSTEIN:  And we would --

19         THE COURT:  Then we'll resolve it today.

20         MR. BERNSTEIN:  -- make that disappear.

21         THE COURT:  Okay.  And then the third thing is, I'm

22    now doing Judge Bohm's work for -- as to the Stipulation,

23    because I think that's the only other thing that's pending in

24    her case, is there any issue with the Stipulation being

25    approved in her case subject to the same caveats which I have

1  raised here before that it would -- it would be approved

2  notwithstanding any objection that you would have to the merits

3  of the claim?

4        MR. BERNSTEIN:  Well, as happens when you have the

5  lack of clarity as to an individual representing themselves and

6  having counsel, there is another matter pending with Judge

7  Bohm.  Ms. Snyder, on her own apparently, filed a Motion to --

8  Motion for Sanctions against Ms. Biros and Mr. Otto for

9  essentially filing the Quiet Title Action, so there is another

10  pending matter in that Court.

11        As to the Stipulation, my partner, Mr. Burkley, has

12  been working on that matter with Mr. Zebley.  I know that

13  Burkley has told me that he is very confident that there would

14  be an agreement with Mr. Zebley before Judge Bohm's deadline of

15  February 7th.  So, I would say it's likely to be resolved,

16  especially in light of the Court's pronouncements today with

17  respect to the Stipulation.  I just can't commit to it, but I

18  can say it's very likely that that can be resolved.

19        THE COURT:  All right.  I'm not aware of what the

20  Motion for Sanctions is.  It's not something that I have

21  reviewed.  And again, it's not on my docket, so I'm not going

22  to go down that path at this point because I feel like I made a

23  lot of progress at the beginning of the hearing, and I don't

24  want to go off the rails at this point.

25        So, I'm going to take what we've got at this point

1  and move forward.  So, Mr. Kobeski --

2       MR. KOBESKI:  Your Honor, the only thing I wanted to

3  add regarding your statements regarding Ms. Shanni's -- or Ms.

4  Snyder's interest in that property, and have there been any

5  findings today, or is it your intention to make any findings

6  regarding the underlying Civil Court judgment that is in place

7  both in the Western District, as well --

8       THE COURT:  Well, I think we've cut to the chase on

9  that because Mr. Bernstein has said that if the Lis Pendens is

10 withdrawn and the Writ of Summons is withdrawn, then that

11 resolves the Quiet Title Action, so we're done.  Okay?

12      MR. KOBESKI:  But the -- I mean, obviously Ms.

13 Snyder's position is her judgment remains in place?

14      THE COURT:  The judgment remains in place.  I don't

15 know what it means, or what impact it has at this point.  I've

16 told you my thoughts on it.

17      MR. KOBESKI:  Right.

18      THE COURT:  But beyond that we can take it up at the

19 claims objection.  But I -- again, I want to be -- the parties

20 be mindful of the inconsistencies of any arguments or positions

21 they may take based on where they were before.  Okay?

22      MR. BERNSTEIN:  And speaking of that, Your Honor, we

23 do intend to file the objection quickly.  I just want to make

24 sure that we're not going to get caught in the Court not having

25 -- not feeling that it has the ability to impact that claim

1  because it's the subject of a judgment that Judge Coville

2  entered.  And that's actually why we were seeking relief from

3  stay with Judge Bohm, so that we could intervene in the civil

4  action to seek a Rule 60 Motion to avoid -- to eliminate that

5  judgment, which is the basis for the claim.  So we are happy to

6  file it here and have Your Honor deal with it if Your Honor

7  feels that that's appropriate.

8           THE COURT:  I'm fine with having it filed here.  I

9  think it makes the most sense.  But, you know, it -- the

10 judgment will be something that's part of the examination if

11 there's a claims objection.  So I will deal with it at the

12 appropriate time.

13          MR. BERNSTEIN:  Thank you.

14          THE COURT:  All right.  Anything further?

15          MR. KOBESKI:  No.  I mean, just to clarify, Ms.

16 Snyder's judgment has a lien against that real property, or the

17 lien is not being waived, or without prejudice to her to assert

18 that in the event that becomes --

19          THE COURT:  Okay.  Well, I want to be very clear,

20 again.  The Stipulation says she has no --

21          MR. KOBESKI:  Right.  And that's based upon --

22          THE COURT:  -- no lien in the assets being sold.

23          MR. KOBESKI:  Right.  And the assets that were sold

24 were --

25          THE COURT:  And that includes all tangible and

1 intangible assets of U LOCK.

2          MR. KOBESKI:  Correct.

3          THE COURT:  And that includes --

4          MR. KOBESKI:  Right.  And the assets that were sold

5 were --

6          THE COURT:  -- all tangible and intangible assets of

7 U LOCK.

8          MR. KOBESKI:  Correct.  And at the time the

9 bankruptcy was filed U LOCK was not the record owner of the

10 real property.  I mean, she acknowledges that, so her --

11          THE COURT:  We're walking in circles, Mr. Kobeski.

12          MR. KOBESKI:  I understand.  But, I mean, we're

13 making determinations regarding a Quiet Title Action that was

14 filed in State Court, you know, sort of on the fly here, so

15 we're just trying to make sure that we're understanding that

16 we're not making any concession regarding the status of her

17 civil judgment that remains in place both in Westmoreland

18 County, as well as --

19          THE COURT:  The judgment remains in place.  Whether

20 or not it's a lien is a different matter at this point.

21          MR. KOBESKI:  That's fine, Your Honor.  We understand

22 --

23          THE COURT:  All right.

24          MR. KOBESKI:  -- I think the clarification that

25 you're making --

50

1          THE COURT:  Well, like I said, I'm going to take what

2    we've done here so far and call it a victory, and move on to

3    the next matter.  So -- wait a minute.  Before I forget --

4          MR. KOBESKI:  So, Your --

5          THE COURT:  Let me see if there's -- okay.  Yes.  So,

6    Christine Biros is the only objecting party to that request.

7    Mr. Kobeski, one final thing?

8          MR. KOBESKI:  I'm sorry, Your Honor.  But final

9    clarification.  Your Honor, you are not making a determination

10   that the judgment is a lien, but Ms. Snyder wouldn't be

11   prejudiced from presenting an argument that might make that

12   argument in the right context in the event --

13         THE COURT:  Again, this is -- this is something that

14   everybody has been doing in this case.  I thought I had been

15   pretty clear on what I viewed as the position, and I thought I

16   stated it clearly, and yet people are hearing what they want to

17   hear.  She has a judgment.  What I don't see at this point is

18   that she has a judgment lien based on the fact that either U

19   LOCK did not have title to the property, or it was stipulated

20   that she does not have a lien against the tangible and

21   intangible assets.

22         Because I can tell you, I mean, the Court would have

23   had some more concerns with the Stipulation because, again,

24   this was a judgment -- let's be mindful, this was a judgment

25   that was obtained on April -- I'm sorry.  When was the --

1 sorry, the Lis Pendens was filed in April.  The judgment was

2 filed within the one year look-back period for an insider

3 transaction.

4          And commensurate with that the Trustee ostensibly

5 gave up whatever right he had to avoid that judgment under the

6 avoiding powers pursuant to the Stipulation.  And the way the

7 Court understood it was he was doing so because there was an

8 acknowledgment that there was no lien against U LOCK.  So, if

9 we're trying to argue against our own Stipulation here, I

10 advise you to tread very carefully.  But I really want to move

11 on, so what's the final word on this?

12          MR. KOBESKI:  I mean, I think -- Your Honor, we are

13 in agreement.  I mean, as set forth in Paragraph 30 and 31 of

14 the Stipulation Ms. Snyder acknowledged that the judgment was

15 not a secured lien against the tangible or intangible assets of

16 U LOCK.

17          THE COURT:  Right.

18          MR. KOBESKI:  Which was personal property, which is

19 what she purchased.

20          THE COURT:  No.  It doesn't say personal property.

21 It says tangible and intangible assets.  Generally accepted

22 accounting principles, a tangible asset includes real property.

23          MR. KOBESKI:  And at the time, I mean, U LOCK, and

24 even now U LOCK has no real property.  I mean, it --

25          THE COURT:  Point taken.

52

1          MR. KOBESKI:  We concede.  We concede.

2          THE COURT:  So, there's no lien.

3          MR. KOBESKI:  Right.  There's no lien against U LOCK

4     is our position.

5          THE COURT:  All right.  Fine.  We're stopping there.

6     But this is the problem that I am having with this.  All right?

7     And it's not -- you know, I'm getting irritable with Mr.

8     Kobeski here, but I have had the same things on this side, too.

9     But it's -- we're trying to circle around and play games with

10    things, and argue cutesy points that just distract us and do

11    not serve any productive purpose other than to try to get some

12    sort of minimal litigation advantage, and it's not reflected as

13    to the facts and records before this Court.

14          So, from that standpoint I am going to deny the

15    Motion to Enforce the Sale Order for the reasons I have stated,

16    and based on the modifications of the record here.  All right?

17          Moving on.  All right.  The next matter I have is a

18    Show Cause Order that was entered against Christine Biros and

19    Attorney Bernstein to show cause why the Court should not

20    impose sanctions against them for filing Christine Biros's

21    Motion for Allowance of Administrative Expense Claim under

22    503(b)(1) in violation of Bankruptcy Rule 9011(b)(1) through

23    (3).

24          By way of background Ms. Biros filed the Motion For

25    an Administrative Expense on December 22nd, 2022, requesting

53

1  payment of an administrative expense claim in the amount of

2  $144,000 for the Estate's use and occupancy of the property

3  post-petition.  The Motion prompted objections from the Chapter

4  7 Trustee, Ms. Snyder and Mr. Snyder.  And on January 17th I

5  issued a Memorandum Opinion sua sponte denying the Motion

6  without prejudice after finding that the Motion was patently

7  frivolous.

8          Specifically, the Court found that although Ms. Biros

9  was likely entitled to administrative expense claim for the

10 post-petition use of her property the Motion suffered from

11 three flaws.

12         First, her use of a return on investment metric

13 calculated to her claim was inappropriate under Section

14 503(b)(1)(A) because it ignored the fair market value benefit

15 of the benefit to the Estate, which is the standard under Third

16 Circuit precedent.

17         Second, her calculation lacked a factual basis, and

18 seemingly relied on dubious assumptions, such as a capital

19 investment of $1.9 million, and the current value of the

20 property.

21         And, lastly, at $144,000 Ms. Biros's claim is more

22 than twice the value of the bankruptcy estate, i.e., the sale

23 proceeds.  It grossly exceeds the value of the tangible assets

24 stored on the property, and represents a monthly rental

25 obligation that far exceeds the annual revenue of the Debtor's

54

pre-petition business.

Because the Motion appeared unsustainable under fact and law and was so unreasonable that the Court could not conceive of a proper purpose, the Court ordered both Ms. Biros and Attorney Bernstein to show cause.  I have reviewed the joint response filed by Ms. Biros and Attorney Bernstein at Docket 304, and again, to expedite matters I am going to offer initial impressions of the response before asking the parties how they would like to proceed.

Note that although the response insists that the Motion did not violate Bankruptcy Rule 9011, its reasons are thin, and offers no real defense to the specific assertion of a $144,000 claim.  In fact, it pays no attention to that number at all.

The response argues, correctly, that Ms. Biros is entitled to request administrative expense for the Estate's usage of he property.  The Court has never quibbled with the propriety of seeking an administrative claim but her conceptual entitlement does not insulate her specific ask, and by that I mean the text of the Motion from liability under Bankruptcy Rule 9011.

The response defends the Motion by suggesting it was the opening volley to spark negotiations of her claim as happens in other cases.  And in so doing she essentially admits the Motion was a litigation tactic so the propriety of the

1 purpose boils down to the defensibility of the amount requested

2 in the first instance.

3 　　　　The response contends that the return on investment

4 as a basis for Ms. Biros's administrative expense claim is

5 supported by law and specifically point to <u>Geltzer v. Helen-May</u>

6 <u>Holdings, LLC (In re Kollel Mateh Efraim, LLC)</u>, which is 2009

7 Westlaw 2929430 at Star 1.  It's a Bankruptcy Court decision

8 from the Southern District of New York dated August 18th, 2009,

9 affirmed at 456 B.R. 185, Decision of the Southern District of

10 New York from 2011, which is an unpublished decision from the

11 Southern District of New York.

12 　　　　Initially the Court observes that the <u>Geltzer</u> case

13 was not cited in the Motion for an administrative expense,

14 raising the question of when counsel was aware of this

15 authority.  Upon a full reading, including the subsequent

16 Bankruptcy Court decision and the District Court decision, the

17 case appears inapposite for a number of reasons.  The facts are

18 somewhat convoluted.  You need to pull them from a series of

19 decisions, but it can be distilled as follows.  The Debtor in

20 that case was the assignee of a contract to acquire real

21 property from Helen-May for $1.4 million in 2004.  The property

22 consisted of a resort hotel located on approximately 77 acres.

23 And when closing did not occur promptly the Debtor, Helen-May

24 -- the Debtor and Helen-May entered into extension agreements

25 by which the Debtor was permitted to occupy and operate the

1    resort.   In fact, the Debtor's operations produced net revenue

2    of $1.4 million between 2004 and 2007.   And ultimately a

3    closing never occurred and the bankruptcy petition followed.

4            Once again, the facts of that case get convoluted,

5    but the point is that the response wants me to focus on is that

6    the Court ordered the Debtor to pay Helen-May adequate

7    protection payments for quote, unquote, use and occupancy based

8    on an uncontested expert testimony that a ten percent ROI on

9    1.4 million plus taxes was a reasonable annual rental value.

10            And notably in a later decision the Court found that

11    Helen-May failed to prove an administrative expense claim in

12    that amount.   See 2010 Westlaw 3782050, which is from the

13    Bankruptcy Court of the Southern District of New York,

14    September 21st, 2010, affirmed at 456 B.R. 185, Southern

15    District of New York, 2011.

16            Importantly, <u>Geltzer</u> does not provide any support for

17    Ms. Biros's position.   Starting with the facts, among the

18    reasons the ten percent ROI on the sale price was found to be a

19    reasonable rental value was that it was the equivalent to ten

20    percent of the Debtor's net revenue for the period of its

21    occupancy.   Again, ten percent of the Debtor's net revenue.

22            In other words, the reasonable rent was not simply an

23    ROI, but ten percent of the Debtor's profits from operating the

24    resort on Helen-May's property.

25            In the present case Ms. Biro's ROI calculation

57

produces a monthly obligation exceeding U LOCK's annual gross

revenues, not to mention any profit.  Next, <u>Geltzer</u> involved an

adequate protection payment for a going concern, not an

administrative expense under Section 503(b)(1).

        The response notes that although Helen-May did not

prove an administrative expense, the Court did not repudiate

ROI as a reasonable monthly rental value.  That dismisses the

bigger point.  Although it may have been reasonable monthly

rental value, reasonable monthly rental value does not

automatically equal an administrative expense.  Ironically, the

<u>Geltzer</u> opinion emphasizes what would seem to be a critical

flaw in Ms. Biros's calculation.  <u>Geltzer</u> involved the use and

occupancy of a profitable resort.  In this sense there was an

identity of value and function between both the seller and the

Debtor.  Here let's call the property for what it is, a largely

undeveloped parcel containing a shed and a single rather

dilapidated self-storage facility.  The rest of the property

contains piles of junk.

        The Debtor seemingly operated a self-storage facility

on only a portion of the land, yet despite these facts Ms.

Biros is seeking to capture an ROI based on a developed, fully-

functional retail plaza.

        In the end the response insists the Court was

premature in denying Ms. Biros's claim and argues that Ms.

Biros could present evidence in support of her claim given the

58

1  opportunity.  Admittedly, the Court is dubious for several

2  reasons, including the question is not whether she can prove

3  her ROI, but whether ROI is an appropriate measure of the

4  Estate's benefit.  And for that to be true Ms. Biros would need

5  to justify how the Estate could receive a benefit far in excess

6  of the property value that was preserved.

7          Frankly, at $18,000 a month it is hard to imagine

8  that it would have been cheaper to move the tangible assets

9  offsite.

10          The Court also finds it telling that neither the

11 Motion nor the response explain even in summary fashion how the

12 Estate benefitted to the tune of $144,000.

13          Finally, and perhaps most damning of all, Biros's

14 administrative expense calculations are undercut by her own

15 proof of claim.  That claim seeks payment of pre-petition rent

16 based on monthly rent of $5,000 a month, roughly 27 percent of

17 her post-petition monthly rent claim.

18          Giving her the benefit of the doubt, the claim

19 suggests the top end rent number could be as high as $10,000,

20 which is still $64,000 less than the aggregate which is claimed

21 in the Motion.

22          I question whether this proof of claim was even

23 reviewed before the Motion was filed.

24          That all said, the Court denied the Motion for an

25 administrative expense without prejudice to the filing of a

1  Motion seeking a reasonable request for administrative claim.

2  So, with the benefit of the Court's added perspective on this

3  matter and my thoughts I just relayed, I leave two options on

4  the table for Ms. Biros and Attorney Bernstein.  You can either

5  have seven days leave to file an amended Motion for an

6  administrative expense claim, or if you truly believe the

7  Motion was meritorious on all counts, in essence you want to

8  double down, then I will set it for an evidentiary hearing

9  where you can put on whatever record you wish.  The choice is

10 yours.

11         In any event, I am going to continue the Order to

12 Show Cause to run parallel to the hearing on either the

13 original Motion for the evidentiary hearing or on the amended

14 Motion.  So, Mr. Bernstein?

15         MR. BERNSTEIN:  May I have a moment?

16         THE COURT:  You may.

17         MR. BERNSTEIN:  Your Honor, I was in some sense

18 looking forward to the opportunity today to provide some

19 additional thoughts and reaction to the Memorandum Opinion.  In

20 light of the Court's pronouncements earlier about cutting to

21 the chase and trying to get to the end of things, I am probably

22 not going to say all the things that I was prepared to say.

23 The answer -- we came in today assuming that the Motion was

24 dismissed pursuant to the Order, and considering when to file a

25 renewed Motion, based on the status of the case at any

1  particular time.  I will say that before I get to the answer to

2  the Court's question the filing of the Motion was to some

3  extent driven -- the timing of the filing was to some extent

4  driven by the Court's comments at one or more of the sale

5  hearings about ending the case.  And understanding that we

6  needed to get to the end of the administrative claims in order

7  for the Trustee to be able to close the case.

8          We will certainly file an amended Motion.  Well, let

9  me say we are likely to file an amended Motion.  I don't want

10  to foreclose the possibility that based on the facts of the

11  case and the other claims that are out there that Ms. Biros may

12  decide not to spend the time or effort filing a 503 request,

13  but it is likely that we will file one.

14          What we file will be informed significantly by the

15  Court's Memorandum Opinion and by the comments that the Court

16  made today, as well as by the significant research that we have

17  done since the Memorandum Opinion, and our hope is that the

18  Court sees that Motion for what it is a property owner's

19  attempt to get a reasonable claim for the Trustee's having used

20  her property for eight or ten months, whatever the time period

21  is, through today, when the Trustee gave it up.

22          There was nothing more to it than that.  It was not a

23  litigation tactic except to the extent that any request for a

24  claim is a litigation tactic when there are other people in the

25  case fighting for the same pot of money.  We have heard what

61

1  the Court said.  We've read what the Court wrote.  I hope that

2  I have heard it the way it was intended to be conveyed, and

3  that I listened carefully.  And I know that what I have heard

4  and read will inform further action.  I don't know what the

5  Court intends to do.  It sounded like the Court was just going

6  to continue the Order to Show Cause to a future point related

7  to the new Motion.  Honestly I'd like the Court to discharge

8  the Order to Show Cause and end that sword of Damocles.  It's

9  personally and professionally distressing, and I would prefer

10  that it no longer be there.  If there is a sanction that the

11  Court believes is appropriate the Court should impose that

12  sanction.  I don't think that if the Court is waiting to see

13  whether we file a Motion that the Court doesn't like again,

14  then I guess I have no choice.

15      THE COURT:  Well, I guess where I am is this.  No

16  one, and I have been clear on this in the Opinion, and I was

17  clear on it today in my remarks, and I've been clear on that at

18  the last couple of hearings, that I had no opposition and think

19  that Ms. Biros is certainly entitled to request a reasonable

20  amount of rent for the use of the property during the time that

21  the Estate had possession.  And in fact, the critical issue is

22  what is reasonable?  And as I mentioned in the Opinion, and as

23  I noted and used the exact same phrase in one of the hearings,

24  was that the request needs to be reasonable, and in fact,

25  reasonableness is inherent in the legal standard.  And despite

62

1  those admonitions I got this.  So, where I am left with is if

2  you are going to, as I said, double down and stay with this

3  Motion, then we will have an evidentiary hearing on it.  I will

4  consider it to still be a live Motion at that point because

5  you've asked for the ability to have the evidentiary hearing.

6  And I'll continue the Show Cause to that date.  If you are not

7  sure yet whether you will file an amended Motion, then that

8  puts me in a quandary of what I do with the Show Cause at this

9  point.  So, that's --

10      MR. BERNSTEIN:  Likely we will file another Motion,

11  Your Honor.  I just haven't had time to consider all this, that

12  Ms. Biros is happy that the Court decided today to terminate

13  the Stay and that she gets her property back, and is happy with

14  several of the other things that happened today, and that may

15  inform the ultimate decision.

16      I think -- I mean, to be very frank, I get that the

17  Court was perturbed, upset with the $144,000 request.  I

18  understand that.  I've heard that.  It's not at all unusual for

19  a party seeking a claim, especially when there are other

20  parties looking for the same pot, to push the limits.  I

21  understand that the Court thinks we went past the limits in

22  this case.  I think that the Court's focus on the size of the

23  Estate is useful but not determinative.  We fight everyday over

24  small estates, trying to get our clients their share, whatever

25  share the Court determines.  In this situation I think I hear

63

1  the Court troubled by the use of a metric that came up with a

2  number that the Court just thinks was much too high, outside

3  the range of reasonableness, and I honestly don't -- don't know

4  how to represent Ms. Biros in the prosecution of a claim under

5  503 in light of the animosity and litigation posture of the

6  other parties in the case without proposing a number which is

7  high, because we're going to have a fight with other parties,

8  and I think in our response we suggested that had we even used

9  the $1,500 that the Court mentioned with regard to the bid,

10  that we certainly would have had objections by one or more of

11  the Snyders.  In fact, the Trustee kind of hinted, and it was

12  based on a conversation he and I had, that $1,500 would

13  certainly be okay with him, 5,000 is probably not outside the

14  range for him.

15          So, it was the --

16          THE COURT:  Was that before or after the Motion was

17  filed?

18          MR. BERNSTEIN:  The discussion with the Trustee was

19  after the Motion was filed, before the Trustee filed his

20  response.  And I don't remember exactly, but I think I called

21  him just to talk with him about what his position might be.

22  And I think we had some discussion, and I said, well, we can

23  come to an understanding, but we can't make an agreement

24  because we still have other parties who will be objecting, and

25  so thanks for the information, we'll see what happens at the

1 hearing.

2        It was as -- and I don't want the Court to think I'm

3 trying to hide behind, well, everybody does it.  It does happen

4 regularly that Motions seeking -- Motions seeking, let's call

5 them big claims, are filed, expecting there to be responses

6 that may bring new information, negotiations that may bring new

7 information, hearings that might bring new information.  And in

8 the end that's how we bring to the Court either a solution or

9 enough facts and argument to get a reasonable decision.

10        Faced with this question again, not having the

11 benefit of the Court's Memorandum and statements here, facing

12 this question again I am not sure that 99 out of 100 lawyers in

13 this district would not file the same sort of Motion.  It's --

14 when I say it's the beginning I don't want to say that it's --

15 you know, it was an unreasonable demand to spark negotiation.

16 We had to start somewhere.  And --

17        THE COURT:  Okay.  Well, let's just get back to --

18 cut to the chase then.

19        MR. BERNSTEIN:  Yes, sir.

20        THE COURT:  It comes down to a justification of the

21 $144,000.  I have an estate that generated a value of no more

22 than 70,000.  I have a Debtor who, in its best case never

23 generated annual income of more than $13,000.  So, if you want

24 to stand by the one forty-four, then give me your best defense

25 as to why that was a justifiable and reasonable number under

1  these sets of circumstances, because I can tell you again, it

2  is so far beyond the pale, it's not just puffing the claim a

3  little bit.  It is way, way off the ledge.  I would not have

4  gone to the trouble of writing a Memorandum Opinion -- and

5  believe me, I don't take lightly issuing a 9011 Order.  I think

6  this is only the second one I've ever done in ten years.  But

7  it's gotten to the point where enough is enough, and so I need

8  to say what I need to say on this.

9          So, if you want to justify the one forty-four, please

10  do so.

11          MR. BERNSTEIN:  Well, I'm not sure that anything I

12  can say today --

13          THE COURT:  I'll give you full range to do whatever

14  you want to do to justify the number and defend the Motion

15  against the show cause.

16          MR. BERNSTEIN:  Well, I would love to have this

17  discussion about justifying that number.  It sounds like my

18  doing that is -- is challenging the Court and is making a

19  decision that --

20          THE COURT:  Well --

21          MR. BERNSTEIN:  -- we can't -- we can't seek a

22  different amount, that we're stuck with this.

23          THE COURT:  What I am trying to do is I'm trying to

24  give you the benefit of my read, the benefit of my view of the

25  case, and the view of the case law, so that you can adjust

1  accordingly in your response to that, and we can have a fully

2  informed and engaged discussion about it, and then at that

3  point I can make a determination.

4          MR. BERNSTEIN:  Excuse me.  The only thing I can say

5  with regard to the one forty-four is that it was our attempt at

6  coming to a calculation that the Court and the parties could

7  then use to be modified by the actual facts to be -- to be

8  developed, what exact percentage of the property the Trustee

9  used, what equipment was on there.  All of those things which

10 modified -- which allow the Court, and which the Court is

11 required to look at to get to a reasonable rent.  That is, in a

12 nutshell, how we justify the one forty-four.  I mean, maybe it

13 cuts against my argument, but nobody expected we would end up

14 with a one forty-four claim.  We expected that the parties

15 would bring their positions to it, the Court would ultimately

16 either approve a consent agreement or make a decision based on

17 all the facts.  That's what I'd say in support of putting a one

18 forty-four number in there.

19         We do not want to proceed with the dismissed Motion.

20 I am not challenging the Court in that regard.  We have now the

21 benefit of this ten days of review of the Memorandum Opinion

22 and the Court's comments, and our research, and I don't think I

23 need to, but I can assure the Court that the next Motion we

24 file, assuming we file one, is going to be significantly

25 different in terms of perhaps number, certainly support within

1  the document, and getting -- and following the necessary flow

2  down through a conclusion of what we think is a reasonable

3  number.

4       I know the Court may have mentioned giving us seven

5  days to do that.  I'd rather have more time.  It gives me an

6  opportunity to -- once we get the property back, take another

7  look at it, talk with the Trustee in the light of day about

8  what exactly happened without the worry about the various

9  Motions that were pending, and it just -- I would like more

10  time.  Having said that, I would rather not have the Order to

11  Show Cause outstanding.  It is very uncomfortable for me.

12       With regard to Ms. Biros, the -- I realize that she

13  is there because she is the client, and she authorized the

14  pleading and she authorized and signed the response.  She was

15  listening to our advice.  And I don't -- I mean, I'd give her

16  the opportunity to say anything else.  I don't think there's --

17  she has anything to add to what I've said, Your Honor.

18       THE COURT:  All right.  So how much time are you

19  asking for to file an amended Motion?

20       MR. BERNSTEIN:  Thirty days.

21       THE COURT:  All right.  And, Ms. Biros, you're

22  incorporating the comments of your counsel.  Do you have

23  anything further you want to add?

24       MS. BIROS:  No, Your Honor.

25       MR. BERNSTEIN:  No, you're agreeing with what I am

68

1  saying?

2          MS. BIROS:  No.  I was answering his second question.

3  I have no more to add.

4          THE COURT:  She has nothing further to add.

5          MR. BERNSTEIN:  All right.

6          THE COURT:  All right.  Okay.  And -- all right.  Mr.

7  Bernstein, anything further you wish to address on this

8  subject?

9          MR. BERNSTEIN:  No, Your Honor.

10          THE COURT:  All right.  Well, then, I will give you a

11  30-day period to file an amended Motion, but I am not in a

12  position to vacate the Show Cause at this point.  I will

13  continue it over to the hearing on that Motion on the

14  administrative expense if an amended Motion is filed.  It gives

15  you up to 30 days, but you can certainly file it sooner if you

16  wish.

17          MR. BERNSTEIN:  Yes, Your Honor.  One question.  And

18  I am not a litigator, so I don't know quite all the rules.  But

19  I note that in the memorandum there were specifically findings

20  and conclusions, and I have been told that we need to, if we

21  have concerns about those findings and conclusions, we need to

22  file a Motion to amend or request for an extension of time to

23  move to amend.  Could we have the same 30 days --

24          THE COURT:  Yes.

25          MR. BERNSTEIN:  -- for that?  Thank you, Your Honor.

69

1          THE COURT:  All right.  Does anyone need a break at

2    this point?

3          MR. SNYDER:  Yes, please.  Just a quick bathroom

4    break.

5          THE COURT:  All right.  Why don't we take a ten-

6    minute break, a recess, and we will convene on the record at 25

7    after?  Court will now stand in -- adjourn, and we will

8    reconvene at 12:25.

9                         (Recess)

10         ECRO:  All rise.

11         THE COURT:  Be seated.  We are back on the record in

12   Case Number 22-20823, U LOCK, Inc.  We have made some headway

13   through the pending matters, and now, according to my score

14   sheet, the only remaining items that we have at this point are

15   the amended Show Cause Order issued by the Court at Docket

16   Number 278.  That is an Order to Show Cause that this Court

17   issued on December 16th, 2022, directed to George Snyder and

18   Christine Biros, requiring them to appear and show cause as to

19   why the Court should not impose sanctions against them, for

20   exercising control over property of the Estate in violation of

21   the Stay, and also interfering with the Trustee's sale of

22   assets.  The Order was amended on January 6th, 2023, solely for

23   the purpose of establishing a response deadline.  And the show

24   cause arose out of a December 1, 2022 hearing on the Trustee's

25   Motion to sell assets.

1          Although the Court was prepared to proceed with the

2    sale Motion these efforts were thwarted by the revelation that

3    many of the Debtor's tangible personal property, including

4    assets specifically listed for sale by the Trustee, had been

5    removed from the Debtor's business premises.  The parties then

6    accused the other of surreptitiously moving the assets.

7          As the sale could not proceed until the location and

8    identity of the assets has been secured the Court implemented

9    two measures.  First, I required George Snyder, Shanni Snyder

10   and Christine Biros to each file a sworn affidavit under 28

11   U.S.C. Section 1746 identifying, A, any assets they removed

12   from the Debtor's place of business, B, the current location of

13   any removed assets, and C, the authority by which those assets

14   were removed.  Second, the Court took the rare step of

15   conducting a site visit on December 2nd, 2022, to visit the

16   three locations where the assets were allegedly situated in an

17   effort to confirm the whereabouts of each item listed in the

18   sale Motion, and that precisely occurred because the parties

19   could not reach any consensus whatsoever as to what assets were

20   located where and who took what.

21         Shanni Snyder filed an affidavit indicating she was

22   not in possession of any assets, while both George Snyder and

23   Christine Biros admitted that they were in possession of Estate

24   assets, and during the site inspection it was allegedly

25   indicated that a gentleman by the name of Glenn Mowry may have

71

1  also removed certain assets listed on the Debtor's bankruptcy

2  schedules and retained possession of them, although at this

3  point he has not entered an appearance in the case, and so the

4  Court deferred any further proceedings against Mr. Mowry to the

5  discretion of the Chapter 7 Trustee.

6      I have responses from both George Snyder and

7  Christine Biros to the pending Show Cause Order.  At this point

8  I have reviewed those responses.  I have had an opportunity to

9  understand what the parties' positions are, and so at this

10 point I am going to offer an opportunity for the parties to

11 supplement the record if there is anything further they want

12 the Court to consider, either in terms of legal argument or

13 evidence they may be prepared to do so.  So, with that said I

14 will begin with Mr. Snyder.  Mr. Snyder, is there anything

15 further you wish to say or present in terms of the Order to

16 Show Cause?

17     MR. SNYDER:  Did you want Mr. Roth to speak first on

18 behalf of U LOCK?  Or me for my personal --

19     THE COURT:  This is a Show Cause Order issued against

20 you.

21     MR. SNYDER:  Okay.

22     THE COURT:  It does not have anything to do with U

23 LOCK itself.

24     MR. SNYDER:  Okay.  Let me ask you one other question

25 you gave in the instructions when you came here.  You said you

1  were trying to streamline things, and you said that you don't

2  necessarily want to hear defenses to the accusations, it's just

3  assumed that I am defending certain things?

4          THE COURT:  No.  I want to hear whatever you want to

5  present as your defense to the Show Cause Order.  What I don't

6  want to do is to get into a screaming match between you and the

7  Biros parties as to who did what.  I just want to hear your

8  side of the case and hear what you have to offer at this point.

9          MR. SNYDER:  Okay.  Then I will just keep it really

10 brief because most of it is in my --

11         THE COURT:  Okay.  Because I was going to say this is

12 -- the floor is yours.  You can enter and put in whatever you

13 wish the Court to consider.

14         MR. SNYDER:  Um, I didn't --

15         THE COURT:  And I'll tell you what, while we're doing

16 this, let me also go through this.  I'm going to have whoever

17 is going to be addressing the Court and raising any factual

18 issues to be sworn.  So -- and I'll do the same thing on the

19 Christine Biros side, too.  So, you'll be testifying, anyone

20 else over here?

21         MS. BIROS:  I'm not sure yet.

22         THE COURT:  Ms. Biros?

23         MS. BIROS:  Not sure.

24         THE COURT:  Okay.  So, I would ask that you both

25 please rise and be sworn, and I ask Ms. Smith to please swear

1 the witnesses.

2                    GEORGE SNYDER, WITNESS, SWORN

3                    CHRISTINE BIROS, WITNESS SWORN

4          ECRO:  Thank you.

5          THE COURT:  All right, thank you.  All right, Mr.

6 Snyder, you may proceed.

7          MR. SNYDER:  Okay.  Regarding anything I've taken off

8 of there, I was in touch with Mr. Slone the whole time.  I

9 didn't remove any assets -- I'm sorry, I didn't remove anything

10 that was on the schedule.  I did remove the two big white tanks

11 that were assets of the Estate that I believe I would be

12 putting on the amended schedule once we amended it.  But I

13 removed those with Mr. Slone's knowledge.  And also, according

14 to your June 3rd, I believe, Court Order, it said to remove all

15 the tanks from the property by a certain date and all the

16 vehicles on the property by a certain date.  So, I believe I

17 moved that stuff with the authority of the Court and with Mr.

18 Slone's permission and knowledge.  And at all times he was

19 aware of where they were at, they weren't hidden.  You could

20 actually see them right from the red light at the highway.  And

21 as you saw, it's a quarter mile away from the site that they

22 were on.

23          So, the Court Order also said that if they were sold

24 to give that money to the -- you know, parse that money to Mr.

25 Slone.  Those tanks weren't sold, they were just preserved

1  there until the outcome of this.

2          As far as the vehicles go, meaning the abandoned

3  cars, I have -- those were salvaged according to the, I think

4  it was a June 3rd Court Order and I brought money orders with

5  me today.  I believe the Court has them already, though.

6          THE COURT:  Are those the ones that were attached to

7  your response?

8          MR. SNYDER:  Yes.

9          THE COURT:  Okay, I do have those.

10          MR. SNYDER:  One is for $500 and one is for 475.

11  That was the total of any car that was scraped there.  And that

12  was provided to Mr. Slone and he received that money.

13          Then the other items that you saw on the site visit,

14  there was a couple pallets of shelving, there was a red or a

15  yellow tri-axial trailer, real old trailer and some unistrut

16  pallet, those were all my personal items, and also the shipping

17  containers too, I'm sorry, and the shipping containers were my

18  personal items.  So, I didn't remove anything, any other

19  scheduled items.  And the only assets of the Estate were those

20  two white water tanks.  And that's pretty much it.

21          THE COURT:  All right, nothing further?

22          MR. SNYDER:  No.  And, I guess just in the event that

23  you would find I did something wrong, I would just like to say

24  I apologize and just put it on the mercy of the Court to

25  sanction me how you feel it necessary.

1          THE COURT:  All right, thank you.  Do we still have

2   Trustee Slone on the line?

3          MR. SLONE:  Yes, I'm still here.

4          THE COURT:  Is you video working?

5          MR. SLONE:  Apparently not.  Every time I press it,

6   it says failed to start video camera, please select another

7   video camera.  I don't have any other video camera.

8          THE COURT:  All right.  I'm going to ask that you

9   also be sworn, Mr. Slone.  So, I'm going to accept your

10  representation that you are raising your right hand and you are

11  agreeing to be sworn.

12         MR. SLONE:  I am, sir.

13         THE COURT:  All right, Ms. Smith.

14              ROBERT SLONE, WITNESS, SWORN

15         ECRO:  Thank you.

16         THE COURT:  All right.  Mr. Slone, anything that you

17  wish to inform the Court with respect to Mr. Snyder's Show

18  Cause about removal of the items that he has mentioned today?

19         MR. SLONE:  Not too much.  A lot of the stuff was

20  removed before I became Trustee.  He did give me the two checks

21  for scrap value of car salvage.  One was for $475 and one was

22  for 500.  I deposited those on July 12th, 2022.

23         The two white water tanks I was aware of, he probably

24  had moved those prior to my being appointed and then I said,

25  just leave them where they are.  I knew they were on his

1  property.  And it was difficult in this case to ascertain what

2  property actually was U LOCK'S.  We only had what was on the

3  schedules.  There was no back-up, there were no tax returns

4  filed, it was very difficult to ascertain exactly what.  I took

5  Mr. Mark Ferry down, we went through with George Snyder, he

6  pointed out some other items.  That's about all I can say, Your

7  Honor.

8         THE COURT:  All right, thank you.  Mr. Snyder,

9  anything further that you wish to say in response to what the

10 Trustee has indicated?

11        MR. SNYDER:  No, that was it.  Just, I agree with

12 him, it was a little difficult and I apologize for that, but

13 when we first, I think, when the limited Relief of Stay was I

14 think the first time the Biros were on the property was July

15 12th, I was only on there for a matter of weeks, then I was

16 banned from the property and so, from that point until about a

17 week ago I wasn't on the property, so I was unable to make a

18 complete inventory like I would like to.  So, I discussed that

19 with Mr. Slone, he wanted the complete inventory but couldn't

20 get me on the property so that was what the delay was all

21 about.  That's all.

22        THE COURT:  All right, thank you.  All right, I'm

23 going to consider that Order to Show Cause to be under

24 submission then, and I will take that under advisement.

25        With respect to the portion of the Show Cause Order

1  as to Christine Biros, Mr. Bernstein.

2         MR. BERNSTEIN:  Thank you, Your Honor.  Just

3  preliminarily, I think in our response, Ms. Biros's response,

4  she tried to focus on her actions and, unfortunately, the

5  actions that she took were based on things she saw and things

6  she heard, and so, it bled over into what may have seemed like

7  accusations about other parties.  We do try to focus on the

8  seven items that she moved and I've outlined in the response

9  the bases on which she moved those things, the reason that she

10  thought she was authorized to move those things and by way of

11  other defenses, of course, we've outlined that we don't think

12  that any of the seven were property of the Estate.  We have

13  since developed and Mr. Otto could testify about that since he

14  pulled them together, we've developed evidence from Mr. Mowry

15  as to the ownership of six of the items.  Mr. Otto has, as to

16  the trailer, that was the item discovered on the morning of the

17  -- or during the site visit, Mr. Otto has, by obtaining the

18  vehicle identification number, he's had that traced and it is

19  owned by another party.  We don't have any other evidence of --

20         THE COURT:  Well, let me ask you something there.  I

21  mean, you know, these items were listed on the schedules.  So,

22  irrespective of whether or not you believe the Estate really

23  owned those items, does that give you the ability to move them?

24         MR. BERNSTEIN:  Well, I guess the question is, what

25  is it that Ms. Biros is accused of violating?  And if it is

1  dealing with property of the Estate, then we have to examine

2  whether it was, in fact, property of the Estate.  And I

3  understand that 541, concept of property of the Estate, is

4  pretty broad.  One could argue that U LOCK listing them on the

5  schedules was an assertion that the Estate had an interest in

6  it which might make it property of the Estate, we're suggesting

7  that, in fact, U LOCK did not have an interest in it.  Whether

8  U LOCK said they did or didn't, if the ultimate finding is that

9  it was owned by somebody else, then it never belonged to U

10  LOCK.  And that's one of our defenses.

11        The second, of course, is that in the June 3rd Order

12  Ms. Biros was given leave to clean up the property, to take

13  things off the property.  That, in combination with her concern

14  about items that could have value disappearing, led her to take

15  the action to move them to the McKeesport site.

16        THE COURT:  So, what in the June 3rd Order gave Ms.

17  Biros the belief that there was authority?  I mean, the

18  response mentions the vehicles and trailers provision.

19        MR. BERNSTEIN:  Yes, that section.

20        THE COURT:  But I thought it was pretty clear from

21  the discussion that was had on the record at the hearing that

22  occurred on June 2nd, that what we were talking about at that

23  time were vehicles that were actually titled automobiles not

24  heavy equipment.

25        MR. BERNSTEIN:  I don't think that was Ms. Biros's

1  understanding, that it was more of a wider cleanup provision.

2          In any event, whether that was a legitimate basis for

3  her to believe that she had the right to remove them or not, in

4  fact, the removal of them did protect them.  They became

5  available to be at the sale.  It certainly inconvenienced

6  everybody and the Court to continue that sale hearing and make

7  the site visit.  We know in the end those things really didn't

8  make a difference to the sale price or the sale process, so we

9  don't think there was any actual harm to the Estate.

10         THE COURT:  Well, why was it that when I set the due

11 diligence date or the site inspection date, where people could

12 come onto the property to look at the assets, which I'm trying

13 to remember the date of that.

14         MR. JOYCE:  November 10th, Your Honor, is that --

15         THE COURT:  I think it was actually November 21st.

16         MR. JOYCE:  Oh, the due diligence date was the 21st,

17 the hearing was the 10th.

18         THE COURT:  Okay, thank you.  I had a hearing on

19 November 10th, and I set a due diligence date of November 21st

20 for parties to go to the property and look at the assets.  And

21 my understanding is from the papers, that the assets had

22 already been moved by November 10th.  So, why was nothing ever

23 said at that hearing that the assets had been moved and if we

24 went to the site you weren't going to see everything that was

25 ostensibly property of the Estate?

1         MR. BERNSTEIN:  The only answer I can give is that

2 the process has been so messy because of all of the accusations

3 and moving things and being unclear whose is what, that it

4 just, Ms. Biros just didn't feel that that was a clarification

5 that needed to be made.  I don't -- I'm sure that's not a

6 satisfactory response, she may have a different response to

7 make personally, but that's my understanding in talking to her

8 and Mr. Otto.

9         And she understands that now, what she did caused

10 difficulty and confusion.  Again, in the end we don't think

11 that it made a difference to the quality of the sale and we

12 think the Court found that  --

13         THE COURT:  Well, irrespective of if it affected the

14 outcome of the sale, it definitely delayed the sale hearing

15 because it required me to have an additional sale hearing.

16         MR. BERNSTEIN:  Yes.

17         THE COURT:  It required me to have a site visit, it

18 required me to bring two U.S. Marshals out there, it required

19 all the professionals to be there, spending I don't know how

20 many hours we did that and, furthermore, it delayed when the

21 closing of the sale could occur.  Is there any issue with that

22 outcome or what resulted from the action of moving those

23 assets?

24         MR. BERNSTEIN:  If she was not justified and she was

25 not authorized to take the steps that she did, then certainly

1  those costs could follow from her actions.  They would, in our

2  view, be shared to the extent there's responsibility for that

3  with Mr. Snyder, who was involved in moving things at the same

4  time and at the same -- we learned of it at the same hearing.

5  So, that's sort of a mitigation argument.  She knows it

6  shouldn't have been done.  It should have been done more

7  cleanly and --

8           THE COURT:  Well, not only should it not have been

9  done, I'm also struggling with the fact that there was no

10  candor or admission to it when the opportunity to do so

11  presented itself at the November 10th hearing.  I had to find

12  out about this because of accusations from the other parties.

13  There was never an affirmative representation and I'm willing

14  to hear from Mr. Slone about this, but from my understanding of

15  the transcript and, again, Ms. Biros can correct me if I'm

16  wrong, you can correct me if I'm wrong, and Mr. Slone can

17  correct me if I'm wrong, my understanding was the Trustee

18  thought the assets were being moved within the property.  He

19  did not have an understanding they were being moved off

20  property.

21           MR. BERNSTEIN:  Well, my understanding is different,

22  Your Honor.

23           THE COURT:  Okay.  Well, then here's what I want to

24  know then.  Again, whatever other record you want to establish

25  with respect to this, I'll give you the opportunity to do so,

1  you mentioned having Mr. Otto speak to this, I'm not sure if

2  you're going to have Ms. Biros say anything further but

3  whatever you want to have the Court consider in relation to

4  this, this is your opportunity to set that record.

5          MR. BERNSTEIN:  So, I think Mr. Otto would like to

6  give the Court some information and he should probably be

7  sworn.

8          THE COURT:  All right, let's have Mr. Otto sworn,

9  please.

10                  WILLIAM OTTO, WITNESS, SWORN

11          ECRO:  Thank you.

12          THE COURT:  You may be seated, Mr. Otto.

13          MR. OTTO:  Your Honor, when this case first started

14  and the Trustee was appointed, I called the Trustee.  I didn't

15  know him, but I talked to Mr. Bernstein and he suggested I call

16  him directly, so I did.  And I strongly urged him to secure the

17  site from the beginning.  And in the period of time from when

18  he was first retained until the November time frame, I met with

19  him among other people at the site six times.  And over those

20  site visits things kept disappearing.  And I told him on a

21  number of occasions that he needed to take better control of

22  the site.  I can't speak to his actions, but I can tell you

23  things kept disappearing.  And at some point in time, Mr. Mowry

24  submitted two affidavits to the Trustee as to equipment he

25  claimed he owned and it's my recollection that at one point a

83

1  Trustee told him to go ahead and take his stuff off the site.

2  I know Mr. Snyder has complained that that was done and that's

3  my understanding, as well.

4          I told the Trustee over a number of phone calls and

5  visits and conversations, that Ms. Biros had moved some of the

6  equipment.  That the reason that she moved it was because other

7  things that were on the site had been moved or taken and that

8  he would be welcomed to either inspect it or we would  return

9  it if he deemed that was necessary and he never asked either to

10 see it or to have it returned.

11         THE COURT:  All right.  Anything further at this

12 point?

13         MR. OTTO:  The only thing I can say about a failure

14 to disclose it in November when we had that discussion, was

15 that there was a focus on the site and since there was only at

16 the time either Mr. Snyder or Ms. Snyder were going to bid on

17 it and they, obviously, knew that the equipment existed.  Ms.

18 Biros never did anything other than move it to another site to

19 make sure that it would be available for whoever bought it.

20 She didn't sell it, she didn't scrap it, she didn't damage it,

21 she just had it moved.

22         THE COURT:  What about the allegations made in the

23 response that the equipment was damaged when it was moved?

24         MR. OTTO:  That the equipment was damaged?  Your

25 Honor, none of it, it was all scrap.  It wasn't usable.

84

1          THE COURT:  Okay.  But the allegation is that it was

2    originally put on the property, the one piece of machinery, was

3    on its side and then it was made to be upright by the time of

4    the site visit.

5          MR. OTTO:  Your Honor, it's my understanding that

6    this gentleman here is the one who moved it and he can speak to

7    the condition.  I never saw it on the McKeesport site.

8          THE COURT:  Okay.  All right.  Anything further from

9    Ms. Biros's side?

10          MS. BIROS:  Yes.  Your Honor, when I had the property

11    removed, I believe I went through my attorney.

12          THE COURT:  You can be seated, if you wish.  If

13    you're more comfortable.

14          MS. BIROS:  Okay, thank you.  I went through my

15    attorney, Mr. Otto, to speak to Mr. Slone.  It was my

16    understanding he knew I was moving it to another site.  It was

17    the only way I could secure it.  I never scraped it, destroyed

18    it purposely.  If in the move or it was damaged it was still

19    scrap.  He could testify to its scrap.  There was no value.

20    That stuff has been there, on that property before 2015.  Mr.

21    Mowry says he's had it there for years.  He was the person who

22    was supposed to buy the property.  I don't want to get off

23    track.  But, I have all of the paperwork from Mr. Mowry, it was

24    never U LOCK'S possession.  I mean, it might have been in their

25    possession, it was never their ownership of anything I took.

1  There was also a red trailer there that belonged to a company

2  that we tracked back to Morris Landscaping, a Mary Morris of

3  North Versailles.  She's never claimed the trailer, we've tried

4  to contact her, I even asked the police to try to contact her,

5  to return her items to her.  Nobody could do anything or help.

6          THE COURT:  And when did you get the information from

7  Mr. Mowry that suggests that he is the owner of some of the

8  equipment?

9          MS. BIROS:  The first time I met Mr. Mowry he came to

10 the site with Mr. Slone was there, Nick Jackson was there.

11 There were a few other people and Mr. Mowry stated that he was

12 the owner of a lot of this heavy equipment.

13         THE COURT:  And when was that?

14         MS. BIROS:  What's that, sir?

15         THE COURT:  When was that?

16         MS. BIROS:  You were there.

17         THE COURT:  I'll --

18         MS. BIROS:  It was one of the visits --

19         THE COURT:  Was it prior to November?

20         MS. BIROS:  Oh, yes.

21         THE COURT:  Was it over the summer?

22         MS. BIROS:  We have so many, we have six listings of

23 site visits so I don't want you to pin me down to a date that I

24 can't back up then.  But he came, I forgot what I was saying.

25 But Mr. Mowry came to the site with his attorney, Mr. Bird

1  (phonetic), I believe and then he also came to the site visit

2  with you and claimed that.  He told me he spoke with Trustee

3  Slone and Trustee Slone told him he didn't have to be at any of

4  the hearings.  He submitted Trustee Slone his ownership of

5  those things.

6          THE COURT:  And when did that occur, do you know?

7  The exchange of whatever ownership documents?  If it was given

8  directly to Trustee Slone, I'll ask Trustee Slone.

9          MS. BIROS:  I have no idea.

10          THE COURT:  Okay.

11          MS. BIROS:  When we were in Court, I don't know if it

12  was the last time or the time before that, I don't know the

13  opposing counsel's name I'm sorry, Mr. Joyce, stated that  Ms.

14  Snyder would not object to anyone taking their personal

15  property off of the U LOCK and all their personal things.

16  Although Mr. Mowry was not given the same opportunity to take

17  his stuff.  But we were at that site, Mr. Snyder, Your Honor,

18  and Mr. Mowry made a comment he had a piece of equipment there

19  as well and August 4th, he turned in an affidavit of all his

20  stuff,  I'm sorry, Your Honor, of 2022.

21          THE COURT:  All right.  So, I want to be clear.  So,

22  August 4th was not the meeting with Mr. Mowry, or was it?

23          MR. OTTO:  That's correct, Your Honor.

24          MS. BIROS:  That's correct, but he --

25          THE COURT:  Okay, so you met with Mr. Mowry on the

1  site on August 4th?

2          MS. BIROS:  No, no, no.

3          MR. OTTO:  No, Your Honor.  On August, I believe,

4  18th --

5          MS. BIROS:  Well, let me just finish my one thought,

6  Your Honor.  The site visit that you attended, we went to Mr.

7  Snyder's and Mr. Mowry expressed interest in a piece of

8  equipment he also had there.  He's tried to obtain back since

9  that date and Mr. Snyder will not let him have his stuff.

10         MR. OTTO:  We had a site visit on August 18th, with

11 the Trustee.

12         THE COURT:  Okay.  So, August 18th, was the site

13 visit and that's when Mr. Mowry first appeared?

14         MR. OTTO:  To the best of our recollection, yes, Your

15 Honor.

16         THE COURT:  Okay.  And then when was it the --

17         MR. OTTO:  The affidavit that he provided to the

18 Trustee --

19         THE COURT:  -- ownership materials provided?

20         MR. OTTO:  -- was August 4th.

21         THE COURT:  August 4th?

22         MR. OTTO:  Yes.

23         THE COURT:  So, he provided ownership materials

24 before he actually saw the items?

25         MR. OTTO:  I believe he had visited the site prior.

88

1   And, in fact, he had been on the site for some time.

2            THE COURT:  All right.  Anything further that you

3   wish to add at this point?

4            MR. BERNSTEIN:  Your Honor, Mr. Otto did bring with

5   him documentation matching each of the seven items that were in

6   question, that were moved, two documents from Mr. Mowry and

7   he's prepared to present those.  We have copies for the other

8   parties.  We don't have, these were statements from Mr. Mowry,

9   so we don't have Mr. Mowry here, but Mr. Otto can tell the

10  Court what he's done with them and submit them.  I don't know

11  how you want to proceed with that.

12           THE COURT:  If you wish to proceed by submitting

13  those to the record, you can do so.  So, if you want to hand

14  them up.

15           MR. JOYCE:  I guess I'd note an objection, that's

16  hearsay.

17           THE COURT:  Well, my understanding is that it's being

18  submitted that there was some sort of ownership document

19  presented, it's not as to the truth of the matter whether or

20  not it actually is an ownership interest.  Quite frankly, you

21  know, I'll accept it, but I want to be clear on one thing.  You

22  know, these are assets that were listed on the schedules as

23  property of the Estate.  And in my view that makes it

24  sacrosanct for the purposes of the Stay.  So, whether someone

25  else has claimed an ownership interest in it, it doesn't

1  necessarily give the right to move the asset absent Court Order

2  or absent some other type of authority.  And so, you know, I

3  will review that but I can tell you as I sit here right now, I

4  don't know that that necessarily carries the day, so I will

5  look at it for what it is and for what Ms. Biros understood to

6  be the competing claim to ownership for Mr. Mowry.  Whether or

7  not that's true or accurate or not is of no difference.  So,

8  I'm going to overrule the objection on that basis.  So, if

9  you'd like to bring that forward.

10        MR. OTTO:  If I may hand these up and then I'll give

11  them to the parties.

12        THE COURT:  So, I'm going to mark this as Exhibit 1,

13  Exhibit 2 --

14        MR. OTTO:  Your Honor, those -- excuse me.  Those

15  exhibit numbers correspond to the exhibit numbers in Ms.

16  Biros's affidavit that she submitted in connection with those

17  originally.

18        THE COURT:  Okay.  We have Exhibits 1, 2, 3, 4, 5, 6

19  and then I've got an Exhibit A, which I'll just call Exhibit 7.

20        MR. BERNSTEIN:  These weren't collated before, Your

21  Honor.

22        THE COURT:  All right, that's fine.  Anyone else wish

23  to be hear with respect to the Court's determination to admit

24  these as exhibits to this Show Cause?

25        MR. JOYCE:  Your Honor, something came to my

1 attention two days ago that I wanted to bring to the Court's

2 attention because I think it's important.  This week we were

3 conferring with our client Ms. Snyder about her removal of the

4 purchased assets that she acquired.  And in that process, she

5 engaged Mr. Nicholas Jackson, who is present in the courtroom

6 here today, to do that, help her with it.

7       And in the course of that and she's never met him

8 before or worked with him before, I should say in any way, but

9 in the course of that process Mr. Jackson said, hey, I didn't

10 get paid for moving the equipment that Christine Biros -- and

11 he could testify to this, I'm just letting the Court know what

12 I understand his testimony would  be, that he was asked by Ms.

13 Biros to move the equipment.

14       And he was told, I believe, that she owned the

15 equipment, that she would pay him and some of the equipment was

16 even moved after the November 10th hearing, I believe on

17 November 11th.  Some was moved by Mr. Jackson November 3rd and

18 5th and then after our hearing here on November 10th, when it

19 wasn't disclosed that it had been moved, he was asked to move

20 equipment on November 11th, down to the McKeesport site.

21       And he will -- you can call him and question him, or

22 I could do so.  He was told that she owned the equipment and

23 she would pay him, she hasn't paid him and I believe in her

24 proffer to the Court, her  affidavit to the Court, she said she

25 incurred costs on the move.  She hasn't paid him at least those

1  costs, and he also was told that, you know, in exchange for

2  payment, she'll just give him the equipment.

3         MR. BERNSTEIN:  Your Honor, can I object to this as

4  hearsay, counsel testifying.  And I'm not sure what interest

5  Ms. Snyder has in this proceeding.

6         MR. JOYCE:  I think we have an interest for our fees

7  being incurred on all these, you know, running around the

8  sites.

9         THE COURT:  Well, I mean, here's the one thing I'm

10 going to say.  You did file a -- well, actually --

11        MR. JOYCE:  I didn't file a response.

12        THE COURT:  -- you didn't file a response.  So, I

13 really don't see you having standing onto this issue.  And so,

14 I'm not going to hear any further on this.

15        MR. BERNSTEIN:  Yeah, he can testify to it.

16        MR. ROTH:  Your Honor, I would like  to call Mr.

17 Jackson as a witness is what I'd like to do.

18        THE COURT:  Okay.  Well, Mr. Roth, I previously ruled

19 that your client does not have standing in this matter and I'm

20 incorporating that ruling from the sale hearing into this as

21 well.  And the third thing I would say is, although Mr. Snyder

22 filed a response, I'm basically finding it's not germane for

23 the other parties to weigh in on a Show Cause Order that was

24 directed to one party.  This is a Court initiated thing.  You

25 know, I'm going to consider my record.  Ms. Biros has mentioned

1 having Mr. Nicholas speak to the Court and if that is the case,

2 then he's free to do so in the context of her presentation.

3 But, I'm not going to open this up to have the other parties

4 weigh in.  I did not ask any of the parties to weigh in on the

5 Show Cause Order that was issued against Mr. Snyder and I'm not

6 going to do the same here and certainly not in a case where

7 someone did not even file a pleading or response to it.  So,

8 with that, I'm back to these exhibits.

9        I didn't hear any objection other than the one from

10 Mr. Joyce, so I am considering them part of the record here.

11 Mr. Bernstein, anything further that you wanted to address with

12 respect to these exhibits, or anything else you want to offer

13 for the record at this point?

14        MR. BERNSTEIN:  No, Your Honor.

15        THE COURT:  All right.  And is there any inclination

16 from Ms. Biros to have Mr. -- is it Jackson? -- Mr. Jackson

17 address the Court?

18        MS. BIROS:  No.

19        MR. BERNSTEIN:  No, Your Honor.

20        THE COURT:  All right.  So, I do want to hear from

21 the Trustee on this because there is a discrepancy, I think, in

22 the facts as to whether or not the Trustee did authorize Ms.

23 Biros to move the equipment.  So, Mr. Slone, can you tell me

24 from your perspective of whether or not you authorized or were

25 aware of Ms. Biros's efforts to relocate the equipment from the

1  Debtor's premises?

2        MR. SLONE:  Your Honor, my recollection is I was told

3  that when they were doing their remediation work, she could

4  move equipment on the property only.  I wasn't aware that it

5  went to the McKeesport location until pleadings were filed in

6  the Court.

7        THE COURT:  All right.  And there's also an

8  indication that you received documents from Mr. Mowry with

9  respect to his claim to ownership interests, is that accurate?

10        MR. SLONE:  Yes, it is.  Mr. Mowry and his attorney,

11  Larry Burns (phonetic), came to my office and sat in the

12  conference room and put those papers -- and gave me those

13  papers.

14        THE COURT:  And when did that occur?

15        MR. SLONE:  I don't know exactly, Your Honor.  I

16  think it was August or September.  I don't have my time sheets

17  in front of me or I don't even know if I put that on.  But they

18  came to my office, both of them, and I gave those papers to

19  both parties, to the Biros side and to the Snyder side.

20        THE COURT:  And was there anything further done from

21  the Trustee's perspective on the claims of ownership to those

22  assets?

23        MR. SLONE:  Just telling both parties that Glenn

24  Mowry was claiming ownership in those properties and that's why

25  we listed it in the original sale Motion Your Honor.

94

1          THE COURT:  All right.  Anything further you wish to

2    add, Mr. Slone?

3          MR. SLONE:  No, sir.

4          THE COURT:  All right, Mr. Bernstein anything further

5    from Ms. Biros?

6          MR. BERNSTEIN:  No, Your Honor.

7          THE COURT:  All right.  Well, then I'll consider this

8    mater to be under submission as well and I will take it under

9    advisement and review the record that's been submitted today as

10   well as the record that's been established in these core

11   proceedings.

12         Again, I, obviously, would not have issued a Show

13   Cause Order if I did not take this seriously and view this as a

14   significant breach of potentially what would be a principle

15   duty of parties, which is to observe the propriety of property

16   of the Estate and to not move or relocate property without the

17   knowledge or consent of the Trustee.  And, furthermore, to not

18   do so in the middle of the sale process in which the parties

19   were aware that it was ongoing and recognizing what the down

20   field implications would be of doing so when a due diligence

21   period and site visit was scheduled.  So, I will consider these

22   matters and then issue a ruling in the near future as to how I

23   see the Show Cause Order shaking out.

24         So, with that I think we have addressed all pending

25   items on the agenda at this point, although, I do have one

1  ancillary item that I do need to address and this is somewhat

2  tangentially related and, again, getting -- running afoul of my

3  own admonition of not moving far afield from the matters at

4  hand, but one thing that was raised that has been also

5  troubling to the Court, is in the pleadings and the papers

6  there was a reference to the involvement of the North

7  Huntington Police Department at some point.

8          And there was a representation made that one of my

9  proceeding memos was given to the police department for the

10 purpose of expanding upon or explaining what was meant by the

11 Court's Order or in view of some sort of interpretation of what

12 that Order was.  And, so, because that involves an allegation

13 against Mr. Otto, I'd like to hear from Mr. Otto with respect

14 to the circumstances there.

15         And by doing so, I want to remind Mr. Otto, to the

16 extent he's not aware, this is available on my website, is that

17 proceeding memos are not to be construed as orders of the

18 Court, they are not even to be construed as transcripts of what

19 happened in the Court, it is merely for the convenience of the

20 parties and the convenience of the Court to have a general

21 sense of what was discussed for the purpose of identifying

22 where documents and things may be worthy of further

23 examination.  But, to the extent that there is a need for a

24 transcript the parties are directed to get the transcript

25 itself.

96

1          So, another concern I have is the use of a proceeding

2   memo and the suggestion that somehow that was viewed to be an

3   Order of the Court, or reflected upon the Court's authority of

4   what was and was not permitted.  Can you address that for me?

5          MR. OTTO:  Your Honor, I believe that what you're

6   referring to is a police report that Ms. Biros and I attempted

7   to file against an individual who was removing a video monitor

8   from the property.  This was at a time after which you had

9   given control of the property to Ms. Biros, as well as the

10  Trustee and the Trustee did not give this individual

11  authorization to be on the site.

12         Ms. Biros has been accused throughout this proceeding

13  of either stealing Mr. Snyder's property or destroying it or

14  doing something with it and since this individual did not have

15  permission from either the Trustee, so far as I was able to

16  ascertain or from Ms. Biros, to be on the site.  And we had the

17  license plate of his car, we did not know at that point who it

18  was but we reported it the following Monday to the North

19  Huntington Township Police.  To my knowledge they took no

20  action other than an investigation.  But, there was a question

21  of what authority did we have to control the site and that was

22  what I used your Opinion, or your transcript or the proceeding

23  memo.

24         THE COURT:  So, you gave a copy of the proceeding

25  memo to the police.

1          MR. OTTO:  Thank you.  Yes.

2          THE COURT:  Okay.  And for what purpose was it given?

3          MR. OTTO:  Because the North Huntington police

4    questioned why they should get involved in it.  And because

5    they had been told by other people involved in this case that

6    Ms. Biros didn't own the property, didn't have the right to

7    keep people out and what was in that proceeding memo, in

8    essence, asserted that Ms. Biros did have that authority.

9          THE COURT:  Okay.  So, you used the proceeding memo

10   with an officer of the law to suggest that Ms. Biros had a

11   legal right to something.

12         MR. OTTO:  I would say that's correct, yes, Your

13   Honor.

14         THE COURT:  Okay.  All right.

15         MR. OTTO:  Your Honor, and I say this not as an

16   excuse, but I was not aware of the policy of this Court as to

17   proceeding memos.  I will keep that in mind at all times

18   hereafter.

19         THE COURT:  But, you've been represented by local

20   counsel throughout this entire time.

21         MR. OTTO:  I understand that, Your Honor.

22         THE COURT:  And you, when you practice and appear

23   before a Court, you are expected to be mindful of what the

24   rules of the Court are and what the Court's procedures are, are

25   you not?

1          MR. OTTO:  I understand that, Your Honor.

2          THE COURT:  All right, thank you.

3          MS. BIROS:  Your Honor, may I ask you a question?

4   I'm sorry.

5          THE COURT:  Go ahead.

6          MS. BIROS:  The North Huntington Police Department

7   told us they had no authority in anything overseeing this.

8   They told us personally that they spoke to you.

9          THE COURT:  I did not speak with the police

10  department.

11         MS. BIROS:  They spoke to you --

12         THE COURT:  They called my office --

13         MS. BIROS:  Okay.

14         THE COURT:  -- and the response from my office was,

15  as would be standard in any action, is that the Court's Orders

16  speak for themselves.

17         MS. BIROS:  Okay.

18         THE COURT:  But when we say that, we mean the Court's

19  Orders, not proceeding memos.

20         MS. BIROS:  Okay.

21         THE COURT:  And I'm very clear that proceeding memos

22  have no effect and no relevance, whatsoever, to anything and

23  should not be used in any fashion to suggest that they are

24  something beyond which they are, which is the simple notes of

25  the hearing.

1          All right.  I think that concludes everything that's

2    set on the Court's agenda for today.  Is there any other

3    matters that the parties want to raise with the Court at this

4    point?

5          All right.  So, based on the following, I have

6    indicated that I will enter the Stipulation between Shanni

7    Snyder and Trustee Zebley and Trustee Slone, with the caveats

8    noted on the record.  I will grant the Stay Relief Motion filed

9    by Christine Biros as indicated on the record.  I will deny the

10   Motion to Enforce the Order confirming the sale of property

11   that is also subject to consent to Stay Relief for the purposes

12   of having a claim objection to the extent Ms. Biros seeks to do

13   one, against the Shanni Snyder claim and that will also

14   otherwise resolve the pending removed action.

15         I have the Order to Show Cause related to the Rule

16   9011 issues.  That is going to be continued to a future date.

17   I've outlined what I think my initial reactions are to the

18   Motion to give the benefit of the Court's insights but I expect

19   that it's incumbent upon Ms. Biros and Mr. Bernstein to justify

20   the number why $144,000 was reasonable and if it is reasonable

21   to tell me why in the context of this case and the proof of

22   claim and, furthermore, why any possible objections that might

23   exist from other parties would be relevant to that discussion,

24   particularly if the Trustee could consent to a number that

25   would otherwise be considered by the Court.  So, that will be

1  set for a future date.

2         And then with respect to the two Show Cause Orders,

3  I'm sorry, one Show Cause Order but it's issued against George

4  Snyder and Christine Biros, I have my record at this point, so

5  I'll take another look at that and issue an Order based on

6  those considerations.

7         So, with that, I appreciate the parties hanging in

8  there for what has been a prolonged day but I think

9  notwithstanding that we have consolidated a number of issues,

10 made some progress which is more than I can say in other

11 instances with this case, but I'm going to end with what I

12 started, which is, I want folks to think twice about what they

13 file, what they do and how they proceed in this matter because

14 I'm not tolerating any more shenanigans and I'm not tolerating

15 any items that go beyond what is permissible in these actions.

16 That has prolonged this case too long and too far and cost too

17 much in expenses and I think from the Show Cause Orders the

18 Court has set the tone at this point that to the extent

19 necessary, I will address these issues vigorously going

20 forward.  So, with that we will consider the matter to be

21 concluded.  The Court will now stand adjourned and we will

22 close the record.  Thank you for your participation again, have

23 a good weekend.

24         ALL:  Thank you, Your Honor.

25                    * * * * *

# C E R T I F I C A T I O N

WE, ALYCE H. STINE, TAMMY DeRISI and ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Alyce H. Stine                /s/ Tammy DeRisi

ALYCE H. STINE                   TAMMY DeRISI


/s/ Elaine Howell

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.    DATE:  January 31, 2023