Transcript of the Testimony of

# 341 (a) MEETING OF CREDITORS

September 9, 2022

## IN RE: U LOCK, INC.



**412-261-2323**
**depo@akf.com**
**www.akf.com**

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Bankruptcy No. 22-20823-GLT

Chapter 7


In re:                          )
                                )
U LOCK INC.,                    )
                                )
        Debtor.                 )
_____/



TRANSCRIPT OF RECORDED PROCEEDINGS:

341(a) MEETING OF CREDITORS

September 9, 2022

2

1                       PRESENT:

2

3

   Robert H. Slone, Esquire, United States Trustee
4
   George Snyder
5
   Sarah Wenrich, Esquire
6
   William Otto, Esquire
7
   Christine Biros
8
   Ms. Shanni Snyder
9
   J. Allen Roth, Esquire
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                                INDEX

2

3

4

5  WITNESS:  GEORGE SNYDER

6  EXAMINATION BY MR. SLONE - PAGE 5

7  EXAMINATION BY MS. WENRICH - PAGE 22

8  EXAMINATION BY MR. OTTO - PAGE 29

9  EXAMINATION BY MS. SHANNI SNYDER - PAGE 95

10

11

12  EXHIBITS INTRODUCED:  (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           MR. SLONE:  Call the Section

2      341(a) Meeting in the case of U Lock Inc.,

3      Case 22-20823-GLT.  This is the time and

4      place for the meeting.  I'm Robert Slone,

5      the interim Trustee.  Allen Roth is present

6      as attorney for U Lock.

7           Mr. Roth, who's present to testify for

8      U Lock today?

9           MR. ROTH:  I have George, excuse

10     me, George Snyder here.

11          MR. SLONE:  Okay.  And what

12     officer is Mr. Snyder?

13          MR. ROTH:  Vice president.

14          MR. SLONE:  Vice president?

15     Okay.

16          MR. ROTH:  Yes.

17          MR. SLONE:  Okay.  Before, let me

18     swear him in.  Mr. Snyder, please raise your

19     right hand.  And do you swear that the

20     testimony you're about to give in this

21     matter to be the truth?

22          MR. GEORGE SNYDER:  Yes, I do.

23          MR. SLONE:  Okay.  Now, we have

24     some creditors present.  I'm going to ask

25     you to state your name for the record.

5

```
 1      Start with Sarah Wenrich.

 2                   MS. WENRICH:  Hi, Mr. Slone.

 3      Sarah Wenrich here on behalf of Christine

 4      Biros, and William Otto is here as well on

 5      behalf of Ms. Biros.

 6                   MR. SLONE:  Okay.

 7                   MS. WENRICH:  My apologies, Ms.

 8      Biros is also on the line.

 9                   MR. SLONE:  Okay, great.  And

10      Shanni Snyder, are you still present?

11                   MS. SHANNI SNYDER:  Yes, I am.

12                   MR. SLONE:  Okay, and you're here

13      for yourself; right?

14                   MS. SHANNI SNYDER:  Yes.

15                   MR. SLONE:  Okay.

16  EXAMINATION OF GEORGE SNYDER:

17  BY MR. SLONE

18      Q.  Okay, Mr. -- Mr. Snyder, you're

19      testifying as vice president of U Lock.  Did

20      you sign -- well, I'll get to that.  Did you

21      receive a copy of the informational sheet

22      prepared by the Office of the U.S. Trustee?

23      A.  Yes.

24      Q.  And did you read that sheet?

25      A.  Yes.
```

6

1          Q.  Are you personally familiar with the

2     information contained in the petitions,

3     schedules, statements, and related

4     documents, and do they accurately reflect

5     all assets and all liabilities of the

6     company?

7          A.  Yes.

8          Q.  And did you sign the petition and

9     related documents?

10         A.  Yes.

11         Q.  Are there any errors or omissions

12     you wish to bring to my attention at this

13     time?

14         A.  No.

15         Q.  Okay.  Other than in the ordinary

16     course of business, did the company sell,

17     transfer, or give away any assets within the

18     four years prior to filing this case?

19         A.  Nothing outside the ordinary

20     operation of the business.

21         Q.  Yes, no, or will you send me a

22     statement?

23         A.  Oh, I'm sorry.  I said no, nothing

24     outside --

25         Q.  Oh, okay, I'm sorry.

7

1          A.   -- business.

2          Q.   Does the company expect to receive

3     anything of value in the next six months?

4          A.   Let me -- let me back up for a

5     minute.  I had mentioned to you, we talked

6     about that Kubota tractor I brought in the

7     -- I brought in the serial number for you.

8     That was sold last year.

9          Q.   Okay.

10          A.   And then the Christine Biros

11     property.

12          Q.   Does the company expect to receive

13     anything of value in the next six months?

14          A.   Just whatever other rents would be

15     collected.

16          Q.   Do you have a claim or cause of

17     action against anyone for any reason or does

18     anyone owe you money?

19          A.   Yeah, everything what's in the

20     schedule there.

21          Q.   Okay.  It says see --

22          A.   And it --

23          Q.   See schedules.  Does the company own

24     any real estate or real estate that has not

25     been listed?

8

1         A.  Yes.

2         Q.  You're saying yes.  Is that the

3    property, the 21 acres?

4         A.  Yes.

5         Q.  And that's subject to the Biros

6    claim; right?

7         A.  Correct.

8         Q.  What was -- this was an involuntary;

9    right?

10        A.  Correct.

11        Q.  But you didn't contest it?

12        A.  That's correct.

13        Q.  So what's the reason for filing this

14   case?

15        A.  The reason that the other person

16   filed the -- filed the lawsuit, you mean, or

17   filed the involuntary bankruptcy?

18        Q.  Yeah, but why didn't you contest it?

19        A.  (Inaudible).

20        Q.  I mean, there's a reason that you're

21   in bankruptcy, or you would have contested

22   it?

23        A.  Well, I was served -- I was served

24   an involuntary bankruptcy and I kind of

25   actually thought (Inaudible).

9

1           MR. SLONE:  Whoever that is,

2      please mute yourself.

3           MS. SHANNI SNYDER:  (Inaudible)

4      playing.

5           A.  We really had, you know, no assets

6      --

7           Q.  Hang on, Mr. Snyder.

8           A.  We have -- okay.

9           MR. SLONE:  Somebody's phone is

10      ringing or something.  Check your phones,

11      everybody.  Thank you.

12           Q.  Okay, Mr. Snyder you can continue.

13           A.  Okay, I said we didn't really have

14      any assets. We owed money, and we didn't

15      really have any defenses for the claims.  So

16      the bankruptcy may have other defenses.

17           Q.  When was U Lock incorporated?

18      Approximately when was it incorporated?

19        Hello?  Anybody there?

20           MS. WENRICH:  I'm here.  I'm

21      still here.

22           MR. OTTO:  I'm here.

23           Q.  Okay.

24           MR. OTTO:  I'm here.

25           Q.  When was the company incorporated?

10

1      Mr. Roth, do you know?

2      George Snyder and Allen Roth, are you guys

3      on the line?  Hello?

4                  MR. SLONE:  Okay, everybody else

5      is on the line; right?  Mr. --

6                  MS. WENRICH:  Yes.

7                  MR. SLONE:  Sarah and Bill?

8                  MR. OTTO:  Yes.

9                  MS. SHANNI SNYDER:  This is

10     Shanni. I'm still on the line.

11                 MR. OTTO:  This is Bill Otto.

12     I'm still on the line.

13                 MR. SLONE:  Okay.  What happened

14     to Snyder and Roth?

15                 MS. SHANNI SNYDER:  Seems like it

16     was disconnected.

17                 MR. SLONE:  Were they at the same

18     place?  Oh, Jesus.

19                 MS. SHANNI SNYDER:  Oh, me?  I

20     have no idea.

21                 MR. SLONE:  Okay.  I don't know

22     what to say.

23                 MS. SHANNI SNYDER:  I think that

24     was just, the music that was playing was

25     from the office.

11

1          MR. SLONE:  Could somebody call

2     Roth?  Maybe I can call him on my cell

3     phone. Okay, we'll call. (Phone dialing.)

4          MR. SLONE:  Hi, Bob Slone

5     calling. We are in a meeting of creditors

6     for U Lock and Allen Roth and George Snyder

7     disappeared.  Are they there?

8          MR. ROTH:  Hi, this is Allen.

9          MR. SLONE:  Allen, you guys

10     disappeared from the --

11          MR. ROTH:  Yeah, I was trying to

12     call back in 'cause I have no idea what

13     happened.  (Inaudible) went blank.

14          MR. SLONE:  Okay, call back in.

15     If not, we'll put you on the -- on, on the

16     cell phone.  But call back in right now.

17          MR. ROTH:  Okay.

18          MR. SLONE:  Thank you.

19          MR. ROTH:  We'll do it right now.

20          MR. SLONE:  Okay, they're calling

21     back in.

22        Okay, Allen Roth?  Hello? (Phone

23     dialing.)

24          UNIDENTIFIED SPEAKER ON PHONE:

25     Allen Roth's office.

12

1          MR. SLONE:  Yes, Allen said he's
2      trying to call back in.  We --
3              UNIDENTIFIED SPEAKER ON PHONE:
4      Okay, hold on a second.
5              MR. SLONE:  If not, we'll just
6      put -- we'll just do it on the cell phone.
7              MR. ROTH:  All right, this is
8      Allen. We're back.
9              MR. SLONE:  Okay, great.  So you
10     have your backup music on, Allen.  Okay,
11     I'll turn -- that's on the other line.  I'll
12     turn that off.  Okay, we're back.
13 CONTINUATION OF EXAMINATION OF GEORGE SNYDER:
14 BY MR. SLONE
15         Q.  Okay, Mr. Snyder, the last question,
16     when was this company incorporated?
17         A.  In 2015.
18         Q.  Who are the officers?
19         A.  It was -- okay, I was going to
20     elaborate on the -- on the corporation part
21     'cause that was kind of what brought us
22     here.  Or is that enough for you?
23         Q.  That's enough for right now.  Just
24     who are the officers now, or at the time of
25     the filing?

13

1          A.   My brother, Kash Snyder.

2          Q.   Kash, what was he?

3          A.   President.

4          Q.   And you're vice president, George

5     Snyder?

6          A.   Yes.

7          Q.   Any other officers?

8          A.   No.

9          Q.   Who are the shareholders?

10         A.   There's a company called Accredited

11    Business Consolidators Corp and --

12         Q.   Could you speak up, please?

13         A.   Yes.  There's a company called

14    Accredited Business Consolidators Corp, and

15    there's over a thousand shareholders, so we

16    issued, issued shares.  But I'm the majority

17    shareholder.

18         Q.   How much do you own, what

19    percentage?

20         A.   I think it's 51 percent.

21         Q.   I didn't see that Accredited

22    creditors listed in your schedules.  Is --

23         A.   You know what, when we -- I'm going

24    back to with Biros, I was 51 percent.  With

25    currently I'm 90 percent.

14

1          Q.  You're 90 percent?

2          A.  We can send you a shareholder list.

3          Q.  Yeah, you should do that.  Do they

4     know that this company is in bankruptcy?

5          A.  We provided Otto with a list.

6          Q.  Well, he's -- so what?  Who's John

7     Biros?

8          A.  They -- and they probably don't know

9     the bankruptcy.

10          Q.  It says he owns 25 percent of this

11     company.

12          A.  Who is that?

13          Q.  John, on your statement, Question

14     No. 28, list all the debtors, officers,

15     directors, managing members, general

16     partners, members in control, controlling

17     shareholders, or other people in control of

18     the debtor.  You have one person listed,

19     John Biros, 25 percent.  It says a silent

20     partner from inception.  Your name's not

21     listed.  Kash isn't listed.  No other names

22     are listed here.  So why don't you file an

23     amended schedules so we know --

24          A.  Okay.

25          Q.  -- where we're coming from.

15

1          A.   Silent partner.  Okay, we'll file an

2     amended.

3          Q.   How many employees did the company

4     have when the bankruptcy was filed?

5          A.   None.

6          Q.   None.  When's the last time the

7     company had employees?

8          A.   Up till recently, we had -- there

9     was always someone helping there.  There was

10    always about a half a dozen people helping

11    at different times, you know, throughout the

12    years.  But just the -- just limited, you

13    know, just a few hours a year.

14         Q.   Can you get me the records of that?

15    Were the withholding taxes paid for the

16    taxes for those employees?  Were they issued

17    W-2's?

18         A.   Okay, I'll get you the records for

19    the people that worked.

20         Q.   Give me copies of the W-2's for the

21    last four years.

22         A.   Okay.  But there wouldn't be any

23    records 'cause they were -- they were

24    contractors, not -- not -- you know, we

25    didn't have W-2's.

16

1          Q.  So they weren't employees?

2          A.  No.

3          Q.  Well, get me records of what, what

4     they were paid.

5          A.  Okay.  Past four years?

6          Q.  Yes.

7          A.  Will do.

8          Q.  Okay, your bankruptcy schedules said

9     your gross revenues for 2021 were about

10    $13,000; for 2020 was about $12,000.  Do you

11    --

12         A.  Yes.

13         Q.  Thirteen two for '21.  Do you know

14    what it would have been for 2019?

15         A.  Not right offhand.  My brother would

16    probably know that.

17         Q.  Well, was it in that same range?

18         A.  Probably pretty much about the same.

19    (Inaudible) kind of estimate, so I would

20    guess that 2019 would be about the same.

21         Q.  Okay.  How about years prior to

22    that, has it always been about that much?

23         A.  Yeah.  Yeah, it's always been

24    (Inaudible).

25         Q.  Okay.  Does the company have an

17

1        accountant?

2             A.   No.

3             Q.   When -- did the company file tax

4        returns 2020 or 2021?

5             A.   No, we did not.

6             Q.   Did the company ever file tax

7        returns?

8             A.   No.

9             Q.   Why?

10            A.   That was, in 2015 when we got it,

11       Christine Biros and John Biros were silent

12       partners, and everything was pretty much at

13       their direction this whole time.  And they,

14       you know, they ordered us not to file the

15       tax returns because they were indicted by

16       the Attorney General. They wanted to wait

17       until that was over, so we were just in kind

18       of a holding pattern since the inception.

19       And then at some point this lawsuit came

20       about.

21            Q.   Since the bank -- yeah, since the

22       bankruptcy was filed, have there been any

23       effort to prepare tax returns?

24            A.   Yes, I think we were looking for an

25       accountant and we're just gathering our bank

18

1      statements and receipts, everything we're

2      going to need for, to file tax returns,

3      'cause we anticipate the Judge had mentioned

4      he was concerned and wanted tax returns, so

5      we're preparing for that.

6          Q.  Has there been any payment to any

7      officers or shareholders in the last two

8      years?

9          A.  The -- no.

10         Q.  No?  If I go back to years three and

11     four, has there been any payments to

12     officers or shareholders?

13         A.  No for three and four.  But let me

14     back up. The last question you asked, was

15     that, you asked for the -- what year were

16     you asking as far as the payments to --

17         Q.  Last two years.  Well, let's say

18     '22, '21, or '20.

19         A.  Yes, in 2021 the -- there was that

20     tractor we had mentioned, the Kubota that

21     was sold.  There was money there and that

22     was -- that was used to reimburse me for

23     loans I provided to U Lock over the past

24     six, seven years.

25         Q.  And how much was that?

19

1          A.   The sale of the tractor was $45,000.

2          Q.   And you got the $45,000?

3          A.   Most of it.

4          Q.   And that was --

5          A.   From two thousand --

6          Q.   -- to reimburse you?

7          A.   Yes.

8          Q.   For loans?

9          A.   Yes.

10         Q.   Can you get me the information

11    regarding this sale and when you got that

12    money for the Kubota?

13         A.   Okay.  Allen, could you -- piece of

14    paper?

15         Q.   Anything else?

16         A.   No, I think that's it.  Well, yeah,

17    as far as what I paid back to my sister

18    also, Tammy, I had to pay her back

19    approximately $7,000 for, she had loaned the

20    company money for property taxes one year.

21         Q.   When was that done?

22         A.   (Inaudible) we anticipate getting

23    our taxes done here in the next 90 days.

24         Q.   When was Tammy paid?  Is that Tammy

25    Snyder?

20

1          A.  Yes.  Or Tammy, Tammy McCarl, M-C-

2     C-A-R-L.

3          Q.  So she was paid $7,000 to reimburse

4     her for taxes?

5          A.  Yes.

6          Q.  And when, when was that done?

7          A.  Right after the sale of the Kubota.

8          Q.  Okay.

9          A.  That would have been probably

10    December of 2021 or November maybe of 2021.

11         Q.  Okay, get me the information on

12    both, on that sale and how the money was

13    disbursed at that time then.

14         A.  Okay, great.  Yeah, I'll get that to

15    you.

16         Q.  Your attorney, Mr. Roth, was there

17    any money paid to him for this bankruptcy

18    yet at this time?

19         A.  Not yet.

20         Q.  Okay, there was a lawsuit in Federal

21    Court that Shanni Snyder filed against the

22    company last year, I believe, and a default

23    judgment was taken.  Why didn't the company

24    defend that case?

25         A.  Well, like I said before, we didn't

21

1      -- we didn't really have any defenses for

2      it.  She had -- she had did the work.  At

3      the time we didn't really consider her an

4      employee.  She was just, you know, she was

5      doing the work and we had the agreement was,

6      you know, once we got everything together,

7      she would get something. And, you know, we

8      kind of thought she'd go away.  We didn't

9      think she was going to follow through with

10     it.

11          Q.  Well, if you didn't consider her an

12     employee, why didn't you defend this?

13          A.  Pardon me?

14          Q.  You said you didn't -- you didn't

15     consider her --

16          A.  (Inaudible).

17          Q.  -- as an employee.  Was there any

18     agreement made with her?

19          A.   Just that she would get something

20     when, when we got our, you know, got

21     everything off the ground.  We didn't have

22     money to defend it.  We would have needed

23     $10,000 for an attorney at that point,

24     because it's a corporation.

25          Q.  So you were aware of the lawsuit

22

1    then; right?

2         A.  Yes, I was served.

3              MR. SLONE:  Okay, I'm going to

4    open up questions to other creditors.  We'll

5    start with Sarah Wenrich.  If you have any

6    questions, this would be a time.  We're

7    going to limit, if we're going to drag this

8    on, we'll -- we'll take a pause and I'll get

9    my other cases and then we'll come back to

10   this.  But I'll give you a few minutes now.

11   Sarah, do you have any questions?

12             MS. WENRICH:  Okay.  Yes, I do.

13   Thanks, Mr. Slone.

14   EXAMINATION OF GEORGE SNYDER:

15   BY MS. WENRICH

16        Q.  Mr. Snyder, first off, with regard

17   to your statement earlier that you, that U

18   Lock had no employees and just had

19   contractors, and I just want to make sure I

20   heard you right.  You say it was just about

21   a half a dozen people helping throughout the

22   year a couple hours a year; is that right?

23        A.  Yes.

24        Q.  Okay, so where does your $99,000

25   claim against the company come from then,

23

1   and why wasn't it listed in the schedules?

2       A.  The $99,000 was what Christine would

3   owe me. We were -- Christine was in charge.

4   She was the -- she was the silent partner,

5   and things changed along the way and now

6   this lawsuit came and as, as a result, any

7   work I've done there over the past seven

8   years I didn't get paid. So I never got any

9   officer compensation or anything from her,

10  so that those -- those stem from my wages,

11  not -- not others.

12      Q.  And we don't -- we don't agree that

13  she was a silent partner, but even if she

14  was, a silent partner wouldn't have any

15  control over the company; isn't that how a

16  silent partner works? So I'm not sure, can

17  you explain --

18      A.  Well, now she's claiming --

19      Q.  -- how a silent partner would have

20  control?

21      A.  Well, now she's not claiming to be a

22  silent partner; she's claiming to be the

23  owner, that over the past seven years that

24  she was the owner, that that -- that doesn't

25  leave me any compensation for officer salary

24

1     or wages, not even minimum wage for the past

2     seven years.

3               MR. SLONE:  Well, is she --

4          Q.  I want to clarify, she's not the

5     owner of the company.  She's the owner of

6     the property.  So those are two different,

7     two different issues, no ownership in the

8     company; right?  I mean --

9          A.  Well, either her or U Lock owes me,

10     you know, at least minimum wage, but she

11     controlled the company.

12          Q.  But, Mr. Snyder, you just said that

13     you are not -- there are not employees.

14     And, you know, does it appear on your

15     personal tax returns, the compensation that

16     you're owed or that --

17          A.  Are you saying I'm not an employee?

18          Q.  You said that U Lock has no

19     employees, so I'm not sure how you would be

20     owed that money.  I'm just, I'm trying to

21     close the loop there, and it's not --

22          A.  Well, I could --

23          Q.  Maybe I'm missing something, but

24     it's not making sense.

25          A.  Okay, well, we can file a brief and

25

1      describe the work that I've done and --

2            MR. SLONE:  Why wasn't it listed

3      in your schedules?  I think if I was owed

4      $99,000, I'd mention it somewhere.

5      A.  I could -- I could amend the

6      schedules, but like I said, things changed

7      from us being partners and them controlling

8      the property. Now they're saying they own

9      the property; it's constructive trust and

10     it's under their direction.  I did all this

11     work for the past seven years.  So they're

12     kind of like, you know, for everything I

13     did, I cleaned out lockers; I met with

14     customers.  I, you know, I developed the

15     land.  I cleaned the weeds, cut the grass,

16     plowed the snow, did building maintenance,

17     fixed the electrical service.

18          All this stuff was done, and it's just,

19     there was no compensation whatsoever.  And

20     they just switched the game (Inaudible),

21     switched it up in the middle here and went

22     from being partners to owners, and then that

23     puts me, you know, with, you know, no

24     compensation for (Inaudible).

25     Q.  Mr. Snyder, I'm not -- I'm not

26

1      disagreeing that you're a partner or an

2      owner of U Lock, but again, I think that is

3      a different question. And again, you are

4      testifying today on behalf of U Lock, who

5      you say has no employees, and yet you file a

6      claim as an alleged employee, and they just,

7      they don't --

8           A.  Well, then maybe --

9           Q.  -- match up.

10          A.  Maybe I'm, okay, maybe I'm using the

11     wrong terminology.  Maybe, like I said

12     before, officer compensation.  When I meant

13     no employees, I meant other, there were no

14     employees on the books.  We didn't have a

15     regular staff.  Nobody was paid in that way.

16          Q.  So you said you had contractors, not

17     employees, so do you have 1099's then, if

18     you didn't have W-2's?

19          A.  No, we don't have, no W-2's.

20          Q.  Do you have -- do you have 1099's?

21          A.  Yeah.  There are -- or there's not

22     any 1099's because they -- they weren't

23     enough to -- I think they all made less than

24     five or six hundred dollars like per year.

25     So like I said, they were just help.  They

27

1       came in sometimes when they were needed if

2       there was -- there was no -- nobody was on a

3       40-hour work week.  But just me, like I said

4       --

5            Q.  Okay, so --

6            A.  -- I was entitled to at least

7       minimum wage for the time I worked there or

8       officer compensation.

9            Q.  So you, okay, so Ms. Snyder then,

10      Shanni Snyder, your sister, if everyone made

11      less than five or six hundred dollars a

12      year, if she worked for four years, that

13      would be around $2,000; right?

14           A.  I wasn't talking about her 'cause we

15      never -- she didn't make anything.  We

16      didn't pay her anything.  And like I said,

17      we didn't really even consider her an

18      employee.  She was my sister; she was

19      helping out, and the arrangement was, once

20      we got things together, she would make some

21      money.  So she kept track of her

22      (Inaudible).

23           Q.  So is it your opinion that the

24      default judgment that was obtained in

25      District Court was not truthful and

28

1      fraudulent for $260,000?

2           A.  Well, that's not what I said at all.

3           Q.  No, no, I'm -- I understand that

4      you're saying you didn't consider her an

5      employee, so I'm trying to get what the

6      company's position on, because you had said

7      you didn't fight it because you didn't have

8      the legal, the money to pay the legal fees;

9      but what is your position on that then if

10     you don't consider her a real employee?  And

11     it sounds like people just helped out; their

12     compensation would have been a couple

13     hundred dollars a year.  Why is that

14     different there?

15          A.  I don't really have a position on

16     that.

17          Q.  Okay.  I guess I'll move on to the

18     Kubota tractor.  So who did it sell to?  Who

19     did you last sell the Kubota tractor to?

20          A.  Give me back the things I -- it was

21     a private individual.  I have, give me one

22     second, I have some papers in front of me.

23     Let me see if I can find his name.

24          Q.  Okay.

25          A.  Do you have that?  You know, I

29

1      apologize.  I can get that to you, though.

2      I can give to you the (Inaudible).  Actually

3      he did have a company.  I can't remember the

4      name of his company or his name.  But I --

5      but I have all that information that I can

6      get to you.

7           Q.  Okay.  Yeah, that would be helpful I

8      think and, you know, copy the Trustee on it

9      as well.  And would, so 45,000 --

10          A.  (Inaudible).

11          Q.  -- was what the tractor was sold

12     for.  How much did the company originally

13     purchase it for and when?

14          A.  I don't know the exact amount, but I

15     think it was around $65,000.  That was

16     purchased in 2016.  And Mr. Slone wants me

17     to get everything around that sale to him,

18     so I'll get all that information, the

19     purchase date, the sale date, the person's

20     name.  I'll get all that to him.

21               MS. WENRICH:  Okay, all right.

22     Mr. Otto, do you have any, any questions?

23               MR. OTTO:  Yes, I do.

24  EXAMINATION OF GEORGE SNYDER:

25  BY MR. OTTO

30

1          Q.  Mr. Snyder, who, who are the

2     secretary and treasurer of U Lock?  You're

3     required under Pennsylvania law to have.

4     Can you tell me who they are?

5          A.  Who the secretary and treasurer are?

6          Q.  That's correct.

7          A.  We just have two officers, me and

8     Kash.  I guess the treasurer and the

9     secretary had to be (Inaudible) vice

10    president and treasurer.  So just between

11    us, we fulfill all the roles of office.

12         Q.  Just one moment.

13          That one.  It's right up there.

14          Sorry for the interruption.

15         A.  Okay.

16         Q.  Mr. Snyder, do you have any proof

17    that either John or Christine Biros had

18    anything to do with U Lock or the control of

19    U Lock?  Do you have any written evidence?

20         A.  As far as like a -- as far as a

21    partnership agreement, you mean, or

22    something like that?

23         Q.  Anything.  You never issued shares,

24    so, or share certificates?

25         A.  Yeah, there -- we had weekly

31

1       meetings.  Every single Wednesday we went

2       to, they owned a bar named Caesar's, and me

3       and my brother went down there every single

4       Wednesday to meet Christine for our

5       meetings.  And then also, John we met almost

6       every single day.  And so I'm sure there's

7       some type of evidence, but there's -- we

8       don't have a written agreement as far as the

9       -- them directing the company.

10          Q.  Well, if you -- if you met at a bar,

11      is there -- is there any -- I mean, did you

12      ever keep written minutes?

13          A.  We have some documentation and we

14      also have, you know, some photographs at

15      times we met.  So there is some types of

16      evidence if we had to provide some type of

17      evidence.  I do think they claimed in the

18      beginning of the lawsuit that they didn't

19      even know who we were.  In fact, they had

20      served the lawsuit by advertising in the Law

21      Journal, so I think John and -- John and

22      Christine both denied our existence in the

23      beginning.

24      So we do have some proof that we were --

25      they knew very well who we were, and they

32

1    were trying to be silent partners or secret

2    partners, I guess, they always told me

3    because of the -- because of their

4    indictment for whatever that was

5    (Inaudible).  We could get evidence and we

6    could also do a deposition of John and also

7    do a deposition of Christine. And their

8    father was there as well, Bob Biros.

9        Q.  Well, I'm not going to get into the

10    -- to the details, but as you already know,

11    because we've been through this issue in

12    State Court, my client denies everything

13    that you've said.  And you certainly have

14    the right as an individual to walk into any

15    bar, and if Christine or John happened to be

16    there, then you can call that a meeting, but

17    that doesn't mean that's what it was.  Let

18    me move on.

19        A.  (Inaudible).

20        Q.  Excuse me, excuse me, Mr. Snyder,

21    let -- let me move on.

22        A.  (Inaudible).

23        Q.  You claim you made a property tax

24    payment. When did you make that and how much

25    was it and what years did it cover?

33

1          A.  I think that was, it was -- I think

2     it was close to 7,000.  I don't have the

3     exact number in front of me.  And that was,

4     I actually can't even remember the -- what

5     year it covered.  But that would just be for

6     one year.  The property taxes are roughly

7     7,000 a year.

8          Q.  Do you know when you made that

9     payment?

10         A.  No, it was -- my sister made it,

11    Tammy.  She made it by check.  So we would

12    have a record of that check we could

13    provide.

14         Q.  Okay.  In the -- in the corporate

15    action you filed to petition for a

16    reorganization, you stated that you had held

17    a shareholders agreement, or I'm sorry, a

18    shareholders meeting.  Did you inform any of

19    your 800-plus shareholders of that meeting?

20         A.  No, it was a -- it was a -- let me

21    take a drink here for a second.  It was just

22    me.  It was just the majority shareholders

23    present. (Inaudible) majority shareholders.

24         Q.  Now, I don't -- I don't remember

25    what the percentages were, but you listed

34

1          Kash Snyder as a shareholder of a

2          substantial number of shares, much greater

3          than, than the 10 percent that you're

4          asserting that he might own if you own 90

5          percent of the company.  When did you --

6          when did Mr. Snyder -- when did Kash Snyder

7          transfer his shares to you?  Or is -- or is

8          your 90 percent assertion incorrect?

9              A.  Well, there's -- there's -- there's

10         over 400 million shares, and I think Kash

11         has about 4 million.

12             Q.  That's not the number you listed in

13         your -- in your minutes, in your minutes of

14         the shareholders meeting.

15             A.  I gave you a list of the

16         shareholders, didn't I?

17             Q.  You know what, that's -- whether you

18         did or not is irrelevant in this, in this

19         bankruptcy.

20             A.  Okay.

21             Q.  But the point is, and I'm only

22         talking about Kash Snyder at this point, so

23         my question is, when did --

24             A.  He testified (Inaudible).

25             Q.  -- when did he transfer his shares

35

1          to you?  Or is the 90 percent that you claim

2          you own incorrect?

3               A.  No, Kash (Inaudible).

4                    UNIDENTIFIED SPEAKER:  And the

5          (Inaudible).

6               A.  I could read you the -- I could read

7          you -- yeah, I can --

8                    MR. SLONE:  Who else is speaking

9          here?

10              Q.  Who is speaking in the background?

11              A.  Nobody here.  I think there's

12         someone -- someone else's end is on the

13         phone here.  Just me and Allen sitting here.

14                   UNIDENTIFIED SPEAKER:  I think

15         they should, you know.

16                   MS. SHANNI SNYDER:  Not me.

17                   UNIDENTIFIED SPEAKER:  I think

18         they should.

19                   MS. SHANNI SNYDER:  It's not me,

20         Shanni.  Mine's on mute.

21                   MR. SLONE:  If this is going to

22         go on, I'm going to ask that we resume later

23         this afternoon and go through the rest of

24         the questioning.  I have 14 other cases to

25         be heard this morning, so --

36

1              MR. OTTO:  What time would you

2        like to do that?

3              MR. SLONE:  How about 2:30?  Call

4        back in at 2:30.

5              MS. WENRICH:  That's, yeah,

6        that's fine.

7              MR. OTTO:  That works for me.

8              MR. SLONE:  Okay?  I'll keep

9        everything here.  Call back at 2:30 and be

10       -- get on at 2:30 p.m. today, okay?

11             MS. WENRICH:  Thank you.

12             MR. OTTO:  All right, very good.

13             MR. SLONE:  Thank you.

14             * * * * * * * (The proceedings

15       were recessed.)

16             * * * * * * *

17             MR. SLONE:  Okay, we're back on

18       the record in the U Lock case, 22-20823-

19       GLT.  This is the continuation of the 341(a)

20       meeting which was started this morning.

21       It's now 2:30 p.m. on September 9.

22            When we left, Mr. Otto was asking

23       questions.  Mr. Otto, you can resume.

24  CONTINUATION OF EXAMINATION OF GEORGE SNYDER:

25  BY MR. OTTO

37

1        Q.   Okay.  First, Mr. Snyder, can you

2    confirm the sale date of the Kubota

3    equipment?  I think you said it was December

4    of 2021; is that correct?

5        A.   I actually think it was, I'm pretty

6    sure it was November 15 of 2021.

7        Q.   November 15?

8        A.   Yes.

9        Q.   Okay.

10        A.   Correct.

11        Q.   Okay, okay.  And you said you

12    received $45,000 for that?

13        A.   That's correct.

14        Q.   Okay.  In your statement of assets

15    and liabilities, among other things, you

16    said that you had not been involved in any

17    environmental, or that U Lock had not been

18    involved in any judicial or administrative

19    proceedings, and you had not been notified

20    by any governmental unit otherwise that you

21    may have -- that the debtor might be liable,

22    and you had never notified any governmental

23    unit of any release of hazardous material.

24    That's in Document 65, Pages 9 and 10 of

25    19.  And there's a couple of questions about

38

1    that.  First of all, U Lock was cited at

2    least twice by North Huntingdon Township for

3    sanitation and accumulation of rubbish and

4    garbage, but you did not report that.  Why

5    didn't you report it?

6        A.  Well, it was my understanding

7    Christine Biros went to the code enforcement

8    officer of North Huntingdon and said, write,

9    write my property up for as many violations

10   as you can.  So I think she was trying to

11   get, you know, some, some strategy there she

12   had.  I went to the Township and he said he

13   was not going to write me up; that he was

14   just going to give me a verbal because --

15       Q.  Mr. Snyder, excuse me one minute.

16   Mr. Snyder, you were cited on or U Lock was

17   cited on September 5, 2019, and June 21,

18   2021, and that was well before a final

19   determination had been made in the Biros v.

20   U Lock case.

21       A.  Okay, I was talking about --

22       Q.  And whether -- and whether, whether

23   Christine Biros initiated that or not, you

24   were cited; U Lock was cited by North

25   Huntingdon Township. And when this comment

39

1      or the statement to the Bankruptcy Court was

2      filed, you did not report this.  So my

3      question is, why didn't you report it?

4      Regardless of who instigated it, the

5      Township issued this.

6          A.   Okay, yeah, my previous answer was

7      talking about the most recent.  You were

8      talking about September 5 and what other

9      date?

10         Q.   September 5, 2019, and June 21,

11     2021.

12         A.   Okay.  So on those, my -- to the

13     best of my recollection, I believe they --

14     that was just some garbage needed cleaned

15     up.  We cleaned it up.  There was no

16     environmental issue there. There was no

17     hazardous material or anything like that.

18     It was just a little bit of garbage, and

19     that was resolved.  And I think it was just

20     a warning, not a citation.  There was no

21     fine that I was aware of.

22         Q.   But the -- but the question in the

23     bankruptcy statement is not are you

24     currently under citation; it's have you

25     ever.  So I go back to my question, which

40

1      you haven't answered yet, why didn't you

2      disclose this?

3          A.  Well, what I -- what I said was, I

4      think I didn't consider it a citation.  It

5      was just a warning to clean up some garbage.

6       And we did that and they were -- the

7      Township was satisfied.  So I didn't think

8      it was a citation.  There was no fine or

9      anything like that.

10         Q.  Did you discuss this with your

11     attorney, Mr. Roth?

12         A.  I discussed pretty much everything

13     with him over the years, so --

14         Q.  And he told you that you didn't have

15     to file this, report this?

16         A.  If there's a mistake on that, we can

17     -- we can certainly (Inaudible) clarify that

18     on there or whatever Mr. Slone would like me

19     to do.  But that's my (Inaudible).

20         Q.  Well, let me take this one step

21     further.  The next question on that section,

22     has the debtor notified any governmental

23     unit of any release of hazardous materials?

24     Now, this was filed in July of 2022, this

25     year, about a month, maybe six weeks after

41

1      the disclosure of PCB's on the site; and yet

2      you say that you never notified any

3      governmental unit of any release, but you

4      testified in court that you had in fact

5      notified the fire department.  So what's the

6      truth here?

7           A.  I think, I don't -- I don't know

8      what you mean by the truth, but I just think

9      you misunderstood something.  I never

10     contacted the fire department.  In fact, I

11     think you guys testified that someone else

12     was the initial person to see that fire.  I

13     was driving past on the highway and I saw

14     the fire in the parking lot and I pulled in.

15     The fire department was already there.

16     The police department was there.  There was

17     at least a dozen personnel from the two

18     outfits. So maybe you misunderstood

19     something, or unless I misspoke in trial,

20     but I don't recall saying that 'cause I

21     never -- I didn't call the fire department.

22     They were there.

23           Q.  So, so let me just make sure I

24     understand, Mr. Snyder.  At no time

25     whatsoever did you go to North Huntingdon

42

1          Township to talk to either the police or the

2          fire department about this event?

3               A.   When I was -- I think the next day,

4          I believe, I went to the property and

5          Christine Biros was there with the

6          Commissioner of the Township, and they were

7          talking about the event and they were

8          standing over the -- over the -- over the --

9          the (Inaudible).

10              Q.   Did you -- did you ever -- did you

11         ever go to the North Huntingdon Township

12         Building to report anything to the police or

13         to the fire department about this event

14         within the couple of days after it occurred?

15              A.   Well, I didn't finish answering what

16         you asked me before.  I did speak with the

17         Commissioner. She was there with, you know,

18         with (Inaudible).

19              Q.   No, I'm not asking you about what

20         happened -- I'm not asking about what

21         happened at the site.

22              A.   (Inaudible) the Township Building.

23              Q.   I'm asking if you -- if you ever

24         went to the Township Building to report to

25         the police and the fire department about

43

1      this event?

2           A.   I don't -- no, I did not go there to

3      report anything because it was already

4      reported; they already got there.  I may

5      have went there to ask for a police report

6      or something of that nature or, but that was

7      -- that was already reported.  There was no

8      need for me to report anything.  And --

9           Q.   But at the end of the day, the

10     answer to the 20, to this question, have you

11     ever notified any governmental unit of any

12     release of hazardous material, your answer

13     to that was no, and that's incorrect, is it

14     not?

15          A.   I'm not recalling what that -- no,

16     that's not.

17          Q.   Well, let me move on.  Have you ever

18     paid anything to Mr. Roth for his

19     representation of you in the State Court

20     action Biros versus U Lock?

21               MR. ROTH:  Objection.

22          A.   Hold on.

23               MR. ROTH:  I object to that

24     question.  That's irrelevant and it's none

25     of his business anyway.

44

1        Q.  Well, in -- in a way it is relevant

2    because you have -- Mr. Roth has not filed a

3    claim in this case and he hasn't filed any

4    request for payment of fees.  It's been

5    stated both in the State Court action and

6    this action that you had not paid him

7    because you were going to pay him something

8    of value when, when U Lock got turned

9    around.  So my question is, do you owe, does

10   U Lock owe anything to Mr. Roth for legal

11   services?

12       A.  He's never billed me to this point

13   as far as this bankruptcy goes.

14       Q.  Do you think you are going to owe

15   him anything?

16       A.  I don't really want to answer that

17   because I --

18            MR. SLONE:  I think the question

19   is, maybe I'm wrong, but -- this is Bob

20   Slone -- I think the question is, does U

21   Lock owe Mr. Roth anything, any money for

22   legal services rendered at any time?

23       A.  No, not right now.

24            MR. SLONE:  So the answer is no?

25       A.  No, just for the post bankruptcy.

45

1          Q.  Okay.

2          A.  But till then, no.

3          Q.  Okay, now, so, so let me -- let me

4      go a little bit further on this in this way.

5       You said earlier today that when Shanni

6      Snyder's case against U Lock was filed, you

7      did not defend it because you would have had

8      to pay an attorney $10,000 to represent U

9      Lock.  And yet, at that point in time, U

10     Lock was represented by Mr. Roth, and all

11     you would have had to do was ask him to go

12     into court to represent you.  If you could

13     -- Mr. Roth represented you from 2017 to

14     2021, and if you never paid him anything for

15     that matter, why would you worry about

16     having to pay him for, for going into court

17     for your sister?

18         A.  We -- that's our -- I think that's

19     work product also.

20             MR. SLONE:  Well, no, it's a

21     question, is, 'cause we're trying to find

22     out if there's a creditor, if U Lock has

23     another creditor.  But you're saying U Lock

24     doesn't owe him any money?

25         A.  Well, to clarify it, I said post

46

1          bankruptcy. So I --

2                    MR. SLONE:  No, I'm asking --

3                    MR. ROTH:  He asked --

4                    MR. SLONE:  -- for prior

5          services. In other words, you know, does U

6          Lock owe Mr. Roth any money; does he have a

7          claim here?

8              A.  No, I don't think.  But to answer

9          his, I think the way, what he's kind of

10         asking is, if Allen's representing me

11         without charging at one point, then that

12         means he'll always just represent me for

13         free across the board on anything, is what

14         I'm getting from --

15                   MR. SLONE:  Well, you can answer

16         that yes or no.

17             A.  -- his office.

18                   MR. SLONE:  If you know.

19             A.  Pardon me?

20                   MR. SLONE:  You can answer that

21         if you know.

22             A.  Okay, yeah, I didn't think -- I

23         didn't think that I could just walk in to

24         him and have, say, come represent me in this

25         for free.  Plus, I didn't think the -- the

47

1        other part of that question, I said we

2        didn't really think that lawsuit

3        (Inaudible), and I had no idea that we'd

4        bankruptcy at this point.

5            Q.   (BY MR. OTTO)  Well, let me -- let

6        me continue with your sister's case for a

7        moment.  You said earlier that the reason

8        that you didn't, among other things, the

9        reason that you did not bother to go in and

10       defend against this, this judgment was

11       because you had no defenses. Well, the easy

12       defense would have been for you to testify

13       that she was not an employee, but you didn't

14       bother to do that.

15       But you and your brother have both given,

16       submitted sworn evidence, number one, that

17       U Lock had no employees throughout that

18       period of time that Shanni Snyder claims she

19       worked for you, and second, that you did not

20       owe anybody any money for employment.  So

21       why wouldn't you go in and at least simply

22       state that?  Even if you lost, you would at

23       least have put up a bona fide defense

24       against her case?

25           A.   I didn't consider -- we didn't

48

1          consider her a current employee at the time,

2          and I still --

3               Q.  I understand that, but if --

4               A.  (Inaudible).

5               Q.  But if you don't consider her an

6          employee, you have to assert that defense.

7          You can understand why, under the

8          circumstances, this does not sound like a

9          case of two arm's length parties arguing

10         about an employment situation. This sounds

11         more like a brother and sister deciding that

12         they need to get a judgment in order to file

13         a lien against real estate in another

14         county.

15              A.  Yeah, that, that's absolutely not

16         the case.  I mean, this whole thing is not

17         an arm's length. Biros, Christine and John

18         --

19              Q.  But you allowed your sister --

20              A.  (Inaudible).

21              Q.  You allowed your sister to get a

22         default judgment against your company.  And

23         it wasn't, you know, a default judgment of

24         $100.  It was 130,000.  Why wouldn't you

25         even go into court to at least put up a --

49

1          A.   Like I said, we figured she'd go

2     away.

3          Q.   Why would she go away?  She got a

4     default judgment.  That's your sister.

5          A.   (Inaudible).

6          Q.   Do you talk to your sister?

7          A.   (Inaudible).  Pardon me?

8          Q.   Never mind, that's a (Inaudible)

9     question.

10         A.   Biros and I have known each other

11    since I was a child.  We've known each other

12    for 45 years. So, and my sister, we've known

13    each other since we were a child, child.

14    I'm not here today to say nothing was --

15    everything was arm's length. That's not the

16    truth.  I was close with my sister.  I was

17    close with Biros.  I was close with the

18    mother, Liz Biros, Bob Biros.

19         Q.   Let -- let me -- let me move on

20    because I don't want you to perjure yourself

21    about the relationship you may have had with

22    the Biros.

23         A.   (Inaudible).

24         Q.   The -- there -- when the -- when

25    title was transferred to you or to U Lock by

50

1          the deeds from the Schur estates, there were

2          a number of trailers and containers on the

3          site.  You have in the last couple months,

4          or maybe more than a couple months,

5          transferred a number of those containers and

6          trailers off the site.  Why did you transfer

7          them or move them and where are they?

8              A.  I believe Mr. Slone said to start

9          moving some of my things out of there, so

10         that would explain the containers.  What

11         about the -- what trailers are you referring

12         to?  'Cause I don't recall moving trailers

13         out of there.

14             Q.  Well, there were a number -- let me

15         put it this way.  Are you saying that, that

16         you own all of those containers that used to

17         be on the U Lock site?

18             A.  Are you referring to the ten

19         shipping containers?

20             Q.  Yes.  Are you -- are you saying that

21         you personally, George Snyder, owns those?

22             A.  Yes.

23             Q.  When was title transferred to them?

24             A.  There is no title.  Those are

25         shipping containers.  They're just a metal

51

1           storage box. I don't believe they have any

2           VIN numbers or titles or anything like that.

3            But I believe I purchased those about 20

4           years ago.

5                Q.  Well, I don't think that's correct

6           because those were all sitting on the

7           property when the property was owned by the

8           Schur estate, and those items were assigned

9           to you by the Schur estate in conjunction

10          with the transfer of title by the Schur

11          estate.  So those containers appear to be

12          owned by U Lock, not George Snyder?

13               A.  Yeah, that's incorrect.  I saw that

14          in one of the (Inaudible).

15               Q.  And you've already testified in

16          court on the first hearing that those

17          containers are worth $6,000 apiece?

18               A.  No, I was talking about the -- the

19          white water tank.  They're 10,000-gallon

20          tanks.  They're white poly tanks.  That's

21          what I was referring to, not the shipping.

22               Q.  No, we were -- no, you were

23          specifically talking about, about

24          containers, the shipping containers.

25               A.  When was that?

52

1          Q.  At the first hearing.

2          A.  Okay.  If someone asked me the

3     value, I don't know what that -- the value

4     the changes over time with those, but the

5     (Inaudible).

6          Q.  Well, the question is, do you have

7     any proof that title of those containers and

8     trailers was transferred to you, as opposed

9     to being still owned by U Lock?

10         A.  Yeah, they were -- well, there's no

11    proof as far as the title goes or whatever,

12    but I had -- I was a tenant at U Lock when

13    the -- the old man who owned it, his name

14    was Nick Schur, and I've been a tenant there

15    for I believe 22 years.  So when you -- I

16    saw that aerial picture you showed with tops

17    of tractor-trailers and tanks and containers

18    and things. Just because there was an aerial

19    photo doesn't mean -- like most, a lot of

20    that stuff belonged to tenants.  And so that

21    was --

22         Q.  Do you have any proof that they were

23    -- that they belonged to you before the

24    property was purchased from the Schur

25    estates?

53

1           A.   I'm not sure.  I'd have to look.  I

2      mean, that's going back 22 years.  But I

3      could see if I have any records of it.  But

4      a lot of that big heavy equipment there was

5      mine.  And as you know, a lot of the big

6      heavy equipment that Glenn Mowry is claiming

7      himself, there was a guy named Vince and

8      there was all kind of other tenants there,

9      and there's another tractor-trailer I think

10      just left today out of there that belonged

11      to someone from Maryland.  So that aerial

12      photo isn't really proof that or that's not

13      really showing ownership of anything.  In

14      fact, it's very misleading.  It's very

15      (Inaudible).

16           Q.   Let me -- let me jump into that

17      since you brought it up.  Let me ask you

18      about the orange trailer.  Who was the

19      renter who had that stored on your site?

20           A.   I believe the company's name is

21      Schapiro Whitehouse.

22           Q.   No, because they -- we've -- we've

23      spoken to them and they had told us that

24      they rented to someone else.  And so the

25      question is not -- it's not Whitehouse &

54

1       Schapiro.  They own the trailer, but they

2       rented it to somebody else who then stored

3       it on your site.  So the question is, who

4       was renting space on your site to store that

5       trailer?

6            A.   They -- they were the contact.  They

7       were the ones who made the arrangements.

8       But they did tell me now recently, you know,

9       this past couple days or this month, that

10      there was some thirty or some third party

11      involved.  But that's -- they said that's

12      between them, not on our end.  So they --

13      they were the ones who (Inaudible).

14           Q.   Well, it's my understanding -- it's

15      my understanding that Whitehouse & Schapiro

16      now is claiming that they shouldn't have to

17      have paid the rent because they rented the

18      trailer to somebody else who stored it on

19      your site.  Did you ever have any direct

20      contact with Whitehouse & Schapiro when that

21      trailer was originally put on your site?

22           A.   That was my only contact.  And she

23      just told me the other day she didn't want

24      to pay 'cause she said the Biros family

25      damaged the trailer and they made it

55

1        inaccessible.  She said she had to pay a

2        thousand dollars for a truck to come out to

3        not be able to pick, get her -- get her

4        trailer.  So she said she (Inaudible), that

5        they had to pay, someone's going to have to

6        pay for that.

7        But she never told me that she didn't want

8        to pay it because it wasn't hers.  In fact,

9        she said it's their trailer, they want it

10       back, and they want -- they want to pay and

11       square up, and she did immediately.  And

12       then it got -- Biros damaged it.  And we

13       have video footage (Inaudible).

14            Q.  How long -- how long was -- how long

15       was that trailer on the site?

16            A.  I believe two years, maybe two years

17       and two months.

18            Q.  So that, that trailer showed up on

19       the site in 2020?

20            A.  I believe it was November of 2020 if

21       my memory serves me right.

22            Q.  And you don't know who entered into

23       a rental agreement with you to (Inaudible) a

24       trailer there?

25            A.  (Inaudible).

56

1          Q.  Because you apparently never

2     collected any rent for it?

3          A.  Pardon me?

4          Q.  Well, Whitehouse & Schapiro paid the

5     Trustee for a couple of years of rent.  So

6     if they had paid you, then they would

7     certainly object to paying the Trustee and

8     they would -- they would have claimed that

9     they had paid you.  But apparently they

10    didn't pay you, and apparently whoever

11    entered into the agreement with you didn't

12    pay you either, unless you accepted cash for

13    it?

14         A.  No, they -- they --

15         Q.  But you still haven't -- who, who is

16    -- who is the person, who is the individual

17    who, who negotiated with you to store that

18    trailer on the site?

19         A.  It was a girl from Whitehouse &

20    Schapiro.

21         Q.  Okay.

22         A.  I believe her (Inaudible).

23         Q.  So when we call Whitehouse &

24    Schapiro and ask them if they negotiated for

25    that truck to be there, they're going to say

57

1      yep, we talked to George?

2          A.  I don't know what they're going to

3      say.

4          Q.  'Cause you know we are going to ask

5      them.  We are going to ask them that

6      question.

7          A.  But I could clarify that if you'll

8      let me.  I spoke with a girl Loretta at

9      Whitehouse --

10         Q.  Oh, please do.

11         A.  Pardon me?

12         Q.  I said please clarify 'cause we're

13     all confused.

14         A.  Well, I answered you already, but

15     I'll say it, you know, more clearly

16     hopefully.  The only person I dealt with was

17     Whitehouse & Schapiro. I believe a woman

18     named Loretta called and made all the

19     arrangements.  Never met her in person.

20     They're from out of state.  She did all this

21     over the phone.  A couple days later

22     (Inaudible).

23         Q.  And this was in 2020?

24         A.  Yes.

25         Q.  Okay.

58

1          A.   The trailer showed up on the lot.  I

2     never collected any rent from them ever in

3     the two years.  Then when I spoke with

4     Whitehouse & Schapiro most recently, a woman

5     named Doll (Phonetic spelling) is who I

6     spoke with.  She said Loretta no longer

7     works for them, she said, but it is their

8     trailer and they want to square up and

9     they'll send out a check immediately, which

10    they did, and they sent it to Mr. Slone.

11         That was it.  I don't know -- I didn't

12    talk to or meet or know this third party

13    that they talked about.  Supposedly they

14    told me that it's their trailer.  Sometimes

15    they rent their trailers and third parties

16    do business out of their trailers.  But I

17    never met that guy, never seen him.  Never

18    seen him, never talked to him on the phone.

19    And that was it. That's all the knowledge I

20    have on that.

21         Q.   During, during the Biros versus U

22    Lock state case, did you disclose that you

23    were the president and Kash Snyder I believe

24    was secretary?  You now tell us that Kash

25    Snyder is president and you're vice

59

1       president, and you don't have a secretary or

2       a treasurer; is that correct?

3            A.  No, I -- I said I was the -- I said

4       we fill all the roles, me and my brother.

5       There's no other members other than my

6       brother.  And I think I said I was president

7       and that Kash was vice president.

8            Q.  I didn't understand that answer.

9       Can you repeat it?

10           A.  I think you just had it flip-

11      flopped.  You said Kash was president, I was

12      the vice president. I think I'm the

13      president and Kash is the vice president.

14      That's (Inaudible).

15           Q.  Okay, so, so your testimony now is

16      that you are president of -- president of U

17      Lock; is that correct?

18           A.  Pardon me?

19           Q.  You -- you are currently the

20      president of U Lock; is that correct?

21           A.  Yes.  Now I am because my brother

22      Kash is in a medical facility and he won't

23      be out for, you know, maybe the end of the

24      month.

25           Q.  And you do not have a secretary or

60

1      treasurer?

2           A.  No, we -- we're also -- we hold all

3      the positions, so I'm everything.

4           Q.  So you're both -- you are -- you are

5      the secretary and treasurer?

6           A.  Yes.

7           Q.  Is that right?  Okay.

8           A.  Yes.

9           Q.  This morning you told us that you

10     own 90 percent of U Lock; right?

11          A.  Yeah, I think you were asking -- no,

12     I'm not -- I wasn't really sure of the

13     percentages.  I know more the -- you were

14     talking about something very specific, and

15     we were -- I had a meeting with Kash over

16     the phone because he hasn't been available.

17     You were talking about the motion to

18     convert.  So I had a meeting with him, and

19     we, you know, we both agreed to the motion

20     to convert, so --

21          Q.  Well, you -- you have --

22          A.  (Inaudible).

23          Q.  You have a corporate resolution of U

24     Lock.  It says that a meeting of

25     shareholders on June 30, 2022, among other

61

1      things, George Snyder owns 345 million

2      shares, Kash Snyder owns 75 million shares,

3      and you had 98.82 percent of the

4      shareholders -- or I'm sorry -- 1.18 percent

5      of the shareholders were not present.

6      That's the 5 million shares that you sold to

7      ABC; is that correct?

8          A.   That's correct.

9          Q.   Okay.  Have you ever communicated

10     anything to those shareholders?

11         A.   No.

12         Q.   So in fact, if you made a ton of

13     money, then those shareholders could have

14     some tax liability for which they are

15     completely unaware; is that correct?

16         A.   That would be a different scenario.

17     If we did, if we made a ton of money, that

18     would be a different scenario.  That doesn't

19     mean --

20         Q.   I'm sorry, your response was a

21     little garbled. Could you repeat that,

22     please?

23         A.   I'm sorry.  That would be a

24     different situation.  And so if they were

25     paid dividends, they would owe taxes on the

62

1          dividends, but we didn't issue any dividends

2          because there was no profit.

3              Q.  But you had them listed as

4          shareholders but never informed them that

5          they were shareholders; is that correct?

6              A.  No, they're aware they're

7          shareholders.  We just didn't notify them of

8          the --

9              Q.  Really?

10             A.  -- the motion to convert because it

11         was a unanimous vote anyways that we had 98

12         percent approval, so --

13             Q.  Well, I can tell you that I have

14         spoken to one of your shareholders, and his

15         first question when I asked him if he was an

16         owner of U Lock shares was, who is U Lock?

17         And I can assure you that he knows -- he

18         knew nothing when I asked him in 2019, and

19         he knew -- he knew nothing when I asked him

20         two months ago.  So if you have any evidence

21         that you've informed all your shareholders,

22         you might want to gather it up, because

23         these people don't know.

24             A.  So we didn't notify them, so

25         (Inaudible).

63

1          Q.  Let me move on to my next -- my next

2     area. You've told us that in the last four

3     years you have not had any employees; is

4     that correct? That was your testimony this

5     morning?

6          A.  Yes.

7          Q.  Okay.  So I come back to your

8     sister.  If you had no employees in that

9     four-year period, how does she have a claim

10    to maintain?

11         A.  Well, I guess the answer to that

12    question --

13         Q.  Why didn't you defend it?

14         A.  -- is we have no -- we had no

15    employees on the payroll.  So maybe that was

16    a better answer. Maybe I, you know, should

17    have said it that way.

18         Q.  Well, does that mean you have

19    employees who are not on the payroll?

20         A.  I explained my sister's situation,

21    yes.

22         Q.  Well, let me ask the question again.

23     Does that mean that you had employees who

24    were not on your payroll?

25         A.  We had workers.  They were people

64

1      that worked there that weren't employees;

2      they weren't on the payroll, but they were

3      people that worked.

4          Q.  Well, let -- let me -- let me ask it

5      this way. I concede that you had independent

6      contractors for whom you paid some amount

7      for small jobs and periodically, okay?

8          A.  Yeah.

9          Q.  But Shanni Snyder claims that she,

10     she worked for you for an extended period of

11     time on a continuous four-year basis.  And

12     you're now telling us that you didn't have

13     any employees on the payroll.  So my

14     question is, did you have employees who were

15     not on the payroll?

16         A.  Yes, me, Kash, and Shanni all

17     worked.

18         Q.  And you were not on a payroll?  Did

19     you report taxes to the IRS, payroll taxes?

20         A.  We, no, never received any pay.  We

21     just worked.  Shanni, you know, we didn't --

22     she worked for U Lock, but we didn't really

23     consider her an employee.  She's my sister,

24     and I thought it was more of a favor and the

25     understanding was when we developed the

65

1       property, she would get something.  As I

2       said in court, you know, I think my brother

3       might have said that he thought it was

4       sisterly love. But anyhow, she was doing the

5       camera stuff and she was driving through,

6       you know, ten times a week (Inaudible).

7            Q.  Well, you said in discovery that was

8       provided as a result of a request from me to

9       your counsel, Mr. Roth, you signed, you

10      personally, George Snyder, signed a document

11      that said you had no employees; U Lock has

12      no employees?

13           A.  Yeah, at that time (Inaudible).

14           Q.  What's that?

15           A.  Yes, and at that time that was the

16      (Inaudible).

17           Q.  Well --

18           A.  I didn't hear anything about this

19      lawsuit (Inaudible).

20           Q.  Well, Shanni Snyder, your sister

21      claims that she worked for you continuously

22      from 2016 to 2020, and that covers the

23      period of time that I asked the question.

24      And in court I asked your brother if she had

25      any connection to U Lock and he said no.

66

1          That sounds pretty clear to me that she

2          didn't have a position as an employee or --

3          or in any fashion.

4          But you're now telling us that in fact she

5          was an employee and that she is entitled to

6          a salary of 130,000, which has now been

7          doubled by the Federal Court to $260,000,

8          which you did not defend on U Lock's behalf?

9               A.   I think if I recall (Inaudible).

10              Q.   Even though, even though your

11         testimony is that she was not an employee?

12              A.   Well, I think, I think, like I said,

13         it's been a couple years, but if I remember

14         correctly, I think you asked this, these

15         same questions of me and my brother Kash,

16         and I think we did tell you that she worked

17         there, and you said why, and I think someone

18         said sisterly love and helping us out or

19         whatever.  And that's what we thought at the

20         time.  She wasn't (Inaudible).

21              Q.   No, that's -- that's incorrect.  I

22         asked the question whether she helped on the

23         legal pleadings, and then I asked whether

24         she had anything to do with U Lock.  And the

25         answer to the second question, which is

67

1     whether she had anything to do with U Lock,

2     and the answer to that question is no.

3          A.  (Inaudible).

4          Q.   There were two parts to that

5     question.  One was her involvement in the

6     pleadings and the legal filing, and the

7     second was whether she had any involvement

8     with U Lock, and the answer to whether she

9     had anything to do with U Lock was no.  And

10    your statement --

11         A.  I don't recall.

12         Q.  -- in discovery was you had no -- U

13    Lock had no employees?

14         A.  Yeah, employees get wages, and she

15    wasn't getting any wages.  She got nothing.

16    So that's probably why, if that's how I

17    answered it, if it is (Inaudible).

18         Q.  Okay.  It still begs the question

19    why you didn't defend it in court, but let's

20    move on. You claim that, that you had an

21    outstanding loan from U Lock or to U Lock,

22    that you loaned U Lock some amount of money

23    for which you repaid yourself when you sold

24    the Kubota tractor and you got $38,000; is

25    that right? That's what you testified this

68

1      morning?

2           Are you there?  Hello?  Anybody there?

3                MS. SHANNI SNYDER:  I'm here.

4                MR. SLONE:  Allen, Allen, are you

5      there, Allen and George?

6                MR. OTTO:  Mr. Slone, that's

7      twice in two days, or in one day.

8                MS. SHANNI SNYDER:  Do you have

9      to call them?

10               MR. SLONE:  We'll have to call

11     Allen's office again.  Shoot, where's his

12     number?  Here it is. (Phone dialing.)

13               UNIDENTIFIED SPEAKER ON PHONE:

14     Get disconnected again?

15               MR. SLONE:  Yes, we did.

16               UNIDENTIFIED SPEAKER ON PHONE:

17     Hold on.  Hang up.

18               MR. ROTH:  Yeah, hello.

19               UNIDENTIFIED SPEAKER ON PHONE:

20     No, hang up.

21               MR. SLONE:  Allen, are you back?

22               MR. GEORGE SNYDER:  Yeah, we're

23     back.  Can you hear me?  We're good.

24               MR. SLONE:  Yes, we can hear you.

25     Go ahead.

69

1            MR. GEORGE SNYDER:  Okay, we must

2        have got disconnected.

3    CONTINUATION OF EXAMINATION OF GEORGE SNYDER:

4    BY MR. OTTO

5            Q.  Mr. Snyder, my last question was,

6        you paid -- you paid yourself back in, after

7        you got payment for the Kubota; is that

8        correct?

9            A.  But not -- not for wages.  I didn't

10       pay anything for wages.

11           Q.  No, I'm just -- but you said you had

12       a loan outstanding --

13           A.  Yes, a loan.

14           Q.  -- that you had made to U Lock, and

15       that, and you repaid yourself back for that;

16       is that correct?

17           A.  Correct.

18           Q.  Okay.  Were there -- did anybody

19       else loan money to the company?

20           A.  Yeah, my sister Tammy.

21           Q.  Was that the money for the taxes?

22           A.  Yes, the --

23           Q.  Okay.

24           A.  I believe it was 7,000.

25           Q.  Anybody else?

70

1          A.   I believe my brother Kash did.

2     Biros did.

3          Q.   How much did you brother loan?

4          A.   I'm not really sure.

5          Q.   Okay.  Let's see.  In your

6     statement, there's a question of whether the

7     -- whether U Lock has any accounts

8     receivable, and you answered no; and yet you

9     have this list of tenants, many of which

10    have never made rental payments.  Don't you

11    keep any records of who pays you?

12         A.   Well --

13         Q.   And who hasn't paid you?

14         A.   Yeah, there are some records.  I was

15    kind of playing catch-up 'cause my brother

16    was, you know, my brother was, you know, he

17    wasn't around.  So we provided the Trustee

18    with everything we had, and then I discussed

19    it personally with Mr. Slone, a couple

20    things, like when that truck came up and,

21    you know, we contacted them and --

22         Q.   So there are a lot of renters that,

23    that have not paid money, so you never made

24    any, took any effort to collect from them or

25    to get rid of their property; is that

71

1      correct?

2            A.  Well, we're attempting that now.  A

3      lot of -- a lot of the tenants are --

4            Q.  Well, why did -- why did it --

5            A.  (Inaudible).

6            Q.  Why did it take bankruptcy to get

7      you to start taking action?

8            A.  I'm sorry, I couldn't hear anything.

9       I was talking.

10                MR. SLONE:  Let's one talk, one

11     person at a time here.

12           Q.  Why did it take --

13                MR. SLONE:  Go ahead.

14           Q.  Why, why did it take the bankruptcy

15     for you to start trying to collect past

16     rents?

17           A.  Well, because Christine didn't want

18     her name on anything, so she told us not to

19     sue anybody and she didn't want any, you

20     know, anything coming up in court or

21     anything like that until after, so we just

22     didn't do anything.

23           Q.  You understand that Christine is

24     going to tell you that that's not true?

25     And, and whether it's true or not --

72

1          A.   (Inaudible).

2          Q.   -- you're supposed to be president

3     -- you're supposed to be president of this

4     corporation, and you're responsible for

5     trying to make it work, and it apparently

6     has not?

7          A.   Well, like I said, most of those

8     people are willing to pay.  Anybody, in my

9     experience, anybody that has stuff stored

10    there is more than willing to pay.  Even a

11    great example is the lady who just paid

12    $3,000 because they want their stuff.  But

13    it's very difficult 'cause Bob Biros and

14    Christine and their family and Andy and

15    everybody is down there destroying all the

16    tenants' things, blocking access to their

17    stuff.  And I'm getting all kind of threats

18    now that they're not going to pay and

19    they're going to sue and they're making some

20    (Inaudible).

21         Q.   Have you ever -- have you referred

22    all these communications to the Trustee?

23         A.   I let the Trustee know what I've

24    been going through, yeah.

25         Q.   So you've been receiving threats

73

1        because of damage?  Who, who specifically

2        has threatened you?

3            A.  I don't know, there's several

4        tenants.  Every time I pull down there and

5        there's a different tenant, they complain

6        that they can't get their stuff, they can't

7        get access.  There's people running around

8        with dozers.

9            Q.  Well, who --

10           A.  (Inaudible) and other tractors.

11           Q.  Who are they?  Who are these people?

12           A.  They're tenants.

13           Q.  I understand they're tenants.  What

14       are their names?

15           A.  You know what, I don't know every

16       single person there by, by name or face.

17       When I -- when I come in and I see them, I

18       wave and I say hi. That's about it.  My

19       brother dealt with most of the, you know, a

20       lot of those people, so, but --

21           Q.  It's beginning to sound like your

22       brother is the one we should have had in the

23       341 meeting?

24           A.  Well, he wasn't available.  He's

25       been in a facility for several months, so

74

1    he, he's going to be discharged I think

2    later this month.  So we -- we didn't even

3    have money to collect or to sue people.  And

4    Christine didn't want -- you know, she's the

5    one that had the money, but she didn't

6    provide any for us to go after these people

7    (Inaudible).

8        Q.  So the long and the short of it is,

9    this is not a viable company unless you get

10   Christine Biros to jump in and pay for

11   everything?

12       A.  No.

13       Q.  Is that what you're telling us?

14       A.  There -- no, not at all.  There's

15   plenty of people with money that would love

16   to be involved.  But Christine got involved

17   saying she'd take the money or, you know,

18   she was going to give us the money, and then

19   she tried to take over the whole property by

20   saying what she said in court and switching

21   this whole thing around.

22       So she -- we tried to pay her back the

23   money we owed her.  Ever since the beginning

24   she will not take the money back.  We

25   offered her interest, everything to make her

75

1          whole, and they just keep saying they want

2          the -- they want the property, they want the

3          property. They said it's a loan but we don't

4          want paid back; we just want the property.

5          So that instead of just foreclosing on the

6          loan, which would have enabled us to pay

7          them off, she did this, this crazy whole

8          thing saying she didn't know who we were.

9          We went to court.  They got a default

10         judgment on us. Then we had to open the

11         judgment.  Then we end up in court and they

12         just, they weren't truthful on almost

13         anything they've said on the stand, so --

14              Q.  Mr. Snyder, your recollection of

15         this legal case is, is not the same as

16         either mine or Ms. Biros.  And I think

17         before you continue to misstate the actions

18         involved, you might want to go back and look

19         at things like the docket and talk to your

20         counsel who was also there.

21              A.  Well, this is true (Inaudible).

22              Q.  Who maintains all -- who maintains

23         all of your -- who maintains all of your

24         books and records; is it you?

25              A.  No, Kash does more of that than me.

76

1       I have some access.  I have access now to

2       some records, but I haven't been able to,

3       you know, really see him in person because

4       he's at a medical facility.  But when --

5           Q.  One of the questions --

6           A.  (Inaudible).

7           Q.  One of the questions here is, list

8       all firms or individuals who were in

9       possession of the debtor's books of account

10      and records when this case was filed, and

11      your answer was none.  And you gave no

12      explanation of why they were unavailable.

13          A.  (Inaudible.)

14          Q.  Is it -- is it -- is it your

15      testimony -- is it your testimony that Kash

16      Snyder has all this stuff and you just can't

17      get to it 'cause he's in an institution?

18          A.  I have some stuff, but if there's

19      anything missing, then he would be the -- he

20      would be the one to have that.

21          Q.  Okay.  In your statement there's a

22      question of, within one year before filing

23      this case, did the debtor provide an insider

24      with the value in any form, including

25      salary, other compensation, draws, bonuses,

77

1          loans, credits on loans, stock redemptions

2          and options exercised, and you say no; is

3          that correct?

4              A.  Are you looking at the schedule?

5              Q.  I am.

6              A.  What page is that?  I was trying to

7          follow along with you.

8              Q.  That is Page, hold on, Page 13 of

9          19, Document No. 65, Question 30.

10             A.  This is Page 13?

11             Q.  That's correct.

12             A.  And what is your question?

13                 MR. SLONE:  Question No. 30.

14             Q.  I'm -- you just -- I'm just asking

15         you if your answer to No. 30 is correct?

16             A.  I'm sorry, trying to find Page 13.

17             Q.  Yep, down at the bottom.  Question

18         30.

19             A.  I didn't get a salary and I had --

20         you know, everything, I received repayments

21         on the loans, but no compensation, no

22         salary.

23             Q.  So, so this --

24             A.  (Inaudible).

25             Q.  This question, your answer to this

78

1      question is not correct?

2          A.  Yeah, the way I read it, the way I

3      read it, I thought it meant salary, and I

4      didn't receive any salary or any payments,

5      no dividends.

6          Q.  Let me move on.  What, what

7      utilities are at the property at 14140?

8          A.  I believe electric service.  I think

9      there are sewage and water taps there, but I

10      don't believe U Lock gets a bill for those.

11          Q.  How about cable?

12          A.  I don't -- no, no cable.

13          Q.  Okay.  Do you have a camera system

14      at the -- at the property?

15          A.  Yes.

16          Q.  Where are the cameras located?

17          A.  We kind of have cameras there to,

18      you know, because the Biros are still

19      (Inaudible) for a lot of things.  I don't

20      know, do I have to tell you the exact

21      locations as to those cameras since your

22      client are the perpetrator?

23              MR. SLONE:  Just say how many

24      cameras are there.

25          A.  I believe there's -- I believe

79

1         there's about ten cameras there.  And they

2         face --

3              Q.  Well, let me ask you this, Mr. --

4              A.  (Inaudible).

5              Q.  Mr. Snyder.

6              A.  (Inaudible).

7              Q.  How -- how does information from

8         those cameras get to some other location if

9         you don't have cable?

10             A.  Well, there's -- I believe there's

11        WiFi at the property, but I think it's the

12        motel's WiFi or someone else's and --

13             Q.  Oh, so you -- you --

14             A.  (Inaudible).

15             Q.  You tap into the -- you tap into

16        somebody else's WiFi?  Did -- did they give

17        you consent to do that?

18             A.  No, I don't -- no, I don't control

19        that camera system, so the one I --

20             Q.  Who does?

21             A.  The one I control is closed circuit

22        and it's not -- it does not go over WiFi.

23             Q.  So it's not remotely available?

24             A.  The one that I --

25             Q.  Is that correct?

80

1          A.   That's correct.

2          Q.   Okay.  So how could Shanni Snyder

3     monitor your camera system, if it's closed-

4     circuit and not remotely available, how

5     could she do that for four years?

6          A.   Well, she had the -- no, I, the one

7     I control is closed-circuit and not -- I

8     don't do it, you know, 'cause my sister

9     does, I believe.

10          Q.   Well, where -- but it's -- but it's

11     U Lock's system; right?  So you're telling

12     me she owns the cameras that monitor U Lock?

13          A.   I believe so.

14          Q.   So she owns the camera system at the

15     U Lock property; is that correct?

16          A.   Some of their -- there's multiple

17     camera systems there, because some of the

18     tenants even have their own systems, I

19     believe.  But, yes, she owns her own system,

20     and then the one I have access to is

21     (Inaudible).

22          Q.   How, how is her -- how is her system

23     accessible remotely?  Where is the WiFi

24     system that, that allows that to happen?

25          A.   I'm not sure.  I know we don't have

81

1       WiFi at the time, but, you know, since -- I

2       don't think we've had it (Inaudible).

3           Q.  Well, that was a four-year period

4       where, where she had -- she claims she had

5       access to cameras.  You're telling me that

6       you only have a closed-circuit camera, so

7       that couldn't have been -- that couldn't

8       have been what she was using.  So she's got

9       her own camera system; is that, is that what

10      you're telling us?

11          A.  Yes, she has her own.  I think she

12      has a -- I think it's called a Dropcam

13      system.  She's a little more technological

14      savvy than me. Mine's kind of like old-

15      school camera, I mean, but it's -- hers has

16      I think (Inaudible).

17          Q.  So if we get into the details of

18      this camera system with her when her claim

19      is, is heard by the District Court, which

20      she's appealed, then she'll understand

21      perfectly how this camera system works?

22          A.  Well, I know she understands better

23      than me. I'm not -- I'm not real -- like I

24      said, mine's the old-fashioned kind.  It's

25      not old-fashioned; it's a high-resolution, I

82

1      mean, but it's just not -- I don't -- I

2      don't look at my camera systems on like my

3      cell phone.  She does all that.  She has all

4      the cellular service and she does that sort

5      of thing.

6          Q.  Okay.

7          A.  I don't know the (Inaudible) on

8      that.

9          Q.  There is currently located on the

10     property a red car?

11         A.  Yes.

12         Q.  Pretty hard to miss if you drive on

13     -- who owns that?

14         A.  The Honda, are you referring to the

15     Honda, the red Honda?

16         Q.  I'm only -- I don't remember what

17     brand it was. I'm only aware of one red car

18     on that site at this point.

19         A.  Yeah, right in front of the

20     building?  That would be --

21         Q.  Yeah, who owns that?

22         A.  My brother Kash.  That's his car.

23         Q.  That's Kash's car?  Why is his car

24     still there? It's obviously not operable?

25         A.  Yeah, I'm not sure.  Like, like I

83

1        told you before, I don't want to keep

2        repeating.  I mean, I feel bad having to

3        keep repeat it, but, you know, there's so

4        much contention there. Biros come down

5        there, kicked me off the property, kicked

6        people off the property.  They blocked his

7        car in.  You can't get a -- I don't even

8        know if you can get a tow truck back to his

9        car at this point.

10       They covered almost all the roads except

11       for one, and so it's very difficult for

12       anybody to get anything down there.  The

13       whole family shows up, Bob Biros, Christine

14       Biros, her son Scotty Biros, Andy Biros,

15       John Biros.  They're like a swarm of bees

16       down there and they're harassing everybody,

17       and they're moving stuff around with dozers

18       and backhoes and taking people's property

19       and damaging it.  They're pushing everything

20       into a pile.  One minute they say it's

21       garbage (Inaudible).

22            Q.  You're prepared -- you're prepared

23       to back up these statements in court, I

24       assume, with evidence?

25            A.  Pardon me?

84

1          Q.  But the mean -- but in the meantime

2      --

3          A.  (Inaudible).

4          Q.  -- the Trustee has, Mr. Snyder, the

5      Trustee has allowed you pretty much

6      unlimited access to the site, and you've --

7      and you've moved a lot of stuff off this

8      site without interference from the Biros.

9      So the question is --

10         A.  That's not true.  I (Inaudible).

11         Q.  -- why is Kash Snyder's broken --

12     excuse me, let me finish my question,

13     please.

14         A.  (Inaudible).

15         Q.  Why is Mr. -- your brother's red car

16     still on the site?  It's clearly not

17     operable and it could be moved just as the

18     other cars were?

19         A.  Well, I -- it -- that probably --

20     I'm guessing it wasn't moved by Kash because

21     he's been in a facility since I believe June

22     or July.  I could probably get, you know,

23     permission from Kash and work with Mr. Slone

24     to get that car out of there, but it's very

25     difficult to do anything. And I disagree

85

1    with you saying I got a lot of stuff out of

2    there.  I don't think I got a couple percent

3    of stuff out of there.  We took one

4    truckload of pallets (Inaudible).

5        Q.  All of those -- all of those

6    shipping containers are gone and most of the

7    trailers are gone?

8        A.  Yeah, I don't --

9        Q.  So --

10       A.  I don't agree with you.  I don't

11   think there was -- I think there was only

12   one trailer that I know of that left the

13   site.  And the shipping containers were

14   moved months ago.  I'm not in agreement with

15   you on your, you know, what you're --

16       Q.  Who paid -- who paid the insurance

17   premium for the insurance on the site?

18       A.  I paid that personally.

19       Q.  Okay.  Who is the principal of USAAG

20   that you've been dealing with?

21       A.  Well, I was talking to Mike Lavinsky

22   (Phonetic spelling).

23       Q.  Do you have contact information for

24   him?

25       A.  Not in front of me.

86

1          Q.  What -- what state was USAAG

2     incorporated in, do you know?

3          A.  No, I don't.

4          Q.  Is there anybody -- is there anybody

5     else associated with USAAG that you're aware

6     of?

7          A.  Yeah, I talked to someone else, but

8     (Inaudible).  There's several people.

9     They're slipping my mind right now.  There

10    was Mike Lavinsky.

11         Q.  How -- how do you know this Mr. Mike

12    Lavesky (Phonetic spelling)?

13         A.  You know what, several years ago, he

14    had -- he had called.  I don't know if you

15    saw the number on the sideline or whatever.

16    He called and he came and he wanted to meet,

17    and we came out and we looked at the

18    properties.  And he's come back a couple

19    times since.

20         Q.  Okay.  Why have you never applied

21    for an occupancy permit for U Lock on that

22    site?

23         A.  I'm not sure.  Like I said, Kash, my

24    brother Kash handled most of that stuff.

25    And then I think we were kind of

87

1          grandfathered in with, you know, the storage

2          facility, is kind of what the Township told

3          us there, so --

4              Q.  I can -- I can assure you that

5          according to North Huntingdon Township, that

6          you are not grandfathered in.

7              A.  (Inaudible).

8              Q.  Do you pay business privilege tax to

9          North Huntingdon Township?

10             A.  Pardon me?

11             Q.  Do you pay business privilege tax to

12         North Huntingdon Township?

13             A.  I don't think so, but --

14             Q.  Any reason why not?

15             A.  No, just like we said before, we

16         haven't paid anything.  We didn't have the

17         money, so we didn't pay any of the taxes

18         yet.  But we don't (Inaudible).  We're going

19         to file them.

20             Q.  Now, when you had the Kubota

21         machinery, you -- you borrowed -- you

22         entered into a loan agreement, U Lock

23         entered into a loan agreement to purchase

24         that equipment; is that correct?

25             A.  In 2016 you mean?

88

1        Q.  Yes.

2        A.  Yes.

3        Q.  Okay.  And I assume that U Lock made

4    payments to keep the loan current; is that

5    correct?

6        A.  Yes.

7        Q.  Okay.  And you then sold the Kubota

8    property or equipment and received $45,000

9    for it, so you must have paid at least

10   $45,000 from U Lock to Kubota; is that

11   correct?

12       A.  Well, a lot of times if U Lock

13   didn't make enough money sometimes to cover

14   it, and I always -- I always put the money

15   in to cover the payments, so I put quite a

16   bit of money towards the payments.

17       Q.  Is it -- is it correct that you

18   rented that equipment out periodically?

19       A.  I don't know that we ever -- I don't

20   know that we ever rented it out.  We put a

21   sign there that, for rent, but we didn't

22   rent that machine out.  That stayed on the

23   property.  But we have another machine like

24   that, so when someone would call and say,

25   hey, can I rent an excavator, yeah, we did

89

1     do that a couple times, but only a handful

2     of times.

3         Q.  When you say we had another piece of

4     equipment, who is the we you're talking

5     about, U Lock?

6         A.  No, no, I'm sorry, no.  Personally I

7     had another piece of equipment that was

8     almost identical to that, that one.  And

9     this is going back years.  I mean, I think

10    that was, if it was in like 2016 or

11    something.  We put that there and we

12    (Inaudible) for rent, but what we rented was

13    a machine that was almost identical to that

14    one.  But I don't -- I think -- I can't even

15    remember the charge.  We rented, I think it

16    was rented to a friend just a couple times.

17    But as far as I know, I don't think that

18    particular machine owned by U Lock was

19    rented out ever.

20        Q.  What is -- what is the involvement

21    of Eric Martin in U Lock?

22        A.  None.  He had -- I think he loaned

23    -- he loaned the down money for U Lock in

24    the beginning, but he was --

25        Q.  And in fact, he was repaid by the --

90

1   by the -- at the closing, or he was repaid

2   with money out of I believe Henry Moore's

3   escrow.  So what, what did you pay Mr.

4   Martin; what did you pay Mr. Martin to loan

5   you the down payment for this property?

6       A.  I don't -- I don't think anything.

7       Q.  So he -- he did it as a -- as a

8   friendship?

9       A.  Yes.

10      Q.  Out of friendship?

11      A.  Yeah.

12      Q.  Okay.  Let's see.  Have you given a

13  complete list of all of the renters on that

14  property to the Trustee?

15      A.  At the time I gave him all, you

16  know, when we filed the schedules, we gave

17  -- I gave him everything I knew about.  And

18  as things came up, like, I believe the

19  tractor-trailer we were talking about

20  earlier was not on the schedule, but I

21  updated him on that.  If anything did come

22  to light after the fact, we'd let him know.

23      Q.  Well, you've controlled -- you've

24  controlled that property from 2015 up until

25  at least when the bankruptcy petition was

91

1          filed, so it would seem logical that you

2          would have a list of tenants for all your --

3          all your lockers and there wouldn't be

4          people who had stuff stored there that you

5          wouldn't know about, even if you didn't know

6          them personally, so --

7               A.  Yeah.

8               Q.  So are you telling us that there are

9          tenants or renters that you don't know

10         about?

11              A.  Well, there were -- I wasn't the one

12         -- when you're saying I was in control of

13         the property, I didn't do every task there

14         at the property, nor was I in control of

15         every aspect of it, so my brother kind of --

16              Q.  Well, U Lock was, and you're the

17         president of U Lock, so it's your

18         responsibility?

19              A.  Yeah, so like I said, Kash was the

20         (Inaudible) with the tenants and myself.

21              Q.  Oh, so you're telling me Kash was in

22         charge of all the renters and had a complete

23         list of the tenants, of the renters?

24              A.  I don't know exactly what he has.  I

25         think you asked him that question before on

92

1      the stand.  I can't remember what he

2      answered, but I -- yeah, he did that way

3      more than I did.  I just, like I said, I've

4      been trying to play catch-up here in the

5      past few months and, you know, like I said,

6      I didn't do every single task on that

7      property.  So, yeah, he would -- he would

8      have more of a complete list than I have.

9      But I think we're -- we're pretty, pretty

10     much, I'd have to say 90, 98 percent or

11     something, you know, accurate when we give

12     Mr. Slone the statements, would be my guess.

13      But like I said --

14                MR. OTTO:  Mr. Slone, we've had a

15     number of questions which in my view are

16     fairly important that Mr. Snyder has said he

17     can't answer because his brother Kash has

18     the information.

19                MR. SLONE:  Well, we can take --

20     you can schedule a 2004 Examination of Kash

21     Snyder. Maybe that's what should be done.

22                MR. OTTO:  I -- I was going to

23     ask, I'm not sure what the mechanism would

24     be, to do that or to continue the 341

25     meeting until Mr. Snyder, Mr. Kash Snyder is

93

1    available.

2              MR. SLONE:  Well, I won't close

3      --

4              MR. OTTO:  I'll leave that to

5      your discretion.

6              MR. SLONE:  I won't close -- I

7      will not close the meeting today.  So we can

8      reschedule a continuation of it when we get

9      a date for Mr. Kash, or you can take a 2004

10     Examination, either way.

11             MR. OTTO:  Okay.  Let me -- let

12     me talk to Sarah Wenrich separately and --

13     and --

14             MR. SLONE:  Yeah, I will not

15     close this.

16             MR. OTTO:  Either I will --

17             MR. SLONE:  I will not close the

18     meeting today.  The meeting will be held

19     open.

20             MR. OTTO:  That's all the

21     questions I have for now, but --

22             MR. SLONE:  Okay.

23             MR. OTTO:  -- I don't know if

24     Sarah or Christine have any.

25             MR. SLONE:  Any other questions?

94

1          MS. BIROS:  I have one, Bill.

2     Bill I had one.

3          MR. OTTO:  Yes, go ahead.

4          MS. BIROS:  Is Biros on the

5     checking account for U Lock?

6          MR. OTTO:  Mr. Snyder, did you

7     hear that question?

8          MR. GEORGE SNYDER:  No, I'm

9     sorry.

10          MR. OTTO:  Who, who has the --

11     who is authorized to sign, with Citizens

12     Bank to sign checks for U Lock?

13          MR. GEORGE SNYDER:  Kash Snyder,

14     my brother.

15          MR. OTTO:  Only Kash, not you?

16          MR. GEORGE SNYDER:  Not me;

17     correct.

18          MR. OTTO:  Only Kash, okay.

19          MR. GEORGE SNYDER:  Yes.

20          MR. OTTO:  Sarah, do you have any

21     questions?

22          MS. WENRICH:  I do not have any

23     further questions at this time.  Thank you.

24          MR. SLONE:  Okay, what I'm going

25     to do, if there's no further questions, I

95

1          will keep the meeting open and then --

2                    MS. SHANNI SNYDER:  I -- excuse

3          me, this is Shanni.

4                    MR. SLONE:  Yes.

5                    MS. SHANNI SNYDER:  I have

6          questions.

7                    MR. SLONE:  Okay, I'm giving --

8                    MS. SHANNI SNYDER:  (Inaudible).

9                    MR. SLONE:  Okay.  Is it going to

10         be lengthy or within the next ten minutes?

11                   MS. SHANNI SNYDER:  No.  Yes, we

12         should be good.

13                   MR. SLONE:  Okay, go.

14    EXAMINATION OF GEORGE SNYDER:

15    BY MS. SHANNI SNYDER

16         Q.  Okay.  George, you were the primary

17         officer of U Lock; isn't that right?

18         A.  Yes.

19         Q.  Did you answer?

20         A.  Yes.

21                   MR. SLONE:  He said yes.

22         Q.  Hello?

23         A.  Correct.

24         Q.  Okay.  You were the primary

25         shareholder of U Lock; isn't that right?

96

1          A.  Yes, majority shareholder.

2          Q.  When you started U Lock, did it have

3     any money?

4          A.  No.  We were (Inaudible).

5          Q.  When you formed U Lock, did you

6     discuss the name with Christine and John

7     Biros?

8          A.  I didn't finish answering your other

9     question when you said we didn't have any

10    money.  We were supposed to, was promised

11    money by Biros to keep U Lock, you know, to,

12    to develop U Lock, so, but when they didn't

13    put up the money, then, no, we didn't have

14    any.  So I'm sorry, what's your next

15    question?

16         Q.  Okay.  When you -- when you formed U

17    Lock, did you discuss the name with

18    Christine and John Biros?

19         A.  Yes, we discussed everything

20    together.  We met almost daily, but at the

21    very least weekly.

22         Q.  Okay, when did U Lock open its bank

23    account?

24         A.  I'm not sure exactly.  I think we

25    purchased it in like 5/2015, something like

97

1        that.  It was sometime after that.

2                    MR. OTTO:  I'm sorry, I didn't

3        hear that date.

4            Q.  (Inaudible).

5            A.  I believe, I think just right after

6        we -- we purchased it.  So I think probably,

7        if we bought it in July, I would say we had

8        the bank account by September.  That's --

9            Q.  The whole idea of U Lock was to get

10       this property and develop it; isn't that

11       right?

12           A.  Correct.

13           Q.  Christine Biros promised to put up

14       the money to help you with that; isn't that

15       right?

16           A.  Yes.

17           Q.  Did you have silent partners from

18       2015 to 2018?

19           A.  Yeah, Christine Biros and John

20       Biros.

21           Q.  And how often did you have meetings

22       with John and Christine Biros from 2015

23       through 2018 then?

24           A.  I would -- 2015 to '18?  I would say

25       with John, I would say almost every day.

98

1        And then he was -- he relayed whatever

2        Christine would say to me.  And then

3        Christine, and I wanted to clarify a

4        question I didn't get to finish answering

5        before.  When I met Christine, it was every

6        Wednesday, and she would ask me to come down

7        to meet with her at her place of business,

8        which happened to be a bar or a tavern.  And

9        I didn't drink; we don't drink.  We didn't

10       sit at the bar.  We'd sit in the office and

11       talk.  And so it wasn't that just we just

12       ran into each other at some bar somewhere.

13       It was, she was the owner of this business.

14       We were meeting at her request there.

15            Q.  Did you discuss the U Lock and its

16       plans at these meetings?

17            A.  Yes, we always, we sat there for

18       hours.  That's all we talked about.

19            Q.  And you're saying it was a bar.

20       What was the name of the bar?

21            A.  Caesar's Tavern.  Well, we didn't

22       always meet at a bar.  There -- we met

23       different places, wherever they requested.

24       You know, there were different places we

25       met, but a lot of it was at that -- at her

99

1      place of business, Caesar's Tavern.

2          Q.  Okay, so you discussed the U Lock

3      and its plans with them at those meetings,

4      and when did the meetings stop?

5          A.  I'm not really sure.  As far as the

6      -- as far as with Christine, it kind of

7      stopped a little earlier, like maybe in

8      2018.  John I talked to a little bit less,

9      less, but I've met up with John just as

10     recently as last year (Inaudible). Maybe

11     even this year.

12         Q.  And did you have progress updates

13     and meetings even after Christine Biros sued

14     you?

15         A.  Yes.  Yeah, we always did.  Even I

16     think at one point they even, you know,

17     paused the lawsuit so we could talk about

18     moving forward.

19         Q.  When you had these meetings during

20     the lawsuit, was Ms. Biros' attorney, was

21     Ms. Biros' attorney present with you?

22         A.  No.

23         Q.  Did you consider Ms. Biros the

24     control person of U Lock?

25         A.  Yes.

100

1           MR. SLONE:  At what point?

2           Q.  Even after the lawsuit, even after

3       the lawsuit, did you feel that Ms. Biros was

4       -- Ms. Biros was making the shots, calling

5       the shots in U Lock, making the decisions?

6           A.  Yes.  The whole time.

7           Q.  U Lock had a company car it used; is

8       that correct?

9           A.  Yes, truck, pickup truck.

10          Q.  Who owned the company car?

11          A.  I believe it's the Biros family.

12      I'm not exactly sure who it's titled to, but

13      I'm -- I believe someone in the Biros

14      family, Bob or John or I'm not sure.

15          Q.  When did U Lock return it?

16          A.  Just in recent years.  We used it

17      from, I believe, I think 2015 maybe from the

18      beginning till I think '20, sometime in

19      2020.  '21, '22. Yeah, so not the past two

20      years.  Somewhere in 2020 they (Inaudible)

21      take it back.

22          Q.  Okay, so from 2015 to 2020 the

23      company car belonged to the Biros family?

24          A.  Yes.

25          Q.  Can you hear me?

101

1          A.  Yeah, I can hear you.

2          Q.  (Inaudible).

3          A.  I'm sorry.  Did I miss a question?

4     Go ahead.

5          Q.  So from 2015 through the beginning

6     of 2020, the company car belonged to the

7     Biros family?

8          A.  Oh, yeah, I thought I answered that.

9      Yes, yeah, we knew -- there was -- there

10    was a truck that was used on the facility,

11    and it belonged, to them and we used it

12    quite a bit.  And then when it would need

13    any maintenance or anything, John would pick

14    up the truck, take it to the -- to get

15    inspected or whatever needed done, brakes

16    done or something, and he would bring it

17    back to the property.

18         Q.  And did the Biros family place

19    trailers onto the property at U Lock?

20         A.  Yes, two (Inaudible) like maybe 70-

21    foot mobile homes.

22         Q.  Did you ask them to do that?

23         A.  No.

24         Q.  So the whole time, even after the

25    lawsuit, you considered Ms. Biros to be part

102

1      of U Lock?

2            A.   Yeah.  And I believe they put those

3      trailers there after the lawsuit.  They

4      just, yeah, she was always in control.

5            Q.   And when Christine Biros sued U

6      Lock, did she ask the Court to order

7      repayment or payment to her for rent?

8            A.   Oh, you mean this most recent thing

9      where they're asking for me, George Snyder,

10     to pay U Lock rent?  Or U Lock to pay her

11     rent?

12           Q.   No, I said when Christine Biros sued

13     U Lock, did she ask the Court to order

14     payment to her for rent?

15           A.   No.  She never mentioned that.

16           Q.   Did Christine Biros ever send you a

17     bill for rent?

18           A.   No, she did not.

19           Q.   Did Christine Biros ever ask you to

20     pay her rent?

21           A.   No, there was no mention of

22     (Inaudible).

23           Q.   When U Lock purchased --

24           A.   The other court (Inaudible).

25           Q.   When U Lock purchased the property,

103

1     did it have tires on it?

2         A.  Yes, there were a lot of tires

3     there.

4         Q.  What did U Lock do to improve this

5     property from 2015 to 2020?

6         A.  I apologize, can you repeat that

7     question?

8         Q.  What did U Lock do to improve the

9     property from 2015 to 2020?

10        A.  No.

11            MR. SLONE:  Where are we -- where

12    are we going with this?  Just give me a

13    heads-up.

14            MS. SHANNI SNYDER:  I only -- I

15    only have -- I only have a few more

16    questions, but I'm trying to determine

17    whether Christine Biros and the Biros

18    insurance trust are co-debtors or insiders

19    of U Lock.

20            MR. SLONE:  Okay, you can ask a

21    few more questions.

22            MS. BIROS:  I think that's

23    already been determined, so --

24        A.  I'll answer pretty quickly.  We did

25    everything there, from changing light bulbs

104

1        to electrical service to guide wires, over a

2        couple hundred tons of substrate for the

3        parking lot.  We fixed garage doors.  We had

4        garage door openers installed.  We met with

5        tenants.  Developed roads to go down below,

6        a road going up to the highway.  We did --

7        we did all, you know, all kind of stuff.  We

8        removed a lot of the garbage from there,

9        cleaned up tires, recycled things.

10           There was dozens and dozens of TV's and

11        different things there.  So the list is

12        quite extensive, but I'll keep it brief

13        since we want to move on here.  So, but,

14        yeah, anything that was entailed down there,

15        we did the work.  I did a lot of work

16        personally.

17           Q.  Okay, I only have a few more

18        questions.  U Lock had me watching its

19        Dropcamera; isn't that correct?

20           A.  Yes.

21           Q.  U Lock never paid me anything; isn't

22        that correct?

23           A.  That's correct.

24           Q.  Did Christine Biros know I was

25        helping?

105

1         A.  Yes, she knew every step of the way,

2     every --

3         Q.  Did you tell her during your weekly

4     meetings?

5         A.  Yes.  I went over everything.

6         Q.  And you considered my work to be a

7     favor; isn't that right?

8         A.  Yes, at the time.

9         Q.  You called it sisterly love; isn't

10    that right?

11        A.  Oh, something like that.  I think

12    Kash used those words.

13        Q.  And Christine Biros didn't object to

14    me doing this work, did she?  When I sued

15    you, someone handed you the summons; isn't

16    that right?

17        A.  That's correct.

18        Q.  You knew about the lawsuit, but you

19    didn't answer it; right?

20        A.  Yes.

21        Q.  Did I discuss the lawsuit with you?

22        A.  No.

23        Q.  Did I ask you not to hire an

24    attorney?

25              MR. OTTO:  I'm sorry, I didn't

106

1      hear the answer.  I'm sorry, what?

2            A.  I'm sorry.

3            Q.  Did I discuss the lawsuit --

4                  MR. OTTO:  What was the answer to

5      your first question?  Did you discuss the

6      lawsuit --

7            A.  No, I did not.

8                  MR. OTTO:  -- with Ms. Snyder?

9            A.  I did not discuss the lawsuit.  I

10     did not discuss the lawsuit with her.

11                 MR. OTTO:  Okay.

12           Q.  Did I ask you not to hire an

13     attorney?

14           A.  No.

15           Q.  Did I tell you to default?

16           A.  No.

17                 MS. SHANNI SNYDER:  That's all my

18     questions.

19                 MR. SLONE:  Okay, thank you.

20     Okay.

21                 MS. SHANNI SNYDER:  You're

22     welcome.

23                 MR. SLONE:  I will hold the

24     meeting open for the possible questions for

25     Kash Snyder, or if you want to schedule a

107

1      2004 Examination, let me know.  And let me

2      know when Mr. Snyder, Kash Snyder would be

3      available, and then we'll get something

4      scheduled.  Any other questions?

5              MR. GEORGE SNYDER:  Okay, Mr. --

6      and also, Mr. Slone, if there's some of

7      those things, I could probably get some

8      answers for some things either maybe by

9      phone with Kash or I could, you know, look,

10     look for some answers for some of the things

11     (Inaudible) might be -- might have been

12     omitted today.

13             MR. SLONE:  Well, get, all the

14     things that have been asked for, get that

15     information either filed or sent to me and

16     then, then we'll see what we're going to do

17     with -- when we're going to schedule Kash

18     Snyder.

19             MR. GEORGE SNYDER:  Okay, sounds

20     --

21             MR. SLONE:  Okay.

22             MS. BIROS:  Mr. Slone, Christine

23     Biros here.  I have a question.

24             MR. SLONE:  Yes.

25             MS. BIROS:  I just want -- I just

108

1          want it on the record that most of this that

2          I just heard is not correct and I knew

3          nothing about (Inaudible).

4                    MR. SLONE:  Okay, well, we're --

5          this is only to ask questions of the

6          representative of U Lock.

7                    MS. BIROS:  Okay.

8                    MR. SLONE:  We're not -- we're

9          not trying the case here.

10                    MS. BIROS:  Okay.

11                    MR. SLONE:  But your comments are

12          received.  So we're -- I'm going to -- I'm

13          going to close the -- I'm going to stop the

14          recording now and we'll reschedule later.

15          Thank you. (End of recording.)

16

17

18

19

20

21

22

23

24

25

109

1

2

3                    C E R T I F I C A T E

4

5        I, Mary J. Carney, a Court Reporter and Notary

6  Public in and for the Commonwealth of Pennsylvania,

7  do hereby certify that the foregoing is a true and

8  correct transcription of the recorded proceedings of

9  the 341(a) Meeting and constitutes a true record.

10

11  This 27th day of January, 2023.

12

13

14  _____

                 Notary Public

15

16

17

18

19

20

21

22

23

24

25

Case 22-20823-GLT    Doc 337-1    Filed 02/24/23    Entered 02/24/23 09:32:45    Desc
Exhibit A    Page 111 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 110

**A**

**ABC** 61:7
**able** 55:3 76:2
**absolutely** 48:15
**accepted** 56:12
**access** 72:16 73:7
  76:1,1 80:20
  81:5 84:6
**accessible** 80:23
**account** 76:9 94:5
  96:23 97:8
**accountant** 17:1
  17:25
**accounts** 70:7
**Accredited** 13:10
  13:14,21
**accumulation**
  38:3
**accurate** 92:11
**accurately** 6:4
**acres** 8:3
**action** 7:17 33:15
  43:20 44:5,6
  71:7
**actions** 75:17
**administrative**
  37:18
**advertising** 31:20
**aerial** 52:16,18
  53:11
**afternoon** 35:23
**ago** 51:4 62:20
  85:14 86:13
**agree** 23:12 85:10
**agreed** 60:19
**agreement** 21:5
  21:18 30:21
  31:8 33:17
  55:23 56:11
  85:14 87:22,23
**ahead** 68:25
  71:13 94:3
  101:4
**alleged** 26:6
**Allen** 2:9 4:5 10:2

  11:6,8,9,22,25
  12:1,8,10 19:13
  35:13 68:4,4,5
  68:21
**Allen's** 46:10
  68:11
**allowed** 48:19,21
  84:5
**allows** 80:24
**amend** 25:5
**amended** 14:23
  15:2
**amount** 29:14
  64:6 67:22
**Andy** 72:14 83:14
**answer** 39:6
  43:10,12 44:16
  44:24 46:8,15
  46:20 59:8
  63:11,16 66:25
  67:2,8 76:11
  77:15,25 92:17
  95:19 103:24
  105:19 106:1,4
**answered** 40:1
  57:14 67:17
  70:8 92:2 101:8
**answering** 42:15
  96:8 98:4
**answers** 107:8,10
**anticipate** 18:3
  19:22
**anybody** 9:19
  47:20 68:2
  69:18,25 71:19
  72:8,9 83:12
  86:4,4
**anyway** 43:25
**anyways** 62:11
**apiece** 51:17
**apologies** 5:7
**apologize** 29:1
  103:6
**apparently** 56:1
  56:9,10 72:5

**appealed** 81:20
**appear** 24:14
  51:11
**applied** 86:20
**approval** 62:12
**approximately**
  9:18 19:19
**area** 63:2
**arguing** 48:9
**arm's** 48:9,17
  49:15
**arrangement**
  27:19
**arrangements**
  54:7 57:19
**asked** 18:14,15
  42:16 46:3 52:2
  62:15,18,19
  65:23,24 66:14
  66:22,23 91:25
  107:14
**asking** 18:16
  36:22 42:19,20
  42:23 46:2,10
  60:11 77:14
  102:9
**aspect** 91:15
**assert** 48:6
**asserting** 34:4
**assertion** 34:8
**assets** 6:5,17 9:5
  9:14 37:14
**assigned** 51:8
**associated** 86:5
**assume** 83:24
  88:3
**assure** 62:17 87:4
**attempting** 71:2
**attention** 6:12
**attorney** 4:6
  17:16 20:16
  21:23 40:11
  45:8 99:20,21
  105:24 106:13
**authorized** 94:11

**available** 60:16
  73:24 79:23
  80:4 93:1 107:3
**aware** 21:25
  39:21 62:6
  82:17 86:5

**B**

**back** 7:4 11:12,14
  11:16,21 12:2,8
  12:12 13:24
  18:10,14 19:17
  19:18 22:9
  28:20 36:4,9,17
  39:25 53:2
  55:10 63:7
  68:21,23 69:6
  69:15 74:22,24
  75:4,18 83:8,23
  86:18 89:9
  100:21 101:17
**background**
  35:10
**backhoes** 83:18
**backup** 12:10
**bad** 83:2
**bank** 17:21,25
  94:12 96:22
  97:8
**bankruptcy** 1:1,2
  8:17,21,24 9:16
  14:4,9 15:4
  16:8 17:22
  20:17 34:19
  39:1,23 44:13
  44:25 46:1 47:4
  71:6,14 90:25
**bar** 31:2,10 32:15
  98:8,10,12,19
  98:20,22
**basis** 64:11
**bees** 83:15
**beginning** 31:18
  31:23 73:21
  74:23 89:24

  100:18 101:5
**begs** 67:18
**behalf** 5:3,5 26:4
  66:8
**believe** 20:22
  39:13 42:4 50:8
  51:1,3 52:15
  53:20 55:16,20
  56:22 57:17
  58:23 69:24
  70:1 78:8,10,25
  78:25 79:10
  80:9,13,19
  84:21 90:2,18
  97:5 100:11,13
  100:17 102:2
**belonged** 52:20
  52:23 53:10
  100:23 101:6,11
**best** 39:13
**better** 63:16
  81:22
**big** 53:4,5
**bill** 10:7,11 78:10
  94:1,2 102:17
**billed** 44:12
**Biros** 2:7 5:4,5,8
  7:10 8:5 13:24
  14:7,19 17:11
  17:11 30:17
  32:8 38:7,19,23
  42:5 43:20
  48:17 49:10,17
  49:18,18,22
  54:24 55:12
  58:21 70:2
  72:13 74:10
  75:16 78:18
  83:4,13,14,14
  83:14,15 84:8
  94:1,4,4 96:7,11
  96:18 97:13,19
  97:20,22 99:13
  99:23 100:3,4
  100:11,13,23

Case 22-20823-GLT    Doc 337-1    Filed 02/24/23    Entered 02/24/23 09:32:45    Desc
Exhibit A    Page 112 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 111

101:7,18,25
102:5,12,16,19
103:17,17,22
104:24 105:13
107:22,23,25
108:7,10
**Biros'** 99:20,21
**bit** 39:18 45:4
88:16 99:8
101:12
**blank** 11:13
**blocked** 83:6
**blocking** 72:16
**board** 46:13
**Bob** 11:4 32:8
44:19 49:18
72:13 83:13
100:14
**bona** 47:23
**bonuses** 76:25
**books** 26:14
75:24 76:9
**borrowed** 87:21
**bother** 47:9,14
**bottom** 77:17
**bought** 97:7
**box** 51:1
**brakes** 101:15
**brand** 82:17
**brief** 24:25
104:12
**bring** 6:12 101:16
**broken** 84:11
**brother** 13:1
16:15 31:3
47:15 48:11
59:4,6,21 65:2
65:24 66:15
70:1,3,15,16
73:19,22 82:22
86:24 91:15
92:17 94:14
**brother's** 84:15
**brought** 7:6,7
12:21 53:17

**building** 25:16
42:12,22,24
82:20
**bulbs** 103:25
**business** 6:16,20
7:1 13:11,14
43:25 58:16
87:8,11 98:7,13
99:1

─────────
**C**
**C** 109:3,3
**C-A-R-L** 20:2
**cable** 78:11,12
79:9
**Caesar's** 31:2
98:21 99:1
**call** 4:1 11:1,2,3
11:12,14,16
12:2 32:16 36:3
36:9 41:21
56:23 68:9,10
88:24
**called** 13:10,13
57:18 81:12
86:14,16 105:9
**calling** 11:5,20
100:4
**camera** 65:5
78:13 79:19
80:3,14,17 81:6
81:9,15,18,21
82:2
**cameras** 78:16,17
78:21,24 79:1,8
80:12 81:5
**car** 82:10,17,22
82:23,23 83:7,9
84:15,24 100:7
100:10,23 101:6
**Carney** 109:5
**cars** 84:18
**case** 4:2,3 6:18
8:14 20:24
36:18 38:20

44:3 45:6 47:6
47:24 48:9,16
58:22 75:15
76:10,23 108:9
**cases** 22:9 35:24
**cash** 56:12
**catch-up** 70:15
92:4
**cause** 7:16 11:12
12:21 15:23
18:3 27:14
41:20 45:21
50:12 54:24
57:4,12 70:15
72:13 76:17
80:8
**cell** 11:2,16 12:6
82:3
**cellular** 82:4
**certainly** 32:13
40:17 56:7
**certificates** 30:24
**certify** 109:7
**changed** 23:5
25:6
**changes** 52:4
**changing** 103:25
**Chapter** 1:3
**charge** 23:3
89:15 91:22
**charging** 46:11
**check** 9:10 33:11
33:12 58:9
**checking** 94:5
**checks** 94:12
**child** 49:11,13,13
**Christine** 2:7 5:3
7:10 17:11 23:2
23:3 30:17 31:4
31:22 32:7,15
38:7,23 42:5
48:17 71:17,23
72:14 74:4,10
74:16 83:13
93:24 96:6,18

97:13,19,22
98:2,3,5 99:6,13
102:5,12,16,19
103:17 104:24
105:13 107:22
**circuit** 79:21 80:4
**circumstances**
48:8
**citation** 39:20,24
40:4,8
**cited** 38:1,16,17
38:24,24
**Citizens** 94:11
**claim** 7:16 8:6
22:25 26:6
32:23 35:1 44:3
46:7 63:9 67:20
81:18
**claimed** 31:17
56:8
**claiming** 23:18
23:21,22 53:6
54:16
**claims** 9:15 47:18
64:9 65:21 81:4
**clarify** 24:4 40:17
45:25 57:7,12
98:3
**clean** 40:5
**cleaned** 25:13,15
39:14,15 104:9
**clear** 66:1
**clearly** 57:15
84:16
**client** 32:12 78:22
**close** 24:21 33:2
49:16,17,17
93:2,6,7,15,17
108:13
**closed** 79:21
**closed-** 80:3
**closed-circuit**
80:7 81:6
**closing** 90:1
**co-debtors**

103:18
**code** 38:7
**collect** 70:24
71:15 74:3
**collected** 7:15
56:2 58:2
**come** 22:9,25
46:24 55:2 63:7
73:17 83:4
86:18 90:21
98:6
**coming** 14:25
71:20
**comment** 38:25
**comments** 108:11
**Commissioner**
42:6,17
**Commonwealth**
109:6
**communicated**
61:9
**communications**
72:22
**company** 6:6,16
7:2,12,23 9:25
12:16 13:10,13
14:4,11 15:3,7
16:25 17:3,6
19:20 20:22,23
22:25 23:15
24:5,8,11 29:3,4
29:12 31:9 34:5
48:22 69:19
74:9 100:7,10
100:23 101:6
**company's** 28:6
53:20
**compensation**
23:9,25 24:15
25:19,24 26:12
27:8 28:12
76:25 77:21
**complain** 73:5
**complete** 90:13
91:22 92:8

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 113 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 112

**completely** 61:15
**concede** 64:5
**concerned** 18:4
**confirm** 37:2
**confused** 57:13
**conjunction** 51:9
**connection** 65:25
**consent** 79:17
**consider** 21:3,11
  21:15 27:17
  28:4,10 40:4
  47:25 48:1,5
  64:23 99:23
**considered**
  101:25 105:6
**Consolidators**
  13:11,14
**constitutes** 109:9
**constructive** 25:9
**contact** 54:6,20
  54:22 85:23
**contacted** 41:10
  70:21
**contained** 6:2
**containers** 50:2,5
  50:10,16,19,25
  51:11,17,24,24
  52:7,17 85:6,13
**contention** 83:4
**contest** 8:11,18
**contested** 8:21
**continuation**
  12:13 36:19,24
  69:3 93:8
**continue** 9:12
  47:6 75:17
  92:24
**continuous** 64:11
**continuously**
  65:21
**contractors** 15:24
  22:19 26:16
  64:6
**control** 14:16,17
  23:15,20 30:18

**79:**18,21 80:7
  91:12,14 99:24
  102:4
**controlled** 24:11
  90:23,24
**controlling** 14:16
  25:7
**convert** 60:18,20
  62:10
**copies** 15:20
**copy** 5:21 29:8
**Corp** 13:11,14
**corporate** 33:14
  60:23
**corporation**
  12:20 21:24
  72:4
**correct** 8:7,10,12
  30:6 37:4,10,13
  51:5 59:2,17,20
  61:7,8,15 62:5
  63:4 69:8,16,17
  71:1 77:3,11,15
  78:1 79:25 80:1
  80:15 87:24
  88:5,11,17
  94:17 95:23
  97:12 100:8
  104:19,22,23
  105:17 108:2
  109:8
**correctly** 66:14
**counsel** 65:9
  75:20
**county** 48:14
**couple** 22:22
  28:12 37:25
  42:14 50:3,4
  54:9 56:5 57:21
  66:13 70:19
  85:2 86:18 89:1
  89:16 104:2
**course** 6:16
**court** 1:1 20:21
  27:25 32:12

**39:**1 41:4 43:19
  44:5 45:12,16
  48:25 51:16
  65:2,24 66:7
  67:19 71:20
  74:20 75:9,11
  81:19 83:23
  102:6,13,24
  109:5
**cover** 32:25 88:13
  88:15
**covered** 33:5
  83:10
**covers** 65:22
**crazy** 75:7
**creditor** 45:22,23
**creditors** 1:13
  4:24 11:5 13:22
  22:4
**credits** 77:1
**current** 48:1 88:4
**currently** 13:25
  39:24 59:19
  82:9
**customers** 25:14
**cut** 25:15

**D**
**daily** 96:20
**damage** 73:1
**damaged** 54:25
  55:12
**damaging** 83:19
**date** 29:19,19
  37:2 39:9 93:9
  97:3
**day** 31:6 42:3
  43:9 54:23 68:7
  97:25 109:11
**days** 19:23 42:14
  54:9 57:21 68:7
**dealing** 85:20
**dealt** 57:16 73:19
**debtor** 1:8 14:18
  37:21 40:22

**76:**23
**debtor's** 76:9
**debtors** 14:14
**December** 20:10
  37:3
**deciding** 48:11
**decisions** 100:5
**deeds** 50:1
**default** 20:22
  27:24 48:22,23
  49:4 75:9
  106:15
**defend** 20:24
  21:12,22 45:7
  47:10 63:13
  66:8 67:19
**defense** 47:12,23
  48:6
**defenses** 9:15,16
  21:1 47:11
**denied** 31:22
**denies** 32:12
**department** 41:5
  41:10,15,16,21
  42:2,13,25
**deposition** 32:6,7
**describe** 25:1
**destroying** 72:15
**details** 32:10
  81:17
**determination**
  38:19
**determine** 103:16
**determined**
  103:23
**develop** 96:12
  97:10
**developed** 25:14
  64:25 104:5
**dialing** 11:3,23
  68:12
**different** 15:11
  24:6,7 26:3
  28:14 61:16,18
  61:24 73:5

**98:**23,24 104:11
**difficult** 72:13
  83:11 84:25
**direct** 54:19
**directing** 31:9
**direction** 17:13
  25:10
**directors** 14:15
**disagree** 84:25
**disagreeing** 26:1
**disappeared** 11:7
  11:10
**disbursed** 20:13
**discharged** 74:1
**disclose** 40:2
  58:22
**disclosure** 41:1
**disconnected**
  10:16 68:14
  69:2
**discovery** 65:7
  67:12
**discretion** 93:5
**discuss** 40:10
  96:6,17 98:15
  105:21 106:3,5
  106:9,10
**discussed** 40:12
  70:18 96:19
  99:2
**District** 1:1 27:25
  81:19
**dividends** 61:25
  62:1,1 78:5
**docket** 75:19
**document** 37:24
  65:10 77:9
**documentation**
  31:13
**documents** 6:4,9
**doing** 21:5 65:4
  105:14
**Doll** 58:5
**dollars** 26:24
  27:11 28:13

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 114 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page  113

55:2
**door** 104:4
**doors** 104:3
**doubled** 66:7
**dozen** 15:10
    22:21 41:17
**dozens** 104:10,10
**dozers** 73:8 83:17
**drag** 22:7
**draws** 76:25
**drink** 33:21 98:9
    98:9
**drive** 82:12
**driving** 41:13
    65:5
**Dropcam** 81:12
**Dropcamera**
    104:19

**E**

**E** 109:3,3
**earlier** 22:17 45:5
    47:7 90:20 99:7
**easy** 47:11
**effort** 17:23 70:24
**either** 24:9 30:17
    42:1 56:12
    75:16 93:10,16
    107:8,15
**elaborate** 12:20
**electric** 78:8
**electrical** 25:17
    104:1
**else's** 35:12 79:12
    79:16
**employee** 21:4,12
    21:17 24:17
    26:6 27:18 28:5
    28:10 47:13
    48:1,6 64:23
    66:2,5,11
**employees** 15:3,7
    15:16 16:1
    22:18 24:13,19
    26:5,13,14,17

47:17 63:3,8,15
    63:19,23 64:1
    64:13,14 65:11
    65:12 67:13,14
**employment**
    47:20 48:10
**enabled** 75:6
**enforcement** 38:7
**entailed** 104:14
**entered** 55:22
    56:11 87:22,23
**entitled** 27:6 66:5
**environmental**
    37:17 39:16
**equipment** 37:3
    53:4,6 87:24
    88:8,18 89:4,7
**Eric** 89:21
**errors** 6:11
**escrow** 90:3
**Esquire** 2:3,5,6,9
**estate** 7:24,24
    48:13 51:8,9,11
**estates** 50:1 52:25
**estimate** 16:19
**event** 42:2,7,13
    43:1
**everybody** 9:11
    10:4 72:15
    83:16
**evidence** 30:19
    31:7,16,17 32:5
    47:16 62:20
    83:24
**exact** 29:14 33:3
    78:20
**exactly** 91:24
    96:24 100:12
**Examination** 3:6
    3:7,8,9 5:16
    12:13 22:14
    29:24 36:24
    69:3 92:20
    93:10 95:14
    107:1

**example** 72:11
**excavator** 88:25
**excuse** 4:9 32:20
    32:20 38:15
    84:12 95:2
**exercised** 77:2
**EXHIBITS** 3:12
**existence** 31:22
**expect** 7:2,12
**experience** 72:9
**explain** 23:17
    50:10
**explained** 63:20
**explanation**
    76:12
**extended** 64:10
**extensive** 104:12

**F**

**F** 109:3
**face** 73:16 79:2
**facility** 59:22
    73:25 76:4
    84:21 87:2
    101:10
**fact** 31:19 41:4
    41:10 53:14
    55:8 61:12 66:4
    89:25 90:22
**fairly** 92:16
**familiar** 6:1
**family** 54:24
    72:14 83:13
    100:11,14,23
    101:7,18
**far** 18:16 19:17
    30:20,20 31:8
    44:13 52:11
    89:17 99:5,6
**fashion** 66:3
**father** 32:8
**favor** 64:24 105:7
**Federal** 20:20
    66:7
**feel** 83:2 100:3

**fees** 28:8 44:4
**fide** 47:23
**fight** 28:7
**figured** 49:1
**file** 14:22 15:1
    17:3,6,14 18:2
    24:25 26:5
    40:15 48:12
    87:19
**filed** 8:16,16,17
    15:4 17:22
    20:21 33:15
    39:2 40:24 44:2
    44:3 45:6 76:10
    90:16 91:1
    107:15
**filing** 6:18 8:13
    12:25 67:6
    76:22
**fill** 59:4
**final** 38:18
**find** 28:23 45:21
    77:16
**fine** 36:6 39:21
    40:8
**finish** 42:15
    84:12 96:8 98:4
**fire** 41:5,10,12,14
    41:15,21 42:2
    42:13,25
**firms** 76:8
**first** 22:16 37:1
    38:1 51:16 52:1
    62:15 106:5
**five** 26:24 27:11
**fixed** 25:17 104:3
**flip-** 59:10
**flopped** 59:11
**follow** 21:9 77:7
**foot** 101:21
**footage** 55:13
**foreclosing** 75:5
**foregoing** 109:7
**form** 76:24
**formed** 96:5,16

**forward** 99:18
**four** 6:18 15:21
    16:5 18:11,13
    27:12 63:2 80:5
**four-year** 63:9
    64:11 81:3
**fraudulent** 28:1
**free** 46:13,25
**friend** 89:16
**friendship** 90:8
    90:10
**front** 28:22 33:3
    82:19 85:25
**fulfill** 30:11
**further** 40:21
    45:4 94:23,25

**G**

**game** 25:20
**garage** 104:3,4
**garbage** 38:4
    39:14,18 40:5
    83:21 104:8
**garbled** 61:21
**gather** 62:22
**gathering** 17:25
**general** 14:15
    17:16
**George** 2:4 3:5
    4:9,10,22 5:16
    10:2 11:6 12:13
    13:4 22:14
    29:24 36:24
    50:21 51:12
    57:1 61:1 65:10
    68:5,22 69:1,3
    94:8,13,16,19
    95:14,16 102:9
    107:5,19
**getting** 19:22
    46:14 67:15
    72:17
**girl** 56:19 57:8
**give** 4:20 6:17
    15:20 22:10

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 115 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 114

28:20,21 29:2
38:14 74:18
79:16 92:11
103:12
given 47:15 90:12
giving 95:7
Glenn 53:6
GLT 36:19
go 18:10 21:8
35:22,23 39:25
41:25 42:11
43:2 45:4,11
47:9,21 48:25
49:1,3 68:25
71:13 74:6
75:18 79:22
94:3 95:13
101:4 104:5
goes 44:13 52:11
going 4:24 12:19
13:23 18:2 21:9
22:3,7,7 32:9
35:21,22 38:13
38:14 44:7,14
45:16 53:2 55:5
56:25 57:2,4,5
71:24 72:18,19
72:24 74:1,18
87:18 89:9
92:22 94:24
95:9 103:12
104:6 107:16,17
108:12,13,13
95:12
good 36:12 68:23
95:12
governmental
37:20,22 40:22
41:3 43:11
grandfathered
87:1,6
grass 25:15
great 5:9 12:9
20:14 72:11
greater 34:2
gross 16:9

ground 21:21
guess 16:20 28:17
30:8 32:2 63:11
92:12
guessing 84:20
guide 104:1
guy 53:7 58:17
guys 10:2 11:9
41:11

H
H 2:3
half 15:10 22:21
hand 4:19
handed 105:15
handful 89:1
handled 86:24
hang 9:7 68:17
68:20
happen 80:24
happened 10:13
11:13 32:15
42:20,21 98:8
harassing 83:16
hard 82:12
hazardous 37:23
39:17 40:23
43:12
he'll 46:12
heads-up 103:13
hear 65:18 68:23
68:24 71:8 94:7
97:3 100:25
101:1 106:1
heard 22:20
35:25 81:19
108:2
hearing 51:16
52:1
heavy 53:4,6
held 33:16 93:18
hello 9:19 10:3
11:22 68:2,18
95:22
help 26:25 97:14

helped 28:11
66:22
helpful 29:7
helping 15:9,10
22:21 27:19
66:18 104:25
Henry 90:2
hey 88:25
hi 5:2 11:4,8
73:18
high-resolution
81:25
highway 41:13
104:6
hire 105:23
106:12
hold 12:4 43:22
60:2 68:17 77:8
106:23
holding 17:18
homes 101:21
Honda 82:14,15
82:15
hopefully 57:16
hours 15:13
22:22 98:18
hundred 26:24
27:11 28:13
104:2
Huntingdon 38:2
38:8,25 41:25
42:11 87:5,9,12

I
idea 10:20 11:12
47:3 97:9
identical 89:8,13
immediately
55:11 58:9
important 92:16
improve 103:4,8
inaccessible 55:1
Inaudible 8:19,25
9:3 11:13 16:19
16:24 19:22

21:16 25:20,24
27:22 29:2,10
30:9 32:5,19,22
33:23 34:24
35:3,5 40:17,19
42:9,18,22 47:3
48:4,20 49:5,7,8
49:23 51:14
52:5 53:15
54:13 55:4,13
55:23,25 56:22
57:22 59:14
60:22 62:25
65:6,13,16,19
66:9,20 67:3,17
71:5 72:1,20
73:10 74:7
75:21 76:6,13
77:24 78:19
79:4,6,14 80:21
81:2,16 82:7
83:21 84:3,10
84:14 85:4 86:8
87:7,18 89:12
91:20 95:8 96:4
97:4 99:10
100:20 101:2,20
102:22,24
107:11 108:3
inception 14:20
17:18
including 76:24
incorporated
9:17,18,25
12:16 86:2
incorrect 34:8
35:2 43:13
51:13 66:21
independent 64:5
INDEX 3:1
indicted 17:15
indictment 32:4
individual 28:21
32:14 56:16
individuals 76:8

inform 33:18
information 6:2
19:10 20:11
29:5,18 79:7
85:23 92:18
107:15
informational
5:21
informed 62:4,21
initial 41:12
initiated 38:23
insider 76:23
insiders 103:18
inspected 101:15
installed 104:4
instigated 39:4
institution 76:17
insurance 85:16
85:17 103:18
interest 74:25
interference 84:8
interim 4:5
interruption
30:14
INTRODUCED
3:12
involuntary 8:8
8:17,24
involved 37:16,18
54:11 74:16,16
75:18
involvement 67:5
67:7 89:20
irrelevant 34:18
43:24
IRS 64:19
issue 32:11 39:16
62:1
issued 13:16,16
15:16 30:23
39:5
issues 24:7
items 51:8

J

Case 22-20823-GLT Doc 337-1 Filed 02/24/23 Entered 02/24/23 09:32:45 Desc
Exhibit A Page 116 of 124
341 (a) MEETING OF CREDITORS - 9/9/2022

Page 115

**J** 2:9 109:5
**January** 109:11
**Jesus** 10:18
**jobs** 64:7
**John** 14:6,13,19
  17:11 30:17
  31:5,21,21 32:6
  32:15 48:17
  83:15 96:6,18
  97:19,22,25
  99:8,9 100:14
  101:13
**Journal** 31:21
**Judge** 18:3
**judgment** 20:23
  27:24 47:10
  48:12,22,23
  49:4 75:10,11
**judicial** 37:18
**July** 40:24 84:22
  97:7
**jump** 53:16 74:10
**June** 38:17 39:10
  60:25 84:21

—————
**K**
**Kash** 13:1,2
  14:21 30:8 34:1
  34:6,10,22 35:3
  58:23,24 59:7
  59:11,13,22
  60:15 61:2
  64:16 66:15
  70:1 75:25
  76:15 82:22
  84:11,20,23
  86:23,24 91:19
  91:21 92:17,20
  92:25 93:9
  94:13,15,18
  105:12 106:25
  107:2,9,17
**Kash's** 82:23
**keep** 31:12 36:8
  70:11 75:1 83:1

83:3 88:4 95:1
  96:11 104:12
**kept** 27:21
**kicked** 83:5,5
**kind** 8:24 12:21
  16:19 17:17
  21:8 25:12 46:9
  53:8 70:15
  72:17 78:17
  81:14,24 86:25
  87:2 91:15 99:6
  104:7
**knew** 31:25 62:18
  62:19,19 90:17
  101:9 105:1,18
  108:2
**know** 9:5 10:1,21
  13:23 14:4,8,23
  15:11,13,24
  16:13,16 17:14
  21:4,6,7,20
  24:10,14 25:12
  25:14,23,23
  28:25 29:8,14
  31:14,19 32:10
  33:8 34:17
  35:15 38:11
  41:7 42:17 46:5
  46:18,21 48:23
  52:3 53:5 54:8
  55:22 57:2,4,15
  58:11,12 59:23
  60:13,19 62:23
  63:16 64:21
  65:2,6 70:16,16
  70:21 71:20
  72:23 73:3,15
  73:15,19 74:4
  74:17 75:8 76:3
  77:20 78:18,20
  80:8,25 81:1,22
  82:7 83:3,8
  84:22 85:12,15
  86:2,11,13,14
  87:1 88:19,20

89:17 90:16,22
  91:5,5,9,24 92:5
  92:11 93:23
  96:11 98:24
  99:16 104:7,24
  107:1,2,9
**knowledge** 58:19
**known** 49:10,11
  49:12
**knows** 62:17
**Kubota** 7:6 18:20
  19:12 20:7
  28:18,19 37:2
  67:24 69:7
  87:20 88:7,10

—————
**L**
**lady** 72:11
**land** 25:15
**Lavesky** 86:12
**Lavinsky** 85:21
  86:10
**law** 30:3 31:20
**lawsuit** 8:16
  17:19 20:20
  21:25 23:6
  31:18,20 47:2
  65:19 99:17,20
  100:2,3 101:25
  102:3 105:18,21
  106:3,6,9,10
**leave** 23:25 93:4
**left** 36:22 53:10
  85:12
**legal** 28:8,8 44:10
  44:22 66:23
  67:6 75:15
**length** 48:9,17
  49:15
**lengthy** 95:10
**let's** 18:17 67:19
  70:5 71:10
  90:12
**liabilities** 6:5
  37:15

**liability** 61:14
**liable** 37:21
**lien** 48:13
**light** 90:22
  103:25
**limit** 22:7
**limited** 15:12
**line** 5:8 10:3,5,10
  10:12 12:11
**list** 14:2,5,14
  34:15 70:9 76:7
  90:13 91:2,23
  92:8 104:11
**listed** 7:25 13:22
  14:18,21,21,22
  23:1 25:2 33:25
  34:12 62:3
**little** 39:18 45:4
  61:21 81:13
  99:7,8
**Liz** 49:18
**loan** 67:21 69:12
  69:13,19 70:3
  75:3,6 87:22,23
  88:4 90:4
**loaned** 19:19
  67:22 89:22,23
**loans** 18:23 19:8
  77:1,1,21
**located** 78:16
  82:9
**location** 79:8
**locations** 78:21
**Lock** 1:7 4:2,6,8
  5:19 9:17 11:6
  18:23 22:18
  24:9,18 26:2,4
  30:2,18,19
  36:18 37:17
  38:1,16,20,24
  43:20 44:8,10
  44:21 45:6,9,10
  45:22,23 46:6
  47:17 49:25
  50:17 51:12

52:9,12 58:22
  59:17,20 60:10
  60:24 62:16,16
  64:22 65:11,25
  66:24 67:1,8,9
  67:13,21,21,22
  69:14 70:7
  78:10 80:12,15
  86:21 87:22
  88:3,10,12 89:5
  89:18,21,23
  91:16,17 94:5
  94:12 95:17,25
  96:2,5,11,12,17
  96:22 97:9
  98:15 99:2,24
  100:5,7,15
  101:19 102:1,6
  102:10,10,13,23
  102:25 103:4,8
  103:19 104:18
  104:21 108:6
**Lock's** 66:8 80:11
**lockers** 25:13
  91:3
**logical** 91:1
**long** 55:14,14,14
  74:8
**longer** 58:6
**look** 53:1 75:18
  82:2 107:9,10
**looked** 86:17
**looking** 17:24
  77:4
**loop** 24:21
**Loretta** 57:8,18
  58:6
**lost** 47:22
**lot** 41:14 52:19
  53:4,5 58:1
  70:22 71:3,3
  73:20 78:19
  84:7 85:1 88:12
  98:25 103:2
  104:3,8,15

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 117 of 124
341 (a) MEETING OF CREDITORS - 9/9/2022

Page 116

**love** 65:4 66:18
74:15 105:9

**M**

**M-C-** 20:1
**machine** 88:22,23
89:13,18
**machinery** 87:21
**maintain** 63:10
**maintains** 75:22
75:22,23
**maintenance**
25:16 101:13
**majority** 13:16
33:22,23 96:1
**making** 24:24
72:19 100:4,5
**man** 52:13
**managing** 14:15
**Martin** 89:21
90:4,4
**Mary** 109:5
**Maryland** 53:11
**match** 26:9
**material** 37:23
39:17 43:12
**materials** 40:23
**matter** 4:21
45:15
**McCarl** 20:1
**mean** 8:16,20
24:8 30:21
31:11 32:17
41:8 48:16
52:19 53:2
61:19 63:18,23
81:15 82:1 83:2
84:1 87:25 89:9
102:8
**means** 46:12
**meant** 26:12,13
78:3
**mechanism** 92:23
**medical** 59:22
76:4

**meet** 31:4 58:12
86:16 98:7,22
**meeting** 1:13 4:2
4:4 11:5 32:16
33:18,19 34:14
36:20 60:15,18
60:24 73:23
92:25 93:7,18
93:18 95:1
98:14 106:24
109:9
**meetings** 31:1,5
97:21 98:16
99:3,4,13,19
105:4
**members** 14:15
14:16 59:5
**memory** 55:21
**mention** 25:4
102:21
**mentioned** 7:5
18:3,20 102:15
**met** 25:13 31:5
31:10,15 57:19
58:17 96:20
98:5,22,25 99:9
104:4
**metal** 50:25
**middle** 25:21
**Mike** 85:21 86:10
86:11
**million** 34:10,11
61:1,2,6
**mind** 49:8 86:9
**mine** 53:5 75:16
**mine's** 35:20
81:14,24
**minimum** 24:1
24:10 27:7
**minute** 7:5 38:15
83:20
**minutes** 22:10
31:12 34:13,13
95:10
**misleading** 53:14

**missing** 24:23
76:19
**misspoke** 41:19
**misstate** 75:17
**mistake** 40:16
**misunderstood**
41:9,18
**mobile** 101:21
**moment** 30:12
47:7
**money** 7:18 9:14
18:21 19:12,20
20:12,17 21:22
24:20 27:21
28:8 44:21
45:24 46:6
47:20 61:13,17
67:22 69:19,21
70:23 74:3,5,15
74:17,18,23,24
87:17 88:13,14
88:16 89:23
90:2 96:3,10,11
96:13 97:14
**monitor** 80:3,12
**month** 40:25 54:9
59:24 74:2
**months** 7:3,13
50:3,4 55:17
62:20 73:25
85:14 92:5
**Moore's** 90:2
**morning** 35:25
36:20 60:9 63:5
68:1
**motel's** 79:12
**mother** 49:18
**motion** 60:17,19
62:10
**move** 28:17 32:18
32:21 43:17
49:19 50:7 63:1
67:20 78:6
104:13
**moved** 84:7,17,20

85:14
**moving** 50:9,12
83:17 99:18
**Mowry** 53:6
**multiple** 80:16
**music** 10:24
12:10
**mute** 9:2 35:20

**N**

**name** 4:25 28:23
29:4,4,20 52:13
53:20 71:18
73:16 96:6,17
98:20
**name's** 14:20
**named** 31:2 53:7
57:18 58:5
**names** 14:21
73:14
**nature** 43:6
**need** 18:2 43:8
48:12 101:12
**needed** 21:22
27:1 39:14
101:15
**negotiated** 56:17
56:24
**never** 23:8 27:15
30:23 37:22
41:2,9,21 44:12
45:14 49:8 55:7
56:1 57:19 58:2
58:17,17,17,18
62:4 64:20
70:10,23 86:20
102:15 104:21
**Nick** 52:14
**North** 38:2,8,24
41:25 42:11
87:5,9,12
**Notary** 109:5,14
**notified** 37:19,22
40:22 41:2,5
43:11

**notify** 62:7,24
**November** 20:10
37:6,7 55:20
**number** 7:7 33:3
34:2,12 47:16
50:2,5,14 68:12
86:15 92:15
**numbers** 51:2

**O**

**object** 43:23 56:7
105:13
**Objection** 43:21
**obtained** 27:24
**obviously** 82:24
**occupancy** 86:21
**occurred** 42:14
**offered** 74:25
**offhand** 16:15
**office** 5:22 10:25
11:25 30:11
46:17 68:11
98:10
**officer** 4:12 23:9
23:25 26:12
27:8 38:8 95:17
**officers** 12:18,24
13:7 14:14 18:7
18:12 30:7
**Oh** 6:23,25 10:18
10:19 57:10
79:13 91:21
101:8 102:8
105:11
**okay** 4:11,15,17
4:23 5:6,9,12,15
5:18 6:15,25
7:9,21 9:8,12,13
9:23 10:4,13,21
11:3,14,17,20
11:22 12:4,9,10
12:12,15,19
14:24 15:1,18
15:22 16:5,8,21
16:25 19:13

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 118 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 117

20:8,11,14,20
22:3,12,24
24:25 26:10
27:5,9 28:17,24
29:7,21 30:15
33:14 34:20
36:8,10,17 37:1
37:9,11,11,14
38:21 39:6,12
45:1,3 46:22
52:2 56:21
57:25 59:15
60:7 61:9 63:7
64:7 67:18 69:1
69:18,23 70:5
76:21 78:13
80:2 82:6 85:19
86:20 88:3,7
90:12 93:11,22
94:18,24 95:7,9
95:13,16,24
96:16,22 99:2
100:22 103:20
104:17 106:11
106:19,20 107:5
107:19,21 108:4
108:7,10
**old** 52:13
**old-** 81:14
**old-fashioned**
81:24,25
**omissions** 6:11
**omitted** 107:12
**once** 21:6 27:19
**ones** 54:7,13
**open** 22:4 75:10
93:19 95:1
96:22 106:24
**openers** 104:4
**operable** 82:24
84:17
**operation** 6:20
**opinion** 27:23
**opposed** 52:8
**options** 77:2

**orange** 53:18
**order** 48:12 102:6
102:13
**ordered** 17:14
**ordinary** 6:15,19
**originally** 29:12
54:21
**Otto** 2:6 3:8 5:4
9:22,24 10:8,11
10:11 14:5
29:22,23,25
36:1,7,12,22,23
36:25 47:5 68:6
69:4 92:14,22
93:4,11,16,20
93:23 94:3,6,10
94:15,18,20
97:2 105:25
106:4,8,11
**outfits** 41:18
**outside** 6:19,24
**outstanding**
67:21 69:12
**owe** 7:18 23:3
44:9,10,14,21
45:24 46:6
47:20 61:25
**owed** 9:14 24:16
24:20 25:3
74:23
**owes** 24:9
**owned** 31:2 51:7
51:12 52:9,13
89:18 100:10
**owner** 23:23,24
24:5,5 26:2
62:16 98:13
**owners** 25:22
**ownership** 24:7
53:13
**owns** 14:10 50:21
61:1,2 80:12,14
80:19 82:13,21

_____
**P**
_____

**p.m** 36:10,21
**page** 3:6,7,8,9
77:6,8,8,10,16
**Pages** 37:24
**paid** 15:15 16:4
19:17,24 20:3
20:17 23:8
26:15 43:18
44:6 45:14
54:17 56:4,6,9
61:25 64:6 69:6
69:6 70:13,23
72:11 75:4
85:16,16,18
87:16 88:9
104:21
**pallets** 85:4
**paper** 19:14
**papers** 28:22
**Pardon** 21:13
46:19 49:7 56:3
57:11 59:18
83:25 87:10
**parking** 41:14
104:3
**part** 12:20 47:1
101:25
**particular** 89:18
**parties** 48:9
58:15
**partner** 14:20
15:1 23:4,13,14
23:16,19,22
26:1
**partners** 14:16
17:12 25:7,22
32:1,2 97:17
**partnership**
30:21
**parts** 67:4
**party** 54:10 58:12
**pattern** 17:18
**pause** 22:8
**paused** 99:17
**pay** 19:18 27:16

28:8 44:7 45:8
45:16 54:24
55:1,5,6,8,10
56:10,12 64:20
69:10 72:8,10
72:18 74:10,22
75:6 87:8,11,17
90:3,4 102:10
102:10,20
**paying** 56:7
**payment** 18:6
32:24 33:9 44:4
69:7 90:5 102:7
102:14
**payments** 18:11
18:16 70:10
78:4 88:4,15,16
**payroll** 63:15,19
63:24 64:2,13
64:15,18,19
**pays** 70:11
**PCB's** 41:1
**Pennsylvania** 1:1
30:3 109:6
**people** 14:17
15:10,19 22:21
28:11 62:23
63:25 64:3 72:8
73:7,11,20 74:3
74:6,15 83:6
86:8 91:4
**people's** 83:18
**percent** 13:20,24
13:25 14:1,10
14:19 34:3,5,8
35:1 60:10 61:3
61:4 62:12 85:2
92:10
**percentage** 13:19
**percentages**
33:25 60:13
**perfectly** 81:21
**period** 47:18 63:9
64:10 65:23
81:3

**periodically** 64:7
88:18
**perjure** 49:20
**permission** 84:23
**permit** 86:21
**perpetrator**
78:22
**person** 8:15
14:18 41:12
56:16 57:16,19
71:11 73:16
76:3 99:24
**person's** 29:19
**personal** 24:15
**personally** 6:1
50:21 65:10
70:19 85:18
89:6 91:6
104:16
**personnel** 41:17
**petition** 6:8 33:15
90:25
**petitions** 6:2
**phone** 9:9 11:3,3
11:16,22,24
12:3,6 35:13
57:21 58:18
60:16 68:12,13
68:16,19 82:3
107:9
**phones** 9:10
**Phonetic** 58:5
85:22 86:12
**photo** 52:19
53:12
**photographs**
31:14
**pick** 55:3 101:13
**pickup** 100:9
**picture** 52:16
**piece** 19:13 89:3
89:7
**pile** 83:20
**place** 4:4 10:18
98:7 99:1

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 119 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 118

101:18
**places** 98:23,24
**plans** 98:16 99:3
**play** 92:4
**playing** 9:4 10:24
  70:15
**pleadings** 66:23
  67:6
**please** 4:18 9:2
  13:12 57:10,12
  61:22 84:13
**plenty** 74:15
**plowed** 25:16
**Plus** 46:25
**point** 17:19 21:23
  34:21,22 44:12
  45:9 46:11 47:4
  82:18 83:9
  99:16 100:1
**police** 41:16 42:1
  42:12,25 43:5
**poly** 51:20
**position** 28:6,9
  28:15 66:2
**positions** 60:3
**possession** 76:9
**possible** 106:24
**post** 44:25 45:25
**premium** 85:17
**prepare** 17:23
**prepared** 5:22
  83:22,22
**preparing** 18:5
**present** 2:1 4:5,7
  4:24 5:10 33:23
  61:5 99:21
**president** 4:13,14
  5:19 13:3,4
  30:10 58:23,25
  59:1,6,7,11,12
  59:13,13,16,16
  59:20 72:2,3
  91:17
**pretty** 16:18
  17:12 37:5

40:12 66:1
  82:12 84:5 92:9
  92:9 103:24
**previous** 39:6
**primary** 95:16,24
**principal** 85:19
**prior** 6:18 16:21
  46:4
**private** 28:21
**privilege** 87:8,11
**probably** 14:8
  16:16,18 20:9
  67:16 84:19,22
  97:6 107:7
**proceedings** 1:12
  36:14 37:19
  109:8
**product** 45:19
**profit** 62:2
**progress** 99:12
**promised** 96:10
  97:13
**proof** 30:16 31:24
  52:7,11,22
  53:12
**properties** 86:18
**property** 7:11 8:3
  19:20 24:6 25:8
  25:9 32:23 33:6
  38:9 42:4 51:7
  51:7 52:24 65:1
  70:25 74:19
  75:2,3,4 78:7,14
  79:11 80:15
  82:10 83:5,6,18
  88:8,23 90:5,14
  90:24 91:13,14
  92:7 97:10
  101:17,19
  102:25 103:5,9
**provide** 31:16
  33:13 74:6
  76:23
**provided** 14:5
  18:23 65:8

70:17
**Public** 109:6,14
**pull** 73:4
**pulled** 41:14
**purchase** 29:13
  29:19 87:23
**purchased** 29:16
  51:3 52:24
  96:25 97:6
  102:23,25
**pushing** 83:19
**put** 11:15 12:6
  47:23 48:25
  50:15 54:21
  88:14,15,20
  89:11 96:13
  97:13 102:2
**puts** 25:23

**Q**
**question** 12:15
  14:13 18:14
  26:3 34:23 39:3
  39:22,25 40:21
  43:10,24 44:9
  44:18,20 45:21
  47:1 49:9 52:6
  53:25 54:3 57:6
  62:15 63:12,22
  64:14 65:23
  66:22,25 67:2,5
  67:18 69:5 70:6
  76:22 77:9,12
  77:13,17,25
  78:1 84:9,12
  91:25 94:7 96:9
  96:15 98:4
  101:3 103:7
  106:5 107:23
**questioning**
  35:24
**questions** 22:4,6
  22:11 29:22
  36:23 37:25
  66:15 76:5,7

92:15 93:21,25
  94:21,23,25
  95:6 103:16,21
  104:18 106:18
  106:24 107:4
  108:5
**quickly** 103:24
**quite** 88:15
  101:12 104:12

**R**
**R** 109:3
**raise** 4:18
**ran** 98:12
**range** 16:17
**read** 5:24 35:6,6
  78:2,3
**real** 7:24,24
  28:10 48:13
  81:23
**really** 9:5,13,15
  21:1,3 27:17
  28:15 44:16
  47:2 53:12,13
  60:12 62:9
  64:22 70:4 76:3
  99:5
**reason** 7:17 8:13
  8:15,20 47:7,9
  87:14
**recall** 41:20 50:12
  66:9 67:11
**recalling** 43:15
**receipts** 18:1
**receivable** 70:8
**receive** 5:21 7:2
  7:12 78:4
**received** 37:12
  64:20 77:20
  88:8 108:12
**receiving** 72:25
**recessed** 36:15
**recollection** 39:13
  75:14
**record** 4:25 33:12

36:18 108:1
  109:9
**recorded** 1:12
  109:8
**recording** 108:14
  108:15
**records** 15:14,18
  15:23 16:3 53:3
  70:11,14 75:24
  76:2,10
**recycled** 104:9
**red** 82:10,15,17
  84:15
**redemptions** 77:1
**referred** 72:21
**referring** 50:11
  50:18 51:21
  82:14
**reflect** 6:4
**regard** 22:16
**regarding** 19:11
**Regardless** 39:4
**regular** 26:15
**reimburse** 18:22
  19:6 20:3
**related** 6:3,9
**relationship**
  49:21
**relayed** 98:1
**release** 37:23
  40:23 41:3
  43:12
**relevant** 44:1
**remember** 29:3
  33:4,24 66:13
  82:16 89:15
  92:1
**remotely** 79:23
  80:4,23
**removed** 104:8
**rendered** 44:22
**rent** 54:17 56:2,5
  58:2,15 88:21
  88:22,25 89:12
  102:7,10,11,14

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 120 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 119

102:17,20
**rental** 55:23
  70:10
**rented** 53:24 54:2
  54:17 88:18,20
  89:12,15,16,19
**renter** 53:19
**renters** 70:22
  90:13 91:9,22
  91:23
**renting** 54:4
**rents** 7:14 71:16
**reorganization**
  33:16
**repaid** 67:23
  69:15 89:25
  90:1
**repayment** 102:7
**repayments**
  77:20
**repeat** 59:9 61:21
  83:13 103:6
**repeating** 83:2
**report** 38:4,5
  39:2,3 40:15
  42:12,24 43:3,5
  43:8 64:19
**reported** 43:4,7
**Reporter** 109:5
**represent** 45:8,12
  46:12,24
**representation**
  43:19
**representative**
  108:6
**represented**
  45:10,13
**representing**
  46:10
**request** 44:4 65:8
  98:14
**requested** 98:23
**required** 30:3
**reschedule** 93:8
  108:14

**resolution** 60:23
**resolved** 39:19
**response** 61:20
**responsibility**
  91:18
**responsible** 72:4
**rest** 35:23
**result** 23:6 65:8
**resume** 35:22
  36:23
**return** 100:15
**returns** 17:4,7,15
  17:23 18:2,4
  24:15
**revenues** 16:9
**rid** 70:25
**right** 4:19 5:13
  8:6,9 10:5
  11:16,19 12:7
  12:23 16:15
  20:7 22:1,20,22
  24:8 27:13
  29:21 30:13
  32:14 36:12
  44:23 55:21
  60:7,10 67:25
  80:11 82:19
  86:9 95:17,25
  97:5,11,15
  105:7,10,16,19
**ringing** 9:10
**road** 104:6
**roads** 83:10
  104:5
**Robert** 2:3 4:4
**roles** 30:11 59:4
**Roth** 2:9 4:5,7,9
  4:13,16 10:1,2
  10:14 11:2,6,8
  11:11,17,19,22
  12:7 20:16
  40:11 43:18,21
  43:23 44:2,10
  44:21 45:10,13
  46:3,6 65:9

68:18
**Roth's** 11:25
**roughly** 33:6
**rubbish** 38:3
**running** 73:7

**S**

**salary** 23:25 66:6
  76:25 77:19,22
  78:3,4
**sale** 19:1,11 20:7
  20:12 29:17,19
  37:2
**sanitation** 38:3
**Sarah** 2:5 5:1,3
  10:7 22:5,11
  93:12,24 94:20
**sat** 98:17
**satisfied** 40:7
**savvy** 81:14
**saw** 41:13 51:13
  52:16 86:15
**saying** 8:2 24:17
  25:8 28:4 41:20
  45:23 50:15,20
  74:17,20 75:1,8
  85:1 91:12
  98:19
**says** 7:21 14:10
  14:19 60:24
**scenario** 61:16,18
**Schapiro** 53:21
  54:1,15,20 56:4
  56:20,24 57:17
  58:4
**schedule** 7:20
  77:4 90:20
  92:20 106:25
  107:17
**scheduled** 107:4
**schedules** 6:3
  7:23 13:22
  14:23 16:8 23:1
  25:3,6 90:16
**school** 81:15

**Schur** 50:1 51:8,9
  51:10 52:14,24
**Scotty** 83:14
**second** 12:4
  28:22 33:21
  47:19 66:25
  67:7
**secret** 32:1
**secretary** 30:2,5
  30:9 58:24 59:1
  59:25 60:5
**section** 4:1 40:21
**see** 7:21,23 13:21
  28:23 41:12
  53:3 70:5 73:17
  76:3 90:12
  107:16
**seen** 58:17,18
**sell** 6:16 28:18,19
**send** 6:21 14:2
  58:9 102:16
**sense** 24:24
**sent** 58:10 107:15
**separately** 93:12
**September** 1:14
  36:21 38:17
  39:8,10 97:8
**serial** 7:7
**served** 8:23,23
  22:2 31:20
**serves** 55:21
**service** 25:17
  78:8 82:4 104:1
**services** 44:11,22
  46:5
**seven** 18:24 23:7
  23:23 24:2
  25:11
**sewage** 78:9
**Shanni** 2:8 3:9
  5:10,11,14 9:3
  10:9,10,15,19
  10:23 20:21
  27:10 35:16,19
  35:20 45:5

47:18 64:9,16
  64:21 65:20
  68:3,8 80:2
  95:2,3,5,8,11,15
  103:14 106:17
  106:21
**share** 30:24
**shareholder**
  13:17 14:2 34:1
  95:25 96:1
**shareholders**
  13:9,15 14:17
  18:7,12 33:17
  33:18,19,22,23
  34:14,16 60:25
  61:4,5,10,13
  62:4,5,7,14,21
**shares** 13:16
  30:23 34:2,7,10
  34:25 61:2,2,6
  62:16
**she'd** 21:8 49:1
  74:17
**she'll** 81:20
**sheet** 5:21,24
**shipping** 50:19
  50:25 51:21,24
  85:6,13
**Shoot** 68:11
**short** 74:8
**shots** 100:4,5
**showed** 52:16
  55:18 58:1
**showing** 53:13
**shows** 83:13
**sideline** 86:15
**sign** 5:20 6:8
  88:21 94:11,12
**signed** 65:9,10
**silent** 14:19 15:1
  17:11 23:4,13
  23:14,16,19,22
  32:1 97:17
**simply** 47:21
**single** 31:1,3,6

Case 22-20823-GLT    Doc 337-1    Filed 02/24/23    Entered 02/24/23 09:32:45    Desc
Exhibit A    Page 121 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 120

73:16 92:6
**sister** 19:17 27:10
27:18 33:10
45:17 48:11,19
48:21 49:4,6,12
49:16 63:8
64:23 65:20
69:20 80:8
**sister's** 47:6
63:20
**sisterly** 65:4
66:18 105:9
**sit** 98:10,10
**site** 41:1 42:21
50:3,6,17 53:19
54:3,4,19,21
55:15,19 56:18
82:18 84:6,8,16
85:13,17 86:22
**sitting** 35:13 51:6
**situation** 48:10
61:24 63:20
**six** 7:3,13 18:24
26:24 27:11
40:25
**slipping** 86:9
**Slone** 2:3 3:6 4:1
4:4,11,14,17,23
5:2,6,9,12,15,17
9:1,9 10:4,7,13
10:17,21 11:1,4
11:4,9,14,18,20
12:1,5,9,14 22:3
22:13 24:3 25:2
29:16 35:8,21
36:3,8,13,17
40:18 44:18,20
44:24 45:20
46:2,4,15,18,20
50:8 58:10 68:4
68:6,10,15,21
68:24 70:19
71:10,13 77:13
78:23 84:23
92:12,14,19

93:2,6,14,17,22
93:25 94:24
95:4,7,9,13,21
100:1 103:11,20
106:19,23 107:6
107:13,21,22,24
108:4,8,11
**small** 64:7
**snow** 25:16
**Snyder** 2:4,8 3:5
3:9 4:10,12,18
4:22 5:10,11,14
5:16,18 9:3,7,12
10:2,9,14,15,19
10:23 11:6
12:13,15 13:1,5
19:25 20:21
22:14,16 24:12
25:25 27:9,10
29:24 30:1,16
32:20 34:1,6,6
34:22 35:16,19
36:24 37:1
38:15,16 41:24
47:18 50:21
51:12 58:23,25
61:1,2 64:9
65:10,20 68:3,8
68:22 69:1,3,5
75:14 76:16
79:5 80:2 84:4
92:16,21,25,25
94:6,8,13,13,16
94:19 95:2,5,8
95:11,14,15
102:9 103:14
106:8,17,21,25
107:2,2,5,18,19
**Snyder's** 45:6
84:11
**sold** 7:8 18:21
29:11 61:6
67:23 88:7
**somebody** 11:1
54:2,18 79:16

**Somebody's** 9:9
**someone's** 55:5
**son** 83:14
**sorry** 6:23,25
30:14 33:17
61:4,20,23 71:8
77:16 89:6 94:9
96:14 97:2
101:3 105:25
106:1,2
**sort** 82:4
**sound** 48:8 73:21
**sounds** 28:11
48:10 66:1
107:19
**space** 54:4
**speak** 13:12
42:16
**SPEAKER** 11:24
12:3 35:4,14,17
68:13,16,19
**speaking** 35:8,10
**specific** 60:14
**specifically** 51:23
73:1
**spelling** 58:5
85:22 86:12
**spoke** 57:8 58:3,6
**spoken** 53:23
62:14
**square** 55:11
58:8
**staff** 26:15
**stand** 75:13 92:1
**standing** 42:8
**start** 5:1 22:5
50:8 71:7,15
**started** 36:20
96:2
**state** 4:25 32:12
43:19 44:5
47:22 57:20
58:22 86:1
**stated** 33:16 44:5
**statement** 6:22

14:13 22:17
37:14 39:1,23
67:10 70:6
76:21
**statements** 6:3
18:1 83:23
92:12
**States** 1:1 2:3
**stayed** 88:22
**stem** 23:10
**step** 40:20 105:1
**stock** 77:1
**stop** 99:4 108:13
**stopped** 99:7
**storage** 51:1 87:1
**store** 54:4 56:17
**stored** 53:19 54:2
54:18 72:9 91:4
**strategy** 38:11
**stuff** 25:18 52:20
65:5 72:9,12,17
73:6 76:16,18
83:17 84:7 85:1
85:3 86:24 91:4
104:7
**subject** 8:5
**submitted** 47:16
**substantial** 34:2
**substrate** 104:2
**sue** 71:19 72:19
74:3
**sued** 99:13 102:5
102:12 105:14
**summons** 105:15
**supposed** 72:2,3
96:10
**Supposedly** 58:13
**sure** 22:19 23:16
24:19 31:6 37:6
41:23 53:1
60:12 70:4
80:25 82:25
86:23 92:23
96:24 99:5
100:12,14

**swarm** 83:15
**swear** 4:18,19
**switched** 25:20
25:21
**switching** 74:20
**sworn** 47:16
**system** 78:13
79:19 80:3,11
80:14,19,22,24
81:9,13,18,21
**systems** 80:17,18
82:2

**T**

**T** 109:3,3
**take** 22:8 33:21
40:20 71:6,12
71:14 74:17,19
74:24 92:19
93:9 100:21
101:14
**taken** 20:23
**talk** 42:1 49:6
58:12 71:10
75:19 93:12
98:11 99:17
**talked** 7:5 57:1
58:13,18 86:7
98:18 99:8
**talking** 27:14
34:22 38:21
39:7,8 42:7
51:18,23 60:14
60:17 71:9
85:21 89:4
90:19
**Tammy** 19:18,24
19:24 20:1,1
33:11 69:20
**tank** 51:19
**tanks** 51:20,20
52:17
**tap** 79:15,15
**taps** 78:9
**task** 91:13 92:6

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 122 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page 121

**tavern** 98:8,21
99:1
**tax** 17:3,6,15,23
18:2,4 24:15
32:23 61:14
87:8,11
**taxes** 15:15,16
19:20,23 20:4
33:6 61:25
64:19,19 69:21
87:17
**technological**
81:13
**tell** 30:4 54:8
58:24 62:13
66:16 71:24
78:20 105:3
106:15
**telling** 64:12 66:4
74:13 80:11
81:5,10 91:8,21
**ten** 50:18 65:6
79:1 95:10
**tenant** 52:12,14
73:5
**tenants** 52:20
53:8 70:9 71:3
73:4,12,13
80:18 91:2,9,20
91:23 104:5
**tenants'** 72:16
**terminology**
26:11
**testified** 34:24
41:4,11 51:15
67:25
**testify** 4:7 47:12
**testifying** 5:19
26:4
**testimony** 4:20
59:15 63:4
66:11 76:15,15
**thank** 9:11 11:18
36:11,13 94:23
106:19 108:15

**Thanks** 22:13
**thing** 48:16 74:21
75:8 82:5 102:8
**things** 23:5 25:6
27:20 28:20
37:15 47:8 50:9
52:18 61:1
70:20 72:16
75:19 78:19
90:18 104:9,11
107:7,8,10,14
**think** 10:23 13:20
17:24 19:16
21:9 25:3 26:2
26:23 29:8,15
31:17,21 33:1,1
34:10 35:11,14
35:17 37:3,5
38:10 39:19
40:4,7 41:7,8,11
42:3 44:14,18
44:20 45:18
46:8,9,22,23,25
47:2 51:5 53:9
59:6,10,12
60:11 65:2 66:9
66:12,12,14,16
66:17 74:1
75:16 78:8
79:11 81:2,11
81:12,16 85:2
85:11,11 86:25
87:13 89:9,14
89:15,17,22
90:6 91:25 92:9
96:24 97:5,6
99:16 100:17,18
103:22 105:11
**third** 54:10 58:12
58:15
**Thirteen** 16:13
**thirty** 54:10
**thought** 8:25
21:8 64:24 65:3
66:19 78:3

101:8
**thousand** 13:15
19:5 55:2
**threatened** 73:2
**threats** 72:17,25
**three** 18:10,13
**till** 15:8 45:2
100:18
**time** 4:3 6:13
12:24 15:6
17:13 20:13,18
21:3 22:6 27:7
36:1 41:24
44:22 45:9
47:18 48:1 52:4
64:11 65:13,15
65:23 66:20
71:11 73:4 81:1
90:15 94:23
100:6 101:24
105:8
**times** 15:11 31:15
65:6 86:19
88:12 89:1,2,16
**tires** 103:1,2
104:9
**title** 49:25 50:23
50:24 51:10
52:7,11
**titled** 100:12
**titles** 51:2
**today** 4:8 26:4
36:10 45:5
49:14 53:10
93:7,18 107:12
**told** 32:2 40:14
53:23 54:23
55:7 58:14 60:9
63:2 71:18 83:1
87:2
**ton** 61:12,17
**tons** 104:2
**tops** 52:16
**tow** 83:8
**Township** 38:2

38:12,25 39:5
40:7 42:1,6,11
42:22,24 87:2,5
87:9,12
**track** 27:21
**tractor** 7:6 18:20
19:1 28:18,19
29:11 67:24
**tractor-trailer**
53:9 90:19
**tractor-trailers**
52:17
**tractors** 73:10
**trailer** 53:18 54:1
54:5,18,21,25
55:4,9,15,18,24
56:18 58:1,8,14
85:12
**trailers** 50:2,6,11
50:12 52:8
58:15,16 85:7
101:19 102:3
**TRANSCRIPT**
1:12
**transcription**
109:8
**transfer** 6:17
34:7,25 50:6
51:10
**transferred** 49:25
50:5,23 52:8
**treasurer** 30:2,5
30:8,10 59:2
60:1,5
**trial** 41:19
**tried** 74:19,22
**truck** 55:2 56:25
70:20 83:8
100:9,9 101:10
101:14
**truckload** 85:4
**true** 71:24,25
75:21 84:10
109:7,9
**trust** 25:9 103:18

**Trustee** 2:3 4:5
5:22 29:8 56:5
56:7 70:17
72:22,23 84:4,5
90:14
**truth** 4:21 41:6,8
49:16
**truthful** 27:25
75:12
**trying** 11:11 12:2
24:20 28:5 32:1
38:10 45:21
71:15 72:5 77:6
77:16 92:4
103:16 108:9
**turn** 12:11,12
**turned** 44:8
**TV's** 104:10
**twice** 38:2 68:7
**two** 16:13 18:7,17
19:5 24:6,7
30:7 41:17 48:9
55:16,16,17
58:3 62:20 67:4
68:7 100:19
101:20
**type** 31:7,16
**types** 31:15

---

                U

**U** 1:7 4:2,6,8 5:19
9:17 11:6 18:23
22:17 24:9,18
26:2,4 30:2,18
30:19 36:18
37:17 38:1,16
38:20,24 43:20
44:8,10,20 45:6
45:8,9,22,23
46:5 47:17
49:25 50:17
51:12 52:9,12
58:21 59:16,20
60:10,23 62:16
62:16 64:22

Case 22-20823-GLT   Doc 337-1   Filed 02/24/23   Entered 02/24/23 09:32:45   Desc
Exhibit A   Page 123 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page  122

65:11,25 66:8
66:24 67:1,8,9
67:12,21,21,22
69:14 70:7
78:10 80:11,12
80:15 86:21
87:22 88:3,10
88:12 89:5,18
89:21,23 91:16
91:17 94:5,12
95:17,25 96:2,5
96:11,12,16,22
97:9 98:15 99:2
99:24 100:5,7
100:15 101:19
102:1,5,10,10
102:13,23,25
103:4,8,19
104:18,21 108:6
**U.S** 5:22
**unanimous** 62:11
**unavailable**
  76:12
**unaware** 61:15
**understand** 28:3
  41:24 48:3,7
  59:8 71:23
  73:13 81:20
**understanding**
  38:6 54:14,15
  64:25
**understands**
  81:22
**UNIDENTIFIED**
  11:24 12:3 35:4
  35:14,17 68:13
  68:16,19
**unit** 37:20,23
  40:23 41:3
  43:11
**United** 1:1 2:3
**unlimited** 84:6
**updated** 90:21
**updates** 99:12
**USAAG** 85:19

86:1,5
**utilities** 78:7

_____

**V**

**v** 38:19
**value** 7:3,13 44:8
  52:3,3 76:24
**verbal** 38:14
**versus** 43:20
  58:21
**viable** 74:9
**vice** 4:13,14 5:19
  13:4 30:9 58:25
  59:7,12,13
**video** 55:13
**view** 92:15
**VIN** 51:2
**Vince** 53:7
**violations** 38:9
**vote** 62:11

_____

**W**

**W-2's** 15:17,20
  15:25 26:18,19
**wage** 24:1,10
  27:7
**wages** 23:10 24:1
  67:14,15 69:9
  69:10
**wait** 17:16
**walk** 32:14 46:23
**want** 22:19 24:4
  44:16 49:20
  54:23 55:7,9,10
  55:10 58:8
  62:22 71:17,19
  72:12 74:4 75:1
  75:2,2,4,4,18
  83:1 104:13
  106:25 107:25
  108:1
**wanted** 17:16
  18:4 86:16 98:3
**wants** 29:16
**warning** 39:20

40:5
**wasn't** 23:1 25:2
  27:14 48:23
  55:8 60:12
  66:20 67:15
  70:17 73:24
  84:20 91:11
  98:11
**watching** 104:18
**water** 51:19 78:9
**wave** 73:18
**way** 23:5 26:15
  44:1 45:4 46:9
  50:15 63:17
  64:5 78:2,2
  92:2 93:10
  105:1
**we'll** 11:3,15,19
  12:5,6 15:1
  22:4,8,8,9 68:10
  107:3,16 108:14
**we're** 12:8,12
  14:25 17:25
  18:1,5 22:6,7
  36:17 45:21
  57:12 60:2
  68:22,23 71:2
  87:18 92:9,9
  107:16,17 108:4
  108:8,8,12
**we've** 32:11
  49:11,12 53:22
  53:22 81:2
  92:14
**Wednesday** 31:1
  31:4 98:6
**weeds** 25:15
**week** 27:3 65:6
**weekly** 30:25
  96:21 105:3
**weeks** 40:25
**welcome** 106:22
**Wenrich** 2:5 3:7
  5:1,2,3,7 9:20
  10:6 22:5,12,15

29:21 36:5,11
  93:12 94:22
**went** 11:13 25:21
  31:1,3 38:7,12
  42:4,24 43:5
  75:9 105:5
**weren't** 16:1
  26:22 64:1,2
  75:12
**WESTERN** 1:1
**whatsoever** 25:19
  41:25
**When's** 15:6
**white** 51:19,20
**Whitehouse**
  53:21,25 54:15
  54:20 56:4,19
  56:23 57:9,17
  58:4
**WiFi** 79:11,12,16
  79:22 80:23
  81:1
**William** 2:6 5:4
**willing** 72:8,10
**wires** 104:1
**wish** 6:12
**withholding**
  15:15
**WITNESS** 3:5
**woman** 57:17
  58:4
**words** 46:5
  105:12
**work** 21:2,5 23:7
  25:1,11 27:3
  45:19 72:5
  84:23 104:15,15
  105:6,14
**worked** 15:19
  27:7,12 47:19
  64:1,3,10,17,21
  64:22 65:21
  66:16
**workers** 63:25
**works** 23:16 36:7

58:7 81:21
**worry** 45:15
**worth** 51:17
**wouldn't** 15:22
  23:14 47:21
  48:24 91:3,5
**write** 38:8,9,13
**written** 30:19
  31:8,12
**wrong** 26:11
  44:19

_____

**X**

_____

**Y**

**yeah** 7:19 8:18
  11:11 14:3
  16:23,23 17:21
  19:16 20:14
  26:21 29:7
  30:25 35:7 36:5
  39:6 46:22
  48:15 51:13
  52:10 60:11
  64:8 65:13
  67:14 68:18,22
  69:20 70:14
  72:24 78:2
  82:19,21,25
  85:8 86:7 88:25
  90:11 91:7,19
  92:2,7 93:14
  97:19 99:15
  100:19 101:1,8
  101:9 102:2,4
  104:14
**year** 7:8 15:13
  18:15 19:20
  20:22 22:22,22
  26:24 27:12
  28:13 33:5,6,7
  40:25 76:22
  99:10,11
**years** 6:18 15:12
  15:21 16:5,21

Case 22-20823-GLT    Doc 337-1    Filed 02/24/23    Entered 02/24/23 09:32:45    Desc
Exhibit A    Page 124 of 124
341 (a) MEETING OF CREDITORS  -  9/9/2022

Page  123

18:8,10,17,24
23:8,23 24:2
25:11 27:12
32:25 40:13
49:12 51:4
52:15 53:2
55:16,16 56:5
58:3 63:3 66:13
80:5 86:13 89:9
100:16,20
**yep** 57:1 77:17

**Z**

**0**

**1**

**1.18** 61:4
**10** 34:3 37:24
**10,000** 21:23 45:8
**10,000-gallon**
 51:19
**100** 48:24
**1099's** 26:17,20
 26:22
**12,000** 16:10
**13** 77:8,10,16
**13,000** 16:10
**130,000** 48:24
 66:6
**14** 35:24
**14140** 78:7
**15** 37:6,7
**18** 97:24
**19** 37:25 77:9

**2**

**2,000** 27:13
**2:30** 36:3,4,9,10
 36:21
**20** 18:18 43:10
 51:3 100:18
**2004** 92:20 93:9
 107:1
**2015** 12:17 17:10
 90:24 97:18,22

97:24 100:17,22
 101:5 103:5,9
**2016** 29:16 65:22
 87:25 89:10
**2017** 45:13
**2018** 97:18,23
 99:8
**2019** 16:14,20
 38:17 39:10
 62:18
**2020** 16:10 17:4
 55:19,20 57:23
 65:22 100:19,20
 100:22 101:6
 103:5,9
**2021** 16:9 17:4
 18:19 20:10,10
 37:4,6 38:18
 39:11 45:14
**2022** 1:14 40:24
 60:25
**2023** 109:11
**21** 8:3 16:13
 18:18 38:17
 39:10 100:19
**22** 3:7 18:18
 52:15 53:2
 100:19
**22-20823-** 36:18
**22-20823-GLT**
 1:2 4:3
**25** 14:10,19
**260,000** 28:1 66:7
**27th** 109:11
**28** 14:14
**29** 3:8

**3**

**3,000** 72:12
**30** 60:25 77:9,13
 77:15,18
**341** 73:23 92:24
**341(a)** 1:13 4:2
 36:19 109:9
**345** 61:1

**38,000** 67:24

**4**

**4** 34:11
**40-hour** 27:3
**400** 34:10
**45** 49:12
**45,000** 19:1,2
 29:9 37:12 88:8
 88:10

**5**

**5** 3:6 38:17 39:8
 39:10 61:6
**5/2015** 96:25
**51** 13:20,24

**6**

**6,000** 51:17
**65** 37:24 77:9
**65,000** 29:15

**7**

**7** 1:3
**7,000** 19:19 20:3
 33:2,7 69:24
**70-** 101:20
**75** 61:2

**8**

**800-plus** 33:19

**9**

**9** 1:14 36:21
 37:24
**90** 13:25 14:1
 19:23 34:4,8
 35:1 60:10
 92:10
**95** 3:9
**98** 62:11 92:10
**98.82** 61:3
**99,000** 22:24 23:2
 25:4