```
 1    IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PA.

 2                        CIVIL DIVISION

 3                           * * *

 4    CHRISTINE BIROS, an Individual,    )
                                         )
 5                        Plaintiff,     )
                                         )
 6              vs.                      )
                                         )
 7    DENISE SCHUR, Executrix of the     )
      ESTATE OF ALEX SCHUR;             )
 8    HENRY L. MOORE and SUSAN STANO,    )   No. 4886 of 2017
      Co-Executors of the ESTATE OF     )
 9    NICHOLAS SCHUR;                    )
      KATHLEEN S. WALTER, Executer of   )
10    the ESTATE OF MICHAEL SCHUR;       )
      CYNTHIA SARRIS, Administrator     )
11    of the ESTATE OF ANN SARRIS and   )
      U LOCK, INC., a Pennsylvania      )
12    Corporation                       )
                                         )
13                        Defendants.    )
                                         )
14                           * * *

15                   HEARD:  April 29, 2019
16         BEFORE:  HONORABLE HARRY F. SMAIL, JR.
                           * * *
17                   NON-JURY TRIAL
                           * * *
18                 A P P E A R A N C E S

19    On behalf of the Plaintiff:
              William E. Otto, Esquire
20
      On behalf of the Defendant U Lock, Inc:
21            J. Allen Roth, Esquire

22    On behalf of D. Schur, H. Moore, S. Stano, C. Sarris:
              Dennis DelCotto, Esquire
23
      On behalf of Kathleen Walter:
24            John Tumolo, Esquire

25    As Co-Administrator for the Est. Of N. Schur:
              Henry L. Moore, Esquire
```

1

<u>I N D E X</u>

2

<u>WITNESS</u>:                                                      <u>PAGE</u>:

3

HENRY L. MOORE

4     Direct Examination by Mr. Otto                          18
      Cross-Examination by Mr Roth                            24

5     Redirect Examination by Mr. Otto                        26
      Recross-Examination by Mr. Roth                         27

6

CHRISTINE BIROS

7     Direct Examination by Mr. Otto                          29
      Cross-Examination by Mr. Roth                           32

8

GEORGE SNYDER

9     Direct Examination by Mr. Roth                          41
      Cross-Examination by Mr. Otto                           50

10

KASH SNYDER

11    Direct Examination by Mr. Roth                          68
      Cross-Examination by Mr. Otto                           70

12

CHRISTINE BIROS

13    Redirect Examination by Mr. Otto                        76

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   April 29, 2019 - 10:44 A.M.
 2                    P R O C E E D I N G S

 3                           * * *

 4              THE COURT:  Call the case with regard to

 5   Christine Biros, Plaintiff, versus Denise Schur,

 6   Executrix of the Estate of Alex Schur; Henry L. Moore

 7   and Susan Stano, Co-Executors of the Estate of Nicholas

 8   Schur; Kathleen S. Walter, Executor of the Estate of

 9   Michael Schur; Cynthia Sarris, Administrator of the

10   Estate of Ann Sarris; and U Lock, Incorporated, a

11   Pennsylvania Corporation, Defendants, at Case No. 4886

12   of 2017.

13              Will counsel please enter your appearance

14   for the record?

15              MR. OTTO:  Good morning, Your Honor.

16   William Otto, attorney for plaintiff.

17              MR. ROTH:  Allen Roth on behalf of

18   Defendant U Lock.

19              MR. DELCOTTO:  Dennis DelCotto on behalf

20   Denise Schur, Executrix of Alex Schur, Henry L. Moore

21   and Susan Stano.  They are actually Co-Administrators

22   d.b.a., c.t.n., Your Honor, of the Estate of Nicholas

23   Schur.  The Estate of Cynthia Sarris, Administrator of

24   the Estate for Ann Sarris.

25              MR. TUMOLO:  John Tumolo on behalf of the
```

1   Estate of Michael Schur, Kathleen S. Walter.

2                   MR. MOORE:  Your Honor, Henry L. Moore.

3   I am the co-administrator d.b.n., c.t.a., for the Estate

4   of Nicholas Schur.

5                   THE COURT:  Are all counsel ready to

6   proceed?

7                   MR. OTTO:  Yes, Your Honor.

8                   THE COURT:  Attorney Otto, you may call

9   your first witness.

10                  MR. MOORE:  Pardon me, Your Honor.

11  Prior --

12                  THE COURT:  Or would you like to do

13  opening statements?

14                  MR. MOORE:  I would like to make a motion

15  before we begin if that's all right?

16                  THE COURT:  That's fine.

17                  MR. MOORE:  The motion I would like to

18  make, Your Honor, is in regard to the four estates

19  involved in the case that ensure Executrix of the Estate

20  of Alex Schur, myself, Henry L. Moore, and Susan Stano

21  Co-Executors in the Estate of Nicholas Shur, Kathleen S.

22  Walter, Executor of the Estate of Michael Schur, and

23  Cynthia Sarris, Administrator of the Estate of Ann

24  Sarris.  Based on plaintiff's complaint and the numerous

25  filings in the case, it's come to our attention that

1   what plaintiff's relief claim request of the

2   four-party-defendant estate, and I quote, wherefore

3   Plaintiff Christine Biros prays this Honorable Court

4   entered an order in favor of Plaintiff Christine Biros,

5   compelling Defendant Owners to convey the simple title

6   to the property by deed to Plaintiff Christine Biros.

7                At this time, all four estates are

8   willing to issue an executor deed, a fiduciary deed, up

9   through the date of the original closing July 16th,

10  2015, in the name of Christine Biros in an offer to

11  implead them into the court so that whatever party

12  prevails, the deeds are available for recordation after

13  you render verdict.

14                And we ask to be dismissed as additional

15  party defendants since that is what plaintiff has

16  requested us to do.

17                MR. TUMOLO:  I would also add to that

18  that there's been no cross claim filed.

19                THE COURT:  So you withdraw the --

20                MR. TUMOLO:  There were none.

21                MR. MOORE:  There are none filed.

22                THE COURT:  Oh, there are none filed.

23  Okay.

24                MR. OTTO:  Your Honor, the only objection

25  my client might have with that is not related to the

1  motion that the estates have made, but specifically to

2  the deeds, the date of the deeds.  Since my client has

3  had no possession or access to the property, the issue

4  of back taxes and liability related to the property is

5  at issue.  Fundamentally, my client is not opposed to

6  letting the estates out of the case provided they

7  deliver the deeds with blank dates that the Court could

8  then in its verdict establish.

9              THE COURT:  With regard to the

10  outstanding taxes, are you looking for a contribution

11  from the estates in any form or fashion?

12              MR. OTTO:  We are looking for

13  contribution.  My client feels very strongly that she

14  shouldn't have to pay any of it.  As a practical matter,

15  there's a question of whether the Defendant U Lock has

16  any assets other than the property itself.

17              THE COURT:  Is there some counterproposal

18  you would make to their motion to be relieved as parties

19  to this action?

20              MR. OTTO:  We have already discussed the

21  possibility of them making a payment of $10,000 towards

22  the back taxes.  We would accept that.

23              THE COURT:  Okay.  Mr. Roth, position

24  with regard to the other three defendants?

25              MR. ROTH:  From our perspective, Your

1   Honor, them being out of the case would not bother us.

2   That would be fine.

3               THE COURT:  Okay.  Therefore, the Court

4   will grant the motion, and the estates --

5               MR. ROTH:  Excuse me, Your Honor.  May I

6   interrupt you?  My client is whispering in my ear that

7   he does object to them being released from the...

8               THE COURT:  Well, do you want to take a

9   minute and we can go off the record and you can speak

10  outside if you like?

11              MR. ROTH:  Sure.  Give me just one

12  moment.

13              THE COURT:  Go ahead.  We will go off the

14  record and everybody can speak.

15  (OFF THE RECORD DISCUSSION.)

16              THE COURT:  Let's go back on the record.

17              Mr. Roth?

18              MR. ROTH:  Yes, Your Honor.  Mr. Snyder

19  has indicated to me that there are other shareholders

20  involved in this corporation, and those shareholders

21  have not been consulted about this.  Therefore, he would

22  object to them being released.

23              MR. MOORE:  Your Honor, during our

24  intermission I had an opportunity to speak with

25  plaintiff's counsel.  Since plaintiff's counsel, the

1   moving party, has requested that we provide the deeds --

2   in this case implead those deeds to the Court, we would

3   also be willing that currently I believe -- and it's not

4   a matter of record -- but approximately $13,000 in back

5   taxes are owed on the property as it now stands.  The

6   four additional party defendant estates are not only to

7   implead the deeds to the Court in the next two weeks, we

8   are also willing to pay $10,000 as consideration towards

9   the back taxes.  And I believe plaintiff's counsel

10   indicated they would be fine with that.

11           THE COURT:  Anybody else from the

12   estates?

13           MR. TUMOLO:  We concur, Your Honor,

14   because at that point we would have done everything

15   that's been asked by the plaintiff for us to do and

16   there is no cross claim within the request for the

17   relief.

18           THE COURT:  Attorney for the plaintiff,

19   anything further?

20           MR. OTTO:  No, Your Honor.

21           THE COURT:  At this time, I am going to

22   grant the motion.  With regard to Denise Schur,

23   Executrix of the Estate of Alex Schur; Henry L. Moore

24   and Susan Stano, Co-Executors of the Estate of Nicholas

25   Schur; Kathleen S. Walter, Executor of the Estate of

1    Michael Schur; Cynthia Sarris, Administrator of the

2    Estate of Ann Sarris are hereby granted relief and

3    removed from the caption and out of the case with the

4    requirement that deeds be impleaded and delivered to the

5    Court no later than May the 13th of 2019 in such a

6    fashion that their interest is removed, and the deeds

7    will be made blank as to how they will be executed for

8    the purposes of the parties by determination of the

9    Court at the conclusion of said trial.

10                   They will also deliver to plaintiff's

11   counsel, William Otto, a check in the amount of $10,000

12   to be utilized for back taxes of what appears to be an

13   outstanding balance of approximately $13,000 in

14   outstanding back taxes.  They will be -- those funds

15   will be submitted for the purpose of payment on an

16   immediate basis upon receipt.

17                   MR. OTTO:  Yes, Your Honor.

18                   MR. MOORE:  One question for

19   clarification.  The deeds that would come from the four

20   estates, all of them would be not dated?  Will they

21   still be made out to Christine Biros only, or do you

22   actually want the grantee left blank?

23                   THE COURT:  I think until we finish the

24   trial, the grantee should be left blank as well.

25                   MR. OTTO:  Your Honor, I ask that the

1   defendants remain in the court during the pendency of

2   the trial just in case I need to call, for instance,

3   Mr. Moore.  I do have plans to call him.

4                   MR. MOORE:  We have no objection to that,

5   Your Honor.

6                   THE COURT:  Therefore, counsel for the

7   estates will remain for the duration of the trial.

8                   MR. DELCOTTO:  I have one question,

9   though, Your Honor.  I have prepared the deeds over the

10  weekend in anticipation of what we are doing.  I can

11  e-mail them to everyone but one who does not communicate

12  with me by e-mail.  I don't foresee a problem with the

13  ten days, but in the event that you were on vacation or

14  something like that, could we apply to the court --

15                  MR. OTTO:  No objection to that.  I know

16  that can be a little bit --

17                  THE COURT:  Any objection pushing it out

18  to May the 20th?

19                  MR. ROTH:  No objection.

20                  THE COURT:  Okay.  Therefore, we will

21  move it to May the 20th instead of May the 13th.  That

22  will allow you three full weeks of time.  I don't want

23  to see this get delayed too much further than that

24  because this is a 2017 case.  We are already two and a

25  half years into it.

1              MR. DELCOTTO:  I will make every effort

2     to have it in within ten days, Your Honor.

3              MR. MOORE:  Your Honor, not to belabor

4     the point, should we wait until the Court renders a

5     decision as to who is the victor before we e-mail those

6     out, or do we put the actual name on the --

7              THE COURT:  Well, you are asking to be

8     relieved and removed from the case, so therefore your

9     interest, with all due respect, is -- has been granted

10    as removed.  The position and posture of the case is it

11    should be left blank with the execution of your parties

12    and submitted to the Court by May the 20th.  At that

13    point in time, in accordance with whatever outcome order

14    of court or opinion this Court makes, the deeds will

15    then be then filled in with regard to the grantor and

16    grantees with respect to the deeds.

17

18              MR. MOORE:  Very good.  Thank you.

19              THE COURT:  At this time, Mr. Otto, your

20    first witness?

21              MR. OTTO:  Your Honor, Mr. Roth --

22              MR. ROTH:  I have one thing before we

23    start.  This goes back to what I argued on Friday.

24              THE COURT:  You have a motion?

25              MR. ROTH:  Yes, a motion that I argued on

```
 1   Friday, which you already denied.  I think I need
 2   something on the record to show we are asking that we
 3   continue the trial.
 4              THE COURT:  Do you want to elaborate
 5   further why you believe that's appropriate?
 6              MR. ROTH:  First of all, there was
 7   outstanding pleadings in the case.
 8              THE COURT:  What are those exactly?
 9              MR. ROTH:  Well those outstanding
10   pleadings were by the other defendants, and they just
11   issued an answer with new matter and nobody responded to
12   the new matter and it's only been about a week since
13   that happened.  I don't think the pleadings are
14   complete.  Therefore, we would ask that the case be
15   continued because of that.
16                   In addition to that, no certificate of
17   readiness was issued in this case by the plaintiff, and
18   therefore we don't believe that the trial should begin
19   without us being able to answer the certificate of
20   readiness.  Therefore, we ask that the trial be
21   continued.
22              THE COURT:  My understanding is there is
23   a new matter out there in the pleadings?
24              MR. DELCOTTO:  There was new matter, but
25   we didn't even endorse a full response, Your Honor.  It
```

1  basically attached the agreement of sale.  The reason

2  that wasn't filed until then is there were outstanding

3  preliminary objections as to removal of --

4              THE COURT:  Sir, you are going to have to

5  put your cell phone away.  We are in the middle of a

6  trial.

7              MR. G. SNYDER:  I was just looking at the

8  time.  I'm sorry.

9              MR. DELCOTTO:  We withdrew the

10  preliminary objections, Your Honor.  At that point we

11  were free to file the answer and we did.  There is

12  really no responses required, especially since we are

13  not involved in the case.

14              MR. OTTO:  Your Honor, after our argument

15  here on Friday, I filed an answer to the new matter.  My

16  comment to Mr. Roth's motion is that we had an argument

17  on the 29th of March, which Mr. Roth was not present

18  for.  The following Monday, I filed a praecipe for

19  trial.  You issued an order on April 4th.  Even with

20  that, he had more than three weeks to file a response

21  prior to today and waited until the Monday prior to last

22  week.  You know, if it was really that critical that he

23  get discovery, he could have done discovery a long time

24  ago and he could have raised these matters right after

25  the issuance of the order.

1              THE COURT:  Prior to this most recent

2   exchange, discovery was essentially closed for months.

3   Is that my understanding?

4              MR. OTTO:  Mine was completed in

5   February.  My discovery was sent out in December or

6   January and Mr. Roth responded in February.  I never did

7   any depositions.  I might have had the opportunity

8   arisen, but I have no problem with where we are right

9   now, no.  He certainly had the opportunity in the one

10  document he cited on Friday that he really didn't have

11  was actually attached to my answer and new matter that I

12  filed in October of last near.

13             THE COURT:  Any response to either

14  statements made by the attorneys?

15             MR. ROTH:  No response, Your Honor.

16             THE COURT:  The Court, in consistency

17  with the situation on Friday, is denying the motion with

18  prejudice.  We will now proceed into trial.  I will

19  execute this order in denial with prejudice as I did the

20  order on Friday.  The motion is denied.

21             At this time, counsel, you may call your

22  first witness.

23             MR. OTTO:  May I make an opening

24  statement, Your Honor.

25             THE COURT:  Oh, I'm sorry.  Yes.  That's

1    fine.

2              MR. OTTO:  This is actually a simple case

3    made confusing by the actions of Defendant U Lock.

4    Simply stated, four estates agreed to sell real estate.

5    They entered into an agreement of sale when the

6    individual represented himself as the incorporator of a

7    to-be-formed company.  There were a number of delays on

8    the closing date.  My client, Christine Biros, was asked

9    by her brother to loan the purchase price for the

10   purchase.  And despite request for documentation prior

11   to the closing, she was only given lip service.

12              Finally, one or two days prior to

13   closing, she was informed that the money was necessary

14   immediately.  She scrambled around trying to get

15   together bank checks in the amount of $309,213.30.  On

16   the closing date before going into the closing, she made

17   a last request for documentation, which was provided by

18   a purported director of U Lock.  After the closing, she

19   spent over a year and a half asking for repayment and

20   got only lip service again.  Finally, this lawsuit

21   resulted.

22              She learned at the time of the conveyance

23   U Lock had not been formed as a corporation.  Under

24   Pennsylvania law, the deeds are void ab initio.

25   Therefore, the estate still owned the property at the

1    time our complaint was filed.  Ms. Biros's claim is

2    based on simple principles.  She paid the entire

3    purchase price and that went directly from her to the

4    estates without going through U Lock.  The estate still

5    owned the property at the time the complaint was filed,

6    but the estates were obligated to convey to whoever paid

7    them for it.  U Lock never made any effort to fulfil

8    their obligations to Ms. Biros.  And Ms. Biros has an

9    X-amount claim to the real estate.

10              Although purported corrective deeds were

11   filed in March of 2018, Your Honor, they're subject by

12   the language of the deeds to lis pendens and are

13   ineffectual against Ms. Biros's higher claim of

14   equitable title.

15              THE COURT:  At this time, Mr. Roth, would

16   you like to make an opening statement?

17              MR. ROTH:  Sure.

18              THE COURT:  Okay.

19              MR. ROTH:  Defendant U Lock became a

20   corporation.  They attempted to become a corporation

21   beginning on the day before the actual closing on the

22   events here.  They followed through and did become a

23   corporation.  We believe that that's a de facto

24   corporation, and therefore the Court should recognize

25   U Lock as a de facto corporation.

1          As a result of that, U Lock made a loan

2    from Ms. Biros, and they got the loan.  Those loan

3    proceeds were used to purchase this property in U Lock's

4    name.

5          THE COURT:  Not to interrupt your opening

6    statement, but did they become a corporation the day

7    before the closing, or they started the process?

8          MR. ROTH:  They did it online and filed

9    it online.  That's what they did and that's what you

10   will hear in the testimony.

11         THE COURT:  Okay.

12         MR. ROTH:  They later completed becoming

13   a corporation.  That's why we believe they are in fact a

14   de facto corporation.  Introduce you to that, this was

15   actually a loan from Ms. Biros to U Lock or to the

16   owners of U Lock.  What they did with the money was

17   purchase land.  We don't believe they have a claim to

18   that land because they have claim to their money.

19         They would be entitled to sue to get

20   their money back because they are entitled to that

21   money, but I don't believe -- they have no interest in

22   this land.  They never had any interest in the land.

23   Therefore, they should have no right to take the land as

24   to what they believe they should get, and that's our

25   position.

1          THE COURT:  Thank you very much.  At this

2   time, Mr. Otto, are you ready to proceed?

3          MR. OTTO:  I am, Your Honor.

4          THE COURT:  Who do you want to call?

5          MR. OTTO:  I call Henry Moore, please.

6          THE COURT:  If you will raise your right

7   hand to be sworn.

8

9   HENRY L. MOORE, having been

10  first duly sworn, was examined

11  and testified as follows:

12

13         THE COURT:  Thank you.  You may take the

14  witness stand.  Once he is situated, you may proceed.

15         MR. OTTO:  Thank you, Your Honor.

16                        * * *

17              DIRECT EXAMINATION

18  BY MR. OTTO:

19  Q.        Good morning, Mr. Moore.

20  A.        Good morning.

21  Q.        What's your position in this case?

22  A.        I am the Co-Administrator c.t.a., d.b.n., of

23  the Estate of Nicholas Schur.

24  Q.        Were you at the, what I'll call, exchange of

25  deeds and dollars of July 16th of 2015?

1  A.        I was.

2  Q.        I would like to show you some checks.

3            MR. OTTO:  Your Honor, I would like to

4  mark this as Exhibit P-1.

5            THE COURT:  Okay.

6  BY MR. OTTO:

7  Q.        Do you recognize those checks?

8  A.        Yes.

9  Q.        And what do they represent?

10  A.        These were the funds that were paid to

11  Mr. DelCotto and I at closing.  To clarify my previous

12  answer, I do believe one of those checks I did not

13  actually see.  That would be the check that Mr. Tumolo

14  actually closed prior to us getting there.  So I

15  physically -- three checks I saw.  I did not see -- the

16  Kathleen Walters check; is that correct?  Right.  The

17  other three checks I did see and I was there at the

18  closing.  Those three checks I did see.

19  Q.        Okay.  Do you see the name of U Lock anywhere

20  on those checks?

21  A.        I do not.

22  Q.        Were the estates fully paid?

23  A.        We were.

24  Q.        Now, in Mr. Roth's opening he said that

25  U Lock was a de facto corporation.  Did you have any

1   reason to question whether U Lock had been incorporated

2   properly or not?

3   A.        No.

4   Q.        And you are an attorney at law; is that

5   correct?

6   A.        Correct.

7   Q.        I'm going to show you two documents.

8           MR. OTTO:  Your Honor, I would like to

9   mark these Exhibit P-2 and P-3 respectively.  Your

10  Honor, that's P-2.

11          THE COURT:  Okay.

12  BY MR. OTTO:

13  Q.        Not that you would have seen this document

14  before, but have you seen similar filings?

15  A.        Yes.

16  Q.        In essence, what does it say?  Please take a

17  moment.

18  A.        Basically your Subsection 103, your filing

19  lacks the specific brief statement of businesses.  Refer

20  to the proper paragraph on the docketing statement.

21          MR. OTTO:  Your Honor, this is Exhibit

22  P-3.

23          THE COURT:  Okay.

24  BY MR. OTTO:

25  Q.        What is that?

1    A.        It's a creation of a corporation by the

2    Secretary of the Commonwealth, Pedro Cortez.

3    Q.        And what does it say in the second and third

4    paragraph?

5    A.        Creation filing filed September 4th of '15.

6    Q.        Would you disagree with me if I said the two

7    documents indicate that U Lock filed -- attempted to

8    file articles of incorporation which were rejected, and

9    then finally filed effective articles of incorporation

10   on September 4th, 2015?

11   A.        I would agree with that.

12             MR. OTTO:  Thank you.  No further -- I do

13   have one.  Sorry.

14             Your Honor, I would like to mark this

15   Exhibit P-4.

16   BY MR. OTTO:

17   Q.        Do you recognize that, Mr. Moore?

18   A.        I do.

19   Q.        And what is it?

20   A.        The settlement sheet to the closing.

21   Q.        Would you look please at line -- it's a

22   little hard to read -- 501 on the right column?

23   A.        Yes.

24   Q.        What is that?

25   A.        Excess deposit.

1    Q.        How much?

2    A.        Thirty thousand dollars.

3    Q.        Okay.  Down below it indicates that the

4    sellers were supposed to get $279,213.30, but in fact

5    they got $309,000.  Do you know what happened to the

6    other $30,000?

7    A.        Yes.

8    Q.        What happened?

9    A.        We originally had a -- a $20,000 deposit was

10   made by the incorporator of U Lock.  I believe it was

11   Eric Martin.  We had a closing set up at the

12   Westmoreland County Bar Association.  On the day of

13   closing, Mr. DelCotto and I appeared.  No one from

14   U Lock appeared.  So we sat for there about an hour and

15   then we left.

16             At that point in time, I instructed

17   Mr. DelCotto that the deal must have fallen through.  No

18   one from U Lock bothered to tell us why they didn't

19   come.  At that point Mr. DelCotto subsequently thereto

20   got a hold of someone from U Lock.  The only way the

21   deal was resurrected would be I demanded another $10,000

22   deposit money.  So twenty thousand became thirty

23   thousand, and the settlement date was set again for

24   July 16th.  So that's how twenty thousand became thirty.

25             I believe from my recollection at that time

1    at the request of U Lock, they wished to have that

2    $30,000 hand money returned to the incorporator, Eric

3    Martin, and pay us the full amount of the loan, which

4    came down to $325,000.  Once you minused out the back

5    taxes it came to $309,213.80 or something like that.

6    Q.          Based on your understanding of events, did

7    U Lock ever pay anything?

8    A.          Not on the first closing.  No one appeared.

9    On the date of the second closing, I believe --

10   Q.          Let me interrupt you.  If they gave you hand

11   money of $30,000 and you returned $30,000 to

12   Mr. Martin --

13   A.          I believe Mr. DelCotto did, yeah.  By check.

14   Q.          If that's the case, did U Lock pay anything?

15   They advanced $30,000, but they received that back?

16   A.          Right.  The way you state it, we received

17   full consideration at the time on July 16th.

18   Q.          From Ms. Biros?

19   A.          She was the remitter of the checks.  She was

20   present.

21              MR. OTTO:  Thank you.  No further

22   questions, Your Honor.

23              THE COURT:  Cross-examination?

24                          * * *

25

1          <u>CROSS-EXAMINATION</u>

2    <u>BY MR. ROTH:</u>

3    Q.        Are you familiar was there sales agreements

4    prior to the sale happening?

5    A.        Yes.

6    Q.        Who signed those sales agreement?

7    A.        Eric Martin as Incorporator of U Lock.

8              MR. ROTH:  Should we mark this

9    Defendant's 1?

10             THE COURT:  Well, actually A.

11             Just a matter of housekeeping, Mr. Otto,

12   are you moving all four items into evidence at this

13   time?

14             MR. OTTO:  Yes, Your Honor.

15             THE COURT:  Any objection to plaintiff's

16   exhibits coming in as evidence?

17             MR. ROTH:  No objection.

18             THE COURT:  There being no objection,

19   Plaintiff's Exhibits 1, 2, 3 and 4 are so moved into

20   evidence without objection.

21             MR. OTTO:  Thank you, Your Honor.

22   <u>BY MR. ROTH:</u>

23   Q.        I'm going to show you what's been marked as

24   Defendant's Exhibit A and ask if you can identify that?

25             MR. OTTO:  Do you have copies?

1           MR. ROTH:  I don't have any copies.

2           THE COURT:  Hold on a second.  Let's step

3    out for five minutes then until we get copies.  I would

4    make five of those.  All right.  Thank you.

5           We will come back in five minutes and

6    resume.

7           (PROCEEDINGS RECESSED -- 11:16 A.M.)

8           (PROCEEDINGS RECONVENED -- 11:26 A.M.)

9           THE COURT:  Mr. Moore, if you will take

10   the stand again.

11          Okay, Mr. Roth, we are back on the

12   record.

13   BY MR. ROTH:

14   Q.       I have handed you a document which is

15   entitled Defendant's Exhibit A.  Are you familiar with

16   that document?

17   A.       I am.

18   Q.       Is this the sales agreement for the

19   transaction that involves the land involved in this

20   trial?

21   A.       It is.

22   Q.       On that sales agreement, can you tell us who

23   the buyer is?

24   A.       Eric Martin, Incorporator for U Lock,

25   Incorporated.

1    Q.          At the time of this transaction, did you

2    have -- at the time that this agreement was signed, did

3    you have any idea who Ms. Biros was?

4    A.          No.

5    Q.          So you never met her?  You didn't know her?

6    A.          No.

7    Q.          You believed you were selling this property

8    to U Lock, Incorporated, via Eric Martin as an

9    incorporator?

10   A.          Correct.

11              MR. ROTH:  No further questions, Your

12   Honor.

13              MR. OTTO:  One question on redirect.

14              THE COURT:  You may.

15                          * * *

16              REDIRECT EXAMINATION

17   BY MR. OTTO:

18   Q.          Mr. Moore, to your recollection, when the

19   dates were executed, did you convey them to Eric Martin

20   or somebody else?

21   A.          No.  U Lock, Incorporated.

22              MR. OTTO:  Thank you.  No further

23   questions.

24              THE COURT:  Based on that redirect, any

25   recross?

```
1                              * * *

2                       RECROSS-EXAMINATION

3    BY MR. ROTH:

4    Q.        Were you present for the actual closing in

5    this matter?

6    A.        Yes.

7    Q.        Was Eric Martin at that closing?

8    A.        I don't know who Eric Martin is.

9    Q.        So you don't know him?

10   A.        No.

11   Q.        Were funds -- there were funds that were

12   actually paid to you prior to the actual closing in this

13   case; is that correct?

14   A.        Correct.

15   Q.        And that started at twenty thousand and

16   increased to thirty thousand I believe was your

17   testimony?

18   A.        Correct.

19   Q.        And do you know where those funds came from?

20   A.        No.

21             MR. ROTH:  No further questions, Your

22   Honor.

23             THE COURT:  Based on that, any redirect?

24             MR. OTTO:  I didn't hear Mr. Roth's

25   question clearly.  What was your last question?
```

1          THE COURT:  I will tell it to you.  There

2    were funds actually paid to you prior to the actual

3    closing in this case?  Correct.  That started at twenty

4    thousand and increased to thirty thousand I believe was

5    your testimony?  Those were the two -- I think the two

6    questions.  Oh, I'm sorry.  And do you know where the

7    funds came from?  No.

8          MR. OTTO:  Okay.

9          THE COURT:  So any redirect?

10          MR. OTTO:  No further questions.

11          THE COURT:  Anything further, Mr. Roth?

12          MR. ROTH:  Nothing further.

13          THE COURT:  Sir, you may stand down.

14    Thank you for your testimony.

15          At this time, do you wish to move

16    Defendant's Exhibit A into evidence?

17          MR. ROTH:  Please, Your Honor.

18          THE COURT:  Any objection?

19          MR. OTTO:  No objection.

20          THE COURT:  There being no objection, it

21    is so moved into evidence and marked as Defendant's

22    Exhibit A without objection.

23          At this time, next witness?

24          MR. OTTO:  Call Christine Biros, Your

25    Honor.

1          THE COURT:  Okay.

2

3    CHRISTINE BIROS, having been

4    first duly sworn, was examined

5    and testified as follows:

6

7          THE COURT:  When you are ready, your

8    witness.

9          MR. OTTO:  Thank you, Your Honor.

10                    * * *

11              DIRECT EXAMINATION

12   BY MR. OTTO:

13   Q.      Ms. Biros, how did you wind up paying

14   approximately $309,000 to the estate?

15   A.      My brother asked me to do that.  I did it for

16   him.

17   Q.      Would you have loaned money to U Lock on your

18   own?

19   A.      No.

20   Q.      Was it for an investment?

21   A.      Not for me, no.

22          MR. OTTO:  One second.  Your Honor, this

23   is the Exhibit P-5.

24          THE COURT:  Okay.

25   BY MR. OTTO:

1  Q.        Do you recognize this document?

2  A.        I do.

3  Q.        How did you come to get this?

4  A.        Before going into the closing, I asked for

5  some sort of guarantee that I would get my money paid

6  back to me from them, being U Lock, Snyders, whoever.  I

7  wanted to make sure that I was getting paid back.

8  Q.        Can you read that, please?

9  A.        It says this loan agreement between U Lock,

10 Incorporated, Borrower, a Pennsylvania Corporation

11 and -- I think it says and -- Christine Biros, Lender

12 and/or guarantor collateralized from S&T Bank for sum of

13 $325,316.  The terms and condition of the payment will

14 be agreed upon on or before 8/16/15.  Lender will set

15 terms of agreement if not settled by that date.  It is

16 signed by Kash Snyder, Director of U Lock, Incorporated,

17 on 7/16/15.

18 Q.        Okay.  Let's talk about this situation.  July

19 16th, '15 was the closing day; is that correct?

20 A.        It was.

21 Q.        Did you come to agreement on the terms before

22 August 16th, 2015?

23 A.        No.

24 Q.        Did you attempt to get repaid between then

25 and when you filed this case?

1   A.        Several times.

2   Q.        Did they ever make any payment to you?

3   A.        Not one.

4   Q.        Did you advance any further sums to them?

5   A.        Five thousand dollars.

6   Q.        Why would you do that?

7   A.        To pay the taxes is what I was told on the

8   property.

9   Q.        Okay.  When you tried to get repaid, who did

10  you talk to and what was his reaction?

11  A.        I spoke with George Snyder, Jr.  I guess it's

12  junior.

13  Q.        Is he in the courtroom?

14  A.        He is.

15  Q.        Is that him?

16  A.        That's him.

17  Q.        What was his reaction?

18  A.        Give him more time.  He just needed more

19  time.  He needed 30 days, 60 days, 90 days, six months.

20  Q.        Did anything happen other than delays and

21  more delays?

22  A.        Nothing.

23  Q.        Did they ever make a counterproposal?  They

24  ever offer to pay --

25  A.        They never came up with any money if that's

1    what you're asking me.  No.

2                   MR. OTTO:  No further questions, Your

3    Honor.

4                   THE COURT:  Okay.  Mr. Roth,

5    cross-examination?

6                          * * *

7                   CROSS-EXAMINATION

8    BY MR. ROTH:

9    Q.        You agree this was a loan to U Lock or to

10   Mr. Snyder, or one of the Snyders; correct?

11   A.        I lent them the money expecting to get paid

12   back; that's right.

13   Q.        In fact, you weren't paid back were you?

14   A.        Not one dime.

15   Q.        And that's why you filed this lawsuit because

16   you wanted to get paid back?

17   A.        Yes.  But it says I will set the terms and

18   agreement if not settled by that date.  That was their

19   agreement with me.

20   Q.        I understand that.  You weren't paid back and

21   you were dissatisfied with that and that's why you are

22   in the courtroom today; correct?

23   A.        Correct.  I prefer to have the cash.  Do you

24   have it?

25                   THE COURT:  Ma'am, you are a witness.

1   You don't get to ask questions.  You only get to hear

2   them and respond to them.

3                  Go ahead, Mr. Roth.

4   BY MR. ROTH:

5   Q.        You sent letters to Mr. Snyder, didn't you?

6   A.        Through my attorney?

7   Q.        Actually, I think on your own at one point;

8   is that correct?

9   A.        If I could see it, please?  We are going back

10  four years here.

11  Q.        I'm going to show you what's been marked as

12  Defendant's Exhibit B and ask if you can identify that?

13  A.        Can I have a minute to read it?

14  Q.        Sure.  Take your time.

15                 MR. OTTO:  Your Honor, I believe we are

16  willing to stipulate that a letter was given by

17  Ms. Biros to Mr. Snyder in an effort to obtain

18  repayment.

19                 THE COURT:  Is that stipulated?

20                 MR. ROTH:  If we can introduce it into

21  evidence?

22                 THE COURT:  That's fine.

23                 MR. ROTH:  The one thing -- I was just

24  going to asking one question.

25                 THE COURT:  That's fine.  You can still

1  ask her questions.  You accept plaintiff's stipulation,

2  though, as to the letter being sent from Christine Biros

3  to your client?

4              MR. ROTH:  (Nods head.)

5              THE COURT:  Okay.  Stipulation so

6  accepted by the Court.

7              MR. ROTH:  I ask that it be introduced

8  into evidence, Your Honor.

9              THE COURT:  Any objection to the letter

10 being introduced?

11             MR. OTTO:  No, Your Honor.

12             THE COURT:  So moved into evidence and

13 marked as Defendant's Exhibit B and moved into evidence.

14             Mr. Otto, with regard to Plaintiff's

15 Exhibit No. 5, do you wish to move that into evidence?

16             MR. OTTO:  I do, Your Honor.  I

17 apologize.

18             THE COURT:  Any objection?

19             MR. ROTH:  No objection.

20             THE COURT:  There being no objection,

21 that is also moved into evidence as Plaintiff's Exhibit

22 No. 5 without objection.

23 BY MR. ROTH:

24 Q.         Now, this is the letter we are referring to

25 is written to George Snyder of U Lock, Incorporated; is

1   that correct?

2   A.          He represented U Lock.

3   Q.          And immediately under that, you have the item

4   that says Re:  Loan from Christine Biros to U Lock,

5   Incorporated; is that correct?

6   A.          Yes.

7   Q.          So that means you were treating this as a

8   loan the entire time?

9                    MR. OTTO:  Objection, Your Honor.  She

10   already admitted she loaned the money to Defendant

11   U Lock.

12                    THE COURT:  It's his cross-examination.

13   I am going to overrule the objection.  Go ahead and

14   proceed.

15   BY MR. ROTH:

16   Q.          So you treated it as a loan the entire time;

17   is that correct?

18   A.          Yes.

19   Q.          And you went to a closing; is that correct?

20   A.          Yes.

21   Q.          And you supplied some funds at that closing;

22   is that right?

23   A.          Yes.

24   Q.          And did you see the documents that were being

25   exchanged at that closing?

1    A.        No.

2    Q.        You didn't see any of them?

3    A.        I only saw my checks and that.  I didn't

4    see -- I saw Kash Snyder signing documents.  That's all

5    I saw.

6    Q.        Were you familiar with why they were at a

7    closing?  Were they getting land?  Is that what they

8    were doing?

9    A.        They were purchasing property.

10   Q.        And you knew they were purchasing property?

11   A.        Yes.

12   Q.        And since Mr. Snyder was the one signing the

13   papers, the property was going to Mr. Snyder you

14   assumed?  I assume you assumed that.

15   A.        I didn't assume anything at that point.  I

16   didn't know who the property was going to.

17   Q.        But you knew the property was not going to

18   you?  You didn't sign any papers that day in order for

19   the property to go to you?

20   A.        That's correct.

21             MR. ROTH:  May I have one second, Your

22   Honor?

23             THE COURT:  Sure.

24             MR. ROTH:  That's all the questions I

25   have, Your Honor.

1          THE COURT:  Any redirect at this time,

2     Mr. Otto?

3          MR. OTTO:  No questions, Your Honor.

4          THE COURT:  Thank you.  Ma'am, if you

5     will pass me that letter up?

6          MR. OTTO:  The other one.

7          THE COURT:  The other.  Thank you.  You

8     may stand down and return back to counsel table.

9          MR. ROTH:  Judge, if you want to

10    substitute, I have a better copy -- if you want to

11    substitute this for -- I forget what exhibit it was.

12         THE COURT:  It's already into evidence.

13    It's already been marked.  But we appreciate that.

14    Thank you.

15         At this time, Mr. Otto, next witness?

16         MR. OTTO:  Call Eric Martin, Your Honor.

17         THE COURT:  Okay.

18         MR. ROTH:  Eric Martin is not here, Your

19    Honor.

20         MR. OTTO:  Your Honor, Mr. Martin is the

21    director of U Lock.  He was involved in the transaction.

22    I informed Mr. Roth on Friday that I wanted him here for

23    this trial.

24         THE COURT:  Mr. Roth, why isn't he here?

25         MR. ROTH:  I got a request to have him

1    present, Your Honor.  My client, Mr. Snyder, contacted

2    him -- tried to contact him to get him in here.

3    Apparently he works a night shift is what I'm told.

4    He's not been able to reach him ever since I got the

5    request to have him here, and I got that on Friday.

6                    THE COURT:  Okay.  Mr. Otto, what would

7    be your offer of proof with regard to Eric Martin?

8                    MR. OTTO:  Several questions, Your Honor.

9    Mostly related to the $30,000.  I wanted to find out

10   from him what the source was of the $30,000 and to

11   confirm from him personally that he received repayment

12   of that.  I have had Mr. Moore testify that the money

13   was returned to him, but only Mr. Martin can answer that

14   question.

15                   THE COURT:  Mr. Roth, would you stipulate

16   that Eric Martin received $30,000 reimbursement funds?

17                   MR. ROTH:  Yes, Your Honor.  We will

18   stipulate to that.

19                   THE COURT:  Would that satisfy your

20   inquiry?

21                   MR. OTTO:  Yes, Your Honor.

22                   THE COURT:  The Court takes judicial

23   notice that had Eric Martin appeared for court, that he

24   did in fact receive back the entire $30,000 in hand

25   money that was either advanced by him or some other

1    individual associated with the then incorporating

2    U Lock, Incorporated.  The Court will also take judicial

3    notice at that time it was not incorporated until after

4    September of 2015.

5              MR. OTTO:  Thank you, Your Honor.  One

6    last item that I would have asked for from Mr. Martin,

7    and that is whether he was aware of any other payments

8    that were made on behalf of U Lock towards the purchase

9    price since he paid $30,000 down and got $30,000 back.

10   It appears that U Lock did not make any payments at all

11   towards the purchase price.  I wanted to confirm that.

12             THE COURT:  Mr. Roth?

13             MR. ROTH:  We don't confirm what he just

14   said.  U Lock did make the payment, they just got

15   reimbursed.  So, yes, they did make a payment towards

16   this purchase price, but they did get reimbursed.

17             THE COURT:  I think the way he phrased it

18   was any other payment, that there were none made other

19   than the $30,000 advanced and then the reimbursed.

20             MR. ROTH:  We agree with that.

21             THE COURT:  Okay.  It's so stipulated

22   then if Eric Martin were here, he would have testified

23   that there were no other payments made outside of the

24   $30,000 in hand money, which was ultimately reimbursed

25   in its entirety back to him --

1           MR. OTTO:  Thank you.

2           THE COURT:  -- or others associated with

3    the corporation.

4           MR. OTTO:  No further questions -- no

5    other witnesses on direct.  I would like to reserve the

6    right to make a closing statement as well as to call

7    witnesses after Mr. Roth's case.

8           THE COURT:  You want to keep your case

9    open until that time?

10          MR. OTTO:  Yes.

11          THE COURT:  Okay.  Mr. Roth, at this

12   time, are you prepared to proceed on your case-in-chief?

13          MR. ROTH:  Yes.  I would like to call

14   Mr. Snyder, please.

15          THE COURT:  If you will come around this

16   way.

17

18   GEORGE SNYDER, having been

19   first duly sworn, was examined

20   and testified as follows:

21

22          THE COURT:  You may take the witness

23   stand.

24          Mr. Roth, your witness.

25                         * * *

1                    <u>DIRECT EXAMINATION</u>

2     <u>BY MR. ROTH:</u>

3     Q.          State your name, please.

4     A.          George Snyder.

5     Q.          Where do you live, George?

6     A.          150 Leger Road.  North Huntington.

7     Q.          Are you a person that's been involved in the

8     transactions involving this property that's at question

9     today?

10    A.          Yes.

11    Q.          And were you involved in this matter from the

12    very beginning?

13    A.          Yes.

14    Q.          Now, the person that we just talked about,

15    Eric Martin, you are familiar with Mr. Martin?

16    A.          Yes.

17    Q.          And has Mr. Martin joined with you in

18    attempting to incorporate U Lock?

19    A.          Yes.

20    Q.          When is it that you first tried to

21    incorporate U Lock?

22    A.          I think about six months before the closing.

23    Q.          Okay.  Did you sign a sales agreement to

24    purchase this property?

25    A.          Eric, I believe, did as incorporator for

1  U Lock.

2  Q.        Did you attempt to incorporate the business

3  prior to him going there to --

4  A.        Yes.

5  Q.        -- try and purchase the property to sign the

6  sales agreement?

7  A.        Yes.

8  Q.        And how did you do that?

9  A.        There were several sales agreements along the

10  way because there were, like I said, a few different

11  extensions.  I'm sorry.  What's your question?

12  Q.        Mainly, when did you incorporate with regard

13  to the sequence of events that happened here?  When did

14  you attempt to incorporate?

15  A.        The first time we had done it online.  I

16  believe Kash and Eric Martin did it online the day

17  before the closing.

18  Q.        You were involved and talked to them about

19  that because you were one of the incorporators; correct?

20  A.        Yes.

21  Q.        When you did that online, did you have any

22  belief as to whether or not you would be incorporated as

23  a result of doing that?

24  A.        We thought it was successful.  We thought it

25  was done.

1    Q.          Did you determine later that it turned out

2    not to be successful?

3    A.          Yes.

4    Q.          After you determined it wasn't successful,

5    did you then continue to make the corporation actually

6    happen later?

7    A.          Yes.

8    Q.          Did you get the paperwork?

9    A.          Yes.

10   Q.          With regard to you purchasing this property,

11   or U Lock purchasing this property, did you have

12   discussions with anybody that might be a partner in the

13   business with you?

14   A.          Yes.

15   Q.          Whom?

16   A.          John Biros.

17   Q.          Do you know how John Biros is related to the

18   woman that just testified?

19   A.          Yes.

20   Q.          How?

21   A.          They are siblings.

22   Q.          When you discussed this with John Biros, did

23   you and he come up with an agreement -- not a written

24   agreement, but a verbal agreement -- how this was going

25   to happen?

1   A.          For quite a long time.  About a year we

2   agreed verbally to a whole bunch of things.

3   Q.          Okay.  Tell us what the agreement was between

4   you and him verbally?

5   A.          We were -- the property was worth, we feel,

6   substantially more than $300,000.  He approached me one

7   day and said he wanted to be a partner and that his

8   family would put up the money.  There was one

9   stipulation.  He said he wanted his brother, Andy,

10  involved also.  I agreed and said that's not a problem.

11  I knew Andy since I was a kid.  I said that's fine.  So

12  we were both on board and interested.  They thought the

13  terms were fair.  I did too.  We spent about a year -- I

14  think it may have been six months to a year before the

15  closing where we got together and tried to make the

16  closing happen.

17  Q.          When it came time to make the purchase, did

18  the brother indicate to you that he wanted you to deal

19  with someone else in his family?

20  A.          Also several months before the closing,

21  Christine and I and John talked about this several times

22  about how they were going to get the money and that sort

23  of thing.  There were a couple of ways they were going

24  to pursue getting the money.  So we talked about that

25  for several months.  I met with them approximately --

1  several times a week.  But at least every Wednesday I

2  met with them for a year.

3  Q.         Did you sign the agreement that said that you

4  would repay this money?

5  A.         No.  Kash signed that.

6  Q.         So that's your brother?

7  A.         For U Lock.

8  Q.         It was signed by your brother and you agreed

9  that would you would repay this money; is that correct?

10  A.         Our verbal agreement up until that point,

11  that wasn't the case.  We were always supposed to be

12  partners.  Unbeknownst to me, on the way -- so the

13  closing was a certain time.  I believe I was on time for

14  the closing, but they were late.  They were out getting

15  the checks.  They drove together.  John, Christine, and

16  my brother Kash drove together.  I think Kash or someone

17  called me from the car and said can you come out to the

18  parking lot?  So we have never talked about this

19  agreement you have there prior to this.

20         Christine said, hey, can you do me a favor

21  just -- can you sign something just to protect me until

22  we iron out the details?  I wasn't prepared for the

23  closing here today.  Can you sign something?  I said,

24  yes, and Kash signed it.

25  Q.         You agreed to do that?

1   A.          Yes.

2   Q.          And you did sign it, so you agreed to be

3   responsible for the money ultimately; is that correct?

4   A.          Correct.

5   Q.          In terms of repaying this money, did you

6   have -- what was your understanding about repaying it or

7   were you still in a possible partnership agreement, or

8   do you know what happened?

9   A.          I thought we were still in a partnership

10  agreement.  I still continued to meet with them several

11  times a week.  Every Wednesday -- sometimes John and I

12  almost daily.  We would get together and get lunch or go

13  to the property or I would go see them at their bar.  I

14  would ask -- you know, they didn't want repaid.  It was

15  a partner.  At one time Christine asked if I could repay

16  it.  I said I can get the money.  I could give you your

17  money back.  She replies -- and I said so John wants out

18  of the partnership?  She said, no, you should be out of

19  it.  I said, well, if I buy you out or pay the amount,

20  then he would no longer be a partner.  She said, well,

21  wait a minute.  We might still be partners.  Let me talk

22  to John.

23          They went back and forth for almost two

24  years.  That was the first demand.  That second letter

25  you put in was in 2017, was the first time they asked

1    for a payment.  So up until then, we were behaving like

2    partners.

3    Q.        On the day of closing, where did the money

4    come from?

5    A.        Christine loaned it to me.

6    Q.        And she had you sign the agreement?

7    A.        For U Lock.

8    Q.        Before she did that?

9    A.        Yes.

10    Q.        And then you took the money and purchased the

11    property, and you purchased it in U Lock's name;

12    correct?

13    A.        Correct.

14    Q.        You actually have deeds, don't you, which

15    transfer this to U Lock; is that correct?

16    A.        Yes.

17    Q.        I'm going to show you several documents here.

18    I'm going to show you what's been marked as Defendant's

19    Exhibits C, D, E and F and ask if you can identify what

20    those are?

21    A.        They look like deeds filed March of 2018 for

22    the four different deeds for the property that U Lock

23    purchased.

24    Q.        You had not gotten the deeds prior to that

25    time; is that correct?

1    A.         We had the deeds -- I believe we received the

2    deeds at the closing, if my memory is correct.  But we

3    didn't record them until later.

4    Q.         You later recorded the deeds which were at

5    the closing and that's what you were trying to

6    accomplish?

7    A.         Correct.

8              MR. ROTH:  I'm going to ask that each of

9    these be introduced into evidence, Your Honor.

10             THE COURT:  Any objection?

11             MR. OTTO:  Are they one exhibit?

12             THE COURT:  They are four separate.

13             MR. ROTH:  C, D, E and F.

14             MR. OTTO:  Can you identify because

15   there's dates from four --

16             THE COURT:  You know what, Mr. Otto, if

17   you want to approach, he has them marked up here.  That

18   way you will know.

19             MR. OTTO:  Okay.  Thank you, Your Honor.

20             THE COURT:  Sir, will you hand those to

21   me?

22             MR. ROTH:  I would ask they be

23   introduced, Your Honor.

24             THE COURT:  Any objection?

25             MR. OTTO:  No, Your Honor.

1          THE COURT:  There being no objection,

2   Defendant's Exhibit C, D, E and F are individually moved

3   into evidence without objection.

4          Anything further, Mr. Roth?

5   BY MR. ROTH:

6   Q.       Do you agree that you still owe this money,

7   or U Lock, or someone, owes this money to Christine

8   Biros?

9   A.       Yes, I do.

10  Q.       Are you attempting to try and make

11  arrangements to pay that back?

12  A.       Well, yes.  We could at any time that the lis

13  pendens -- the deed makes it difficult.

14  Q.       Okay.  Are you willing to attempt to get that

15  money together to pay her?

16  A.       Absolutely.

17  Q.       Do you have people that want to become

18  involved in your corporation, after this lawsuit is

19  over, that would give you money to be able to pay her

20  off?

21  A.       A whole list of people are very interested.

22          MR. ROTH:  I have no further questions,

23  Your Honor.

24          THE COURT:  Cross-examination at this

25  time, Mr. Otto?

1          MR. OTTO:  Yes, I do, Your Honor.

2                    * * *

3               CROSS-EXAMINATION

4  BY MR. OTTO:

5  Q.          Mr. Snyder, if I understand your testimony,

6  your position that you are a de facto corporation is

7  based on your contention that you acted or U Lock acted

8  as a corporation even prior to July of 2015; is that

9  correct?

10 A.          I'm not sure.  I just related my involvement

11 to my attorney and he mentioned de facto corporation.

12 Q.          He came up with the theory of de facto

13 corporation?

14 A.          Well, he's my counsel.

15 Q.          That's what I am asking.

16 A.          I don't understand the legal -- you know,

17 exactly everything.

18 Q.          He prepared all of the materials that you

19 filed; right?

20 A.          He's my attorney.  Any question like that, if

21 I don't understand it, then I can --

22 Q.          I'm confused.  Just yes or no?

23 A.          Yes, sir.

24 Q.          To your knowledge, did anybody other than

25 Mr. Roth prepare any of the filings?

1    A.          To my knowledge, I don't know who -- it's him

2    and a paralegal.

3    Q.          Just a yes or no?

4    A.          Not to my knowledge.

5    Q.          To your knowledge, nobody other than Mr. Roth

6    prepared all of the documentation?

7    A.          Correct.

8    Q.          Okay.  Well, let's talk about any actions

9    that you might have made to conform to that standard of

10   acting as a corporation.  All through the pleadings

11   those claims have been made, that you did act -- that

12   U Lock did in fact act as a corporation?

13   A.          Yes.

14   Q.          Did you have any financial statements?

15   A.          We included in the discovery the rent roles,

16   things like that.

17   Q.          That's just rent roles.  Did you have

18   financial statements?

19   A.          The bank statements from Citizen's Bank?

20   Those types of statements?

21   Q.          When was that bank opened?

22   A.          I don't recall the date.

23   Q.          I can tell you when it is.  I have -- which

24   was provided to me in discovery.  I will give you a copy

25   if you want to look at it, but it says beginning

1    September 17th, 2015.  This is from your discovery.  So

2    that's after the closing date; correct?

3    A.        The date you said it is, yes.

4    Q.        Have you filed tax returns?  Has U Lock filed

5    any tax returns?

6    A.        None.

7    Q.        None?

8    A.        Not that I'm aware of.

9    Q.        You have been in operation since 2014 as a de

10   facto corporation?  So now, 2019, five years later, you

11   never filed a tax return?

12   A.        Correct.

13   Q.        You have over 800 shareholders.  Have you

14   ever issued stock certificates to any of them?

15   A.        I'm not sure.  I believe they do.  I'm not

16   sure.

17   Q.        You are an officer and director of U Lock.

18   Wouldn't they get the stock certificates from U Lock?

19   A.        I'm not aware of whether they have them or

20   not.

21   Q.        Have you mailed them?

22   A.        Personally me?  No.

23   Q.        Do you know who would have mailed them?

24   A.        I don't know if my brother Kash would have.

25   I don't think so though.

1   Q.          So if I get him on the stand and ask him the

2   question, he will say that he mailed them?

3   A.          That's not what I said.  I said I don't think

4   he did.

5   Q.          So to the best of your knowledge, no share

6   certificates have been sent out; is that correct?

7   A.          Possibly --

8   Q.          To the best of your --

9   A.          But that's not --

10              THE COURT:  One at a time, okay?

11              MR. OTTO:  I'm sorry.  I will slow down.

12              THE COURT:  Anything further you want to

13  say to that answer?

14              THE WITNESS:  No.

15  BY MR. OTTO:

16  Q.          Have you sent out tax reports, Form 1099s, to

17  any of the shareholders?

18  A.          No.

19  Q.          Do you have insurance on the property?

20  A.          No.

21  Q.          No liability for the --

22  A.          No, we don't.

23  Q.          No insurance on a property worth over

24  $300,000?

25  A.          Correct.

1    Q.        One of the things I requested in discovery

2    was copies of bylaws and corporate minutes.  The

3    response was you couldn't find them.  Have you found

4    those?

5    A.        No.

6    Q.        Do you know that they exist?

7    A.        I believe they exist.  They may be in one of

8    my boxes over there.  I brought four boxes that I looked

9    through --

10   Q.        If you have --

11   A.        -- but I can't find anything.

12             THE COURT:  One at a time, please.

13             MR. OTTO:  Sorry, Your Honor.

14   BY MR. OTTO:

15   Q.        If you had them, you were required to provide

16   them.  If I don't have them, they must not exist?

17   A.        I wasn't aware we were going to trial until

18   Friday.  I worked diligently this weekend to try and

19   gather as much as I could.

20   Q.        But my request for those documents, my first

21   one was in October of last year, my second one was in

22   February or January of this year.  So you certainly had

23   plenty of time.  We are in April now.  I'm assuming they

24   don't exist.  Do you disagree with that?

25   A.        I don't necessarily -- you can assume what

1    you want to assume.  I don't...

2    Q.          Okay.  You made claims that you had a

3    shareholders agreement or some kind of agreement between

4    you and your brother and Mr. Martin.  Do you have a copy

5    of that in writing?

6    A.          Did we provide that in discovery?

7    Q.          No.

8    A.          Hm.  I don't have that then either.

9    Q.          I'm trying to figure out what exactly did you

10   do prior to the closing date to justify calling yourself

11   a de facto corporation?

12   A.          About a year prior to that, we operated that

13   way.  We signed the sales agreement to that effect.

14   Then we signed another sales agreement to that effect.

15   And then a few months later, we signed another one to

16   that effect.

17   Q.          What sales agreement?

18   A.          Sales agreement from the estates to U Lock,

19   Inc.

20   Q.          The agreement that your counsel provided

21   earlier?

22   A.          Yes.

23   Q.          All that says is from Eric to Eric Martin as

24   Incorporator.  That's to an individual.

25   A.          As incorporator for U Lock, Inc.

1    Q.        But he was an individual.

2    A.        I think we had several sales agreements I

3    believe that were subsequent ones that we had that were

4    signed under U Lock, Inc.

5    Q.        If I recall Mr. Moore, he will say that there

6    were at least two maybe three sales agreements?

7    A.        To my recollection I think so, or extensions

8    or something.  At some point then, Eric Martin had

9    assigned his rights as director over to my brother,

10   Kash.  And Kash signed documents.  We did things like no

11   lien letters at the township and tax certifications and

12   did a bunch of things leading up to the closing all

13   under U Lock, Inc.

14   Q.        So you basically represented to a lot of

15   people that U Lock had been formed, but you said you

16   didn't file anything until the day before the closing.

17   So what did you do prior to that date?

18   A.        Well, like I said earlier, I think six months

19   or a year before that, I thought we applied online at

20   that time for U Lock.

21   Q.        You think you did?

22   A.        Yeah.

23   Q.        Did you do it or somebody else?

24   A.        I think my brother, Kash, did, but I think I

25   was there when he did it.

1    Q.        Who is Samantha McKee?

2    A.        Ex-girlfriend of mine that was going to be

3    involved in this, and she applied for one previous to

4    the day of the closing I think.

5    Q.        Do you have a copy of that?

6    A.        I thought we provided it in the discovery.

7    Q.        No.

8    A.        She applied, I think, online for U Lock for

9    that name also.

10   Q.        I will tell you -- I will be happy to show

11   them to you, but I will tell you that the only two

12   filings I was able to find online were the fist filing

13   that you had, which was rejected, and the second one

14   that was effective in September of 2015.  So if you

15   filed something else, it's not of record --

16   A.        I know they --

17   Q.        -- unless your attorney has something?

18   A.        I know they sent something back, but we got

19   it months later.  It was after that September date when

20   we got a number approved by the state.  Sometime after

21   that, we received something in the mail.  It was

22   crinkled up.  It was a rejection letter saying something

23   about our previous filing was rejected because the

24   articles of the corporation were fine.  But in the

25   docketing statements, there was one blank that asked the

1    nature of the business and we left that blank.  They

2    rejected it for that reason.

3    Q.        You are saying that they didn't respond to

4    you in a timely manner through the U.S. mail because you

5    didn't receive it?

6    A.        What I said is what I said.  But what my

7    point was was when we filed that the date before the

8    closing, we were under the assumption everything was

9    okay.  We were acting as U Lock, and we had successfully

10   completed it on the computer the day before.  That

11   turned out not to be the case.

12   Q.        You have made several statements that you

13   tried to reach, or you did reach, an agreement with John

14   Biros and Christine Biros for them to become investors.

15   Do you have anything in writing to the effect?

16   A.        No.  That was all verbal for about a year or

17   so.

18   Q.        You understand if I call them, they are going

19   to disagree that -- or at least Ms. Biros will disagree

20   that she ever agreed to being a shareholder?

21   A.        Yeah.

22   Q.        I will be happy to do that, but you

23   understand that's going to happen?

24   A.        I'm aware they are not being truthful in all

25   of this -- a lot of this paperwork I received.

1   Q.          We are going to get to truthful in a few

2   minutes, Mr. Snyder.  Let's see.  You made some claims

3   in some of the pleadings -- first of all, let me ask you

4   this.  There have been a number of filings in this case.

5   There were answers, there were preliminary objections,

6   and briefs related to preliminary objections, there were

7   two petitions, and there were discovery requests.  Did

8   you provide information to Mr. Roth for that, or how did

9   those come to be prepared?

10  A.          I gave Mr. Roth all of the information I had.

11  We have talked about things that --

12  Q.          Did anybody else give him information?

13  A.          Possibly my sister or my brother.  Any

14  information we had or paperwork we had, I provided him

15  with boxes of paperwork.

16  Q.          If there's anything that's not accurate in

17  those pleadings, is it Mr. Roth who is not telling the

18  truth, or is it you?

19  A.          I'm not sure exactly what -- I provided him

20  with information.  I made certain statements.  He put

21  things in there, so I don't know what specifically you

22  are referring to.

23  Q.          Well, in the amended answer to the complaint

24  of new matter that was filed on your behalf on September

25  21st, it says:  To the contrary of said funds -- and

1    this refers to Ms. Biros, money that she paid -- such

2    funds were paid on behalf of U Lock which said funds

3    being a loan to U Lock, Inc.  That kind of flies in the

4    face of your statement that you intended it to be an

5    investment all along, doesn't it?

6    A.         I think that goes to show their dishonesty.

7    We were supposed to be a partnership the whole time.

8    Now I realize looking back the day of the closing, when

9    everybody was waiting there, Mr. Tumolo, or one of the

10   attorneys, I remember had prior engagements in

11   Pittsburgh or something.  They were ready to walk away.

12   They had me run out there and sign this paper real

13   quick.  At that point, I guess, looking back it became a

14   loan at that point.  Everything we discussed for a year,

15   now it's changed to a loan.  That's not dishonesty on my

16   part.  They changed the game in the middle.

17   Q.         You have nothing in writing to demonstrate

18   any agreement on the part of John or Christine that it

19   was an investment?

20   A.         Yes.

21   Q.         The only documentation that is out there is

22   that it's a loan?

23   A.         That's correct.  That's why I said I realized

24   it change to a loan that day we signed the paper.

25   Q.         Okay.  Now the reason I ask you the question

1    about who provided the information is because -- and

2    your attorney can back this up if you have any

3    questions -- but every pleading that's filed of a

4    factual nature is required to be verified by a party who

5    has direct knowledge of that.  Out of 14 filings by

6    U Lock, 12 of them were signed by Mr. Roth.  So is he

7    responsible for anything that's wrong in the pleadings,

8    or is that you?

9    A.          I'm not sure what you mean exactly.  I don't

10   know who is responsible.  I know we filed a whole lot of

11   paperwork.  If I made a mistake in something, I guess

12   maybe I would be responsible.  If I signed it, I'm

13   responsible.  If he signed something, he's responsible.

14   I'm not sure.

15   Q.          Well, he signed for everything so I don't

16   know whether he's taking responsibility for it or not.

17   But let's go on.  You agreed -- well, first of all, in

18   Ms. Biros's complaint, she alleged that you made

19   substantial sums of money from the operation of the

20   property.  In two of your pleadings you agreed that you

21   did, in fact, make substantial funds from that.  Later

22   in two of your pleadings, you said that wasn't true.  So

23   did you or didn't you?  Was it wrong the first two times

24   or the second two times?

25   A.          I would not define the amount of money coming

1    in there substantial, especially in lieu of the fact

2    that you had mentioned you charged 18 percent interest

3    or we paid 9 percent interest.  Then certainly the

4    property doesn't make a substantial amount of money, if

5    that's what you mean.  Are you asking me to clarify the

6    word substantial?

7    Q.          I said that we believe you made substantial

8    money?

9    A.          I recall that.

10   Q.          The first two answers you admitted that, yes,

11   indeed you did.  Later you said, no, you didn't and in

12   fact you were loosing money.  Well, even if you say

13   substantial is undefined, that's different from nothing.

14   So the question is which is true in the pleading, the

15   first one or the second one?

16   A.          Well, I guess it's interpreted by -- I spoke

17   with Christine about it.  She -- one time we were

18   talking at the bar and she said it was very -- she was

19   upset that we are making all kinds of money up there,

20   and she knows we're making money, and she wants money.

21   So I guess she felt that was substantial.  I told her

22   that -- exactly what we were making, which is in our

23   responses.  At this time, I don't consider that to be

24   substantial based on the mortgage that will be -- or

25   what the bank loan will be if we have to pay them back.

1    Q.        You say you have got people very interested

2    in advancing money once the lis pendens is gone and this

3    lawsuit is over.  Why would anybody advance money to you

4    when you have no financial records to show for how the

5    property is operated?  You don't have financial

6    statements, you don't have tax returns?

7    A.        There's not a substantial amount of money

8    coming into the business.  The business isn't worth --

9    not just the property.  The property itself is worth

10   several times what we paid for it.

11   Q.        Do you have an appraisal?

12   A.        The there was an appraisal done.  I don't

13   have one to that effect.

14   Q.        What was it appraised for?

15   A.        I don't recall.

16   Q.        I'm sorry.  Did you have it appraised --

17   A.        No.

18   Q.        -- or did somebody else have it appraised?

19   A.        I forget.  I know Christine Biros and John

20   Biros were talking to S&T Bank.  She said the bank

21   lady -- I think her name was Sue, but I'm not sure --

22   said she road past the property and said it's worth

23   twice that all day long.  It wasn't an appraisal.

24   That's where we kind of got that the property was worth

25   more than $300,000.

1   Q.        If there's a statement in the pleadings --

2   A.        Yes.

3   Q.        -- and it's not accurate, would you agree

4   that that's a lie?  Generally?

5   A.        No.  It could be a mistake.  There was so

6   much paperwork and so many questions answered.  I was

7   bombarded with you guys with discovery, then a second

8   discovery.  Sometimes I was up late at night doing it,

9   sometimes I'm looking for papers, looking for receipts

10  or checks and different things.  I honestly put my best

11  foot forward to answer your questions and be truthful

12  with everything.  I absolutely didn't lie about

13  anything.  I'm human.  I may have made a mistake, but

14  there was never anything that's a lie.

15  Q.        Well, let me read the last statement.  This

16  is the verification.  By the way, this is one Mr. Roth

17  signed.  In a sense he is hanging out there.  It says

18  facts contained herein are true and correct to the best

19  knowledge, information or belief.  This verification is

20  made subject to the penalties 18 Pa.C.S. 4904 relating

21  to unsworn falsifications to authorities.

22        If you make the same mistake over and over

23  again -- I mean, a typo is a typo.  Anybody can make

24  those.  But if you make a statement on more than one

25  occasion, which is demonstratively false -- and I'm

1    asking a simple yes or no question -- is that a lie?

2    A.          I don't know what statement you are referring

3    to.

4    Q.          Well, I will tell you in a minute.  But

5    generally speaking, is that a lie?

6    A.          I'm not going to say I lied.

7    Q.          Well, I will tell you that in the pleadings,

8    in a number of places, you stated that U Lock paid

9    $30,000 when, in fact, we have already established that

10   even though U Lock, through Mr. Martin, advanced

11   $30,000, at the end of the day U Lock paid nothing for

12   this property.  Remember that you are under oath to tell

13   the truth the whole truth and nothing but the truth, do

14   you agree that U Lock paid nothing for this property?

15   A.          No.  I do not agree.  U Lock -- well, I guess

16   U Lock has spent almost equal that on assets, fork

17   lifts, excavators, and all kinds of things that came

18   with the property.  The property itself, the land

19   itself, I think in the earlier thing said $30,000.  I

20   think we corrected that later.  I let my attorney know

21   that we had -- Eric Martin had gotten that check back

22   because there seemed so be confusion on how that went so

23   I explained exactly how that went to my attorney.  I

24   believe that was corrected at some point.  It was not a

25   lie.  It was clarified at some point.

1    Q.         Let me ask this question again.  I appreciate

2    the answer, but it didn't answer my question.  So let me

3    ask the question one more time.  For the purchase of

4    this property -- I'm not asking about any other things

5    you have done -- for the purchase of this property, did

6    U Lock pay anything?  Yes or no?

7    A.         U Lock borrowed the money from Christine

8    Biros and that's -- she secured the funds to purchase

9    the property.

10                THE COURT:  Sir, with all due respect,

11   its a yes or no answer.

12                THE WITNESS:  Oh, I'm sorry.

13   BY MR. OTTO:

14   Q.         Did U Lock pay anything for the property?

15   A.         No.

16                MR. OTTO:  Thank you.  Your Honor, I have

17   no more questions.

18                THE COURT:  Any redirect?

19                MR. ROTH:  Nothing further.

20                THE COURT:  Sir, you may stand down and

21   return back to counsel table.

22                At this time, it's about 20 after 12:00.

23   I think it's appropriate to break for lunch and return

24   at 1:30.  We will return back and you can all get lunch.

25   We will resume at that time.  Be prepared with your next

1   witness or however you are going to move forward.

2                    MR. ROTH:  All right thank you.

3                    THE COURT:  Thank you.

4           (PROCEEDINGS RECESSED -- 12:16 P.M.)

5           (PROCEEDINGS RECONVENED -- 1:35 P.M.)

6                    THE COURT:  Mr. Roth, your next witness?

7                    MR. OTTO:  Before we start, Your Honor,

8    just an administrative matter --

9                    THE COURT:  Okay.  Hold on.  We are going

10   to go back on the record.  Go ahead.

11                    MR. OTTO:  During the lunch break,

12   Mr. Moore found a couple of documents in his records,

13   which he shared with Mr. Roth and I.  Two of them are

14   better copies of what you have already had, and I think

15   with Mr. Roth's agreement, we would like to substitute

16   them.  The third one, I think Mr. Roth would like to

17   introduce -- I have no objection -- this is the

18   assignment.

19                    THE COURT:  So that's a new one?

20                    MR. ROTH:  Yes.

21                    MR. OTTO:  We discussed and I have no

22   objection to it, Your Honor.

23                    THE COURT:  So Defendant's Exhibit G will

24   be so moved into evidence without objection.  The bet

25   copies of the plaintiff's records will be substituted

 1   for those already admitted into evidence at this time.

 2                   At this time, Mr. Roth, next witness?

 3                   MR. ROTH:  I call Kash Snyder, please.

 4                   THE COURT:  Okay.  Raise your right hand,

 5   please.

 6

 7   KASH SNYDER, having been

 8   first duly sworn, was examined

 9   and testified as follows:

10

11                   THE COURT:  Thank you, sir.  You may get

12   situated.

13                            * * *

14                     DIRECT EXAMINATION

15   BY MR. ROTH:

16   Q.        Would you state your name please?

17   A.        Kash Snyder.

18   Q.        Tell us how to spell Kash?

19   A.        K-a-s-h.

20   Q.        All right.  Your brother is George who

21   testified earlier; is that correct?

22   A.        Correct.

23   Q.        Have you been involved in the transactions

24   involving this piece of property the whole time this is

25   has been going on?

1    A.          I have.

2    Q.          We heard testimony earlier that there's been

3    no tax returns filed.  Can you tell us about that and

4    why that's the case?

5    A.          The reason is because -- well, collectively

6    seeing an accountant on the matter, he felt that we

7    should not do it because there's no profit.  There are

8    losses and it would be complicated at this point, but in

9    the following year, the next year coming up, that we

10   should.

11   Q.          You haven't filed any tax returns yet and

12   you're saying because there's been no profit yet to be

13   reported for tax purposes?

14   A.          That's correct.

15   Q.          Were you at the closing for this matter?

16   A.          I was.

17   Q.          And Ms. Biros was at the closing?

18   A.          That's correct.  We drove together.

19   Q.          You went in together?

20   A.          Correct.

21   Q.          Were all of you getting along well at that

22   time?

23   A.          Yes.  We are like long friends.

24   Q.          Was it a shock to you when they came out with

25   this document they wanted your brother to sign saying

1    that he owed her the money?

2    A.          It was news to me, or -- say it again.  I'm

3    sorry.

4    Q.          Was it a shock to you or unusual?

5    A.          Yes.  Sorry.  I was confusing the day of the

6    closing to this -- yeah, it was.

7                    MR. ROTH:  That's all the questions I

8    have, Judge.

9                    THE COURT:  Cross-examination?

10                        * * *

11                   CROSS-EXAMINATION

12   BY MR. OTTO:

13   Q.          Mr. Snyder, who is the accountant you got

14   this advice from?

15   A.          A gentleman in White Oak named Marino.  Calls

16   himself little Trump.

17   Q.          In light of the fact that federal tax laws

18   require every existing entity to file tax returns,

19   profit or no profit, doesn't this advice seem a little

20   strange to you?

21   A.          It didn't seem to me, but I'm advised to move

22   forward and do them so.

23   Q.          Did you get Mr. Marino's opinion in writing

24   that you didn't have to file or shouldn't have to file?

25   A.          No.

1   Q.        Who -- this is the document that you signed?

2   A.        That's correct.

3   Q.        Is that your handwriting?

4   A.        It's my handwriting.  Yes.

5   Q.        So you wrote this out?

6   A.        I took it -- I dictated -- I'm sorry.  I took

7   it from dictation.  It was the three of us, John,

8   Christine and I in her vehicle.  They handed me paper,

9   dictated, and I wrote it and I signed it.

10  Q.        So it's not your language?

11  A.        Correct.

12  Q.        Who dictated it?

13  A.        I can't recall.  I would think it's mostly

14  John, but it was probably -- it may have been the both

15  of them.  But I can't be sure.

16  Q.        Was George in the car at the time?

17  A.        He drove separately.

18  Q.        At the time you signed this, was he in the

19  car with you?

20  A.        No.

21  Q.        He wasn't?

22  A.        Correct.

23  Q.        Did you sit in the front seat or back seat?

24  A.        Back seat.  Back passenger side.

25  Q.        Did you go to law school?

1    A.        I did.

2    Q.        Did you graduate?

3    A.        I did.

4    Q.        Did you take the bar exam?

5    A.        No.  I did not go to get a juris doctorate.

6    I have a masters degree in corporate law.

7    Q.        Where did you get that?

8    A.        University of Pittsburgh School of Law.

9    Q.        A masters degree in law, but you don't have a

10   juris doctor?

11   A.        That's correct.

12   Q.        So you can't take the bar exam?

13   A.        That's correct.

14   Q.        But you have a legal background of sorts?

15   A.        It would be a matter of opinion, but I did

16   graduate from law school.

17   Q.        So you understand the impact of writing out a

18   document that says U Lock will repay this?

19   A.        I absolutely do.

20   Q.        You can't step back and say, well, I didn't

21   really mean what I said?

22   A.        I never tried to do that.  No.

23   Q.        Let me ask some of the same questions I asked

24   your brother.  You haven't filed tax returns.  What's

25   your position within the corporation?  Are you

1  secretary?

2  A.        No, I'm listed as an officer.

3  Q.        Okay.  Just officer or does it -- every

4  corporation is required to have a president, secretary

5  and treasurer.  Are you one of those?

6  A.        I am not.

7  Q.        Who are the secretary, treasurer and

8  president?

9  A.        I don't know that we have that established.

10  Typically when I sign on something, I sign director.

11  Q.        You have been in that existence since

12  September of 2015?

13  A.        A little earlier.

14  Q.        You contend earlier, but that means no later

15  than -- you still don't have a president, secretary or

16  treasurer?

17  A.        Admittedly it's a little unsophisticated.

18  Q.        Well, it's not just unsophisticated.  You are

19  violating Pennsylvania corporation law; right?

20  A.        I don't --

21  Q.        I mean, you have a law background?

22  A.        I do.  But I can't -- I don't know -- it's

23  been 2013 since I graduated and it's use it or lose it.

24  I don't do too much legally.

25  Q.        Would you say you're in compliance with the

1   corporation law?

2   A.          I don't know that.

3   Q.          Did you ever prepare minutes for the

4   corporation?

5   A.          I never did.

6   Q.          You did not?

7   A.          I did not.

8   Q.          How about bylaws?

9   A.          Worked on them, I believe, but I don't know

10  that anything was complete.

11  Q.          Okay.  To your knowledge, did anybody help

12  Mr. Roth with the pleadings and the documents that have

13  been filed?

14  A.          To my knowledge, no.  I know his paralegal

15  and George and my sister have been helpful.

16  Q.          What involvement did your sister have in all

17  of this?

18  A.          Just like you said helping with the

19  documents.

20  Q.          But she's not a shareholder, director,

21  officer?

22  A.          Correct.

23  Q.          Is she like a friend of the court?

24  A.          No.  She's a loved one, I guess, you know.

25  Q.          What's her background?

1  A.          Nothing.  Nothing legal if that's what you're

2  asking.  She's just a run-of-the-mill layman.

3  Q.          What involvement did she have in the company?

4  A.          None in the company.

5  Q.          But she helped write pleadings including

6  factual statements that were made?

7  A.          She may have.

8  Q.          Okay.

9                  MR. OTTO:  Your Honor, I have no more

10 questions.

11                 THE COURT:  Any redirect?

12                 MR. ROTH:  No redirect.

13                 THE COURT:  Sir, you may stand down.

14                 Any further witnesses?

15                 MR. ROTH:  No further witnesses, Your

16 Honor.

17                 THE COURT:  Do you rest?

18                 MR. ROTH:  Yes.

19                 THE COURT:  Your case is still open.  Do

20 you rest or do you have any rebuttal?

21                 MR. OTTO:  I have one rebuttal witness.

22                 THE COURT:  Sure.

23                 MR. OTTO:  Christine Biros.

24                 THE COURT:  Ma'am, you have already been

25 sworn.  You may take the witness stand.

1              THE WITNESS:  Thank you.

2                          * * *

3                  REDIRECT EXAMINATION

4    BY MR. OTTO:

5    Q.        Mr. Snyder, George Snyder, testified that he

6    had multiple discussions with you concerning the issue

7    of you becoming a shareholder.  Was that ever anything

8    you considered?

9    A.        Never.

10   Q.        Would you be a shareholder?

11   A.        No.

12   Q.        Do you consider the money that you paid as an

13   investment of any sort for you or your brother John?

14   A.        No.

15              MR. OTTO:  Thank you.  No further

16   questions.

17              MR. ROTH:  No questions.

18              THE COURT:  Thank you, ma'am, you may

19   stand down.

20              Do you rest at this time?

21              MR. OTTO:  I rest, Your Honor.  Thank

22   you.

23              THE COURT:  Mr. Roth, would you like to

24   make a closing argument?

25              MR. ROTH:  Yes, I would.

1          Even if it's correct that the corporation

2   was not in place at the time of the initial deeds, which

3   is some of what they are complaining about, it doesn't

4   fall automatically that they would somehow receive the

5   property.  If anything, they should be able to sue in

6   law to rescind their loan contract and get their money

7   back.

8          An action, the quiet title, is not the

9   appropriate remedy because there's all kinds of remedies

10  in law.  There's promissory note, counta meruit, there's

11  money had and received, and there's other common law

12  actions available to them.  The quiet title action goes

13  far beyond any of those.

14          What this really is -- if I lent you

15  $20,000 and you went out and bought a car, I can't make

16  a claim for your car.  I can make a claim for my $20,000

17  back.  That's what this case is about.  She lent the

18  money.  They used the money to buy something, and now

19  she is saying I deserve to have that because I gave them

20  the money to buy it.  She wasn't involved in the

21  process.  She did not have an ownership interest in it.

22  She didn't get anything at the closing.  She got nothing

23  at all.  So she never had an ownership interest in the

24  property.  Therefore, now, she shouldn't be able to say

25  I should have this property because I gave them money

1    that enabled them to buy it.

2              With regard to the corporation -- and I

3    don't think it really matters whether the corporation

4    was formed immediately or not because I believe you do

5    have a de facto corporation here because they filed

6    papers believing that they were incorporated, and then

7    they acted upon the corporation, and they ultimately

8    concluded the corporation and there is a corporation.

9    Therefore, I believe that if you -- whether or not this

10   corporation was formed or not, it's still a loan.  Since

11   it's a loan, they can do what they choose with the money

12   and she can now try and collect on that loan and I

13   believe that's the lawsuit she should have filed here.

14              THE COURT:  Okay.  Thank you.

15              Mr. Otto, you get the final word.

16              MR. OTTO:  Thank you.

17              Your Honor, as I said at the beginning of

18   this trial, it's really a simple situation made more

19   confusing by the actions of Defendant U Lock.  Simply

20   stated, Christine Biros paid for the property in full.

21   U Lock paid nothing, even though they advanced funds,

22   they got all of it back.  They still have paid nothing.

23   In fact, they have even refused to acknowledge in

24   writing that they have an obligation to repay.

25              At the time of the closing, U Lock didn't

1    exist.  So the Pennsylvania law provides that the deeds

2    are void ab initio.  I have a memorandum of law that I

3    will provide to you, Your Honor, to explain that

4    further.  But our claim against the estate has always

5    been for the property.  It has never been for any

6    monetary damages.

7                    Our position and the reason we proceeded

8    the way we did is very simple.  We believed that we have

9    an equitable claim for the title to the property.

10   Because legal title to the real estate was never

11   properly transferred, which under Pennsylvania law meant

12   that the estates retained legal title.  Because my

13   client paid for the property, it's my view that she had

14   legal title -- equitable title to the property.  That's

15   what we are asking for, to circle the loop and provide

16   legal title.

17                   U Lock has had four years plus to get

18   money or to agree to loan terms and refused.  Never paid

19   anything.  They claim there's no money to be made.  They

20   haven't made any effort to file their taxes, so if they

21   can't file their taxes and they are not afraid of

22   Internal Revenue Services, they are certainly not afraid

23   of us.

24                   They now -- Mr. Roth suggested that they

25   were ready to obtain financing if the lis pendens got

1    dropped.  They have maintained that all of the time.

2    But the fact of the matter is, it would not be difficult

3    to set up a situation with a lender to simply say put

4    money in escrow.  When the money is in escrow and ready

5    to be delivered subject to us releasing the lis pendens,

6    we would have done that.  We have made that offer on

7    numerous occasions to Mr. Roth.  He is aware of that.

8              Ms. Biros never had any intention or

9    desire to be an investor.  This was always an

10   advancement of funds.  Without financial tax returns and

11   so forth, they are never going to get a commercial

12   lender to deliver financing on this.  So the situation

13   right now is that money isn't available.  The only thing

14   that's available is the property.  Defendants would ask

15   us to start over and file a claim for money damages, but

16   money is not there.  So even if we had a judgment, we

17   would wind up trying to foreclose or taking a judgment

18   against the property, which is where we are right now.

19   So if for no other reason than conservation of this

20   Court's time, I think Mr. Roth's argument should be

21   dismissed.

22             What we ask for from the Court, I have a

23   proposed order of court that the Court can use.

24   Ultimately what we would like to have is have the

25   property -- if you rule in our favor, have the property

1    transferred immediately.  If the verdict is in our

2    favor, we tend to ask for an appeal bond if there is an

3    appeal made.  But it's our desire to get the property

4    transferred as soon as possible so we can get it cleaned

5    up.

6              THE COURT:  That's the proposed order?

7              MR. OTTO:  The proposed, yes.

8              THE COURT:  At this time, what I would

9    like to have is, within the next 20 days, your

10   conclusions of law and findings of fact.  If you can

11   prepare those for me in a proposed order of court --

12   now, I'm getting that from Mr. Otto right now.  He is

13   giving me a memorandum on the lis pendens.

14             MR. OTTO:  This is on the de facto

15   corporation issue.

16             THE COURT:  Understood.  If you would

17   like to do findings of fact and conclusions of law

18   within 20 days proposed order for the outcome, what I

19   will do is take those under consideration as well as

20   testimony here given on the transcript and I have the

21   rest of the file pulled.  There's four portions to it.

22             I will take all of that under

23   consideration, and we will then expediently try to get

24   to an opinion and order of court for the outcome.  You

25   have 30 days thereafter because it will be a final order

1   of court if you should so desire to file an appeal.  The

2   Court will consider whether or not I believe an appeal

3   bond is necessary.  We will address that as well in the

4   opinion and final order of court.

5               Mr. Moore and Mr. DelCotto -- the other

6   gentleman is not here now -- as we indicated earlier, I

7   would expect those deeds by May the 20th and, of course,

8   the $10,000 transfer as soon as possible.

9               Mr. Otto, as directed previously, that

10  will be paid directly to the back taxes at the county

11  tax office.

12              MR. OTTO:  Yes, sir.

13              THE COURT:  Anything further that anyone

14  wants to put on the record.

15  (NO RESPONSE.)

16              THE COURT:  Okay.  Thank you.  At this

17  time, we are adjourned.

18              MR. OTTO:  Thank you, Your Honor.

19              MR. ROTH:  Thank you.

20          (PROCEEDINGS ADJOURNED -- 1:59 P.M.)

21

22

23

24

25

1        C E R T I F I C A T E

2

3                    * * *

4

5        I hereby certify that the proceedings are

6   contained fully and accurately in the notes taken by me

7   at the hearing of the within cause and that this copy is

8   a true and correct transcript of the same.

9

10

11        _Blake Schaum_
        _____
12        Blake Schaum, Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [5] - 6:21, 8:8, 9:11, 22:21, 82:8
**$13,000** [2] - 8:4, 9:13
**$20,000** [3] - 22:9, 77:15, 77:16
**$279,213.30** [1] - 22:4
**$30,000** [16] - 22:6, 23:2, 23:11, 23:15, 38:9, 38:10, 38:16, 38:24, 39:9, 39:19, 39:24, 65:9, 65:11, 65:19
**$300,000** [3] - 44:6, 53:24, 63:25
**$309,000** [2] - 22:5, 29:14
**$309,213.30** [1] - 15:15
**$309,213.80** [1] - 23:5
**$325,000** [1] - 23:4
**$325,316** [1] - 30:13

## '

**'15** [2] - 21:5, 30:19

## 1

**1** [2] - 24:9, 24:19
**103** [1] - 20:18
**1099s** [1] - 53:16
**10:44** [1] - 3:1
**11:16** [1] - 25:7
**11:26** [1] - 25:8
**12** [1] - 61:6
**12:00** [1] - 66:22
**12:16** [1] - 67:4
**13th** [2] - 9:5, 10:21
**14** [1] - 61:5
**150** [1] - 41:6
**16th** [6] - 5:9, 18:25, 22:24, 23:17, 30:19, 30:22
**17th** [1] - 52:1
**18** [3] - 2:4, 62:2, 64:20
**1:30** [1] - 66:24
**1:35** [1] - 67:5
**1:59** [1] - 82:20

## 2

**2** [1] - 24:19
**20** [3] - 66:22, 81:9, 81:18
**2013** [1] - 73:23
**2014** [1] - 52:9
**2015** [9] - 5:10, 18:25,

21:10, 30:22, 39:4, 50:8, 52:1, 57:14, 73:12
**2017** [4] - 1:8, 3:12, 10:24, 46:25
**2018** [2] - 16:11, 47:21
**2019** [4] - 1:15, 3:1, 9:5, 52:10
**20th** [4] - 10:18, 10:21, 11:12, 82:7
**21st** [1] - 59:25
**24** [1] - 2:4
**26** [1] - 2:5
**27** [1] - 2:5
**29** [3] - 1:15, 2:7, 3:1
**29th** [1] - 13:17

## 3

**3** [1] - 24:19
**30** [2] - 31:19, 81:25
**32** [1] - 2:7

## 4

**4** [1] - 24:19
**41** [1] - 2:9
**4886** [2] - 1:8, 3:11
**4904** [1] - 64:20
**4th** [3] - 13:19, 21:5, 21:10

## 5

**5** [2] - 34:15, 34:22
**50** [1] - 2:9
**501** [1] - 21:22

## 6

**60** [1] - 31:19
**68** [1] - 2:11

## 7

**7/16/15** [1] - 30:17
**70** [1] - 2:11
**76** [1] - 2:13

## 8

**8/16/15** [1] - 30:14
**800** [1] - 52:13

## 9

**9** [1] - 62:3
**90** [1] - 31:19

## A

**A.M** [3] - 3:1, 25:7, 25:8
**ab** [2] - 15:24, 79:2
**able** [6] - 12:19, 38:4, 49:19, 57:12, 77:5, 77:24
**absolutely** [3] - 49:16, 64:12, 72:19
**accept** [2] - 6:22, 34:1
**accepted** [1] - 34:6
**access** [1] - 6:3
**accomplish** [1] - 48:6
**accordance** [1] - 11:13
**accountant** [2] - 69:6, 70:13
**accurate** [2] - 59:16, 64:3
**accurately** [1] - 83:6
**acknowledge** [1] - 78:23
**act** [2] - 51:11, 51:12
**acted** [3] - 50:7, 78:7
**acting** [2] - 51:10, 58:9
**action** [3] - 6:19, 77:8, 77:12
**actions** [4] - 15:3, 51:8, 77:12, 78:19
**actual** [5] - 11:6, 16:21, 27:4, 27:12, 28:2
**add** [1] - 5:17
**addition** [1] - 12:16
**additional** [2] - 5:14, 8:6
**address** [1] - 82:3
**adjourned** [1] - 82:17
**ADJOURNED** [1] - 82:20
**administrative** [1] - 67:8
**Administrator** [7] - 1:10, 1:25, 3:9, 3:23, 4:23, 9:1, 18:22
**administrator** [1] - 4:3
**Administrators** [1] - 3:21
**admitted** [3] - 35:10, 62:10, 68:1
**admittedly** [1] - 73:17
**advance** [2] - 31:4, 63:3
**advanced** [5] - 23:15, 38:25, 39:19, 65:10, 78:21
**advancement** [1] - 80:10

**advancing** [1] - 63:2
**advice** [2] - 70:14, 70:19
**advised** [1] - 70:21
**afraid** [2] - 79:21, 79:22
**ago** [1] - 13:24
**agree** [8] - 21:11, 32:9, 39:20, 49:6, 64:3, 65:14, 65:15, 79:18
**agreed** [10] - 15:4, 30:14, 44:2, 44:10, 45:8, 45:25, 46:2, 58:20, 61:17, 61:20
**agreement** [33] - 13:1, 15:5, 24:6, 25:18, 25:22, 26:2, 30:9, 30:15, 30:21, 32:18, 32:19, 41:23, 42:6, 43:23, 43:24, 44:3, 45:3, 45:10, 45:19, 46:7, 46:10, 47:6, 55:3, 55:13, 55:14, 55:17, 55:18, 55:20, 58:13, 60:18, 67:15
**agreements** [4] - 24:3, 42:9, 56:2, 56:6
**ahead** [4] - 7:13, 33:3, 35:13, 67:10
**Alex** [4] - 3:6, 3:20, 4:20, 8:23
**ALEX** [1] - 1:7
**alleged** [1] - 61:18
**Allen** [1] - 1:21, 3:17
**allow** [1] - 10:22
**almost** [3] - 46:12, 46:23, 65:16
**amended** [1] - 59:23
**amount** [8] - 9:11, 15:15, 16:9, 23:3, 46:19, 61:25, 62:4, 63:7
**Andy** [2] - 44:9, 44:11
**Ann** [4] - 3:10, 3:24, 4:23, 9:2
**ANN** [1] - 1:11
**answer** [13] - 12:11, 12:19, 13:11, 13:15, 14:11, 19:12, 38:13, 53:13, 59:23, 64:11, 66:2, 66:11
**answered** [1] - 64:6
**answers** [2] - 59:5, 62:10
**anticipation** [1] - 10:10
**apologize** [1] - 34:17
**appeal** [4] - 81:2, 81:3, 82:1, 82:2

**appearance** [1] - 3:13
**appeared** [4] - 22:13, 22:14, 23:8, 38:23
**applied** [3] - 56:19, 57:3, 57:8
**apply** [1] - 10:14
**appraisal** [3] - 63:11, 63:12, 63:23
**appraised** [3] - 63:14, 63:16, 63:18
**appreciate** [2] - 37:13, 66:1
**approach** [1] - 48:17
**approached** [1] - 44:6
**appropriate** [3] - 12:5, 66:23, 77:9
**approved** [1] - 57:20
**April** [4] - 1:15, 3:1, 13:19, 54:23
**argued** [2] - 11:23, 11:25
**argument** [4] - 13:14, 13:16, 76:24, 80:20
**arisen** [1] - 14:8
**arrangements** [1] - 49:11
**articles** [3] - 21:8, 21:9, 57:24
**assets** [2] - 6:16, 65:16
**assigned** [1] - 56:9
**assignment** [1] - 67:18
**associated** [2] - 39:1, 40:2
**Association** [1] - 22:12
**assume** [4] - 36:14, 36:15, 54:25, 55:1
**assumed** [2] - 36:14
**assuming** [1] - 54:23
**assumption** [1] - 58:8
**attached** [2] - 13:1, 14:11
**attempt** [4] - 30:24, 42:2, 42:14, 49:14
**attempted** [2] - 16:20, 21:7
**attempting** [2] - 41:18, 49:10
**attention** [1] - 4:25
**attorney** [11] - 3:16, 4:8, 8:18, 20:4, 33:6, 50:11, 50:20, 57:17, 61:2, 65:20, 65:23
**attorneys** [2] - 14:14, 60:10
**August** [1] - 30:22
**authorities** [1] - 64:21
**automatically** [1] -

77:4
**available** [4] - 5:12, 77:12, 80:13, 80:14
**aware** [6] - 39:7, 52:8, 52:19, 54:17, 58:24, 80:7

# B

**background** [3] - 72:14, 73:21, 74:25
**balance** [1] - 9:13
**bank** [5] - 15:15, 51:19, 51:21, 62:25, 63:20
**Bank** [3] - 30:12, 51:19, 63:20
**bar** [4] - 46:13, 62:18, 72:4, 72:12
**Bar** [1] - 22:12
**based** [7] - 4:24, 16:2, 23:6, 26:24, 27:23, 50:7, 62:24
**basis** [1] - 9:16
**became** [4] - 16:19, 22:22, 22:24, 60:13
**become** [5] - 16:20, 16:22, 17:6, 49:17, 58:14
**becoming** [2] - 17:12, 76:7
**BEFORE** [1] - 1:16
**begin** [4] - 4:15, 12:18
**beginning** [4] - 16:21, 41:12, 51:25, 78:17
**behalf** [10] - 1:19, 1:20, 1:22, 1:23, 3:17, 3:19, 3:25, 39:8, 59:24, 60:2
**behaving** [1] - 47:1
**belabor** [1] - 11:3
**belief** [2] - 42:22, 64:19
**below** [1] - 22:3
**best** [4] - 53:5, 53:8, 64:10, 64:18
**bet** [1] - 67:24
**better** [2] - 37:10, 67:14
**between** [4] - 30:9, 30:24, 44:3, 55:3
**beyond** [1] - 77:13
**Biros** [34] - 3:5, 5:3, 5:4, 5:6, 5:10, 9:21, 15:8, 16:8, 17:2, 17:15, 23:18, 26:3, 28:24, 29:13, 30:11, 33:17, 34:2, 35:4, 43:16, 43:17, 43:22, 49:8, 58:14, 58:19,

60:1, 63:19, 63:20, 66:8, 69:17, 75:23, 78:20, 80:8
**BIROS** [4] - 1:4, 2:6, 2:12, 29:3
**Biros's** [3] - 16:1, 16:13, 61:18
**bit** [1] - 10:16
**Blake** [1] - 83:11
**blank** [7] - 6:7, 9:7, 9:22, 9:24, 11:11, 57:25, 58:1
**board** [1] - 44:12
**bombarded** [1] - 64:7
**bond** [2] - 81:2, 82:3
**borrowed** [1] - 66:7
**Borrower** [1] - 30:10
**bother** [1] - 7:1
**bothered** [1] - 22:18
**bought** [1] - 77:15
**boxes** [3] - 54:8, 59:15
**break** [2] - 66:23, 67:11
**brief** [1] - 20:19
**briefs** [1] - 59:6
**brother** [16] - 15:9, 29:15, 44:9, 44:18, 45:6, 45:8, 45:16, 52:24, 55:4, 56:9, 56:24, 59:13, 68:20, 69:25, 72:24, 76:13
**brought** [1] - 54:8
**bunch** [2] - 44:2, 56:12
**business** [5] - 42:2, 43:13, 58:1, 63:8
**businesses** [1] - 20:19
**buy** [4] - 46:19, 77:18, 77:20, 78:1
**buyer** [1] - 25:23
**BY** [25] - 18:18, 19:6, 20:12, 20:24, 21:16, 24:2, 24:22, 25:13, 26:17, 27:3, 29:12, 29:25, 32:8, 33:4, 34:23, 35:15, 41:2, 49:5, 50:4, 53:15, 54:14, 66:13, 68:15, 70:12, 76:4
**bylaws** [2] - 54:2, 74:8

# C

**c.t.a** [2] - 4:3, 18:22
**c.t.n** [1] - 3:22
**caption** [1] - 9:3
**car** [5] - 45:17, 71:16, 71:19, 77:15, 77:16
**case** [30] - 3:4, 4:19,

4:25, 6:6, 7:1, 8:2, 9:3, 10:2, 10:24, 11:8, 11:10, 12:7, 12:14, 12:17, 13:13, 15:2, 18:21, 23:14, 27:13, 28:3, 30:25, 40:7, 40:8, 40:12, 45:11, 58:11, 59:4, 69:4, 75:19, 77:17
**Case** [1] - 3:11
**case-in-chief** [1] - 40:12
**cash** [1] - 32:23
**cell** [1] - 13:5
**certain** [2] - 45:13, 59:20
**certainly** [4] - 14:9, 54:22, 62:3, 79:22
**certificate** [2] - 12:16, 12:19
**certificates** [3] - 52:14, 52:18, 53:6
**certifications** [1] - 56:11
**certify** [1] - 83:5
**change** [1] - 60:24
**changed** [2] - 60:15, 60:16
**charged** [1] - 62:2
**check** [5] - 9:11, 19:13, 19:16, 23:13, 65:21
**checks** [12] - 15:15, 19:2, 19:7, 19:12, 19:15, 19:17, 19:18, 19:20, 23:19, 36:3, 45:15, 64:10
**chief** [1] - 40:12
**choose** [1] - 78:11
**CHRISTINE** [4] - 1:4, 2:6, 2:12, 29:3
**Christine** [25] - 3:5, 5:3, 5:4, 5:6, 5:10, 9:21, 15:8, 28:24, 30:11, 34:2, 35:4, 44:21, 45:15, 45:20, 46:15, 47:5, 49:7, 58:14, 60:18, 62:17, 63:19, 66:7, 71:8, 75:23, 78:20
**circle** [1] - 79:15
**cited** [1] - 14:10
**Citizen's** [1] - 51:19
**CIVIL** [1] - 1:2
**claim** [14] - 5:1, 5:18, 8:16, 16:1, 16:9, 16:13, 17:17, 17:18, 77:16, 79:4, 79:9, 79:19, 80:15
**claims** [3] - 51:11,

55:2, 59:2
**clarification** [1] - 9:19
**clarified** [1] - 65:25
**clarify** [2] - 19:11, 62:5
**cleaned** [1] - 81:4
**clearly** [1] - 27:25
**client** [9] - 5:25, 6:2, 6:5, 6:13, 7:6, 15:8, 34:3, 38:1, 79:13
**closed** [2] - 14:2, 19:14
**closing** [51] - 5:9, 15:8, 15:11, 15:13, 15:16, 15:18, 16:21, 17:7, 19:11, 19:18, 21:20, 22:11, 22:13, 23:8, 23:9, 27:4, 27:7, 27:12, 28:3, 30:4, 30:19, 35:19, 35:21, 35:25, 36:7, 40:6, 41:22, 42:17, 44:15, 44:16, 44:20, 45:13, 45:14, 45:23, 47:3, 48:2, 48:5, 52:2, 55:10, 56:12, 56:16, 57:4, 58:8, 60:8, 69:15, 69:17, 70:6, 76:24, 77:22, 78:25
**Co** [7] - 1:8, 1:25, 3:7, 3:21, 4:21, 8:24, 18:22
**co** [1] - 4:3
**Co-Administrator** [2] - 1:25, 18:22
**co-administrator** [1] - 4:3
**Co-Administrators** [1] - 3:21
**Co-Executors** [4] - 1:8, 3:7, 4:21, 8:24
**collateralized** [1] - 30:12
**collect** [1] - 78:12
**collectively** [1] - 69:5
**column** [1] - 21:22
**coming** [4] - 24:16, 61:25, 63:8, 69:9
**comment** [1] - 13:16
**commercial** [1] - 80:11
**COMMON** [1] - 1:1
**common** [1] - 77:11
**Commonwealth** [1] - 21:2
**communicate** [1] - 10:11
**company** [3] - 15:7, 75:3, 75:4
**compelling** [1] - 5:5

**complaining** [1] - 77:3
**complaint** [5] - 4:24, 16:1, 16:5, 59:23, 61:18
**complete** [2] - 12:14, 74:10
**completed** [3] - 14:4, 17:12, 58:10
**compliance** [1] - 73:25
**complicated** [1] - 69:8
**computer** [1] - 58:10
**concerning** [1] - 76:6
**concluded** [1] - 78:8
**conclusion** [1] - 9:9
**conclusions** [2] - 81:10, 81:17
**concur** [1] - 8:13
**condition** [1] - 30:13
**confirm** [3] - 38:11, 39:11, 39:13
**conform** [1] - 51:9
**confused** [1] - 50:22
**confusing** [3] - 15:3, 70:5, 78:19
**confusion** [1] - 65:22
**conservation** [1] - 80:19
**consider** [3] - 62:23, 76:12, 82:2
**consideration** [4] - 8:8, 23:17, 81:19, 81:23
**considered** [1] - 76:8
**consistency** [1] - 14:16
**consulted** [1] - 7:21
**contact** [1] - 38:2
**contacted** [1] - 38:1
**contained** [2] - 64:18, 83:6
**contend** [1] - 73:14
**contention** [1] - 50:7
**continue** [2] - 12:3, 43:5
**continued** [2] - 12:15, 12:21, 46:10
**contract** [1] - 77:6
**contrary** [1] - 59:25
**contribution** [2] - 6:10, 6:13
**convey** [3] - 5:5, 16:6, 26:19
**conveyance** [1] - 15:22
**copies** [6] - 24:25, 25:1, 25:3, 54:2, 67:14, 67:25
**copy** [5] - 37:10, 51:24, 55:4, 57:5,

83:7
**corporate** [2] - 54:2, 72:6
**Corporation** [3] - 1:12, 3:11, 30:10
**corporation** [38] - 7:20, 15:23, 16:20, 16:23, 16:24, 16:25, 17:6, 17:13, 17:14, 19:25, 21:1, 40:3, 43:5, 49:18, 50:6, 50:8, 50:11, 50:13, 51:10, 51:12, 52:10, 55:11, 57:24, 72:25, 73:4, 73:19, 74:1, 74:4, 77:1, 78:2, 78:3, 78:5, 78:7, 78:8, 78:10, 81:15
**correct** [49] - 19:16, 20:5, 20:6, 26:10, 27:13, 27:14, 27:18, 28:3, 30:19, 32:10, 32:22, 32:23, 33:8, 35:1, 35:5, 35:17, 35:19, 36:20, 42:19, 45:9, 46:3, 46:4, 47:12, 47:13, 47:15, 47:25, 48:2, 48:7, 50:9, 51:7, 52:2, 52:12, 53:6, 53:25, 60:23, 64:18, 68:21, 68:22, 69:14, 69:18, 69:20, 71:2, 71:11, 71:22, 72:11, 72:13, 74:22, 77:1, 83:8
**corrected** [2] - 65:20, 65:24
**corrective** [1] - 16:10
**Cortez** [1] - 21:2
**counsel** [12] - 3:13, 4:5, 7:25, 8:9, 9:11, 10:6, 14:21, 37:8, 50:14, 55:20, 66:21
**counta** [1] - 77:10
**counterproposal** [2] - 6:17, 31:23
**county** [1] - 82:10
**COUNTY** [1] - 1:1
**County** [1] - 22:12
**couple** [2] - 44:23, 67:12
**course** [1] - 82:7
**court** [11] - 5:11, 10:1, 10:14, 11:14, 38:23, 74:23, 80:23, 81:11, 81:24, 82:1, 82:4
**COURT** [127] - 1:1, 3:4, 4:5, 4:8, 4:12, 4:16, 5:19, 5:22, 6:9, 6:17, 6:23, 7:3, 7:8,

7:13, 7:16, 8:11, 8:18, 8:21, 9:23, 10:6, 10:17, 10:20, 11:7, 11:19, 11:24, 12:4, 12:8, 12:22, 13:4, 14:1, 14:13, 14:16, 14:25, 16:15, 16:18, 17:5, 17:11, 18:1, 18:4, 18:6, 18:13, 19:5, 20:11, 20:23, 23:23, 24:10, 24:15, 24:18, 25:2, 25:9, 26:14, 26:24, 27:23, 28:1, 28:9, 28:11, 28:13, 28:18, 28:20, 29:1, 29:7, 29:24, 32:4, 32:25, 33:19, 33:22, 33:25, 34:5, 34:9, 34:12, 34:18, 34:20, 35:12, 36:23, 37:1, 37:4, 37:7, 37:12, 37:17, 37:24, 38:6, 38:15, 38:19, 38:22, 39:12, 39:17, 39:21, 40:2, 40:8, 40:11, 40:15, 40:22, 48:10, 48:12, 48:16, 48:20, 48:24, 49:1, 49:24, 53:10, 53:12, 54:12, 66:10, 66:18, 66:20, 67:3, 67:6, 67:9, 67:19, 67:23, 68:4, 68:11, 70:9, 75:11, 75:13, 75:17, 75:19, 75:22, 75:24, 76:18, 76:23, 78:14, 81:6, 81:8, 81:16, 82:13, 82:16
**Court** [19] - 5:3, 6:7, 7:3, 8:2, 8:7, 9:5, 9:9, 11:4, 11:12, 11:14, 14:16, 16:24, 34:6, 38:22, 39:2, 80:22, 80:23, 82:2, 83:11
**Court's** [1] - 80:20
**courtroom** [2] - 31:13, 32:22
**creation** [2] - 21:1, 21:5
**crinkled** [1] - 57:22
**critical** [1] - 13:22
**Cross** [4] - 2:4, 2:7, 2:9, 2:11
**cross** [7] - 5:18, 8:16, 23:23, 32:5, 35:12, 49:24, 70:9
**CROSS** [4] - 24:1, 32:7, 50:3, 70:11
**Cross-Examination**

[4] - 2:4, 2:7, 2:9, 2:11
**cross-examination** [5] - 23:23, 32:5, 35:12, 49:24, 70:9
**CROSS-EXAMINATION** [4] - 24:1, 32:7, 50:3, 70:11
**Cynthia** [4] - 3:9, 3:23, 4:23, 9:1
**CYNTHIA** [1] - 1:10

## D

**d.b.a** [1] - 3:22
**d.b.n** [2] - 4:3, 18:22
**daily** [1] - 46:12
**damages** [2] - 79:6, 80:15
**date** [15] - 5:9, 6:2, 15:8, 15:16, 22:23, 23:9, 30:15, 32:18, 51:22, 52:2, 52:3, 55:10, 56:17, 57:19, 58:7
**dated** [1] - 9:20
**dates** [3] - 6:7, 26:19, 48:15
**days** [9] - 10:13, 11:2, 15:12, 31:19, 81:9, 81:18, 81:25
**de** [11] - 16:23, 16:25, 17:14, 19:25, 50:6, 50:11, 50:12, 52:9, 55:11, 78:5, 81:14
**deal** [3] - 22:17, 22:21, 44:18
**December** [1] - 14:5
**decision** [1] - 11:5
**deed** [4] - 5:6, 5:8, 49:13
**deeds** [27] - 5:12, 6:2, 6:7, 8:1, 8:2, 8:7, 9:4, 9:6, 9:19, 10:9, 11:14, 11:16, 15:24, 16:10, 16:12, 18:25, 47:14, 47:21, 47:22, 47:24, 48:1, 48:2, 48:4, 77:2, 79:1, 82:7
**Defendant** [7] - 1:20, 3:18, 5:5, 6:15, 15:3, 35:10, 78:19
**defendant** [5] - 5:2, 8:6, 16:19
**Defendant's** [10] - 24:9, 24:24, 25:15, 28:16, 28:21, 33:12, 34:13, 47:18, 49:2,

67:23
**defendants** [5] - 5:15, 6:24, 10:1, 12:10, 80:14
**Defendants** [2] - 1:13, 3:11
**define** [1] - 61:25
**degree** [2] - 72:6, 72:9
**delayed** [1] - 10:23
**delays** [3] - 15:7, 31:20, 31:21
**DELCOTTO** [5] - 3:19, 10:8, 11:1, 12:24, 13:9
**delCotto** [2] - 22:17, 22:19, 23:13, 82:5
**DelCotto** [1] - 1:22, 3:19, 19:11, 22:13
**deliver** [3] - 6:7, 9:10, 80:12
**delivered** [2] - 9:4, 80:5
**demand** [1] - 46:24
**demanded** [1] - 22:21
**demonstrate** [1] - 60:17
**demonstratively** [1] - 64:25
**denial** [1] - 14:19
**denied** [2] - 12:1, 14:20
**Denise** [3] - 3:5, 3:20, 8:22
**DENISE** [1] - 1:7
**dennis** [1] - 3:19
**Dennis** [1] - 1:22
**denying** [1] - 14:17
**deposit** [3] - 21:25, 22:9, 22:22
**depositions** [1] - 14:7
**deserve** [1] - 77:19
**desire** [3] - 80:9, 81:3, 82:1
**despite** [1] - 15:10
**details** [1] - 45:22
**determination** [1] - 9:8
**determine** [1] - 43:1
**determined** [1] - 43:4
**dictated** [3] - 71:6, 71:9, 71:12
**dictation** [1] - 71:7
**different** [4] - 42:10, 47:22, 62:13, 64:10
**difficult** [2] - 49:13, 80:2
**diligently** [1] - 54:18
**dime** [1] - 32:14
**DIRECT** [4] - 18:17, 29:11, 41:1, 68:14

**Direct** [4] - 2:4, 2:7, 2:9, 2:11
**direct** [2] - 40:5, 61:5
**directed** [1] - 82:9
**directly** [2] - 16:3, 82:10
**Director** [1] - 30:16
**director** [6] - 15:18, 37:21, 52:17, 56:9, 73:10, 74:20
**disagree** [4] - 21:6, 54:24, 58:19
**discovery** [13] - 13:23, 14:2, 14:5, 51:15, 51:24, 52:1, 54:1, 55:6, 57:6, 59:7, 64:7, 64:8
**discussed** [4] - 6:20, 43:22, 60:14, 67:21
**DISCUSSION** [1] - 7:15
**discussions** [2] - 43:12, 76:6
**dishonesty** [2] - 60:6, 60:15
**dismissed** [2] - 5:14, 80:21
**dissatisfied** [1] - 32:21
**DIVISION** [1] - 1:2
**docketing** [2] - 20:20, 57:25
**doctor** [1] - 72:10
**doctorate** [1] - 72:5
**document** [8] - 14:10, 20:13, 25:14, 25:16, 30:1, 69:25, 71:1, 72:18
**documentation** [4] - 15:10, 15:17, 51:6, 60:21
**documents** [10] - 20:7, 21:7, 35:24, 36:4, 47:17, 54:20, 56:10, 67:12, 74:12, 74:19
**dollars** [3] - 18:25, 22:2, 31:5
**don't..** [1] - 55:1
**done** [7] - 8:14, 13:23, 42:15, 42:25, 63:12, 66:5, 80:6
**down** [9] - 22:3, 23:4, 28:13, 37:8, 39:9, 53:11, 66:20, 75:13, 76:19
**dropped** [1] - 80:1
**drove** [4] - 45:15, 45:16, 69:18, 71:17
**due** [2] - 11:9, 66:10

**duly** [4] - 18:10, 29:4, 40:19, 68:8
**duration** [1] - 10:7
**during** [3] - 7:23, 10:1, 67:11

# E

**e-mail** [3] - 10:11, 10:12, 11:5
**ear** [1] - 7:6
**effect** [5] - 55:13, 55:14, 55:16, 58:15, 63:13
**effective** [2] - 21:9, 57:14
**effort** [4] - 11:1, 16:7, 33:17, 79:20
**either** [3] - 14:13, 38:25, 55:8
**elaborate** [1] - 12:4
**enabled** [1] - 78:1
**end** [1] - 65:11
**endorse** [1] - 12:25
**engagements** [1] - 60:10
**ensure** [1] - 4:19
**enter** [1] - 3:13
**entered** [2] - 5:4, 15:5
**entire** [4] - 16:2, 35:8, 35:16, 38:24
**entirety** [1] - 39:25
**entitled** [3] - 17:19, 17:20, 25:15
**entity** [1] - 70:18
**equal** [1] - 65:16
**equitable** [3] - 16:14, 79:9, 79:14
**Eric** [17] - 22:11, 23:2, 26:8, 26:19, 27:7, 27:8, 37:16, 38:7, 38:16, 38:23, 39:22, 41:15, 42:16, 55:23, 56:8, 65:21
**eric** [4] - 24:7, 25:24, 37:18, 41:25
**escrow** [1] - 80:4
**especially** [2] - 13:12, 62:1
**Esquire** [5] - 1:19, 1:21, 1:22, 1:24, 1:25
**essence** [1] - 20:16
**essentially** [1] - 14:2
**Est** [1] - 1:25
**establish** [1] - 6:8
**established** [2] - 65:9, 73:9
**estate** [8] - 5:2, 15:4, 15:25, 16:4, 16:9,

29:14, 79:4, 79:10
**Estate** [18] - 3:6, 3:7, 3:8, 3:10, 3:22, 3:23, 3:24, 4:1, 4:3, 4:19, 4:21, 4:22, 4:23, 8:23, 8:24, 8:25, 9:2, 18:23
**ESTATE** [4] - 1:7, 1:8, 1:10, 1:11
**estates** [16] - 4:18, 5:7, 6:1, 6:6, 6:11, 7:4, 8:6, 8:12, 9:20, 10:7, 15:4, 16:4, 16:6, 19:22, 55:18, 79:12
**event** [1] - 10:13
**events** [3] - 16:22, 23:6, 42:13
**evidence** [16] - 24:12, 24:16, 24:20, 28:16, 28:21, 33:21, 34:8, 34:12, 34:13, 34:15, 34:21, 37:12, 48:9, 49:3, 67:24, 68:1
**ex** [1] - 57:2
**ex-girlfriend** [1] - 57:2
**exactly** [7] - 12:8, 50:17, 55:9, 59:19, 61:9, 62:22, 65:23
**exam** [1] - 72:4, 72:12
**EXAMINATION** [11] - 18:17, 24:1, 26:16, 27:2, 29:11, 32:7, 41:1, 50:3, 68:14, 70:11, 76:3
**examination** [5] - 23:23, 32:5, 35:12, 49:24, 70:9
**Examination** [11] - 2:4, 2:4, 2:5, 2:5, 2:7, 2:7, 2:9, 2:9, 2:11, 2:11, 2:13
**examined** [4] - 18:10, 29:4, 40:19, 68:8
**excavators** [1] - 65:17
**excess** [1] - 21:25
**exchange** [2] - 14:2, 18:24
**exchanged** [1] - 35:25
**excuse** [1] - 7:5
**execute** [1] - 14:19
**executed** [2] - 9:7, 26:19
**Executer** [1] - 1:9
**execution** [1] - 11:11
**Executor** [3] - 3:8, 4:22, 8:25
**executor** [1] - 5:8
**Executors** [4] - 1:8, 3:7, 4:21, 8:24

**Executrix** [5] - 1:7, 3:6, 3:20, 4:19, 8:23
**Exhibit** [15] - 19:4, 20:9, 20:21, 21:15, 24:24, 25:15, 28:16, 28:22, 29:23, 33:12, 34:13, 34:15, 34:21, 49:2, 67:23
**exhibit** [2] - 37:11, 48:11
**exhibits** [1] - 24:16
**Exhibits** [2] - 24:19, 47:19
**exist** [5] - 54:6, 54:7, 54:16, 54:24, 79:1
**existence** [1] - 73:11
**existing** [1] - 70:18
**expect** [1] - 82:7
**expecting** [1] - 32:11
**expediently** [1] - 81:23
**explain** [1] - 79:3
**explained** [1] - 65:23
**extensions** [2] - 42:11, 56:7

# F

**face** [1] - 60:4
**fact** [14] - 17:13, 22:4, 32:13, 38:24, 51:12, 61:21, 62:1, 62:12, 65:9, 70:17, 78:23, 80:2, 81:10, 81:17
**facto** [1] - 16:23, 16:25, 17:14, 19:25, 50:6, 50:11, 50:12, 52:10, 55:11, 78:5, 81:14
**facts** [1] - 64:18
**factual** [2] - 61:4, 75:6
**fair** [1] - 44:13
**fall** [1] - 77:4
**fallen** [1] - 22:17
**false** [1] - 64:25
**falsifications** [1] - 64:21
**familiar** [4] - 24:3, 25:15, 36:6, 41:15
**family** [2] - 44:8, 44:19
**far** [1] - 77:13
**fashion** [2] - 6:11, 9:6
**favor** [4] - 5:4, 45:20, 80:25, 81:2
**February** [3] - 14:5, 14:6, 54:22
**federal** [1] - 70:17
**felt** [2] - 62:21, 69:6
**few** [3] - 42:10, 55:15, 59:1

**fiduciary** [1] - 5:8
**figure** [1] - 55:9
**file** [12] - 13:11, 13:20, 21:8, 56:16, 70:18, 70:24, 79:20, 79:21, 80:15, 81:21, 82:1
**filed** [32] - 5:18, 5:21, 5:22, 13:2, 13:15, 13:18, 14:12, 16:1, 16:5, 16:11, 17:8, 21:5, 21:7, 21:9, 30:25, 32:15, 47:21, 50:19, 52:4, 52:11, 57:15, 58:7, 59:24, 61:3, 61:10, 69:3, 69:11, 72:24, 74:13, 78:5, 78:13
**filing** [4] - 20:18, 21:5, 57:12, 57:23
**filings** [6] - 4:25, 20:14, 50:25, 57:12, 59:4, 61:5
**filled** [1] - 11:15
**final** [3] - 78:15, 81:25, 82:4
**finally** [3] - 15:12, 15:20, 21:9
**financial** [5] - 51:14, 51:18, 63:4, 63:5, 80:10
**financing** [2] - 79:25, 80:12
**findings** [2] - 81:10, 81:17
**fine** [8] - 4:16, 7:2, 8:10, 15:1, 33:22, 33:25, 44:11, 57:24
**finish** [1] - 9:23
**first** [19] - 4:9, 11:20, 12:6, 14:22, 18:10, 23:8, 29:4, 40:19, 41:20, 42:15, 46:24, 46:25, 54:20, 59:3, 61:17, 61:23, 62:10, 62:15, 68:8
**fist** [1] - 57:12
**five** [5] - 25:3, 25:4, 25:5, 31:5, 52:10
**flies** [1] - 60:3
**followed** [1] - 16:22
**following** [2] - 13:18, 69:9
**follows** [4] - 18:11, 29:5, 40:20, 68:9
**foot** [1] - 64:11
**foreclose** [1] - 80:17
**foresee** [1] - 10:12
**forget** [2] - 37:11, 63:19
**fork** [1] - 65:16

**form** [1] - 6:11
**Form** [1] - 53:16
**formed** [5] - 15:7, 15:23, 56:15, 78:4, 78:10
**forth** [2] - 46:23, 80:11
**forward** [3] - 64:11, 67:1, 70:22
**four** [14] - 4:18, 5:2, 5:7, 8:6, 9:19, 15:4, 24:12, 33:10, 47:22, 48:12, 48:15, 54:8, 79:17, 81:21
**four-party-defendant** [1] - 5:2
**free** [1] - 13:11
**Friday** [9] - 11:23, 12:1, 13:15, 14:10, 14:17, 14:20, 37:22, 38:5, 54:18
**friend** [1] - 74:23
**friends** [1] - 69:23
**front** [1] - 71:23
**fulfil** [1] - 16:7
**full** [5] - 10:22, 12:25, 23:3, 23:17, 78:20
**fully** [2] - 19:22, 83:6
**fundamentally** [1] - 6:5
**funds** [16] - 9:14, 19:10, 27:11, 27:19, 28:2, 28:7, 35:21, 38:16, 59:25, 60:2, 61:21, 66:8, 78:21, 80:10

# G

**game** [1] - 60:16
**gather** [1] - 54:19
**generally** [2] - 64:4, 65:5
**gentleman** [2] - 70:15, 82:6
**GEORGE** [2] - 2:8, 40:18
**George** [8] - 31:11, 34:25, 41:4, 41:5, 68:20, 71:16, 74:15, 76:5
**girlfriend** [1] - 57:2
**given** [3] - 15:11, 33:16, 81:20
**graduate** [2] - 72:2, 72:16
**graduated** [1] - 73:23
**grant** [2] - 7:4, 8:22
**granted** [2] - 9:2, 11:9
**grantee** [2] - 9:22, 9:24

**grantees** [1] - 11:16
**grantor** [1] - 11:15
**guarantee** [1] - 30:5
**guarantor** [1] - 30:12
**guess** [1] - 31:11, 60:13, 61:11, 62:16, 62:21, 65:15, 74:24
**guys** [1] - 64:7

## H

**half** [2] - 10:25, 15:19
**hand** [7] - 18:7, 23:2, 23:10, 38:24, 39:24, 48:20, 68:4
**handed** [2] - 25:14, 71:8
**handwriting** [1] - 71:3, 71:4
**hanging** [1] - 64:17
**happy** [2] - 57:10, 58:22
**hard** [1] - 21:22
**HARRY** [1] - 1:16
**head** [1] - 34:4
**hear** [3] - 17:10, 27:24, 33:1
**heard** [1] - 69:2
**HEARD** [1] - 1:15
**hearing** [1] - 83:7
**help** [1] - 74:11
**helped** [1] - 75:5
**helpful** [1] - 74:15
**helping** [1] - 74:18
**HENRY** [3] - 1:8, 2:3, 18:9
**Henry** [7] - 1:25, 3:6, 3:20, 4:2, 4:20, 8:23, 18:5
**hereby** [2] - 9:2, 83:5
**herein** [1] - 64:18
**higher** [1] - 16:13
**himself** [2] - 15:6, 70:16
**hm** [1] - 55:8
**hold** [3] - 22:20, 25:2, 67:9
**honestly** [1] - 64:10
**Honor** [75] - 3:15, 3:22, 4:2, 4:7, 4:10, 4:18, 5:24, 7:1, 7:5, 7:18, 7:23, 8:13, 8:20, 9:17, 9:25, 10:5, 10:9, 11:2, 11:3, 11:21, 12:25, 13:10, 13:14, 14:15, 14:24, 16:11, 18:3, 18:15, 19:3, 20:8, 20:10, 20:21, 21:14, 23:22, 24:14, 24:21,
26:12, 27:22, 28:17, 28:25, 29:9, 29:22, 32:3, 33:15, 34:8, 34:11, 34:16, 35:9, 36:22, 36:25, 37:3, 37:16, 37:19, 37:20, 38:1, 38:8, 38:17, 38:21, 39:5, 48:9, 48:19, 48:23, 48:25, 49:23, 50:1, 54:13, 66:16, 67:7, 67:22, 75:9, 75:16, 76:21, 78:17, 79:3, 82:18
**HONORABLE** [1] - 1:16
**Honorable** [1] - 5:3
**hour** [1] - 22:14
**housekeeping** [1] - 24:11
**human** [1] - 64:13
**Huntington** [1] - 41:6

## I

**idea** [1] - 26:3
**identify** [4] - 24:24, 33:12, 47:19, 48:14
**immediate** [1] - 9:16
**immediately** [4] - 15:14, 35:3, 78:4, 81:1
**impact** [1] - 72:17
**implead** [3] - 5:11, 8:2, 8:7
**impleaded** [1] - 9:4
**IN** [1] - 1:1
**INC** [1] - 1:11
**Inc** [6] - 1:20, 55:19, 55:25, 56:4, 56:13, 60:3
**included** [1] - 51:15
**including** [1] - 75:5
**incorporate** [5] - 41:18, 41:21, 42:2, 42:12, 42:14
**incorporated** [4] - 20:1, 39:3, 42:22, 78:6
**Incorporated** [9] - 3:10, 25:25, 26:8, 26:21, 30:10, 30:16, 34:25, 35:5, 39:2
**incorporating** [1] - 39:1
**incorporation** [2] - 21:8, 21:9
**incorporator** [6] - 15:6, 22:10, 23:2, 26:9, 41:25, 55:25
**Incorporator** [3] -
24:7, 25:24, 55:24
**incorporators** [1] - 42:19
**increased** [2] - 27:16, 28:4
**indeed** [1] - 62:11
**indicate** [2] - 21:7, 44:18
**indicated** [3] - 7:19, 8:10, 82:6
**indicates** [1] - 22:3
**Individual** [1] - 1:4
**individual** [4] - 15:6, 39:1, 55:24, 56:1
**individually** [1] - 49:2
**ineffectual** [1] - 16:13
**information** [7] - 59:8, 59:10, 59:12, 59:14, 59:20, 61:1, 64:19
**informed** [2] - 15:13, 37:22
**initial** [1] - 77:2
**initio** [2] - 15:24, 79:2
**inquiry** [1] - 38:20
**instance** [1] - 10:2
**instead** [1] - 10:21
**instructed** [1] - 22:16
**insurance** [2] - 53:19, 53:23
**intended** [1] - 60:4
**intention** [1] - 60:8
**interest** [8] - 9:6, 11:9, 17:21, 17:22, 62:2, 62:3, 77:21, 77:23
**interested** [3] - 44:12, 49:21, 63:1
**intermission** [1] - 7:24
**Internal** [1] - 79:22
**interpreted** [1] - 62:16
**interrupt** [3] - 7:6, 17:5, 23:10
**introduce** [3] - 17:14, 33:20, 67:17
**introduced** [4] - 34:7, 34:10, 48:9, 48:23
**investment** [3] - 29:20, 60:5, 60:19, 76:13
**investor** [1] - 80:9
**investors** [1] - 58:14
**involved** [13] - 4:19, 7:20, 13:13, 25:19, 37:21, 41:7, 41:11, 42:18, 44:10, 49:18, 57:3, 68:23, 77:20
**involvement** [3] - 50:10, 74:16, 75:3
**involves** [1] - 25:19
**involving** [2] - 41:8, 68:24
**iron** [1] - 45:22
**issuance** [1] - 13:25
**issue** [5] - 5:8, 6:3, 6:5, 76:6, 81:15
**issued** [4] - 12:11, 12:17, 13:19, 52:14
**item** [2] - 35:3, 39:6
**items** [1] - 24:12
**itself** [4] - 6:16, 63:9, 65:18, 65:19

## J

**January** [1] - 14:6, 54:22
**John** [16] - 1:24, 3:25, 43:16, 43:17, 43:22, 44:21, 45:15, 46:11, 46:17, 46:22, 58:13, 60:18, 63:19, 71:7, 71:14, 76:13
**joined** [1] - 41:17
**JR** [1] - 1:16
**Jr** [1] - 31:11
**judge** [1] - 37:9
**Judge** [1] - 70:8
**judgment** [2] - 80:16, 80:17
**judicial** [2] - 38:22, 39:2
**July** [6] - 5:9, 18:25, 22:24, 23:17, 30:18, 50:8
**junior** [1] - 31:12
**juris** [2] - 72:5, 72:10
**JURY** [1] - 1:17
**justify** [1] - 55:10

## K

**K-a-s-h** [1] - 68:19
**KASH** [2] - 2:10, 68:7
**Kash** [13] - 30:16, 36:4, 42:16, 45:16, 45:24, 52:24, 56:10, 56:24, 68:3, 68:17, 68:18
**kash** [1] - 45:5
**KATHLEEN** [1] - 1:9
**Kathleen** [6] - 1:23, 3:8, 4:1, 4:21, 8:25, 19:16
**keep** [1] - 40:8
**kid** [1] - 44:11
**kind** [3] - 55:3, 60:3, 63:24
**kinds** [3] - 62:19, 65:17, 77:9
**knowledge** [9] - 50:24, 51:1, 51:4,
51:5, 53:5, 61:5, 64:19, 74:11, 74:14
**knows** [1] - 62:20

## L

**lacks** [1] - 20:19
**lady** [1] - 63:21
**land** [8] - 17:17, 17:18, 17:22, 17:23, 25:19, 36:7, 65:18
**language** [2] - 16:12, 71:10
**last** [7] - 13:21, 14:12, 15:17, 27:25, 39:6, 54:21, 64:15
**late** [2] - 45:14, 64:8
**Law** [1] - 72:8
**law** [17] - 15:24, 20:4, 71:25, 72:6, 72:9, 72:16, 73:19, 73:21, 74:1, 77:6, 77:10, 77:11, 79:1, 79:2, 79:11, 81:10, 81:17
**laws** [1] - 70:17
**lawsuit** [5] - 15:20, 32:15, 49:18, 63:3, 78:13
**layman** [1] - 75:2
**leading** [1] - 56:12
**learned** [1] - 15:22
**least** [3] - 45:1, 56:6, 58:19
**left** [5] - 9:22, 9:24, 11:11, 22:15, 58:1
**legal** [7] - 50:16, 72:14, 75:1, 79:10, 79:12, 79:14, 79:16
**legally** [1] - 73:24
**Leger** [1] - 41:6
**Lender** [1] - 30:11
**lender** [3] - 30:14, 80:3, 80:12
**lent** [2] - 32:11, 77:14, 77:17
**letter** [7] - 33:16, 34:2, 34:9, 34:24, 37:5, 46:24, 57:22
**letters** [2] - 33:5, 56:11
**letting** [1] - 6:6
**liability** [2] - 6:4, 53:21
**lie** [6] - 64:4, 64:12, 64:14, 65:1, 65:5, 65:25
**lied** [1] - 65:6
**lien** [1] - 56:11
**lieu** [1] - 62:1
**lifts** [1] - 65:17
**light** [1] - 70:17

**line** [1] - 21:21
**lip** [2] - 15:11, 15:20
**lis** [6] - 16:12, 49:12, 63:2, 79:25, 80:5, 81:13
**list** [1] - 49:21
**listed** [1] - 73:2
**live** [1] - 41:5
**loan** [22] - 15:9, 17:1, 17:2, 17:15, 23:3, 30:9, 32:9, 35:4, 35:8, 35:16, 60:3, 60:14, 60:15, 60:22, 60:24, 62:25, 77:6, 78:10, 78:11, 78:12, 79:18
**loaned** [2] - 29:17, 35:10, 47:5
**LOCK** [1] - 1:11
**Lock** [82] - 1:20, 3:10, 3:18, 6:15, 15:3, 15:18, 15:23, 16:4, 16:7, 16:19, 16:25, 17:1, 17:15, 17:16, 19:19, 19:25, 20:1, 21:7, 22:10, 22:14, 22:18, 22:20, 23:1, 23:7, 23:14, 24:7, 25:24, 26:8, 26:21, 29:17, 30:6, 30:9, 30:16, 32:9, 34:25, 35:2, 35:4, 35:11, 37:21, 39:2, 39:8, 39:10, 39:14, 41:18, 41:21, 42:1, 43:11, 45:7, 47:7, 47:15, 47:22, 49:7, 50:7, 51:12, 52:4, 52:17, 52:18, 55:18, 55:25, 56:4, 56:13, 56:15, 56:20, 57:8, 58:9, 60:2, 60:3, 61:6, 65:8, 65:10, 65:11, 65:14, 65:15, 65:16, 66:6, 66:7, 66:14, 72:18, 78:19, 78:21, 78:25, 79:17
**Lock's** [2] - 17:3, 47:11
**look** [3] - 21:21, 47:21, 51:25
**looked** [1] - 54:8
**looking** [7] - 6:10, 6:12, 13:7, 60:8, 60:13, 64:9
**loop** [1] - 79:15
**loosing** [1] - 62:12
**lose** [1] - 73:23
**losses** [1] - 69:8
**loved** [1] - 74:24

**lunch** [4] - 46:12, 66:23, 66:24, 67:11

## M

**ma'am** [4] - 32:25, 37:4, 75:24, 76:18
**mail** [5] - 10:11, 10:12, 11:5, 57:21, 58:4
**mailed** [3] - 52:21, 52:23, 53:2
**maintained** [1] - 80:1
**manner** [1] - 58:4
**March** [3] - 13:17, 16:11, 47:21
**Marino** [1] - 70:15
**marino's** [1] - 70:23
**mark** [4] - 19:4, 20:9, 21:14, 24:8
**marked** [7] - 24:23, 28:21, 33:11, 34:13, 37:13, 47:18, 48:17
**martin** [6] - 37:20, 38:13, 41:15, 41:17, 55:4, 65:10
**Martin** [21] - 22:11, 23:3, 23:12, 24:7, 25:24, 26:8, 26:19, 27:7, 27:8, 37:16, 37:18, 38:7, 38:16, 38:23, 39:6, 39:22, 41:15, 42:16, 55:23, 56:8, 65:21
**masters** [2] - 72:6, 72:9
**materials** [1] - 50:18
**matter** [17] - 6:14, 8:4, 12:11, 12:12, 12:23, 12:24, 13:15, 14:11, 24:11, 27:5, 41:11, 59:24, 67:8, 69:6, 69:15, 72:15, 80:2
**matters** [2] - 13:24, 78:3
**Mckee** [1] - 57:1
**mean** [5] - 61:9, 62:5, 64:23, 72:21, 73:21
**means** [2] - 35:7, 73:14
**meant** [1] - 79:11
**meet** [1] - 46:10
**memorandum** [2] - 79:2, 81:13
**memory** [1] - 48:2
**mentioned** [2] - 50:11, 62:2
**meruit** [1] - 77:10
**met** [2] - 26:5, 44:25, 45:2
**Michael** [4] - 3:9, 4:1,

4:22, 9:1
**MICHAEL** [1] - 1:10
**middle** [2] - 13:5, 60:16
**might** [5] - 5:25, 14:7, 43:12, 46:21, 51:9
**mill** [1] - 75:2
**mine** [2] - 14:4, 57:2
**minused** [1] - 23:4
**minute** [4] - 7:9, 33:13, 46:21, 65:4
**minutes** [5] - 25:3, 25:5, 54:2, 59:2, 74:3
**mistake** [4] - 61:11, 64:5, 64:13, 64:22
**moment** [2] - 7:12, 20:17
**Monday** [2] - 13:18, 13:21
**monetary** [1] - 79:6
**money** [60] - 15:13, 17:16, 17:18, 17:20, 17:21, 22:22, 23:2, 23:11, 29:17, 30:5, 31:25, 32:11, 35:10, 38:12, 38:25, 39:24, 44:8, 44:22, 44:24, 45:4, 45:9, 46:3, 46:5, 46:16, 46:17, 47:3, 47:10, 49:6, 49:7, 49:15, 49:19, 60:1, 61:19, 61:25, 62:4, 62:8, 62:12, 62:19, 62:20, 63:2, 63:3, 63:7, 66:7, 70:1, 76:12, 77:6, 77:11, 77:18, 77:20, 77:25, 78:11, 79:18, 79:19, 80:4, 80:13, 80:15, 80:16
**months** [9] - 14:2, 31:19, 41:22, 44:14, 44:20, 44:25, 55:15, 56:18, 57:19
**MOORE** [13] - 1:8, 2:3, 4:2, 4:10, 4:14, 4:17, 5:21, 7:23, 9:18, 10:4, 11:3, 11:18, 18:9
**moore** [3] - 10:3, 18:19, 56:5
**Moore** [14] - 1:22, 1:25, 3:6, 3:20, 4:2, 4:20, 8:23, 18:5, 21:17, 25:9, 26:18, 38:12, 67:12, 82:5
**morning** [3] - 3:15, 18:19, 18:20
**mortgage** [1] - 62:24

**most** [1] - 14:1
**mostly** [2] - 38:9, 71:13
**motion** [11] - 4:14, 4:17, 6:1, 6:18, 7:4, 8:22, 11:24, 11:25, 13:16, 14:17, 14:20
**move** [5] - 10:21, 28:15, 34:15, 67:1, 70:21
**moved** [7] - 24:19, 28:21, 34:12, 34:13, 34:21, 49:2, 67:24
**moving** [2] - 8:1, 24:12
**MR** [165] - 3:15, 3:17, 3:19, 3:25, 4:2, 4:7, 4:10, 4:14, 4:17, 5:17, 5:20, 5:24, 6:12, 6:20, 6:25, 7:5, 7:11, 7:18, 7:23, 8:13, 8:20, 9:17, 9:18, 9:25, 10:4, 10:8, 10:15, 10:19, 11:1, 11:3, 11:18, 11:21, 11:22, 11:25, 12:6, 12:9, 12:24, 13:7, 13:9, 13:14, 14:4, 14:15, 14:23, 15:2, 16:17, 16:19, 17:8, 17:12, 18:3, 18:5, 18:15, 18:18, 19:3, 19:6, 20:8, 20:12, 20:21, 20:24, 21:12, 21:16, 23:21, 24:2, 24:8, 24:14, 24:17, 24:21, 24:22, 24:25, 25:1, 25:13, 26:11, 26:13, 26:17, 26:22, 27:3, 27:21, 27:24, 28:8, 28:10, 28:12, 28:17, 28:19, 28:24, 29:9, 29:12, 29:22, 29:25, 32:2, 32:8, 33:4, 33:15, 33:20, 33:23, 34:4, 34:7, 34:11, 34:16, 34:19, 34:23, 35:9, 35:15, 36:21, 36:24, 37:3, 37:6, 37:9, 37:16, 37:18, 37:20, 37:25, 38:8, 38:17, 38:21, 39:5, 39:13, 39:20, 40:1, 40:4, 40:10, 40:13, 41:2, 48:8, 48:11, 48:13, 48:14, 48:19, 48:22, 48:25, 49:5, 49:22, 50:1, 50:4, 53:11, 53:15, 54:13, 54:14,

66:13, 66:16, 66:19, 67:2, 67:7, 67:11, 67:20, 67:21, 68:3, 68:15, 70:7, 70:12, 75:9, 75:12, 75:15, 75:18, 75:21, 75:23, 76:4, 76:15, 76:17, 76:21, 76:25, 78:16, 81:7, 81:14, 82:12, 82:18, 82:19
**multiple** [1] - 76:6
**must** [2] - 22:17, 54:16

## N

**name** [9] - 5:10, 11:6, 17:4, 19:19, 41:3, 47:11, 57:9, 63:21, 68:16
**named** [1] - 70:15
**nature** [2] - 58:1, 61:4
**near** [1] - 14:12
**necessarily** [1] - 54:25
**necessary** [2] - 15:13, 82:3
**need** [2] - 10:2, 12:1
**needed** [2] - 31:18, 31:19
**never** [17] - 14:6, 16:7, 17:22, 26:5, 31:25, 45:18, 52:11, 64:14, 72:22, 74:5, 76:9, 77:23, 79:5, 79:10, 79:18, 80:8, 80:11
**new** [8] - 12:11, 12:12, 12:23, 12:24, 13:15, 14:11, 59:24, 67:19
**news** [1] - 70:2
**next** [8] - 8:7, 28:23, 37:15, 66:25, 67:6, 68:2, 69:9, 81:9
**Nicholas** [6] - 3:7, 3:22, 4:4, 4:21, 8:24, 18:23
**NICHOLAS** [1] - 1:9
**night** [2] - 38:3, 64:8
**NO** [1] - 82:15
**nobody** [2] - 12:11, 51:5
**NON** [1] - 1:17
**NON-JURY** [1] - 1:17
**none** [7] - 5:20, 5:21, 5:22, 39:18, 52:6, 52:7, 75:4
**North** [1] - 41:6
**note** [1] - 77:10
**notes** [3] - 43:6
**nothing** [13] - 28:12, 31:22, 60:17, 62:13,

65:11, 65:13, 65:14, 66:19, 75:1, 77:22, 78:21, 78:22
**notice** [2] - 38:23, 39:3
**number** [4] - 15:7, 57:20, 59:4, 65:8
**numerous** [2] - 4:24, 80:7

## O

**Oak** [1] - 70:15
**oath** [1] - 65:12
**object** [2] - 7:7, 7:22
**objection** [27] - 5:24, 10:4, 10:15, 10:17, 10:19, 24:15, 24:17, 24:18, 24:20, 28:18, 28:19, 28:20, 28:22, 34:9, 34:18, 34:19, 34:20, 34:22, 35:9, 35:13, 48:10, 48:24, 49:1, 49:3, 67:17, 67:22, 67:24
**objections** [4] - 13:3, 13:10, 59:5, 59:6
**obligated** [1] - 16:6
**obligation** [1] - 78:24
**obligations** [1] - 16:8
**obtain** [2] - 33:17, 79:25
**occasion** [1] - 64:25
**occasions** [1] - 80:7
**October** [2] - 14:12, 54:21
**OF** [6] - 1:1, 1:7, 1:8, 1:10, 1:11
**OFF** [1] - 7:15
**offer** [4] - 5:10, 31:24, 38:7, 80:6
**office** [1] - 82:11
**officer** [4] - 52:17, 73:2, 73:3, 74:21
**once** [3] - 18:14, 23:4, 63:2
**one** [52] - 7:11, 9:18, 10:8, 10:11, 11:22, 14:9, 15:12, 19:12, 21:13, 22:13, 22:18, 23:8, 26:13, 29:22, 31:3, 32:10, 32:14, 33:7, 33:23, 33:24, 36:12, 36:21, 37:6, 39:5, 42:19, 44:6, 44:8, 46:15, 48:11, 53:10, 54:1, 54:7, 54:12, 54:21, 55:15, 57:3, 57:13, 57:25, 60:9, 62:15, 62:17,

63:13, 64:16, 64:24, 66:3, 67:16, 67:19, 73:5, 74:24, 75:21
**ones** [1] - 56:3
**online** [8] - 17:8, 17:9, 42:15, 42:16, 42:21, 56:19, 57:8, 57:12
**open** [2] - 40:9, 75:19
**opened** [1] - 51:21
**opening** [5] - 4:13, 14:23, 16:16, 17:5, 19:24
**operated** [2] - 55:12, 63:5
**operation** [2] - 52:9, 61:19
**opinion** [5] - 11:14, 70:23, 72:15, 81:24, 82:4
**opportunity** [3] - 7:24, 14:7, 14:9
**opposed** [1] - 6:5
**order** [14] - 5:4, 11:13, 13:19, 13:25, 14:19, 14:20, 36:18, 80:23, 81:6, 81:11, 81:18, 81:24, 81:25, 82:4
**original** [1] - 5:9
**originally** [1] - 22:9
**Otto** [22] - 1:19, 2:4, 2:5, 2:7, 2:9, 2:11, 2:13, 3:16, 4:8, 9:11, 11:19, 18:2, 24:11, 34:14, 37:2, 37:15, 38:6, 48:16, 49:25, 78:15, 81:12, 82:9
**oTTO** [1] - 6:12
**OTTO** [83] - 3:15, 4:7, 5:24, 6:20, 8:20, 9:17, 9:25, 10:15, 11:21, 13:14, 14:4, 14:23, 15:2, 18:3, 18:5, 18:15, 18:18, 19:3, 19:6, 20:8, 20:12, 20:21, 20:24, 21:12, 21:16, 23:21, 24:14, 24:21, 24:25, 26:13, 26:17, 26:22, 27:24, 28:8, 28:10, 28:19, 28:24, 29:9, 29:12, 29:22, 29:25, 32:2, 33:15, 34:11, 34:16, 35:9, 37:3, 37:6, 37:16, 37:20, 38:8, 38:21, 39:5, 40:1, 40:4, 40:10, 48:11, 48:14, 48:19, 48:25, 50:1, 50:4, 53:11, 53:15, 54:13, 54:14, 66:13, 66:16,

67:7, 67:11, 67:21, 70:12, 75:9, 75:21, 75:23, 76:4, 76:15, 76:21, 78:16, 81:7, 81:14, 82:12, 82:18
**outcome** [3] - 11:13, 81:18, 81:24
**outside** [2] - 7:10, 39:23
**outstanding** [6] - 6:10, 9:13, 9:14, 12:7, 12:9, 13:2
**overrule** [1] - 35:13
**owe** [1] - 49:6
**owed** [2] - 8:5, 70:1
**owes** [1] - 49:7
**own** [2] - 29:18, 33:7
**owned** [2] - 15:25, 16:5
**Owners** [1] - 5:5
**owners** [1] - 17:16
**ownership** [2] - 77:21, 77:23

## P

**P-1** [1] - 19:4
**P-2** [2] - 20:9, 20:10
**P-3** [2] - 20:9, 20:22
**P-4** [1] - 21:15
**P-5** [1] - 29:23
**P.M** [3] - 67:4, 67:5, 82:20
**PA** [1] - 1:1
**Pa.C.S** [1] - 64:20
**PAGE** [1] - 2:2
**paid** [27] - 16:2, 16:6, 19:10, 19:22, 27:12, 28:2, 30:5, 30:7, 32:11, 32:13, 32:16, 32:20, 39:9, 60:1, 60:2, 62:3, 63:10, 65:8, 65:11, 65:14, 76:12, 78:20, 78:21, 78:22, 79:13, 79:18, 82:10
**paper** [3] - 60:12, 60:24, 71:8
**papers** [4] - 36:13, 36:18, 64:9, 78:6
**paperwork** [6] - 43:8, 58:25, 59:14, 59:15, 61:11, 64:6
**paragraph** [2] - 20:20, 21:4
**paralegal** [2] - 51:2, 74:14
**pardon** [1] - 4:10
**parking** [1] - 45:18
**part** [2] - 60:16, 60:18

**parties** [3] - 6:18, 9:8, 11:11
**partner** [4] - 43:12, 44:7, 46:15, 46:20
**partners** [3] - 45:12, 46:21, 47:2
**partnership** [4] - 46:7, 46:9, 46:18, 60:7
**party** [6] - 5:2, 5:11, 5:15, 8:1, 8:6, 61:4
**pass** [1] - 37:5
**passenger** [1] - 71:24
**past** [1] - 63:22
**pay** [14] - 6:14, 8:8, 23:3, 23:7, 23:14, 31:7, 31:24, 46:19, 49:11, 49:15, 49:19, 62:25, 66:6, 66:14
**paying** [1] - 29:13
**payment** [8] - 6:21, 9:15, 30:13, 31:2, 39:14, 39:15, 39:18, 47:1
**payments** [3] - 39:7, 39:10, 39:23
**Pedro** [1] - 21:2
**penalties** [1] - 64:20
**pendency** [1] - 10:1
**pendens** [6] - 16:12, 49:13, 63:2, 79:25, 80:5, 81:13
**Pennsylvania** [7] - 1:11, 3:11, 15:24, 30:10, 73:19, 79:1, 79:11
**people** [4] - 49:17, 49:21, 56:15, 63:1
**percent** [2] - 62:2, 62:3
**person** [2] - 41:7, 41:14
**personally** [2] - 38:11, 52:22
**perspective** [1] - 6:25
**petitions** [1] - 59:7
**phone** [1] - 13:5
**phrased** [1] - 39:17
**physically** [1] - 44:7
**piece** [1] - 68:24
**Pittsburgh** [2] - 60:11, 72:8
**place** [1] - 77:2
**places** [1] - 65:8
**plaintiff** [5] - 3:16, 5:15, 8:15, 8:18, 12:17
**Plaintiff** [6] - 1:5, 1:19, 3:5, 5:3, 5:4, 5:6
**Plaintiff's** [3] - 24:19, 34:14, 34:21

**plaintiff's** [9] - 4:24, 5:1, 7:25, 8:9, 9:10, 24:15, 34:1, 67:25
**plans** [1] - 10:3
**pleading** [2] - 61:3, 62:14
**pleadings** [14] - 12:7, 12:10, 12:13, 12:23, 51:10, 59:3, 59:17, 61:7, 61:20, 61:22, 64:1, 65:7, 74:12, 75:5
**PLEAS** [1] - 1:1
**plenty** [1] - 54:23
**plus** [1] - 79:17
**point** [19] - 8:14, 11:4, 11:13, 13:10, 22:16, 22:19, 33:7, 36:15, 45:10, 56:8, 58:7, 60:13, 60:14, 65:24, 65:25, 69:8
**portions** [1] - 81:21
**position** [5] - 6:23, 11:10, 17:25, 18:21, 50:6, 72:25, 79:7
**possession** [1] - 6:3
**possibility** [1] - 6:21
**possible** [3] - 46:7, 81:4, 82:8
**possibly** [2] - 53:7, 59:13
**posture** [1] - 11:10
**practical** [1] - 6:14
**praecipe** [1] - 13:18
**prays** [1] - 5:3
**prefer** [1] - 32:23
**prejudice** [2] - 14:18, 14:19
**preliminary** [4] - 13:3, 13:10, 59:5, 59:6
**prepare** [3] - 50:25, 74:3, 81:11
**prepared** [7] - 10:9, 40:12, 45:22, 50:18, 51:6, 59:9, 66:25
**present** [4] - 13:17, 23:20, 27:4, 38:1
**president** [2] - 73:4, 73:8, 73:15
**prevails** [1] - 5:12
**previous** [3] - 19:11, 57:3, 57:23
**previously** [1] - 82:9
**price** [5] - 15:9, 16:3, 39:9, 39:11, 39:16
**principles** [1] - 16:2
**problem** [3] - 10:12, 14:8, 44:10
**proceed** [6] - 4:6, 14:18, 18:2, 18:14,

35:14, 40:12
**proceeded** [1] - 79:7
**PROCEEDINGS** [5] - 25:7, 25:8, 67:4, 67:5, 82:20
**proceedings** [1] - 83:5
**proceeds** [1] - 17:3
**process** [2] - 17:7, 77:21
**profit** [4] - 69:7, 69:12, 70:19
**promissory** [1] - 77:10
**proof** [1] - 38:7
**proper** [1] - 20:20
**properly** [2] - 20:2, 79:11
**property** [56] - 5:6, 6:3, 6:4, 6:16, 8:5, 15:25, 16:5, 17:3, 26:7, 31:8, 36:9, 36:10, 36:13, 36:16, 36:17, 36:19, 41:8, 41:24, 42:5, 43:10, 43:11, 44:5, 46:13, 47:11, 47:22, 53:19, 53:23, 61:20, 62:4, 63:5, 63:9, 63:22, 63:24, 65:12, 65:14, 65:18, 66:4, 66:5, 66:9, 66:14, 68:24, 77:5, 77:24, 77:25, 78:20, 79:5, 79:9, 79:13, 79:14, 80:14, 80:18, 80:25, 81:3
**proposed** [5] - 80:23, 81:6, 81:7, 81:11, 81:18
**protect** [1] - 45:21
**provide** [6] - 8:1, 54:15, 55:6, 59:8, 79:3, 79:15
**provided** [8] - 6:6, 15:17, 51:24, 55:20, 57:6, 59:14, 59:19, 61:1
**provides** [1] - 79:1
**pulled** [1] - 81:21
**purchase** [14] - 15:9, 15:10, 16:3, 17:3, 17:17, 39:8, 39:11, 39:16, 41:24, 42:5, 44:17, 66:3, 66:5, 66:8
**purchased** [3] - 47:10, 47:11, 47:23
**purchasing** [4] - 36:9, 36:10, 43:10, 43:11
**purported** [2] - 15:18, 16:10
**purpose** [1] - 9:15

**purposes** [2] - 9:8, 69:13
**pursue** [1] - 44:24
**pushing** [1] - 10:17
**put** [8] - 11:6, 13:5, 44:8, 46:25, 59:20, 64:10, 80:3, 82:14

## Q

**questions** [23] - 23:22, 26:11, 26:23, 27:21, 28:6, 28:10, 32:2, 33:1, 34:1, 36:24, 37:3, 38:8, 40:4, 49:22, 61:3, 64:6, 64:11, 66:17, 70:7, 72:23, 75:10, 76:16, 76:17
**quick** [1] - 60:13
**quiet** [2] - 77:8, 77:12
**quite** [1] - 44:1
**quote** [1] - 5:2

## R

**raise** [2] - 18:6, 68:4
**raised** [1] - 13:24
**Re** [1] - 35:4
**reach** [3] - 38:4, 58:13
**reaction** [2] - 31:10, 31:17
**read** [4] - 21:22, 30:8, 33:13, 64:15
**readiness** [2] - 12:17, 12:20
**ready** [6] - 4:5, 18:2, 29:7, 60:11, 79:25, 80:4
**real** [4] - 15:4, 16:9, 60:12, 79:10
**realize** [1] - 60:8
**realized** [1] - 60:23
**really** [7] - 13:12, 13:22, 14:10, 72:21, 77:14, 78:3, 78:18
**reason** [7] - 13:1, 20:1, 58:2, 60:25, 69:5, 79:7, 80:19
**rebuttal** [2] - 75:20, 75:21
**receipt** [1] - 9:16
**receipts** [1] - 64:9
**receive** [3] - 38:24, 58:5, 77:4
**received** [8] - 23:15, 23:16, 38:11, 38:16, 48:1, 57:21, 58:25, 77:11
**recent** [1] - 14:1

**RECESSED** [2] - 25:7, 67:4
**recognize** [4] - 16:24, 19:7, 21:17, 30:1
**recollection** [3] - 22:25, 26:18, 56:7
**RECONVENED** [2] - 25:8, 67:5
**RECORD** [1] - 7:15
**record** [11] - 3:14, 7:9, 7:14, 7:16, 8:4, 12:2, 25:12, 48:3, 57:15, 67:10, 82:14
**recordation** [1] - 5:12
**recorded** [1] - 48:4
**records** [3] - 63:4, 67:12, 67:25
**recross** [1] - 26:25
**Recross** [1] - 2:5
**RECROSS** [1] - 27:2
**Recross-Examination** [1] - 2:5
**RECROSS-EXAMINATION** [1] - 27:2
**Redirect** [2] - 2:5, 2:13
**redirect** [8] - 26:13, 26:24, 27:23, 28:9, 37:1, 66:18, 75:11, 75:12
**REDIRECT** [2] - 26:16, 76:3
**refer** [1] - 20:19
**referring** [3] - 34:24, 59:22, 65:2
**refers** [1] - 60:1
**refused** [2] - 78:23, 79:18
**regard** [11] - 3:4, 4:18, 6:9, 6:24, 8:22, 11:15, 34:14, 38:7, 42:12, 43:10, 78:2
**reimbursed** [4] - 39:15, 39:16, 39:19, 39:24
**reimbursement** [1] - 38:16
**rejected** [4] - 21:8, 57:13, 57:23, 58:2
**rejection** [1] - 57:22
**related** [6] - 5:25, 6:4, 38:9, 43:17, 50:10, 59:6
**relating** [1] - 64:20
**released** [2] - 7:7, 7:22
**releasing** [1] - 80:5
**relief** [3] - 5:1, 8:17, 9:2

**relieved** [2] - 6:18, 11:8
**remain** [2] - 10:1, 10:7
**remedies** [1] - 77:9
**remedy** [1] - 77:9
**remember** [2] - 60:10, 65:12
**remitter** [1] - 23:19
**removal** [1] - 13:3
**removed** [4] - 9:3, 9:6, 11:8, 11:10
**render** [1] - 5:13
**renders** [1] - 11:4
**rent** [2] - 51:15, 51:17
**repaid** [3] - 30:24, 31:9, 46:14
**repay** [5] - 45:4, 45:9, 46:15, 72:18, 78:24
**repaying** [2] - 46:5, 46:6
**repayment** [3] - 15:19, 33:18, 38:11
**replies** [1] - 46:17
**reported** [1] - 69:13
**Reporter** [1] - 83:11
**reports** [1] - 53:16
**represent** [1] - 19:9
**represented** [3] - 15:6, 35:2, 56:14
**request** [8] - 5:1, 8:16, 15:10, 15:17, 23:1, 37:25, 38:5, 54:20
**requested** [3] - 5:16, 8:1, 54:1
**requests** [1] - 59:7
**require** [1] - 70:18
**required** [4] - 13:12, 54:15, 61:4, 73:4
**requirement** [1] - 9:4
**rescind** [1] - 77:6
**reserve** [1] - 40:5
**respect** [3] - 11:9, 11:16, 66:10
**respectively** [1] - 20:9
**respond** [2] - 33:2, 58:3
**responded** [2] - 12:11, 14:6
**RESPONSE** [1] - 82:15
**response** [5] - 12:25, 13:20, 14:13, 14:15, 54:3
**responses** [2] - 13:12, 62:23
**responsibility** [1] - 61:16
**responsible** [6] - 46:3, 61:7, 61:10, 61:12, 61:13

**rest** [5] - 75:17, 75:20, 76:20, 76:21, 81:21
**result** [2] - 17:1, 42:23
**resulted** [1] - 15:21
**resume** [2] - 25:6, 66:25
**resurrected** [1] - 22:21
**retained** [1] - 79:12
**return** [5] - 37:8, 52:11, 66:21, 66:23, 66:24
**returned** [2] - 23:2, 23:11, 38:13
**returns** [8] - 52:4, 52:5, 63:6, 69:3, 69:11, 70:18, 72:24, 80:10
**Revenue** [1] - 79:22
**rights** [1] - 56:9
**road** [1] - 63:22
**Road** [1] - 41:6
**roles** [2] - 51:15, 51:17
**Roth** [11] - 1:21, 2:4, 2:5, 2:7, 2:9, 2:11, 3:17, 28:11, 39:12, 67:16, 80:7
**ROTH** [62] - 3:17, 6:25, 7:5, 7:11, 7:18, 10:19, 11:22, 11:25, 12:6, 12:9, 14:15, 16:17, 16:19, 17:8, 17:12, 24:2, 24:8, 24:17, 24:22, 25:1, 25:13, 26:11, 27:3, 27:21, 28:12, 28:17, 32:8, 33:4, 33:20, 33:23, 34:4, 34:7, 34:19, 34:23, 35:15, 36:21, 36:24, 37:9, 37:18, 37:25, 38:17, 39:13, 39:20, 40:13, 41:2, 48:8, 48:13, 48:22, 49:5, 49:22, 66:19, 67:2, 67:20, 68:3, 68:15, 70:7, 75:12, 75:15, 75:18, 76:17, 76:25, 82:19
**roth** [28] - 6:23, 7:17, 11:21, 13:17, 14:6, 16:15, 25:11, 32:4, 33:3, 37:22, 37:24, 38:15, 40:11, 40:24, 49:4, 50:25, 51:5, 59:8, 59:10, 59:17, 61:6, 64:16, 67:6, 67:13, 68:2, 74:12, 76:23, 79:24
**roth's** [5] - 13:16,

19:24, 27:24, 40:7,
67:15
**Roth's** [1] - 80:20
**rule** [1] - 80:25
**run** [2] - 60:12, 75:2
**run-of-the-mill** [1] -
75:2

## S

**S&T** [2] - 30:12, 63:20
**sale** [3] - 13:1, 15:5,
24:4
**sales** [13] - 24:3, 24:6,
25:18, 25:22, 41:23,
42:6, 42:9, 55:13,
55:14, 55:17, 55:18,
56:2, 56:6
**Samantha** [1] - 57:1
**Sarris** [9] - 1:22, 3:9,
3:10, 3:23, 3:24,
4:23, 4:24, 9:1, 9:2
**SARRIS** [2] - 1:10,
1:11
**sat** [1] - 22:14
**satisfy** [1] - 38:19
**saw** [4] - 19:15, 36:3,
36:4, 36:5
**Schaum** [1] - 83:11
**school** [2] - 71:25,
72:16
**School** [1] - 72:8
**SCHUR** [4] - 1:7, 1:7,
1:9, 1:10
**Schur** [18] - 1:22,
1:25, 3:5, 3:6, 3:8,
3:9, 3:20, 3:23, 4:1,
4:4, 4:20, 4:22, 8:22,
8:23, 8:25, 9:1,
18:23
**scrambled** [1] - 15:14
**seat** [3] - 71:23, 71:24
**second** [11] - 21:3,
23:9, 25:2, 29:22,
36:21, 46:24, 54:21,
57:13, 61:24, 62:15,
64:7
**secretary** [4] - 73:1,
73:4, 73:7, 73:15
**Secretary** [1] - 21:2
**secured** [1] - 66:8
**see** [12] - 10:23, 19:13,
19:15, 19:17, 19:18,
19:19, 33:9, 35:24,
36:2, 36:4, 46:13,
59:2
**seeing** [1] - 69:6
**seem** [2] - 70:19,
70:21
**sell** [1] - 15:4

**sellers** [1] - 22:4
**selling** [1] - 26:7
**sense** [1] - 64:17
**sent** [6] - 14:5, 33:5,
34:2, 53:6, 53:16,
57:18
**separate** [1] - 48:12
**separately** [1] - 71:17
**September** [8] - 21:5,
21:10, 39:4, 52:1,
57:14, 57:19, 59:24,
73:12
**sequence** [1] - 42:13
**service** [2] - 15:11,
15:20
**Services** [1] - 79:22
**set** [5] - 22:11, 22:23,
30:14, 32:17, 80:3
**settled** [2] - 30:15,
32:18
**settlement** [2] - 21:20,
22:23
**several** [12] - 31:1,
38:8, 42:9, 44:20,
44:21, 44:25, 45:1,
46:10, 47:17, 56:2,
58:12, 63:10
**share** [1] - 53:5
**shared** [1] - 67:13
**shareholder** [4] -
58:20, 74:20, 76:7,
76:10
**shareholders** [5] -
7:19, 7:20, 52:13,
53:17, 55:3
**sheet** [1] - 21:20
**shift** [1] - 38:3
**shock** [2] - 69:24, 70:4
**show** [10] - 12:2, 19:2,
20:7, 24:23, 33:11,
47:17, 47:18, 57:10,
60:6, 63:4
**Shur** [1] - 4:21
**siblings** [1] - 43:21
**side** [1] - 71:24
**sign** [12] - 36:18,
41:23, 42:5, 45:3,
45:21, 45:23, 46:2,
47:6, 60:12, 69:25,
73:10
**signed** [20] - 24:6,
26:2, 30:16, 45:5,
45:8, 45:24, 55:13,
55:14, 55:15, 56:4,
56:10, 60:24, 61:6,
61:12, 61:13, 61:15,
64:17, 71:1, 71:9,
71:18
**signing** [2] - 36:4,
36:12

**similar** [1] - 20:14
**simple** [6] - 5:5, 15:2,
16:2, 65:1, 78:18,
79:8
**simply** [3] - 15:4,
78:19, 80:3
**sister** [3] - 59:13,
74:15, 74:16
**sit** [1] - 71:23
**situated** [2] - 18:14,
68:12
**situation** [5] - 14:17,
30:18, 78:18, 80:3,
80:12
**six** [4] - 31:19, 41:22,
44:14, 56:18
**slow** [1] - 53:11
**SMAIL** [1] - 1:16
**SNYDER** [5] - 2:8,
2:10, 13:7, 40:18,
68:7
**Snyder** [19] - 7:18,
30:16, 31:11, 33:5,
33:17, 34:25, 36:4,
36:12, 36:13, 38:1,
40:14, 41:4, 50:5,
59:2, 68:3, 68:17,
70:13, 76:5
**snyder** [1] - 32:10
**Snyders** [2] - 30:6,
32:10
**someone** [4] - 22:20,
44:19, 45:16, 49:7
**sometime** [1] - 57:20
**sometimes** [3] -
46:11, 64:8, 64:9
**soon** [2] - 81:4, 82:8
**sorry** [12] - 13:8,
14:25, 21:13, 28:6,
42:11, 53:11, 54:13,
63:16, 66:12, 70:3,
70:5, 71:6
**sort** [3] - 30:5, 44:22,
76:13
**sorts** [1] - 72:14
**source** [1] - 38:10
**speaking** [1] - 65:5
**specific** [1] - 20:19
**specifically** [2] - 6:1,
59:21
**spell** [1] - 68:18
**spent** [3] - 15:19,
44:13, 65:16
**stand** [10] - 18:14,
25:10, 28:13, 37:8,
40:23, 53:1, 66:20,
75:13, 75:25, 76:19
**standard** [1] - 51:9
**stands** [1] - 8:5
**STANO** [1] - 1:8

**Stano** [5] - 1:22, 3:7,
3:21, 4:20, 8:24
**start** [3] - 11:23, 67:7,
80:15
**started** [3] - 17:7,
27:15, 28:3
**state** [4] - 23:16, 41:3,
57:20, 68:16
**statement** [11] - 14:24,
16:16, 17:6, 20:19,
20:20, 40:6, 60:4,
64:1, 64:15, 64:24,
65:2
**statements** [11] - 4:13,
14:14, 51:14, 51:18,
51:19, 51:20, 57:25,
58:12, 59:20, 63:6,
75:6
**step** [2] - 25:2, 72:20
**still** [13] - 9:21, 15:25,
16:4, 33:25, 46:7,
46:9, 46:10, 46:21,
49:6, 73:15, 75:19,
78:10, 78:22
**stipulate** [2] - 33:16,
38:15, 38:18
**stipulated** [2] - 33:19,
39:21
**stipulation** [3] - 34:1,
34:5, 44:9
**stock** [2] - 52:14,
52:18
**strange** [1] - 70:20
**strongly** [1] - 6:13
**subject** [3] - 16:11,
64:20, 80:5
**submitted** [2] - 9:15,
11:12
**Subsection** [1] - 20:18
**subsequent** [1] - 56:3
**subsequently** [1] -
22:19
**substantial** [10] -
61:19, 61:21, 62:1,
62:4, 62:6, 62:7,
62:13, 62:21, 62:24,
63:7
**substantially** [1] -
44:6
**substitute** [3] - 37:10,
37:11, 67:15
**substituted** [1] - 67:25
**successful** [3] -
42:24, 43:2, 43:4
**successfully** [1] - 58:9
**Sue** [1] - 63:21
**sue** [2] - 17:19, 77:5
**suggested** [1] - 79:24
**sum** [1] - 30:12
**sums** [2] - 31:4, 61:19

**supplied** [1] - 35:21
**supposed** [3] - 22:4,
45:11, 60:7
**Susan** [4] - 3:7, 3:21,
4:20, 8:24
**SUSAN** [1] - 1:8
**sworn** [6] - 18:7,
18:10, 29:4, 40:19,
68:8, 75:25

## T

**table** [2] - 37:8, 66:21
**tax** [14] - 52:4, 52:5,
52:11, 53:16, 56:11,
63:6, 69:3, 69:11,
69:13, 70:17, 70:18,
72:24, 80:10, 82:11
**taxes** [12] - 6:4, 6:10,
6:22, 8:5, 8:9, 9:12,
9:14, 23:5, 31:7,
79:20, 79:21, 82:10
**ten** [2] - 10:13, 11:2
**tend** [1] - 81:2
**terms** [7] - 30:13,
30:15, 30:21, 32:17,
44:13, 46:5, 79:18
**testified** [8] - 18:11,
29:5, 39:22, 40:20,
43:18, 68:9, 68:21,
76:5
**testify** [1] - 38:12
**testimony** [7] - 17:10,
27:17, 28:5, 28:14,
50:5, 69:2, 81:20
**THE** [131] - 1:1, 3:4,
4:5, 4:8, 4:12, 4:16,
5:19, 5:22, 6:9, 6:17,
6:23, 7:3, 7:8, 7:13,
7:15, 7:16, 8:11,
8:18, 8:21, 9:23,
10:6, 10:17, 10:20,
11:7, 11:19, 11:24,
12:4, 12:8, 12:22,
13:4, 14:1, 14:13,
14:16, 14:25, 16:15,
16:18, 17:5, 17:11,
18:1, 18:4, 18:6,
18:13, 19:5, 20:11,
20:23, 23:23, 24:10,
24:15, 24:18, 25:2,
25:9, 26:14, 26:24,
27:23, 28:1, 28:9,
28:11, 28:13, 28:18,
28:20, 29:1, 29:7,
29:24, 32:4, 32:25,
33:19, 33:22, 33:25,
34:5, 34:9, 34:12,
34:18, 34:20, 35:12,
36:23, 37:1, 37:4,

37:7, 37:12, 37:17, 37:24, 38:6, 38:15, 38:19, 38:22, 39:12, 39:17, 39:21, 40:2, 40:8, 40:11, 40:15, 40:22, 48:10, 48:12, 48:16, 48:20, 48:24, 49:1, 49:24, 53:10, 53:12, 53:14, 54:12, 66:10, 66:12, 66:18, 66:20, 67:3, 67:6, 67:9, 67:19, 67:23, 68:4, 68:11, 70:9, 75:11, 75:13, 75:17, 75:19, 75:22, 75:24, 76:1, 76:18, 76:23, 78:14, 81:6, 81:8, 81:16, 82:13, 82:16

the.. [1] - 7:7

theory [1] - 50:12

thereafter [1] - 81:25

therefore [13] - 7:3, 7:21, 10:6, 10:20, 11:8, 12:14, 12:18, 12:20, 15:25, 16:24, 17:23, 77:24, 78:9

thereto [1] - 22:19

third [2] - 21:3, 67:16

thirty [5] - 22:2, 22:22, 22:24, 27:16, 28:4

thousand [9] - 22:2, 22:22, 22:23, 22:24, 27:15, 27:16, 28:4, 31:5

three [8] - 6:24, 10:22, 13:20, 19:15, 19:17, 19:18, 56:6, 71:7

timely [1] - 58:4

title [10] - 5:5, 16:14, 77:8, 77:12, 79:9, 79:10, 79:12, 79:14, 79:16

to-be-formed [1] - 15:7

today [4] - 13:21, 32:22, 41:9, 45:23

together [8] - 15:15, 44:15, 45:15, 45:16, 46:12, 49:15, 69:18, 69:19

took [3] - 47:10, 71:6

towards [5] - 6:21, 8:8, 39:8, 39:11, 39:15

township [1] - 56:11

transaction [3] - 25:19, 26:1, 37:21

transactions [2] - 41:8, 68:23

transcript [2] - 81:20,

83:8

transfer [2] - 47:15, 82:8

transferred [3] - 79:11, 81:1, 81:4

treasurer [3] - 73:5, 73:7, 73:16

treated [1] - 35:16

treating [1] - 35:7

trial [14] - 9:9, 9:24, 10:2, 10:7, 12:3, 12:18, 12:20, 13:6, 13:19, 14:18, 25:20, 37:23, 54:17, 78:18

TRIAL [1] - 1:17

tried [6] - 31:9, 38:2, 41:20, 44:15, 58:13, 72:22

true [4] - 61:22, 62:14, 64:18, 83:8

Trump [1] - 70:16

truth [4] - 59:18, 65:13

truthful [3] - 58:24, 59:1, 64:11

try [5] - 42:5, 49:10, 54:18, 78:12, 81:23

trying [4] - 15:14, 48:5, 55:9, 80:17

TUMOLO [4] - 3:25, 5:17, 5:20, 8:13

Tumolo [3] - 1:24, 3:25, 19:13

tumolo [1] - 60:9

turned [2] - 43:1, 58:11

twenty [4] - 22:22, 22:24, 27:15, 28:3

twice [1] - 63:23

two [17] - 8:7, 10:24, 15:12, 20:7, 21:6, 28:5, 46:23, 56:6, 57:11, 59:7, 61:20, 61:22, 61:23, 61:24, 62:10, 67:13

types [1] - 51:20

typically [1] - 73:10

typo [1] - 64:23

## U

U.S [1] - 58:4

ultimately [4] - 39:24, 46:3, 78:7, 80:24

unbeknownst [1] - 45:12

undefined [1] - 62:13

under [9] - 15:23, 35:3, 56:4, 56:13, 58:8, 65:12, 79:11, 81:19, 81:22

understood [1] - 81:16

university [1] - 72:8

unless [1] - 57:17

unsophisticated [2] - 73:17, 73:18

unsworn [1] - 64:21

unusual [1] - 70:4

up [20] - 5:8, 22:11, 29:13, 31:25, 37:5, 43:23, 44:8, 45:10, 47:1, 48:17, 50:12, 56:12, 57:22, 61:2, 62:19, 64:8, 69:9, 80:3, 80:17, 81:5

upset [1] - 62:19

utilized [1] - 9:12

## V

vacation [1] - 10:13

vehicle [1] - 71:8

verbal [3] - 43:24, 45:10, 58:16

verbally [2] - 44:2, 44:4

verdict [5] - 5:13, 6:8, 81:1

verification [2] - 64:16, 64:19

verified [1] - 61:4

versus [1] - 3:5

via [1] - 26:8

victor [1] - 11:5

view [1] - 79:13

violating [1] - 73:19

void [2] - 15:24, 79:2

vs [1] - 1:6

## W

wait [2] - 11:4, 46:21

waited [1] - 13:21

waiting [1] - 60:9

walk [1] - 60:11

Walter [1] - 1:23

WALTER [1] - 1:9

walter [4] - 3:8, 4:1, 4:22, 8:25

Walters [1] - 19:16

wants [3] - 46:17, 62:20, 82:14

ways [1] - 44:23

Wednesday [2] - 45:1, 46:11

week [4] - 12:12, 13:22, 45:1, 46:11

weekend [2] - 10:10, 54:18

weeks [3] - 8:7, 10:22,

13:20

Westmoreland [1] - 22:12

WESTMORELAND [1] - 1:1

wherefore [1] - 5:2

whispering [1] - 7:6

White [1] - 70:15

whole [6] - 44:2, 49:21, 60:7, 61:10, 65:13, 68:24

william [1] - 1:19

William [2] - 3:16, 9:11

willing [5] - 5:8, 8:3, 8:8, 33:16, 49:14

wind [2] - 29:13, 80:17

wish [2] - 28:15, 34:15

wished [1] - 23:1

withdraw [1] - 5:19

withdrew [1] - 13:9

WITNESS [4] - 2:2, 53:14, 66:12, 76:1

witness [15] - 4:9, 11:20, 14:22, 18:14, 28:23, 29:8, 32:25, 37:15, 40:22, 40:24, 67:1, 67:6, 68:2, 75:21, 75:25

witnesses [4] - 40:5, 40:7, 75:14, 75:15

woman [1] - 43:18

word [2] - 62:6, 78:15

works [1] - 38:3

worth [6] - 44:5, 53:23, 63:8, 63:9, 63:22, 63:24

write [1] - 75:5

writing [6] - 55:5, 58:15, 60:17, 70:23, 72:17, 78:24

written [2] - 34:25, 43:23

wrote [2] - 71:5, 71:9

## X

X-amount [1] - 16:9

## Y

year [13] - 15:19, 44:1, 44:13, 44:14, 45:2, 54:21, 54:22, 55:12, 56:19, 58:16, 60:14, 69:9

years [5] - 10:25, 33:10, 46:24, 52:10, 79:17

yourself [1] - 55:10