## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>U LOCK INC.,<br><br>    Debtor. | Bankruptcy No. 22-20823-GLT<br><br>Chapter 7 |
| CHRISTINE BIROS,<br><br>   Movant,<br><br>v.<br><br>U LOCK INC., Debtor, and ROBERT H.<br>SLONE, Chapter 7 Trustee for the Debtor,<br><br>   Respondents. | Related Doc. Nos.: 258 & 314 |

## CHRISTINE BIROS' AMENDED MOTION FOR ALLOWANCE AND PAYMENTOF ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. § 503(b)(1) AND/OR FOR PAYMENT OF ADEQUATE PROTECTION

For her amended motion seeking allowance and payment of an administrative expense, and/or for payment of adequate protection (the "Motion"), Christine Biros ("Biros" or "Movant"), by and through her attorneys, Bernstein-Burkley, P.C., states as follows:

### PRELIMINARY STATEMENT

Biros owns real property that debtor U Lock Inc.'s estate has occupied, used, and enjoyed during this case from the date it was commenced on April 27, 2022, until January 27, 2023 – 9 months – when the Court fully lifted the automatic stay against Biros. Since the early weeks of this case, Biros sought relief from stay to gain possession of her property, but her requests were opposed and largely rebuffed. Although the Court periodically granted Biros certain limited relief in response to her repeated requests, the debtor's estate has operated on or used the premises during

those 9 months rent-free.  In this Motion, Biros seeks allowance and payment of an administrative

claim and/or adequate protection claim to compensate her for the benefit the estate derived from

the premises, as any landlord would expect.

For the reasons explained below, Biros now believes she is entitled to allowance and

payment of at least $63,000 for post-petition use and occupancy as an administrative expense

and/or as adequate protection.

Biros has entered into a settlement agreement with the Trustee for the allowance and

payment of a reduced amount of allowed rent, as well as compromise and allowance of Biros'

other claims filed in the case.  A motion will shortly be filed under Bankruptcy Rule 9019 setting

for the details of the compromise.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  The Motion is a core proceeding for purposes of 28 U.S.C. § 157.

2.     Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1408 and

1409.

3.     Sections 105, 361, 363(e), and 503(b) of title 11 of the United States Code, 11

U.S.C. § 101, *et seq*. (as amended, the "Bankruptcy Code"), are the statutory predicate for the

relief requested in this Motion.

## BACKGROUND

4.     The bankruptcy case of U Lock Inc. ("Debtor" or "U Lock") was commenced by

the filing of an involuntary petition for relief under Chapter 7 of the Bankruptcy Code on April 27,

2022 (the "Petition Date").

5.     The Debtor did not answer or controvert the involuntary petition.

6.      On June 17, 2022, the Court entered an order for relief.

7.      Robert H. Slone (the "Trustee") is the duly appointed Chapter 7 Trustee for the Debtor and is so acting.

## I.      The Property and buildings

8.      Biros owns certain non-residential real property located at 14140 Route 30, North Huntington, Westmoreland County, PA, County Tax Map Number of 54-03019-0-103 (the "Property").

9.      The Property consists of vacant, rentable land comprising approximately 21.09 acres.  In addition, a 3,200 square foot pole barn (storage building) and a 2,600 square foot building (containing approximately 26 self-storage units of varying sizes) are located on the Property.

10.      On or around July 16, 2015, without a valid lease, the Debtor began to operate its business as a storage facility on the Property.

11.      From July 2015 forward, the Debtor continued to operate its business on the Property.  Presumably due to state court litigation regarding ownership of the Property (which the state courts ultimately decided in Biros' favor), the Debtor never paid Biros any rent pre-petition. Biros has filed a claim for prepetition rent.

12.      After the Petition Date, the Debtor likewise continued to operate its business at the Property and, after an order for relief was entered and the Trustee was appointed, the estate continued to use the Property, to rent storage space to tenants, and to collect rent from tenants.

13.      From the Petition Date forward, the Debtor and its estate have not paid any rent or other consideration to Biros for the continued use and enjoyment of the Property or the revenues derived from it.

## II.    Biros' first request for relief from stay

14.    A few weeks after this case began, Biros initiated her efforts to obtain her Property. On May 20, 2022, Biros filed an Emergency Motion [Doc. No. 14] (the "Stay Relief Motion") seeking, among other things, dismissal of the Debtor's bankruptcy case or, alternatively, abandonment of the Property from the estate and relief from stay so that she may pursue a pending state court action, eject the Debtor, and possess her Property. *See id.* at pp. 6-7.

15.    The Debtor filed a response two days later [Doc. No. 22], in which it opposed the relief Biros sought.    Among other arguments, the Debtor asserted that it should remain in possession of the Property until this Court determines whether Biros' acquisition of ownership was a voidable preferential transfer under state law or the Bankruptcy Code. *Id*. at ¶4, p. 4.    The Debtor also argued that granting Biros relief from stay "would cause an immediate hardship to the bankruptcy estate and [its] renters and creditors" and would expose the Debtor's estate to the risk of potential bailment claims and increased litigation by disgruntled renters if they had to vacate the premises. *Id*. at ¶10, p. 6.

16.    Similarly, on May 31, 2022, Shanni Snyder ("Snyder") filed an extensive Opposition [Doc. No. 24] to Biros' Stay Relief Motion, in which she echoed many of the Debtor's arguments and made additional ones of her own.

17.    This Court allowed the Debtor to retain possession of the Property, without paying any rent.    Specifically, on June 3, 2022, the Court entered an *Order Granting Christine Biros Limited Relief From Stay* [Doc. No. 36] (the "June 3 Order"), in which Biros was authorized to "commence environmental remediation activities" at the Property, subject to certain restrictions the Court imposed – citing its preliminary understanding that the Debtor "continues to conduct business on the Property." *Id*. at ¶1.    Among other provisions, that Order also directed the Debtor

4

to remove all vehicles and trailers from the Property, as well as all tires the Debtor placed on the Property, within specified periods. *Id*. at ¶s 4-7. Biros also was authorized to remove such items after specified dates if the Debtor did not do so timely.

18.     Following a hearing, on July 6, 2022, the Court entered an *Order* [Doc. No. 73] in which, among other things, it denied Biros' Stay Relief Motion to the extent she sought dismissal of the Debtor's bankruptcy case.  The Court adjourned the hearing on Biros' alternative request for relief from stay to August 9, 2022.  *Id.*

19.     In a text order dated August 10, 2022 [Doc. No. 113], the Court adjourned the stay relief hearing again, this time until August 25, 2022.

20.     On August 26, 2022, following the adjourned hearing at which the creditor parties accused one another of stay violations, the Court entered another text order [Doc. No. 129], directing the Trustee to review the parties' alleged violations of the automatic stay and determine whether to file any appropriate causes of action.  It did not decide Biros' request for relief from stay.

21.     Two months later, on October 25, 2022, the Trustee and Biros submitted a proposed, *Stipulated Order for Relief From Stay* [Doc. No. 189-1] for the Court's consideration (the "Stipulated Order").  If approved, that Stipulated Order would have granted relief from stay to Biros and provided for related relief.

22.     In the proposed Stipulated Order, the Trustee acknowledged, among other things, that the Debtor's estate had paid no rent or other consideration to Biros relating to the Property since the Petition Date.  *See, e.g.,* Stipulated Order at ¶ 5.

23.     Following a hearing on November 11, 2022, the Court entered its *Order Denying Stipulated Order for Stay Relief* [Doc. No. 211] (the "Order Denying Relief"), in which it

expressed concerns with the Stipulated Order and denied it as being procedurally defective. Instead, the Court reiterated the limited relief Biros had been granted in the June 3 Order, and also authorized her to implement certain security measures and to perform a walk-through inspection at the Property, none of which (the Court opined) required stay relief. *Id*. at ¶2(a), (b)(i), (b)(ii). In essence, the Order Denying Relief authorized implementation of the security measures and the walk-through inspection to which the Trustee and Biros already had agreed in paragraph 12 of the proposed Stipulated Order, before the Court denied it.

24.     In the Order Denying Relief, though, the Court also directed that the Trustee and any tenants who were current on their rent would have "unfettered access" to the Property, but that the Trustee would "conclude any rental arrangements through November 30, 2022 so as to effectuate a closing on the sale of the estate's assets in December 2022." *Id*. at ¶2(b)(iii).

25.     The Court held that its Order Denying Relief "would strike the balance necessary to protect Biros' interest in the Real Property and the trustee's interest in maximizing value of the bankruptcy estate for the benefit of creditors," *id*. at p. 3, but at that time the Court did not direct the estate to pay any rent to Biros. Yet the Trustee had acknowledged in the proposed Stipulated Order that ever since the Petition Date the estate had been using the Property rent-free.

III.    **The Trustee's sale of tangible and intangible personal property**

26.     With respect to the proposed sale mentioned in the Order Denying Relief, on November 17, 2022, the Trustee had filed his *Amended Motion for Sale of Tangible and Intangible Personal Property of the Estate Under 11 U.S.C. Section 363(f) Free and Clear of Liens, Claims and Encumbrances* [Doc. 217] (the "Amended Sale Motion"), seeking approval to sell certain property to Biros, subject to the competitive bidding conditions contained in the Amended Sale Motion.

Document    Page 7 of 23

27.     Pursuant to the Amended Sale Motion, Biros and Snyder submitted qualified bids.

28.     For purposes of valuing Biros' bid for the Debtor's assets, at a December 15, 2022 hearing on the proposed sale the Court agreed to consider, as a component of Biros' bid, the "waiver" of her right to the first $10,000 of distribution she would receive. The Court noted that the $10,000 "waiver" was equal to roughly $1,500 per month for the estate's use of the Property for (what then was) approximately 7 months. *See Transcript of December 15, 2022 Hearing* [Doc. No. 264] at 21:5-15.

29.     During that sale hearing, the Court took "judicial notice" that roughly $1,500 per month was "a reasonable commercial lease amount." *Id*. at 21:5-11.  But the Court also explained that, while it was willing to give Biros a $10,000 credit for the waiver, if Biros "wanted to ask for more than that" as an administrative claim, the Court was "not prepared to do that on the record today, and if [Biros] wants to present additional evidence on that [she] can," but it would "not be a useful exercise" to do so at that hearing.  *Id*. at 21:16-20.

30.     Accordingly, the Court's approval of the $10,000 waiver (for purposes of Biros' bid for the Debtor's assets) did not foreclose Biros from seeking a larger administrative expense amount for unpaid rent or other claims, if she wished.  Given that the Court received no evidence at that hearing regarding rent, and "was not prepared to" consider a larger request at that hearing, the $10,000 waiver also did not constitute a final determination about what reasonable rent for use and occupancy of the Property might be.

31.     During the sale hearing, the Court also cautioned that "pigs get fat and hogs get slaughtered," and expressed its views that the parties had been over-litigating the case relative to the size of the estate, were motivated by mutual animosity and spite, and were not displaying common sense.  *Id*. at 21:15-16; 22:21 - 23:9.  Biros recognizes and understands the Court's

concerns and through this Motion attempts to use her best good faith efforts to strike a balance between protecting and asserting her rights, while also taking into consideration the Court's directives.

32.     Snyder was the prevailing bidder for the assets. The Court approved the Amended Sale Motion and authorized the Trustee to sell the affected assets to her for $70,000.

33.     Pursuant to the Court's *Order Confirming Sale of Tangible and Intangible Personal Property of the Estate . . .*, entered December 20, 2022 [Doc. No. 254] (the "Sale Order"), Snyder was given thirty days after the closing of the sale by which to remove tangible property she purchased from (among other locations) the Property. *Id*. at ¶ 18. The Sale Order also provides that any such tangible property Snyder did not remove or left behind would, as of the thirty-first day after the closing, be deemed abandoned by Snyder. *Id*.[1]

34.     The sale of tangible and intangible assets closed on December 28, 2022. *See Report of Sale Regarding Tangible and Intangible Personal Property of the Estate* [Doc. No. 266].

**IV.     Biros' second request for relief from stay**

35.     Meanwhile, anticipating that the estate no longer would need her Property after the asset sale closed, Biros filed a second *Motion for Relief From the Automatic Stay* [Doc. No. 255] on December 22, 2022, in a renewed effort to gain exclusive possession of her Property (the "Second Stay Relief Motion"). She pointed out, yet again, that the estate has not paid her any rent since the bankruptcy case began.

36.     Notably, in her Second Stay Relief Motion Biros argued that her ownership interest in the Property was not being adequately protected. *Id*. at ¶s 46-47, 52-53.

---

[1]  The Debtor appealed from the Sale Order on January 3, 2023. *See Notice of Appeal* [Doc. No. 269], W.D. Pa. Case No 2:23-cv-00010.

37.     Yet again, Snyder objected [Doc. No. 284], on January 9, 2023.  So did her brother, George Snyder [Doc. No. 292].

38.     On January 27, 2023, the Court entered an *Amended Order Granting Motion for Relief from the Automatic Stay* [Doc. No. 307], in which it granted Biros "relief from the stay under 11 U.S.C. § 362 to facilitate the transfer of possession and pursue any and all state court rights related to" the Property.  The relief was effective as of January 28, 2023.  *Id.*

**V.      Biros' initial motion for an administrative claim**

39.     Concurrently with her Second Stay Relief Motion, on December 22, 2022, Biros filed her *Motion for Allowance of Administrative Expense Claim* . . . [Doc. No. 258] (the "Initial Admin Claim Motion"), in which Biros advocated for an allowed administrative expense claim of $144,000 for the estate's use and occupancy of the Property since the Petition Date.  At that time, and given the unique facts of this case, Biros put forth her best estimate of the value of her claim.

40.     Once again, Snyder objected [Doc. No. 285], on January 9, 2023.  So did George Snyder [Doc. No. 286].  The Trustee also responded [Doc. No. 277].  He asked that the Initial Admin Claim Motion be denied for the amount requested, but that Biros be granted an administrative expense in a lesser dollar amount.  *Id*. at p. 3 of 4.  Biros' counsel had discussions with the Trustee prior to the Trustee filing his response, and was prepared to negotiate a reduced claim with the Trustee and fully expected to do so prior to the hearing.

41.     That hearing never happened.  On January 17, 2023, the Court entered a *Memorandum Opinion* [Doc. No. 293] in which it canceled the self-scheduled hearing on, and denied, the Initial Admin Claim Motion *sua sponte*.  Concurrently, the Court issued an order to show cause [Doc. No. 294], directing Biros and her counsel, Robert S. Bernstein, Esq., to appear

for hearing.  Biros and attorney Bernstein responded to the order to show cause on January 25, 2023 [Doc. No. 304].

42.     During the January 27, 2023 hearing on the order to show cause and other pending matters in the case, the Court granted leave for Biros to file, on or before March 1, 2023, a "renewed or amended application for an administrative expense claim to the extent she still seeks one."  *See Order Regarding Order to Show Cause and Request for Administrative Expense* [Doc. No. 314] at ¶ 3.

43.     Having considered the Court's directives in its Memorandum Opinion and during the January 27 hearing, and appreciating the Court's concerns, Biros submits this amended request for allowance and payment of an administrative expense and/or adequate protection.  As explained above, this request is subject to the compromise agreement reached with the Trustee and pursuant to an appropriate Motion under Bankruptcy Rule 9019.

<b>RELIEF REQUESTED</b>

## I.   Legal standards

44.     In bankruptcy, landlords face unique economic risks.  They are forced to let delinquent tenants remain in possession and to control the landlord's real estate, and must continue doing business with them.  Meanwhile, other creditors often can opt to cease rendering services, to stop goods in transit, or to refrain from supplying financially distressed debtors unless and until those creditors receive whatever protections or enhancements they deem sufficient, such as "critical vendor" or adequate protection orders.  Congress amended the Bankruptcy Code in 1984 to better protect landlords for the very reason that "unlike other creditors who could simply choose to stop doing business with the debtor post-petition, landlords were stuck with the debtor while it decided whether to assume or reject the lease, during which time the debtor was not paying rent

and the landlord could not re-let the space." *In re Imperial Beverage Group, LLC*, 457 B.R. 490, 497 (Bankr. N.D. Tex. 2011) (citation omitted).  That risk is precisely what happened to Biros in this case:  For 9 months, the Debtor's estate continued to use Biros' Property and did not pay any rent for it, while the automatic stay barred Biros from developing or re-letting the premises.

### A.  Adequate protection principles

45.    Of course, landlords do have certain statutory remedies.  For example, a landlord's right to timely payment of rents during bankruptcy constitutes an interest in property entitled to adequate protection under sections 361 and 363.  *See In re Tihi Rest. Corp.*, 2023 Bankr. LEXIS 279 at *5-6 (Bankr. S.D.N.Y. Feb. 3, 2023) (citing cases).  A landlord's interests are not adequately protected if a debtor fails to remain current on post-petition rent.  *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. 63, 69 (Bankr. S.D.N.Y. 2010).  Likewise, a debtor's failure to pay post-petition rent can be "cause" to lift the stay under section 362(d)(1).  *Id.*

46.    Similarly, section 363(e) enables a court to prohibit or condition the use or lease of property in which another entity has an interest as is necessary to adequately protect that entity's interest.  11 U.S.C. § 363(e).  "Section 363 sets forth the conditions under which a debtor may use property in which others have an interest, including lessors," and subsection (e) empowers the court to impose conditions necessary to adequately protect lessors' interests.  *In re RB Furniture, Inc.*, 141 B.R. 796, 713 (Bankr. C.D. 1992).

47.    Section 361 provides a list of methods by which an entity with an interest in property (such as a landlord) may be provided with adequate protection under section 363.  The estate can make a single cash payment or "periodic cash payments" to the landlord.  If applicable, the estate can grant the landlord a replacement or additional lien.  Or the estate can grant the landlord other relief – other than entitling such entity to compensation as an administrative expense

under section 503(b)(1) – as will result in the landlord's realization of the "indubitable equivalent" of its interest in its property.  *See* 11 U.S.C. § 361.

48.    Courts can rely exclusively on sections 361, 362, and 363 to fashion relief that safeguards landlords' property interests during tenants' bankruptcies.  *See, e.g., In re Borbridge*, 66 B.R. 998, 1002 (Bankr. E.D. Pa. 1986) (sections 361, 362(d)(1), and 363(e) apply to a leasehold interest in a Chapter 7 case involving a nonresidential lease).

49.    Some courts therefore have issued adequate protection orders directing tenants to pay landlords for use and occupancy of real property – and have granted relief from stay if the debtors fail to make those adequate protection payments – all without any reliance upon the principles applicable to section 503(b)(1) of the Bankruptcy Code.  *See, e.g., In re Winer,* 2008 Bankr. LEXIS 1535 at *4, 10-11 (Bankr. E.D.N.Y. May 13, 2008) (landlord's interest in premises was not adequately protected, and "cause" existed to lift the automatic stay, where the debtor failed to make two adequate protection payments "for use and occupancy" pursuant to an adequate protection order).  Thus, sections 361, 362, and 363(e) can provide the statutory predicate to ensure adequate protection of a landlord's interests in real property and compensation for an estate's post-petition use and occupancy.

50.    Adequate protection is not a guarantee that a landlord's claim will be paid in full, though.  "Instead, the [c]ourt must determine whether the landlords' interests are protected as nearly as possible against possible risks to that interest."  *In re Ernst Home Center, Inc.,* 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997).

51.    If the automatic stay is not lifted (despite non-payment of post-petition rent or other harms), "adequate protection" may fall short of protecting a landlord's interests "as nearly as possible against possible risks."

52.     Congress sought to ameliorate some of those risks for commercial landlords by, for example, enacting section 365(d)(3).  It requires debtors-in-possession and trustees to "timely perform all the obligations . . . arising from and after an order for relief under any unexpired leases of nonresidential real property . . .".  *See* 11 U.S.C. § 365(d)(3).  Congress added this provision (among others) in 1984 to "[e]insure that the debtor-tenants [of nonresidential property] pay their rent, common area and other charges on time, pending the trustee's assumption or rejection of the lease."  130 Cong. Rec. S8891, 599 (1984) (statement of Sen. Hatch).

53.     Section 365(d)(3) has its limits, though, because it only protects landlords who are parties to bona fide "unexpired leases" of commercial real property.  *See Imperial Bev. Group, supra*, 457 B.R. at 496 (citing *In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986)).

54.     Section 363(e)'s mandate to "adequately protect" landlords is not that limited, however; it applies even where (as in this case) no commercial lease exists on the petition date. As the court in *RB Furniture* observed generally:

> Section 365(d)(3) just applies to commercial real property leases. There are many other executory contracts that require the protection of § 363(e). ***In addition, adequate protection is a fluid concept that reflects all the circumstances surrounding a debtor's use of the property***, while § 365(d)(3) deals solely with debtor's performance of its obligations under the contract. It could be that the mere performance of debtor's obligations under the contract would not provide adequate protection for the party in interest.

*RB Furniture, supra*, 141 B.R. at 713-14 (emphasis added).  Thus, a landlord's rights to adequate protection are expansive, derived from all the circumstances surrounding the debtor's use of the landlord's premises.

55.     A debtor must pay reasonable rent for the use of premises during bankruptcy.  If the debtor does not, then section 363(e) requires the debtor to provide some form of adequate protection.  *See In re Attorneys Office Management, Inc.*, 29 B.R. 96, 98 (Bankr. C.D. Cal. 1983).

56.     Here, the Trustee acknowledges that (despite using her Property since the Petition Date) the estate has paid Biros nothing.  *See* Stipulated Order at ¶5.  Since early in this case, Biros consistently demanded relief from stay.  Section 363(e) therefore required the estate (through the Debtor or the Trustee, as the case may be) to adequately protect Biros' interest in the Property. The estate did not.

57.     Nor did the Court condition the estate's ongoing use of Biros' Property to the extent necessary to protect her interests "as nearly as possible against possible risks." *In re Ernst Home Center, Inc.,* 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997).  The Court approved only partial, circumscribed relief.  It denied Biros the most fundamental protection she sought – i.e., relief from stay to eject the Debtor and possess the Property – while not requiring the estate to pay her *anything*.

58.     Pursuant to section 363(e), the Court can and should award Biros sufficient compensation, in the form of a single payment as contemplated in section 361(1) or an indubitable equivalent as provided in section 361(3), to adequately protect her interest in the Property and its reasonable rental value since the Petition Date, albeit retroactively.

**B.  Section 503(b)(1) administrative expense principles**

59.     Adequate protection principles under sections 361, 362, and 363 are not the only remedies available to a landlord.  Section 503(b)(1) provides another basis on which to protect a landlord's interests – by potentially entitling it to an administrative expense claim for, among other things, post-petition rent.  Unlike section 365(d)(3), with its directive that trustees must proactively and "timely perform all the [lease] obligations," section 503(b)(1) requires the landlord to request post-petition rent as "actual, necessary costs and expenses of preserving the estate . . .".  *See* 11 U.S.C. § 503(b)(1)(A).

60.    "Actual and necessary costs under [s]ection 503 include costs ordinarily incident to operation of a business, and need not be limited to costs without which rehabilitation would be impossible." *In re Cohen & Sons Caterers, Inc.,* 143 B.R. 27 (E.D. Pa. 1992).  Bankruptcy courts have broad discretion to determine whether a claim is a proper administrative expense. *Upper Peninsula Power Co. v. Verso Corp. (In re Verso Corp.)*, 2019 U.S. Dist. LEXIS 125420, at \*6 n.3 (D. Del. July 29, 2019) (citations omitted).

61.    In order to be entitled to an administrative expense claim under section 503(b)(1)(A), the claimant must show that "(1) there was a post-petition transaction between the claimant and the estate and (2) those expenses yielded a benefit to the estate." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021) (internal quotations and citations omitted).

62.    With respect to section 503(b)(1), the Third Circuit has adopted the view that the "benefit does not, however, 'have to be substantial' to qualify" as an administrative expense. *Id.* at 742 (quoting *In re Women First Healthcare, Inc*., 332 B.R. 115, 121 (Bankr. D. Del. 2005)).

63.    The Third Circuit also has recognized that, even after a lease expires, if the debtor continues to use and occupy the premises post-petition, its landlord is entitled to an administrative expense for the reasonable rent associated with that use and occupancy. *See, e.g., Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 629 (3d. Cir. 1990). *See also In re Goody's Family Clothing, Inc.,* 610 F.3d 812, 819 (3d Cir. 2010) ("Although it addressed an expired lease, *Zagata* supports that the Debtors' retaining possession of the premises, thereby inducing post-petition services from the Landlords, is sufficient under the *O'Brien* and *Mammoth Mart* inquiries to be a transaction justifying administrative priority."); *In re Jeans.com*, 491 B.R. 16, 2013 Bankr. LEXIS 1548 (Bankr. D. P.R. 2013).

15

64.     As the Circuit explained further in *Zagata*, "[t]here is no question, of course, that the payment of rent for the use and occupancy of real estate ordinarily counts as an 'actual, necessary' cost to which a landlord, as a creditor, is entitled." *Zagata, supra,* 892 F.2d at 627 (citation omitted). "Because bankruptcy proceedings are considered to be equitable, however, the landlord's right to collect monetary relief is somewhat curtailed: a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease." *Id.*

65.     In connection with balancing the equities between an estate's needs and a landlord's interests – even if a landlord is alleged to have misbehaved, as Snyder has self-servingly alleged on multiple occasions – courts should be mindful that "the equitable maxim requiring parties to come to the court with clean hands must be balanced against the paramount common sense principle that you can't get something for nothing." *Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 629 (3d. Cir. 1990). Otherwise, "the inequities created by the remedy granted by the bankruptcy court [may] far outweigh the inequities sought to be redressed." *Id*. (where seller breached its contract of sale, bankruptcy court erred by allowing debtor to retain possession of and use the seller's real property rent-free).

66.     Moreover, a landlord is entitled to recover administrative rent even if the premises' post-petition use was not "profitable" to the debtor. *See, e.g., In re Patient Educ. Media, Inc.*, 221 B.R. 97 (S.D.N.Y. 1998) ("Just as the debtor in possession must still pay a trade vendor who provides inventory that cannot be sold, the debtor in possession must pay for the use of a nondebtor's property, even where the use turns out to be unprofitable.") (citing *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 26 (2d Cir. 1996)). *See also In re Continental Airlines, Inc.*, 146 B.R. 520, 527 (Bankr. D. Del. 1992). The district court in *Patient Education Media* explained that, as

16

a matter of policy, "[l]inking the creditor's priority entitlement to the profitable use of his credit will chill the creditor's willingness to extend credit, and ultimately, frustrate the goal of rehabilitation." 221 B.R. at 104. In other words, conditioning a landlord's entitlement to post-petition rent on the debtor showing a profit (e.g., not becoming administratively insolvent) would force landlords to subsidize reorganizations and liquidations alike, and would motivate them to press for relief early and often in virtually every case.

67.     Furthermore, although disagreement exists among the courts, many have held (including in the Third Circuit) that the "reasonable value of use and occupancy" should be measured objectively, focusing on the reasonable value of the premises without regard to the debtor's actual use of the property. *See In re F.A. Potts & Co.,* 137 B.R. 13, 17 (E.D. Pa. 1992). This is so even if the debtor does not use the premises for the same purposes post-petition that it did pre-petition. *Id.*

68.     Even if the use and occupation of real estate is merely to provide storage for property of the estate, that storage constitutes "preserving the estate" within the meaning of section 503(b)(1). Therefore, post-petition expenses of storage are entitled to administrative expense priority too. *See, e.g., In re Aerospace Techs*., 199 B.R. 331, 339-340 (Bankr. M.D.N.C. 1996). In *Aerospace*, no lease or rental agreement existed. The court observed that, in order for the trustee to sell the estate's personal property, the property had to be stored somewhere. If it was not stored at the landlord's facility, the court reasoned, the trustee would have had store it elsewhere and pay the rent and storage fees to do so. *Id*. at 340. Based upon the evidence presented regarding reasonable rent for storage under the particular facts of that case, the court awarded the landlord an administrative expense of $16,250, equal to $2,500 per month for six and a half months of storage. *Id.*

**II.**    **Determining the amount of Biros' administrative rent or adequate protection claim**

69.    Since the date upon which Biros filed her Initial Admin Claim Motion, the December 15 asset sale closed, the estate's tangible personal property was removed from the Property, and the automatic stay has terminated as to Biros.  Thanks to these intervening developments, Biros now knows the total period during which the estate used her Property, for purposes of determining her administrative rent or adequate protection claim.

70.    If an unexpired lease exists, determining the "reasonable post-petition rent" often is straightforward, because the stated rental amount in the lease typically is presumed to be a reasonable amount.  When no lease exists, though, "there is no rental rate which is presumptively reasonable."  *In re Aerospace Techs*., 199 B.R. at 340.  Consequently, when no lease exists, determining the proper, reasonable rent necessitates use of other measures, other metrics.

71.    In other words, because no lease existed between Biros and the Debtor pre-petition, and because the Debtor operated without any rental agreement post-petition, the central question continues to be how best to "value" or determine the amount of Biros' "administrative rent" claim. Similarly, what is the proper amount of "adequate protection" required to compensate Biros for the real property?  Biros believes, and therefore avers, that this is a unique situation, and she should be compensated fairly for the time the estate used her Property without adequately protecting her interests.

72.    First, mindful of the Court's comments about "reasonable rent" in its Memorandum Opinion, Biros recently obtained an estimate of fair rental value from a real estate appraisal firm. That report indicates that the fair rental value consists of the following:

1) Pole building – $5.50 per square foot (triple net), for 3,200 square feet, yielding a total of $1,466 per month;

2) Self-storage areas – 5 units at $275 per month (i.e., $55 per unit per month (4 foot by 7 foot)), 20 units at $1,500 per month (i.e., $75 per unit per month (10 foot by 10 foot)), and 1 unit at $100 per month (10 foot by 20 foot by 30 foot); and

3) Land areas of $2,500 per month for 50 rentable spaces (at $50 per space) and $1,240 per month for 31,000 square feet of lay down space (at $0.48 per square foot).

The rounded total for these rental values is $7,000 per month. Thus, for 9 months' use, the total "reasonable rent" for the space under this metric would be $63,000.

73.    Second, Biros obtained a broker's opinion that the current value of the real estate is between $703,000 and $904,000. For purposes of argument, utilizing the lesser of these two amounts (in place of the $1.9 million valuation listed in the Debtor's Schedules of Assets and Liabilities), and then multiplying that by 11.82% (the updated average return on commercial real estate investment for the S&P as of August 2022), the product is $83,424 per year – or an expected return by a developer of at least $6,952 per month. (Biros' acquisition cost also includes substantial legal fees, taxes, carry costs and related expenses, which a real estate investor would include for purposes of determining a proper return on its assets (soft costs) – and as one means of gauging the rents it should charge its tenants in order to recover such amounts. Adding those legal fees and expenses in this instance would enlarge this amount considerably.)

74.    Biros understands that the Court does not consider a "return on assets" or "return on investment" metric to be an appropriate analytical standard to determine reasonable rent in this context, and therefore does not rely on it for purposes of this request. Biros merely observes that the adjusted amount calculated under that metric (without adding her legal fees and expenses) is congruent with the $7,000 per month "fair rental value" in the appraiser's report.

75.    Third, as the Court noted in its Memorandum Opinion, if the Trustee had opted to move the tangible personal property off-site to another location in preparation for the sale, the estate would have incurred moving expenses and rental or storage fees at an alternative location –

moving expenses and storage fees the estate avoided by continuing to use the Property for storage.

Biros obtained an estimate that a moving company would have charged $6,680 to move everything

from the Property, assuming it was given access to the on-site high-lift to help load the personal

property.  Storage fees elsewhere may have been approximately $1,500 per month – e.g., the

$1,500 per month "credit" toward unpaid rent that the Court granted to Biros in connection with

her bid at the asset sale.  The total of $6,680 (to move the personal property) and $1,500 per month

(to store it) for up to 9 months would equal $20,180.  Add to that any expenses necessary to insure,

secure, or otherwise safeguard all of the personal property until consummation of the sale.

76.     Fourth, as yet another method of assessing "reasonable rent," Biros also has

considered the amount of rent the Debtor actually charged its renters for storage space at the

Property (inside and outside).  Based upon testimony and lists the Debtor provided, it appears that

post-petition the Debtor rented space at the Property as follows:

1)  21 storage units (based on rent records of George Snyder) at an average of
    $80.00/unit, totaling $1,680.00 per month; plus

2)  Garage rental: 2 half-garage at $250.00 per month, totaling $500.00 per month; plus

3)  Vehicles: 55 containers, trailers, cars and construction equipment at $50.00 per
    month, totaling $2,750.00 per month.

The total monthly rentals charged for these uses was $4,930 per month.  For the 9-month period,

under this metric the aggregate amount the Debtor charged was $44,370.

77.     Biros understands, though, that the Trustee did not actually collect that much

money.  Nonetheless, the Trustee presumably has claims against the renters to recover the amounts

they owe but did not pay, plus interest if applicable.  Whether the Trustee opts to pursue such

claims is a matter within his discretion (and subject to this Court's overview).  In any event, the

rental amounts charged to those tenants is yet another measure of the benefit the estate derived

from the Property, even if the Trustee does not try and collect all of that rent.

78.    <u>Fifth</u>, Biros has considered the total rent the Trustee actually did collect.  She is informed that the Trustee collected rent of approximately $4,145, plus proceeds from junk cars of $975, for a total of $5,120.  If the Trustee pursued and collected even just 20% of the possible rents of $44,370 (after netting his legal fees to do so), the result would be almost $8,900.  Adding such net recovery to the $5,120 actually collected would constitute yet another measure of the estate's benefit from its use of the Property, totaling $14,020.

79.    Furthermore, adding this amount to the $20,180 the estate saved by not moving the personal property and paying to store it elsewhere (see above), the estate realized an aggregate benefit of $34,200.

80.    Given the unusual facts of this situation, and Congress' concern that landlords or landowners should be treated fairly during tenants' bankruptcy cases, Biros asserts that her claim does not fit squarely into the category normally associated with an administrative rent claim under section 503(b)(1).  Instead, Biros, and the Court for that matter, must analyze this complex set of facts and circumstances to arrive at an appropriate amount to compensate Biros with an administrative claim or as adequate protection of her interest in the Property – including because she was denied its possession and use.

81.    In any event, it is undisputed that the Debtor used the Property after the Petition Date to operate its business for a time, and that the Debtor and Trustee rented space to third parties and stored the estate's personal property until it could be sold during December 2022 and removed during January 2023.  Their use generated revenues and produced sale proceeds that benefited the estate, including as explained above.  To the extent section 503(b)(1) applies, its two elements for allowance of an administrative expense – i.e., a "transaction with the estate" and "benefit to the estate" – therefore are satisfied.

82.     That leaves the question of how much "administrative rent" or adequate protection is owed.  Where no lease exists to "presumptively" establish the "reasonable rent" amount, courts often rely on "expert" testimony to determine it.  In this instance, the appraiser provides an answer: Based upon the appraiser's report, the reasonable rent for the estate's use of the Property during this case is at least $7,000 per month.  Consequently, for 9 months' use since the Petition Date, ending January 27, 2023, the total reasonable rent is at least $63,000.

83.     Biros therefore now believes an appropriate  administrative expense claim or adequate protection payment would be $63,000 for the estate's post-petition use and occupancy of her Property.

## III.    Reservation of rights

84.     Biros reserves all of her rights with respect to her section 503(b)(1) administrative expense and claim for adequate protection, including in conjunction with the Court's consideration of and action on any proposed global settlement that may be achieved between the Trustee and Biros and that will be the subject of a separate motion in this case under Bankruptcy Rule 9019. Furthermore, Biros reserves the right to amend or supplement this request for any purpose.

WHEREFORE, Christine Biros requests that the Court enter an order (I) allowing Biros an administrative expense pursuant to 11 U.S.C. § 503(b)(1) or award of adequate protection pursuant to 11 U.S.C. § 363(e) in the amount of $63,000, (II) directing the Trustee to pay such allowed administrative expense or award of adequate protection to Biros from funds in the Debtor's estate promptly after entry of the order, and (III) granting to Biros such other and further relief this Court deems just and proper after a hearing on the merits.

Dated: March 1, 2023                                    BERNSTEIN-BURKLEY, P.C.

                                                        By:  */s/ Robert S. Bernstein*
                                                             Robert S. Bernstein (PA ID No. 34308)
                                                             Lara S. Martin (PA ID No. 307272)
                                                             601 Grant Street, Floor 9
                                                             Pittsburgh, PA 15219
                                                             Telephone: (412) 456-8108
                                                             Facsimile: (412) 456-8135
                                                             rbernstein@bernsteinlaw.com
                                                             lmartin@bernsteinlaw.com

                                                             *Counsel for Christine Biros*