FILED
7/26/23 1:37 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                          .    Case No. 22-20823-GLT
                                .
U LOCK INC,                     .    5414 U.S. Steel Tower
                                .    600 Grant Street
                                .    Pittsburgh, PA 15219
            Debtor.             .
                                .    July 14, 2023
. . . . . . . . . . . . . .     .    1:32 p.m.

TRANSCRIPT OF #340 EVIDENTIARY HEARING ON OBJECTION TO
CLAIM #1 OF SHANNI SNYDER FILED BY CREDITOR CHRISTINE BIROS
BEFORE THE HONORABLE GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Christine Biros:        Bernstein-Burkley, P.C.
                            By:  STUART C. GAUL, JR., ESQ.
                                 SARAH ELIZABETH WENRICH, ESQ.
                                 DANIEL McARDLE BOOKER, ESQ.
                            601 Grant Street, Ste 9th Floor
                            Pittsburgh, PA 15219

Lead Counsel in State       The Law Firm of William E. Otto
Court Action for            By: WILLIAM E. OTTO, ESQ.
Christine Biros:            4027 Old William Penn Highway
                            P.O. Box 701
                            Murrysville, PA 15668

For Shanni Snyder:          The Lynch Law Group LLC
                            By:  JOHN PATRICK LACHER, ESQ.
                            501 Smith Drive, Suite 3
                            Cranberry Twp, PA 16066

                            Fuchs Law Office, LLC
                            By: DAVID L. FUCHS, ESQ.
                            554 Washington Ave., First Floor
                            Carnegie, PA 15106

ECRO:                       Connie Ulysse

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

## INDEX

**WITNESSES**

**PAGE**

FOR THE MOVANT, CHRISTINE BIROS:

SHANNI SNYDER
  Direct Examination by Mr. Lacher                    13
  Cross-Examination by Mr. Gaul                       24

GEORGE SNYDER
  Direct Examination by Mr. Lacher                    86
  Cross-Examination by Mr. Gaul                       88


FOR THE OBJECTOR, SHANNI SNYDER:

KASH SNYDER
  Direct Examination by Mr. Gaul                     102
  Cross-Examination by Mr. Lacher                    111


EXHIBITS

FOR THE MOVANT, CHRISTINE BIROS:

(None)

FOR THE OBJECTOR, SHANNI SNYDER:

(None)

1          (Proceedings commenced at 1:32 p.m.)

2          ECRO:  All rise.

3          THE COURT:  Please be seated.

4          All right.  This is the United States Bankruptcy

5  Court for the Western District of Pennsylvania, and this is the

6  time set for this Evidentiary Hearing on Case Number 22-20823,

7  U LOCK INCORPORATED.

8          I'll begin by taking appearances first for the

9  objecting party.

10          MR. GAUL:  Your Honor, on behalf of Christine Biros,

11  Stuart Gaul and Sarah Wenrich of Bernstein-Burkley.  William

12  Otto is out in the hall.  He'll be right back in.

13          THE COURT:  Okay.

14          MR. GAUL:  Also present today Mac Booker also of

15  Bernstein-Burkley, and Ms. Biros is here, as well.

16          THE COURT:  All right.  Good afternoon, everyone.

17          I'll take appearances for the Claimant, please.

18          MR. LACHER:  Good afternoon, Your Honor.  John Lacher

19  and David Fuchs is with me with and for Respondent,

20  Shanni Snyder.

21          THE COURT:  All right.  Good afternoon.

22          I'll take appearances over here.

23          MR. G. SNYDER:  George Snyder, Your Honor.

24          THE COURT:  All right.  Good afternoon.

25          MR. K. SNYDER:  Kash Snyder.

4

1              THE COURT:  Kash Snyder?

2              MR. K. SNYDER:  Yes.

3              THE COURT:  Okay, good afternoon.

4              All right.  This is the time set for the Evidentiary

5    Hearing on the Objection to Claim #1 filed by Shanni Snyder.

6    That Objection was filed by Christine Biros.  I have a Response

7    In Opposition.  I had set this for an Evidentiary Hearing

8    following a Preliminary Hearing that we had several months

9    back.

10             At this point, let me ask if there's any housekeeping

11   matters or other items that we need to address.

12             MR. GAUL:  We do have a few, Your Honor.  The first

13   housekeeping matter is that I believe yesterday we filed a

14   document as Exhibit 24.  It's a document that simply didn't

15   exist when we filed our documents and delivered our exhibits

16   last week.  It is a supplemental document response that we

17   received from Ms. Snyder on Tuesday.  I'd ask leave of court to

18   supplement the exhibit binder that's up there for the witnesses

19   with that document.

20             THE COURT:  I have to apologize.  I saw that you

21   filed the Amended Exhibit List, but I don't know that I saw the

22   actual exhibit.  Was that --

23             MR. GAUL:  I thought it was an exhibit to our

24   Supplemental List.  We'd be happy to provide it to the Court at

25   this time, certainly.

1          THE COURT:  I think all I have is the Certificate of

2  Service that was attached, so if you do have extra copies --

3          MR. GAUL:  We do, Your Honor.

4          THE COURT:  -- first circulate it to Attorney Lacher

5  and then we'll proceed from there.

6          MR. GAUL:  Your Honor, may I approach?

7          THE COURT:  You may.

8          Thank you.

9          All right.  Any other housekeeping items for me?

10          Attorney Gaul?

11          MR. GAUL:  Just one other, Your Honor.

12          We have two persons in the courtroom who are neither

13  attorneys nor representatives of either Ms. Biros or Ms.

14  Snyder.  And I'd ask that pursuant to Rule of Evidence 615,

15  they be excluded.

16          THE COURT:  Okay.  Well, they will be excluded once

17  we start taking testimony.

18          Mr. Lacher, anything you wish to say with respect to

19  that?

20          MR. LACHER:  No, I certainly have no objection to

21  that, Your Honor.  I have a housekeeping matter that's more

22  suggestive.

23          THE COURT:  Yeah, I'll come to you.

24          MR. LACHER:  Oh, I'm sorry.

25          THE COURT:  But, yeah, I'm happy to --

6

1              MR. LACHER:  I apologize.

2              THE COURT:  Yeah, I was going to hear each side on

3    their housekeeping matters first.

4              MR. LACHER:  Certainly, sorry.

5              THE COURT:  All right.  Anything else other than

6    that?

7              MR. GAUL:  No, Your Honor.  Other than the

8    evidentiary objections that we outlined for this Court earlier

9    this week.

10             THE COURT:  Okay, very good.

11             All right.  Mr. Lacher?

12             MR. LACHER:  Thank you, Your Honor.

13             I suggested this to Mr. Gaul.  He didn't say yes or

14   he didn't say no.  But we have all of these Exhibits.  I don't

15   think there are any objections whatsoever to authenticity.  I

16   think all the objections are based on relevance because

17   Your Honor created a very narrow scope for this hearing,

18             In light of that, my suggestion and, again, we have a

19   limited time here, rather than fuss over these things, I would

20   suggest that we enter all the Exhibits for both sides into

21   evidence and Your Honor can certainly determine what's

22   relevant, not relevant, and give it proper weight.

23             THE COURT:  Well, was there any other discussion that

24   the parties had this week as a result of my Text Order?

25             MR. GAUL:  There was, Your Honor.  And, frankly, Mr.

7

1    Lacher and I did discuss this earlier in the week.  I think we

2    discussed it on Monday morning.  That produced the document

3    that was filed with you as 470.  I have only a limited concern

4    about Mr. Lacher's proposal, and that is that Exhibit C that

5    Mr. Lacher has offered on behalf of Ms. Snyder is Ms. Snyder's

6    Complaint in the District Court.

7              THE COURT:  Yes.

8              MR. GAUL:  Exhibit D, I believe, is her Motion for

9    Default Judgment.

10             THE COURT:  Right.

11             MR. GAUL:  My only objection to those is hearsay, and

12   I'd just ask that they not be admitted for the matters asserted

13   therein, which is something that Your Honor can certainly keep

14   straight.

15             MR. LACHER:  Which I agreed to, Your Honor.

16             THE COURT:  Okay.  But here's one thing I want to be

17   clear on.  This is a statement that I was going to make to the

18   parties.  I mean I thought I was pretty explicit in prior

19   hearings about how I felt the lawyering in this case has

20   degraded and that I expected everybody to act at a higher

21   standard.

22             And I've said on numerous occasions that I thought

23   Rule 9011 is in play because people just weren't getting a

24   sense of how they needed to be acting in this case and how they

25   needed to be communicating with opposing counsel.  And then I

1   get this Exhibit List where virtually every Exhibit from both

2   sides is objected to.  And I figured that sending a Text Order

3   after I received that on a Friday afternoon requiring you to

4   provide me with a report by Tuesday at noon would have been a

5   fair warning that the Court was displeased with what it

6   received.

7         And if that message was not clearly conveyed, I think

8   I'm going to convey it now, is that that was completely

9   unacceptable.  Not only that, I directed you to file that by

10  the 11th at noon.  And you both decided that I must not have

11  meant the 11th at noon, and so you filed it on the 12th at

12  noon.  So I don't know what to take from this as far as the

13  parties' interactions with the Court and the respect or lack of

14  respect that you have for this Court.  But I'm tired of it.

15        There's been too many games going on in this case as

16  it is, and I'm putting down guardrails on how I expect this to

17  move forward.  And the parties are simply not getting the

18  message.  And I'm going to come back to this thing that just

19  really struck me as being offensive is that Ms. Biros' counsel

20  has objected to every single Exhibit that Shanni is offering

21  here.

22        And from what I can see, Ms. Snyder's Exhibits are

23  all publicly-filed documents.  I understand you made this

24  hearsay objection, but you've also made this representation

25  about Exhibit C which is the Complaint.  Yet, you yourself have

1  offered that same exhibit into the record.  So how am I

2  reconcile that?

3          MR. GAUL:  If I may respond, Your Honor?

4          THE COURT:  Sure.

5          MR. GAUL:  When we read your Order, we read it as

6  somewhat different in scope from Rule 26 of the Rules of Civil

7  Procedure, which state that objections that aren't stated other

8  than I believe as to relevancy are waived.  We did not read the

9  same limitation into your Order.  And we objected essentially

10 prophylactically.

11         As Your Honor is aware, it's our position that we are

12 not in any way bound by the Order that Ms. Biros -- I'm sorry,

13 that Ms. Snyder or the Judgment that Ms. Snyder obtained from

14 the District Court.  Our objections on the basis of relevancy

15 were consistent with those two readings, and those were other

16 than the truths of the matters asserted in C and D the only

17 basis on which we objected.

18         And I apologize, I thought we tried to communicate

19 that in what we did subsequently file with the Court.  But it

20 wasn't our intention to be contumacious.  It was our intention

21 to just indicate that we did have relevancy concerns about

22 those documents.

23         THE COURT:  Okay.  But if the Court was somehow going

24 to accept those matters for the truth that they were asserted,

25 why would I be having an Evidentiary Hearing today?

1          MR. GAUL:  That's completely true, Your Honor.  It's

2     also true of some of the other documents that we filed and we'd

3     submitted.

4          THE COURT:  Well, again, I am just perplexed at this

5     point that we are now over a year into this case and I am

6     dealing with the same issues, if not worse, that I had on day

7     one.  And nobody is getting the message here.  I mean I'm not a

8     yeller and a screamer, and if that's going to be what it takes,

9     I'm ready to do that.  But this is just completely

10    unacceptable.

11         And now I've had to spend five minutes at the start

12    of this hearing to address this issue.  And it also perpetuates

13    the expense of this whole litigation because I just don't think

14    the parties are acting reasonably and they're over-lawyering

15    this.  And it's distracting us from what the real issues are

16    and getting us closer to just sorting through what needs to be

17    sorted through.

18         So bottom line is if the parties are agreeing to

19    admit all the Exhibits and let the Court decide relevance, I'm

20    fine with that.  But that's the result that I should have

21    gotten on July 11th at noon and not Friday at 1:42 p.m.  Got

22    it?

23         MR. GAUL:  Understood, Your Honor.

24

25         MR. LACHER:  Yes, Your Honor.  Thank you, and I

1 appreciate your ruling.  Thank you.

2          THE COURT:  Okay.  Any other housekeeping items, Mr.
3 Lacher?

4          MR. LACHER:  Not on our side.  No, thank you, Your
5 Honor.

6          THE COURT:  All right.

7          All right.  So where we are going forward, this is
8 obviously a Claim Objection, and I'm viewing this through the
9 lens of the Third Circuit's decision in <u>Allegheny</u>
10 <u>International</u>.  And I've decided at this point in terms of how
11 we will proceed that I've reviewed the documents.  And given
12 that the Proof of Claim that was originally filed was a Proof
13 of Claim that simply included just the Default Judgment,
14 nothing beyond that, and given that I also have other items of
15 record, both in Shanni's  -- and I apologize if that's too
16 informal.  We have multiple Snyders here, so if you'd prefer I
17 refer to her as Ms. Snyder, I'm happy to do that.

18          MS. SNYDER:  That's fine.

19          THE COURT:  Okay.  But Ms. Snyder's Chapter 7 case.
20 I've got contemporaneous documents indicating this issue that
21 there was no employment and no indication of the claim.  I've
22 got Schedules in U LOCK that indicate that there were no
23 employees.

24          And so, therefore, I'm coming to the conclusion that
25 there is no presumptive validity to the claim at this point.

1   And so I am going to find at this stage, or at least that to

2   the extent necessary Ms. Biros has rebutted the original

3   presumption of validity.  And so the burden of proof will be on

4   Ms. Snyder to verify the voracity of the claim.  And so from

5   that standpoint, I'll allow Ms. Snyder to proceed with the

6   burden of proof to go first, and then we'll proceed on that

7   basis.

8           Any questions from the parties on that?

9           MR. LACHER:  No, sir.

10          THE COURT:  Okay.

11          MR. GAUL:  None, Your Honor.

12          THE COURT:  Very well.  Then, Mr. Lacher, if you'd

13  like to begin.  You can present your --

14          MR. LACHER:  I would, Your Honor.  And, again, I

15  think Your Honor has made it very clear what the confines of

16  this hearing is and so with that, I don't think I need an

17  opening statement.  I think the Court probably made it for me.

18  And I'd like to have Ms. Snyder on the stand.

19          THE COURT:  Very well.  Ms. Snyder, if you'd like to

20  come forward to the witness stand, please.  And once you're

21  there, if you could raise your right hand and be sworn.

22          Oh, and -- well, let's let her be sworn and then I'm

23  going to excuse the other witnesses.

24          ECRO:  Please raise your right hand.

25              SHANNI SNYDER, MOVANT'S WITNESS, SWORN

**WWW.JJCOURT.COM**

S. Snyder - Direct/Lacher                          13

1          THE COURT:  All right.  So at this point, Kash

2    Snyder, you are listed as a prospective witness.  George

3    Snyder, you are, as well.  Although technically, I'm viewing

4    Mr. Snyder could be the representative of U LOCK at this point.

5    So, Mr. Gaul, tell me why he should not be able to stay in that

6    capacity.

7          MR. GAUL:  Your Honor, that's actually a question we

8    looked at, and I think the conclusion we came to was as long as

9    the designation of the corporate representative doesn't shift,

10   for instance, Mr. Kash Snyder doesn't become the representative

11   while George Snyder is testifying, I think we appreciate that

12   that's where the Court has to go.

13         THE COURT:  All right.  Very well.

14         So, Kash Snyder, Mr. Kash Snyder, I'm sorry, if you

15   could please be excused.  We will call you when it's time for

16   you to testify but, otherwise, I'll ask you to exit the

17   courtroom at this point.

18         All right.  Mr. Lacher, you may begin.

19         MR. LACHER:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21   BY MR. LACHER:

22   Q    Ms. Snyder, could you please state your name for the

23   record and for the Court?

24   A    Shanni Snyder.

25   Q    Thank you.  And I will tell you and inform the Court

S. Snyder - Direct/Lacher                    14

1 ordinarily I do a little background stuff, but again I think

2 the Court's familiar with who you are and what the issues are.

3 So if nobody has a problem with it, I'm just going to start

4 asking you about your dealings with U LOCK.

5 A    Okay.

6        THE COURT:  And I'm sorry to interrupt, too, but I'm

7 going to just note this at the very outset for the parties, as

8 well.  I mean I did set this on a rather stringent time period,

9 a Friday afternoon no less.  I do view this is a narrow issue,

10 so I may interject if I feel that the questions are going

11 afield a bit so that we focus on what the matters are that need

12 to be before the Court for its determination.

13        MR. LACHER:  Fair enough.  And I don't know how I

14 could object to that, Your Honor.  So that's fine.

15 BY MR. LACHER:

16 Q    Ms. Snyder, are you familiar with the company known as U

17 LOCK, INC.?

18 A    Yes, I am.

19 Q    Okay.  What is it?  What does it do?

20 A    It is a storage facility in North Huntingdon,

21 Pennsylvania.

22 Q    Okay.  Are you an owner, officer, or director of U LOCK?

23 A    No.

24 Q    You have alleged that you worked for U LOCK.  Is that

25 accurate?

S. Snyder - Direct/Lacher                    15

1  A    That's accurate.

2  Q    When did you work there?

3  A    It was January of 2016 to around February 2020.

4  Q    2020.  So a little over four years.  Is that accurate?

5  A    (No audible response).

6  Q    What was your job?  What did you do for U LOCK?

7  A    I monitored an independent dropcam of the premises.

8  Q    And how did that work?  Yeah, how did you view these

9  videos or monitor these things?  What did you do?

10  A    Telephone, I have an iPhone.

11  Q    Okay.

12         MR. GAUL:  Your Honor, I apologize.  We're having

13  some difficulty hearing Ms. Snyder over here.  If there's any

14  way she could keep her voice up a little more?

15         THE COURT:  All right, Ms. Snyder, if you could

16  please speak up.

17         THE WITNESS:  Sure.

18  BY MR. LACHER:

19  Q    So could I ask did you sit in front of a screen for eight

20  hours at a time and stare at it or was there another way that

21  you monitored it on your telephone?

22  A    So I absolutely dedicated certain hours, and I had my

23  phone charged and with me at all hours that I was supposed to

24  be doing it which was 5:00 p.m. to around 3:00 a.m.  So it

25  wasn't like I was glued, my eyes were glued to it, but if I got

S. Snyder - Direct/Lacher                          16

1  push notification, the wind would blow, I'd get a push

2  notification, I looked.

3      And aside from that, during those hours, you know, I'm not

4  saying I never fell asleep earlier than 3:00 a.m.  That could

5  have happened.  If I was at a social gathering, I'm still

6  watching it.  I have my children, I'm still watching it.  I'm

7  making dinner, I'm still watching it.  So it was just general.

8  It was very general, but I absolutely dedicated those hours

9  toward that activity.  But there were times in the day I would

10 watch it, too.  But I did a general for my Complaint.

11 Q    Who did you report to at U LOCK?

12 A    My brother George.

13 Q    Okay.  If you did see something out of the ordinary when

14 you got a notification, who would you inform of that?

15 A    I would call George.

16 Q    And when would you call George?

17 A    I pretty much talked to him every day, but as far as the

18 cameras were concerned, I would call him.  I got used to the

19 property and what should be there, what shouldn't be there, I

20 didn't know all the time if something should be there.  If I'd

21 see like a new truck there, I would say, "Hey, is this okay,

22 this car here?"

23      There was one man in particular always had different very

24 nice vehicles and cranes and different things.  I'd call and

25 say, "Hey, is that okay, should that be there?"  So I'd call

S. Snyder - Direct/Lacher                    17

1  him for something as simple as that.  Kids loitering.  Leaves

2  blowing, you know, I wouldn't call for obviously, but the

3  Biros, John Biros in particular and the father, they would show

4  up at night and just walk around.  So just, you know, anything

5  that happened that was unusual.

6  Q    That was normal and you might not have reported that?

7  A    No, that -- that I would have reported because the night

8  thing.  But I mean it was okay they were there, but I might

9  have just said, "Hey, the Biroses were there last night."  So

10 just anything unusual I called him.  Sometimes I knew it was

11 okay, like it wasn't --

12 Q    Let me ask you this, Ms. Snyder.  You've asserted that you

13 worked 70 hours per week --

14 A    Correct.

15 Q    -- for the four years.  That's a lot of time.

16 A    Yes.

17 Q    Now I know you have young children.  Is that correct?

18 A    Correct.

19 Q    Could you perform your services at the same time that you

20 dealt with your children?

21 A    I did.  I did.

22 Q    Okay.  Can you just explain how or why you would be able

23 to do that?

24 A    Well, the children were born in 2016.  I have twins.

25 They're very easy children.  It was very regimented.  I had

S. Snyder - Direct/Lacher                                        18

1   them on a schedule.  So it was just easy.  I had my phone with

2   me all the time.  So, like I said, if I were making dinner, I

3   could certainly just have my phone right beside me.  So they

4   were very regimented with their naps, going to bed.  You know,

5   my sleep schedule is really whacked, but I can absolutely --

6   you know, I dedicated those hours just to do that.

7   Q    Is it safe to say that you were on call for --

8   A    I was on call, yeah.

9   Q    -- 70 hours a week?

10  A    I was on call, yes.

11  Q    Thank you.  Were you paid for the work you did for U LOCK?

12  A    No, I was not.

13  Q    Did you expect to be paid for the work you did for U LOCK?

14  A    Yes, I did.

15  Q    You weren't acting as a volunteer or?

16  A    No, he promised to pay when things got straightened out,

17  if he got a mortgage on the place, if the property were

18  developed.  You know, he kept promising he would pay.  It

19  continued.  He promised over and over.

20  Q    When you say "he," you mean --

21  A    My brother George.

22  Q    -- George Snyder?

23  A    Yes.  Yeah.

24  Q    You'd asked to be paid?

25  A    Yes.  And he said he would pay in the beginning.  He said,

S. Snyder - Direct/Lacher                          19

1  when we got things straightened out.  You know, there were

2  legal issues with the Biroses.  They were indicted, so they

3  wanted things, you know, to just, you know, wait until 2018.

4  And we were waiting on that money maybe to clear up after 2018.

5  Q    Now how much did you expect to be paid?

6  A    At least minimum wage, but he at one point said he would

7  give me more.  If it were developed and it took off, it could

8  have been a commercial, a strip mall, whatever it was.

9  Q    Now when you worked and didn't receive payment, that went

10 on for some time, what did you do?

11 A    Well, I argued with him and would ask when I'm getting

12 paid.  And the same thing, I got the runaround.  You know,

13 eventually he'll pay me, he'll pay me.

14 Q    Now at some point you stopped working for U LOCK, correct?

15 A    Correct.

16 Q    When did that occur?

17 A    Around 2020.

18 Q    And why did you stop working for U LOCK?

19 A    Because I wasn't getting paid and it was taking too long.

20 And I knew nothing was going to happen.

21 Q    You then sued U LOCK for the monies owed to you, correct?

22 A    Yes.

23 Q    Where did you sue them?

24 A    The Western District, the United States Western District.

25 Q    And you filed a Complaint to initiate that action?

S. Snyder - Direct/Lacher                         20

1  A    Yes.

2  Q    Was U LOCK served with that Complaint?

3  A    Yes, they were.

4  Q    Did U LOCK respond to that complaint?

5  A    No.

6  Q    What did you do when they failed to respond?

7  A    I -- I entered the default.

8  Q    You requested a Default Judgment?

9  A    Yes.

10 Q    Was U LOCK noticed with the Motion, the Hearing for the

11 Default Judgment?

12 A    Yes, they were.

13 Q    Did U LOCK appear at the hearing?

14 A    No, they did not.

15 Q    Did you appear at the hearing?

16 A    Yes, I did.

17 Q    Who was the Judge at the Hearing?

18 A    Judge Colville.

19 Q    And what happened at the hearing?

20 A    He took testimony, and I just had to go over what we just

21 went over about my work.  And he awarded me the 130,000, and

22 then he awarded me liquidated damages which I never even asked

23 for.

24 Q    So the amount of wages --

25 A    Yes.

S. Snyder - Direct/Lacher                    21

1  Q    -- I just want to get this straight, based on the minimum

2  wage for the 70 hours a week for the four-plus years?

3  A    Yes.

4  Q    You got an award for that of approximately $130,000?

5  A    Correct.

6  Q    And then the Judge awarded you essentially double that.

7  He called the other half liquidated damages but you don't claim

8  to have earned $260,000 --

9  A    No.  I asked for --

10  Q    -- over that time frame?

11  A    -- 130,000.

12  Q    One hundred and thirty over the time frame.  Thank you.

13       Did you coordinate with George, with U LOCK, anyone at U

14  LOCK in regard to your Complaint or the action you brought in

15  the District Court?  By that, I mean did you tell them not to

16  come to the hearing, did they agree not to come to the hearing?

17  Were there any dealings whatsoever of that nature?

18  A    No, not at all.

19  Q    Okay.  Do you have any idea why U LOCK did not attend the

20  hearing or respond to the Complaint?

21  A    No, I don't know, but I hear things that he has said in

22  court.  He said he thought I'd go away, he didn't think I was

23  serious and he owed me the money.  You know, I heard that

24  after.  But as far as back then, I wouldn't know why he didn't

25  show.

S. Snyder - Direct/Lacher                                         22

1  Q    And then did you eventually file Proof of Claim in the U

2  LOCK Chapter 7 case in this Court?

3  A    Yes, I did.

4  Q    And what was the basis of your Claim?

5  A    Because I was owed the money.

6  Q    Okay.  And you attached to your Proof of Claim what?

7  A    (No audible response).

8  Q    Okay.  A Notice of the Judgment you'd received?

9  A    Yes.

10 Q    That was based on a Complaint you made for services you

11 performed and didn't get paid for?

12 A    Correct.

13 Q    Thank you.

14      Are you aware did U LOCK have any other employees?

15 A    I don't know them personally because I was more just

16 driving by, doing the camera remotely from my house.  I didn't

17 have an office.  It was from my house.  But, yes, they did and

18 I hear that more in the court hearings, too.  So I don't know

19 them.  I might have known a couple of them, you know, but I

20 don't know specifically his arrangements with U LOCK.

21 Q    Were there any employees there that were not members of

22 the Snyder family?

23 A    Yes, there are.  I read in his declaration, too.

24 Q    Do you have any idea if they were getting paid?

25 A    I don't know the arrangements.

**WWW.JJCOURT.COM**

S. Snyder - Cross/Gaul                                    23

1    Q    Now you filed a Chapter 7 case of your own.  Is that

2    correct?

3    A    Correct.

4    Q    And when you filed that case, you didn't initially include

5    this Claim, correct?

6    A    That's correct.

7    Q    You didn't indicate that you had employment with U LOCK.

8    Is that correct?

9    A    Correct.

10   Q    Okay.  Why was that not in there?

11   A    Well, at the time I wasn't even thinking of it because the

12   form is, you know, pretty straightforward.  It asks income.  I

13   never received any money, so I just wasn't thinking of it.  And

14   a little bit more, when I first filed in 2018, I was having

15   problems with my child's school.

16        He went to a Catholic school, and I couldn't pay it.  So I

17   kind of, you know, put it together real fast because they

18   wouldn't give him his diploma unless I paid the full balance.

19   And I wanted him to attend graduation, so that was really my

20   biggest problem that resolved, you know, because of the

21   bankruptcy.

22   Q    So, again, you weren't getting paid at all.

23   A    No.

24   Q    And you viewed it --

25   A    I just didn't think of it because it was income.  I never

S. Snyder - Cross/Gaul                           24

1  got anything.

2  Q    Understood.

3       And let me ask, I actually think I have just one more

4  question at this point.  Would that be true for any application

5  you filed around that time?  You talked about you were having

6  little problems with the kids' schooling or you might have

7  applied here or applied there.  Is it safe to say you did not

8  list U LOCK or income on any of those applications?

9  A    It's absolutely true.  I would have never listed them as

10 any income or that I worked there because I wasn't receiving

11 income.  I didn't even know that I could until later.

12           MR. LACHER:  Can I just very quickly confer with Mr.

13 Fuchs?

14           THE COURT:  Uh-huh.

15           MR. LACHER: Thank you.

16                (Counsel confer briefly)

17           MR. LACHER:  Your Honor, I have no more direct for

18 Ms. Snyder.

19           THE COURT:  All right.  Thank you.

20           Mr. Gaul.

21                  CROSS-EXAMINATION

22 BY MR. GAUL:

23 Q    Good afternoon, Ms. Snyder.

24 A    Good afternoon.

25 Q    Next to you on the table, there's a thicker binder.

S. Snyder - Cross/Gaul                         25

1  A    Okay.

2  Q    A white binder.  Could you open that up and take a look at

3  the document that's marked at Tab 15?

4  A    On the table here?

5          THE COURT:  No, you can put it in front of the

6  witness stand there.  And the drawer actually pulls out, if

7  that's easier for you.

8          THE WITNESS:  Okay.

9          THE COURT:  But you may want to keep the other binder

10 on the side so that you have a --

11         THE WITNESS:  Okay.  Yeah.

12         THE COURT:  -- easier.

13         THE WITNESS:  Because my eyes are kind of bad even

14 with glasses on.

15         Okay.  I'm ready.

16 BY MR. GAUL:

17 Q    At Exhibit 15, this is the Proof of Claim that you filed

18 in this proceeding?

19 A    Yes.

20 Q    And this Claim is what you're here today to defend?

21 A    Yes.

22 Q    Now in this proceeding, you've been represented by counsel

23 at certain times, correct?

24 A    Correct.

25 Q    You are represented by Mr. Lacher and Mr. Fuchs today?

S. Snyder - Cross/Gaul                    26

1  A    Yes.

2  Q    And you were previously represented by Mr. Joyce?

3  A    Correct.

4  Q    Mr. Joyce doesn't represent you anymore, correct?

5  A    Correct.

6  Q    And you are not aware of any of those attorneys

7  representing anybody else in this proceeding?

8  A    No, they're not.

9  Q    You were not represented by an attorney when you prepared

10 this form, correct?

11 A    (No audible response).

12 Q    And you weren't represented by an attorney when you

13 submitted the form?

14 A    No, I was not.

15 Q    Is it fair to say that you weren't assisted by anybody in

16 preparing this form?

17 A    No.  I amended these.  These were my old ones, and I just

18 added some things, correct.  No.

19 Q    So you did this by yourself?

20 A    Yes.

21 Q    And you filed it with this Court on May 27th of last year?

22 A    Yes.

23 Q    I'd ask you if you can take a look at the page that's

24 marked in the lower right-hand corner Biros 244.  And in

25 response to the question, "What is the basis of the claim?",

S. Snyder - Cross/Gaul                    27

1  you've written in 28 U.S.C. 3201?

2  A    Correct.

3  Q    That refers to the Docket Number, a Docket Number?

4  A    Correct.

5  Q    Okay.  I'm sorry.  The next page, two down from that, 246,

6  that is an Abstract of Judgment?

7  A    Okay.

8  Q    And that does refer to a Docket Number, correct?

9  A    Correct.

10 Q    And the Docket Number is about midway down on the

11 right-hand side.  It says Docket Number 2:21-CV-00904?

12 A    Yes.

13 Q    That was for a different case?  That's correct?

14 A    Okay.

15 Q    That's for the case that you discussed with Mr. Lacher

16 that you filed across the street in the Western District Court,

17 correct?

18 A    Okay.  Yes.

19 Q    So your Claim here in this proceeding is based on the same

20 allegations that you made in that case?

21 A    Well, I'm just -- we're just deciding whether or not the

22 Claim or not.  That was to receive money.

23 Q    Okay.

24 A    For the Judgment.

25 Q    But the factual allegations under -- that support your

S. Snyder - Cross/Gaul                    28

1  Claim here are the same factual allegations that supported your

2  Claim across the street?

3  A    Correct.

4  Q    And you got the Judgment from the District Court in

5  October of 2021?

6  A    Yes.

7  Q    And that --

8  A    October 15th.

9  Q    I'm sorry.

10  A    I think the 15th, the middle of -- yeah, the 15th.

11  Q    Okay.  And that Judgment arises from, as you told Mr.

12  Lacher, your Claim that you worked for U LOCK?

13  A    Correct.

14  Q    And your Claim that U LOCK didn't pay you for that work?

15  A    They didn't.

16  Q    And you prepared your complaint in that action yourself,

17  as well?

18  A    The complaint for the United States District Court?

19  Q    Yes.

20  A    I did.

21  Q    I want you to look at Exhibit Number 7.

22  A    7?

23  Q    Yes, please.

24  A    Okay.

25  Q    This is your Complaint?

S. Snyder - Cross/Gaul                    29

1  A    Yes.

2  Q    And is it fair to say that you got to decide who you were

3  going to sue?

4  A    Yes.

5  Q    And you used a form to prepare your Complaint?

6  A    Yes.

7  Q    And it's captioned Complaint For Violation of Fair Labor

8  Standards?

9  A    Correct.

10 Q    You read this form before you completed it, correct?

11 A    Yes.

12 Q    And on the first two pages of this document that are

13 numbered 199 and 200 down in the lower right-hand corner, the

14 form asked you to identify all the Defendants that you wanted

15 to sue.

16 A    Uh-huh.

17 Q    And --

18 A    Yes.

19 Q    Yes.  And if I am reading right on the first page of the

20 instructions below, are the instructions state to name each

21 Defendant, whether the Defendant is an individual, a government

22 agency, an organization or a corporation?

23 A    Yes.

24 Q    On Page 2 --

25 A    Are you talking about the instructions at the very end?

S. Snyder - Cross/Gaul                30

1  Q    Yes.

2  A    Okay.

3  Q    Bottom of the page.  It's numbered Biros 199.

4  A    You mean on 207.  Wait, what instructions are you talking

5  about?

6  Q    It's the first page of Exhibit 7.

7  A    Okay.  But what instructions are you talking about, the

8  last page?

9  Q    Under B on that very first page.

10  A    Okay.

11  Q    It starts, "Provide the information below for each

12  Defendant named in the Complaint."  Then it continues, "Whether

13  the Defendant is an individual, a government agency, an

14  organization, or a corporation."

15  A    Yes.

16  Q    And on Page 2, there's space for four Defendants.

17  A    Okay.

18  Q    The only Defendant you named was U LOCK, correct?

19  A    Correct.

20  Q    You didn't name George Snyder as a Defendant?

21  A    I did not.

22  Q    And George Snyder is your brother?

23  A    Yes.

24  Q    And you didn't name Kash Snyder as a Defendant?

25  A    No.

S. Snyder - Cross/Gaul                          31

1  Q    Kash is your brother, also?

2  A    Kash is my brother, yes.

3  Q    You filed this Complaint in July of 2021?

4  A    Yes.

5  Q    After you filed the Complaint, you knew you had to serve

6  it on U LOCK?

7  A    Yes.

8  Q    And when you served it, you asked your friend Katrina

9  Mycka to take care of that, correct?

10 A    Correct.

11 Q    And you asked her to give a copy of that Complaint to

12 George?

13 A    Correct.

14 Q    And it's your understanding that she did that?

15 A    Correct.  And I wouldn't call her a friend either.  She's

16 just an associate that I knew who would give it to him.

17 Q    Okay.  So you filed a Proof of Service with the District

18 Court stating that U LOCK had been served with the Complaint?

19 A    Correct.

20 Q    Is it fair to say that you didn't try to serve this

21 Complaint on Christine Biros?

22 A    No, I did not.

23 Q    Okay.  And you didn't name her as a party when you

24 prepared your Complaint?

25 A    No, because George was my go-to.

S. Snyder - Cross/Gaul                        32

1  Q    And when you filed your Complaint, you weren't in

2  communication with Christine Biros?

3  A    No.

4  Q    So you didn't tell her about your lawsuit against U LOCK?

5  A    No, I did not.

6  Q    And during the three months that your case was pending,

7  Christine Biros never spoke with you about it?

8  A    No.

9  Q    Now you told Mr. Lacher that the Court took testimony in

10 this case in your case in the District Court, correct?

11 A    Can you repeat that?  I was turning the page.

12 Q    Sure.  Did you tell Mr. Lacher that the District Court

13 took testimony in the case that you filed in 2021?

14 A    I did.

15 Q    Take a look at Exhibit 8.

16 A    Okay.

17 Q    And I'm going to represent to you that this is the

18 transcript of the District Court's Hearing for the Default

19 Judgment Motion that you filed.

20 A    Correct.

21 Q    Is it accurate to say that the entirety of your testimony

22 is set forth on Page 5 and the first two lines of Page 6?

23 A    I don't know what you mean by that.

24 Q    Do you see any part of this transcript other than Page 5

25 and the top two lines of Page 6 in which you testified?

S. Snyder - Cross/Gaul                           33

1  A    I was there and, yeah, the Judge asked me the questions

2  and we discussed all of this.  He asked what happened and what

3  brought me there.  He asked if George -- he knew it was George.

4  He asked if he was served, I believe.  I would have to read

5  through these.  I haven't read through these.

6  Q    Okay.

7  A    I think I had in my documents the hearing notes.

8  Q    Let me ask you a couple of questions about the Complaint

9  if we can go back to Exhibit 7.

10  A    Uh-huh.

11  Q    In the Complaint, you say that you worked for U LOCK.

12  A    Correct.

13  Q    And on the top of -- the bottom of the page that's

14  numbered Biros 201 and the top of the page that's numbered

15  Biros 202, you claim -- I'm sorry.  On Biros 202 in Section E,

16  you claim that you worked for U LOCK from January 1, 2016 to

17  February 15th, 2020?

18  A    Correct.

19  Q    And you claim that you worked for 70 hours per week?

20  A    Yes, I did.

21  Q    And you claim that you worked from 5:00 p.m. to 3:00 a.m.?

22  A    Yes.

23  Q    That's ten hours?

24  A    Yes.

25  Q    So your claim at the District Court was that you worked

S. Snyder - Cross/Gaul                                    34

1  seven ten-hour days every week?

2  A    Correct.

3  Q    For more than four years?

4  A    Yes.  I said -- yeah, a little more than four years.

5  Q    And it's fair to say that in 2016, you knew you were doing

6  this work?

7  A    Yes.

8  Q    And you knew that in 2017 and '18 and '19 and '20, as

9  well?

10  A    Correct.

11  Q    And your claim at the top of that page, 202, is that

12  U LOCK was supposed to pay you $7.25 an hour, correct?

13  A    Correct.

14  Q    So before over time that works out to $507.50 a week?

15  A    I don't have my calculations here, but I did it minimum

16  wage times the 40 and then the over time.  So that's how I

17  calculated.  So --

18  Q    And your total claim in the District Court action was for

19  $131,351?

20  A    Yes, that's correct.

21  Q    And of that, $108,079 was hourly wage, correct?

22  A    Correct.

23  Q    And everything that we've discussed so far, all these

24  assertions are also the basis for your Claim here in this

25  bankruptcy proceeding?

S. Snyder - Cross/Gaul                    35

1  A     Correct.

2  Q     You are not alleging any basis for your claim in this

3  proceeding other than unpaid wages?

4  A     Correct, with the Judgment.

5  Q     You're not alleging that you worked for U LOCK before

6  2016?

7  A     No.

8  Q     Or after February 15, 2020?

9  A     No.

10 Q     Or more than ten hours a day every day during those four

11 years?

12 A     No, I'm saying I worked ten hours a day during those

13 years.

14 Q     Okay.  So are you aware that if you do the math,

15 essentially you're claiming that you were due $507.50 per week

16 for 213 straight weeks?

17 A     Well, I don't know.  I figured out the math and my math

18 was just -- I mean it was accurate.  I don't know what your

19 math is.  We'd have to take a break and we'd have to go through

20 the math.

21 Q     You didn't make any allowance in your calculation for

22 vacation?

23 A     No.

24 Q     Or sick time?

25 A     I didn't take vacations.

S. Snyder - Cross/Gaul                                          36

1  Q    No allowance for sick time?

2  A    There wasn't sick time.  I included -- I had a stay at the

3  hospital when I had my children.  And I used to always have my

4  phone.  I'm not saying there weren't days, you know, that I

5  might have been a little more lax with it, but for the majority

6  of the time, yes, I separated that time, designated it just for

7  that.

8  Q    So when you did your calculation, you didn't really

9  account for any interruption in what you were doing?

10 A    No, because I had -- I had my phone on me every day.

11 Q    So ten hours at night every night for 213 straight weeks?

12 A    Yes.  And, like I said, I'm not saying I never fell

13 asleep, I'm never -- I'm not saying at -- I would be out at

14 social gatherings.  I set that time aside just to watch the

15 cameras.  I dedicated that time for U LOCK.

16 Q    Okay.  And this was for roughly 1,500 consecutive days?

17 A    Yeah.

18 Q    You also claim that U LOCK was supposed to pay you

19 monthly?

20 A    Can I back up there?  I was doing a general, too, for

21 District Court.  They asked for a general statement.

22 Q    You also claim that U LOCK was supposed to pay and in this

23 Court, you're making the same claim?

24 A    Yes.

25 Q    You also claim that U LOCK was supposed to pay you

S. Snyder - Cross/Gaul                    37

1  monthly?

2  A    Well, I would -- they could do it however they wanted.  I

3  never got anything.

4  Q    Take a look at the top of the page that's marked Biros

5  202.

6  A    Yes.

7  Q    The first line on that page says $7.25 an hour to be paid

8  monthly.

9  A    Okay.

10  Q    And that's in your Complaint?

11  A    Yes.

12  Q    And your first month of work was January 2016.

13  A    Correct.

14  Q    So by sometime in February of 2016, you knew that U LOCK

15  hadn't paid you for January?

16  A    Correct.

17  Q    And for every single day from February 2016 to today,

18  you've known that U LOCK hasn't paid you?

19  A    Correct.

20  Q    You claim that U LOCK acknowledged that it owed you this

21  money?

22  A    Yes, they did.

23  Q    And that U LOCK asked you to defer paying this money to

24  you?

25  A    Yes.

S. Snyder - Cross/Gaul                                38

1  Q    So that happened in February 2016?

2  A    Yes.

3  Q    And for every single day from February 2016 to today,

4  you've still known that U LOCK hasn't made good on its promise

5  to pay you?

6  A    Well, yes, I haven't received anything, correct.

7  Q    You got your Judgment against U LOCK in October of 2021?

8  A    Yes.

9  Q    And you recorded that Judgment with the Court in

10 Westmoreland County?

11 A    Correct.

12 Q    So that Judgment gave you an opportunity to try to collect

13 the amount of your Judgment from U LOCK?

14 A    Correct.

15 Q    Did you ever serve any discovery on U LOCK to learn about

16 what assets it had?

17 A    No, I did not.

18 Q    I'm sorry.

19 A    I did not.

20 Q    Okay.  Did anyone ever tell you about the things that you

21 could do in order to collect on the Judgment?

22 A    The Department of Labor did.

23 Q    But that's it?

24 A    The Department of Labor, yeah.

25 Q    Okay.  Beginning of 2016, did you understand George to

S. Snyder - Cross/Gaul                                    39

1  have a role at U LOCK?

2  A    Did I understand he did or did not?

3  Q    Did have a role at U LOCK?

4  A    Yes, I did.

5  Q    And during this period, you I think told Mr. Lacher that

6  you were speaking with your brother George every day?

7  A    Probably almost every day, yes.

8  Q    What do you understand Mr. -- what did you understand

9  George Snyder's role at U LOCK to be?

10 A    Well, he obviously was, I just called it U LOCK, officer

11 in charge, you know, maintenance, you know, whatever came up at

12 U LOCK.  As far as the business, I didn't really know how it

13 was run exactly.

14 Q    Okay.  And your brother George had that same role

15 throughout the time that you claimed to have worked for U LOCK?

16 A    Yes.

17 Q    And that's why you served him with your Complaint?

18 A    He was my go-to, yes.

19 Q    The beginning of --

20       THE COURT:  I'm going to just interrupt.  Ms. Snyder,

21 if you wouldn't mind just moving the microphone a little bit

22 closer to you.

23       THE WITNESS:  Yes.

24       THE COURT:  Thank you.

25       THE WITNESS:  Okay, you're welcome.

S. Snyder - Cross/Gaul                                    40

1  BY MR. GAUL:

2  Q    And at the beginning of 2016, did you understand

3  Kash Snyder to have a role at U LOCK?

4  A    Well, I knew he had a part to do with it, but I don't

5  understand what his role is, no, because he also has another

6  job.

7  Q    Did his role appear to change throughout the time that you

8  claim to have worked at U LOCK?

9  A    I wouldn't know, like, how U LOCK was run except the

10 basics, you know, with John, George, Christine.  Actually, you

11 asked if I had ever talked to Christine during that time.  We

12 ran into each other maybe in Giant Eagle once.  We had

13 discussed it, but -- so I just knew they were all working

14 together.  I figured they were working together to try to

15 develop a shopping center or something similar to other things

16 that the Biros own.  I don't know what the exact plans were for

17 it, but -- I don't know everybody's role specifically what they

18 were.

19      My job was the cameras.  That's all.  I had nothing to do

20 with the management.  I had nothing to do with U LOCK, just the

21 cameras.

22 Q    Is it fair to say, drilling down on something you said

23 earlier, that if everything in your Complaint across the street

24 and your Claim here is true, you knew by March 2018 that you

25 were working for U LOCK?

S. Snyder - Cross/Gaul                    41

1  A     Yes.

2  Q     In fact, you knew that you were working for U LOCK for ten

3  hours a day?

4  A     Yes, I knew I was doing the work in the monitoring of the

5  systems.  I don't know if I would want to say I worked like if

6  you're going to say would I put this is my work on a job

7  application.  But, yes, I know I was doing the work.  I was

8  doing it.  I had my phone.  Yes, so I considered it.

9       And, you know, parting this time, it's taking distracting

10 my life, so, you know, yeah, I feel like I -- it was work and I

11 should be compensated and I didn't think minimum wage was too

12 outrageous.

13 Q     And you had been working for U LOCK more than two years at

14 that point?

15 A     Correct.

16 Q     And you knew that your brother George had a role with U

17 LOCK?

18 A     Yes, but I can't speak to -- you have to ask George his

19 role.  I can't speak to George, Kash.  I can't speak to anybody

20 else's role but mine watching the video cameras and what the --

21 I know what the goal was to -- to develop the property to do

22 something more.  But as far as what they wanted to do, I don't

23 know exactly.

24 Q     Do you remember beginning the process of filing a court

25 proceeding that didn't involve U LOCK in March of 2018?

S. Snyder - Cross/Gaul                          42

1  A    What was it?

2  Q    I'm sorry.

3  A    What was it?

4  Q    If you could take a look at Exhibit 1 of the Complaint --

5  I'm sorry, Exhibit 1 from the book.

6         MR. GAUL:  And as an aside, it may hearten the Court

7  to know that Counsel have worked together and agreed to the

8  redactions on this document.

9         THE COURT:  All right.  Thank you.

10  BY MR. GAUL:

11  Q    Do you remember, if you look at Exhibit 1, do you remember

12  beginning a  proceeding in the Court of Common Pleas of

13  Westmoreland County in --

14  A    Yes, I do.  Yes.

15  Q    Okay.  And that was in March of 2018?

16  A    Correct.

17  Q    And did you learn that there were fees that you needed to

18  pay in order to file that action?

19  A    Correct.

20  Q    You asked that Court to allow you to file your proceeding

21  without paying those fees?

22  A    Correct.

23  Q    And you filed a document with that Court in order to make

24  that request?

25  A    Correct.

S. Snyder - Cross/Gaul                              43

1  Q    And Exhibit 1 that we're looking at here, that's the

2  document that you filed?

3  A    Correct.

4  Q    If you'd look about 80 percent of the way down the first

5  page which is labeled Biros 01, is that your signature at the

6  bottom?

7  A    Yes, it is.  Uh-huh.  Correct, it's my signature.

8  Q    If you look at the last page of this Exhibit which is

9  Biros 5, about two-thirds of the way down, is that your

10 signature there, as well?

11 A    It's my signature.

12 Q    If we could go back to Page 1 for a moment.  The last

13 paragraph above the full paragraph above the signature reads in

14 part, "I understand that false statements made are subject to

15 the criminal penalties under 18 Pa.C.S. Section 4904 crime of

16 Unsworn Falsification To Authorities."

17      Do you remember that text being present when you signed

18 this document?

19 A    I did.

20 Q    And the fourth box on this form which is next to the

21 legend, "I am unemployed and receive no other income or

22 benefits," you checked that, correct?

23 A    Correct.

24 Q    And the second block in this form which reads, "Paystubs

25 are not available, a notarized statement from my employer and

S. Snyder - Cross/Gaul                    44

1  notarized statement from the employer of any adults who reside

2  with me indicating my and their monthly wages," you didn't

3  check that box, correct?

4  A    Correct.

5  Q    So you didn't submit the type of statement that's

6  described here from U LOCK?

7  A    What do you mean by that?

8  Q    U LOCK did not provide a statement in support of your --

9  A    No.

10 Q    -- IFP Petition and this Petition?

11 A    No.  And I would never put it because it was income.

12 Q    Okay.  The second -- reading from the second line in the

13 first paragraph, there's  sentence that states, "In support of

14 my Petition, I've attached verification which fully and

15 truthfully describes my current income and financial

16 condition."

17 A    Correct.

18 Q    Did you read that before you signed this page?

19 A    Yes, I did.

20 Q    And if you look at Pages 2 to 5 of this Exhibit, as

21 redacted, this document is the verification that you provided?

22 A    Yes, it is.

23 Q    Okay.  And if you can look at Page 5 for a moment.

24 A    I'm  on it, yes.

25 Q    Above your signature, it states, "I verify that the

S. Snyder - Cross/Gaul                          45

1  statements made in this Affidavit are true and correct.  I

2  understand that false statements herein are made subject to the

3  penalties of 18 Pa.C.S. Section 4904 relating to Unsworn

4  Falsification To Authorities."

5  A    Yes, I read it.

6  Q    And you read that text before you -- or that paragraph

7  before you signed this in 2018?

8  A    I did.  Again, there is no income.  They're asking my

9  income situation.

10 Q    In fact, on Page 2 of this Exhibit in Paragraph 3B, it

11 states, "Employment, if you presently employed, state

12 employer," and you've written in "N/A" for not applicable?

13 A    That's -- yes, correct.

14 Q    Okay.

15 A    Again, no income.  I didn't get any income.

16 Q    But you had an employer even if it wasn't paying you,

17 right?

18 A    Well, I didn't know until about 2020, like I said, when

19 the Department of Labor came to my -- what was it, a motel

20 attached to my house that I could even -- they said there's no

21 favors, there's no bartering, there's no sisterly love, that

22 they should have paid me the 7.25.  Yes.

23 Q    And, in fact, they had promised to pay you the 7.25 as

24 early as February of 2016, right?

25 A    Correct.

S. Snyder - Cross/Gaul                                          46

1  Q    Okay.  And you continued to work after that ten hours a

2  day, right?

3  A    Correct.  He kept putting me off.

4  Q    So you had an employer, even if they weren't paying you?

5  A    I went -- I didn't look at like that, like you're saying

6  it.  I didn't look at it is employer, I didn't receive no

7  paycheck.  I had no income from what I was doing.  It was a

8  promise in the future.

9  Q    And you didn't indicate anywhere on this form that you are

10 owed unpaid wages.  Is that correct?

11 A    I don't think it even asks.  It does ask.

12 Q    So, for instance, on Page -- I'm sorry, on the fourth page

13 of this Exhibit where it states "Property owned" and you say

14 "None," you didn't identify unpaid wages anywhere in that part?

15 A    It -- I wouldn't consider that property.  I would consider

16 that like a home, I would say here.  Motor vehicle.  So I

17 didn't have any of the things so, yes, I put none.

18 Q    So when you completed this form, you hoped that the Court

19 in Westmoreland County would rely on the information you gave?

20 A    They did rely on it.

21 Q    And that was your expectation when you completed the form?

22 A    Correct.

23 Q    So by the same token, if everything in your Complaint and

24 your Claim is true, you knew by May of 2018 that you were

25 working for U LOCK?

S. Snyder - Cross/Gaul                        47

1  A    I didn't consider it income.

2  Q    But you were working for U LOCK and you knew you were

3  working for U LOCK in May of 2018?

4  A    But the promise in the future to get money.  At the

5  current time, nothing's coming in.

6  Q    But you continued to work ten hours a day as you had been

7  for more than two years?

8  A    Well, he's my brother, and I would hope that he would

9  square up with me when the time came, yes.  That's why I

10 continued.

11 Q    And to be clear, U LOCK hadn't been paid you for any of

12 this work by --

13 A    They did not.

14 Q    Not by --

15 A    Nothing.

16 Q    -- May of 2018?

17 A    No.

18 Q    Did you personally file for bankruptcy protection on May

19 15th, 2018?

20 A    I did.

21 Q    And that was under Chapter 7 of the Bankruptcy Code?

22 A    Correct.

23 Q    Do you remember completing a Petition as part of that

24 filing?

25 A    Yes.

S. Snyder - Cross/Gaul                     48

1  Q    And filing it with the Court?

2  A    Yes.

3  Q    You can take a look at Exhibit 2.  Is that the Petition

4  that you filed?

5  A    It is.

6  Q    You completed this Petition yourself, right?

7  A    Correct.

8  Q    By hand?

9  A    That's my handwriting, yes.

10 Q    And you completed all of the Schedules that were attached

11 to the Petition?

12 A    Yes.  This was the one I said I moved along very quickly

13 because I wanted my son's graduation certificate to attend

14 graduation.

15 Q    Why did you attempt to tell the truth in these documents?

16 A    I didn't hear what you said.

17 Q    Did you attempt to tell the truth when you filled --

18 A    I did.

19 Q    -- out these documents?

20 A    Yes.

21 Q    Why?

22 A    Why did I want to tell the truth?

23 Q    Yes.

24 A    I guess you're supposed to.

25 Q    Okay.  So it's important in filling out these forms the

S. Snyder - Cross/Gaul                    49

1 information be correct?

2 A    Correct.

3 Q    And it's important in filling out these forms that the

4 information be complete?

5 A    Correct.

6 Q    Can you take a look at Page 11 in Exhibit 2?  It's marked

7 Biros 11 in the lower right-hand corner.  That's your signature

8 at the bottom of the page?

9 A    It is.

10 Q    And that's in Part 7 which is captioned "Signed Below."

11 A    Wait, are you on Page 6 or 7?

12 Q    I'm on -- it's marked Page 6 at the bottom.

13 A    Okay, yes.

14 Q    And it's Biros 11 in the lower right-hand corner.

15 A    Okay.

16 Q    So the first sentence of Section 7 reads, "I have examined

17 this Petition, and I declare under penalty of perjury that the

18 information provided is true and correct."  Right?

19 A    Correct.

20 Q    And the last sentence reads, "I understand making a false

21 statement, concealing property, or obtaining money or property

22 by fraud in connection with a bankruptcy case can result in

23 fines up to $250,000 or imprisonment for up to 20 years or

24 both."  Correct?

25 A    Correct.

S. Snyder - Cross/Gaul                                    50

1  Q    And if you could flip to Page 16, Biros 15.

2  A    I'm on it, yes.

3  Q    The page that's captioned "Declaration About An Individual

4  Debtor's Schedules."

5  A    Correct.

6  Q    And, similarly, and that's your signature on that form, as

7  well?

8  A    It's my signature.

9  Q    And at the top of the page in the second paragraph of

10 text, it makes the same caution about making a false statement

11 or concealing property?

12 A    I see it, yes.

13 Q    And at the bottom of the page above your signature, you

14 state, "Under penalty of perjury, I declare that I have read

15 the Summary and Schedules filed with this Declaration and that

16 they are true and correct."

17 A    That's correct.

18 Q    And it said that when you filed it, correct?

19 A    That's correct.

20 Q    Let's flip over and take a look at Page 17.  It states,

21 "Schedule A/B Property."

22 A    Correct.

23 Q    Am I correct the first paragraph of the instruction says,

24 "In each category, separately list and describe items.  List an

25 asset only once.  If an asset fits in more than one category,

S. Snyder - Cross/Gaul                    51

1  list the asset in the category where you think it fits best."

2  Correct?

3  A    Correct.

4  Q    And can you flip ahead to the page that's marked Biros 21

5  in the lower right-hand corner?  A bit of an overprint, so it

6  also says Page 5.

7  A    Okay.  I'm on it.

8  Q    It says, "Part 4, Describe your financial assets."

9  A    Okay.

10 Q    And you took filling out this form seriously, right?

11 A    Yes.

12 Q    For instance, if we flip ahead to Page 24, which is also

13 -- Biros 24, which is also Page 8.  Question 33 asks you to

14 identify Claims against third parties, whether or not you have

15 filed a lawsuit or made a demand for payment.  Correct?

16 A    Correct.

17 Q    And you indicated that you had a Claim against the North

18 Huntingdon Police?

19 A    Correct.

20 Q    Let's flip back one page to Page 23.  Question 30 states,

21 "Other amounts someone owes you."  Below that, it says

22 "Examples"  The very first example is "Unpaid Wages."  Did I

23 read that correctly?

24 A    Yes, you did.

25 Q    What was your answer to the request that you identify that

S. Snyder - Cross/Gaul                                52

1  information?

2  A    It's no.  I wasn't receiving any -- any money, income.

3  Q    And there was nothing that prevented you from reading or

4  understanding Question 30 in 2018?

5  A    Well, I understand it but not the way you're saying.  I

6  receive no income, so I didn't consider unpaid wages.  I didn't

7  know that I could even do this until years later until the

8  Department of Labor came to my house to collect.

9  Q    Even though you knew as of January of 2016 that you were

10 working?

11 A    Yes.

12 Q    And even though you knew as of February 2016 that U LOCK

13 wasn't prepared to pay you?

14 A    Correct.

15 Q    And that was more than two years before you filled out

16 this form?

17 A    Yes, correct.

18 Q    And U LOCK had not paid you in the period you worked

19 between January of 2016 and May of 2018?

20 A    They never paid my anything, correct.

21 Q    They had not paid you at all?

22 A    Nothing.

23 Q    So is it fair to say at this point, U LOCK owed you more

24 than $50,000?

25 A    Probably, yes.  Uh-huh.

S. Snyder - Cross/Gaul                    53

1  Q    More than $500 a week for more than 100 weeks?

2  A    Yes, but he's my brother so I thought he's square up at

3  the end if -- if anything ever even happened with the property.

4  Q    Now let's go back for a moment.  The instructions for

5  Schedule A/B on Page 17 said that if an asset fits in more than

6  one category, list the asset in the category where you think it

7  fits best.  Correct?

8  A    Well, let me get to it.

9       They're hard to see.

10  Q   Sure.  And we're on Page 17 which is Page 1 -- Biros 17

11  which is Page 1 of Schedule A/B.

12  A   Okay.  Yep, I got it.

13  Q   Did you decide that -- and do you see the language that I

14  just read at the top in the instructions, "If an asset fits in

15  more than one category?"

16  A   Yes.

17  Q   Did you decide that there was another line on Schedule A/B

18  that was a better fit?

19  A   Wait, where are you?

20  Q   I'm still looking at the top of Page 1 of Schedule A/B.

21  A   Okay.

22  Q   Did you decide that there was another line in Schedule A/B

23  that was a better fit for the more than $50,000 you claimed U

24  LOCK owed you?

25  A   Wait, what section are you in, though, that you just read

S. Snyder - Cross/Gaul                          54

1 that because it doesn't --

2 Q    Schedule A/B.

3 A    Uh-huh.

4 Q    "Property."

5 A    I'm on that.

6 Q    On top of the page.  Right below that.

7 A    What is the property?

8 Q    That's not my question.

9 A    I know, but tell me where you want me to look because --

10 Q    I wanted to know did you decide that there was a more

11 appropriate place on Schedule A/B --

12 A    Uh-huh.

13 Q    -- to list the $50,000 that you claimed U LOCK owed you by

14 May of 2018.

15 A    I keep saying I didn't consider it when I filled out this

16 application at all.  I just wasn't thinking of it because I

17 just kept thinking income.  So I didn't consider it in this or

18 it would have been in here.

19 Q    So your testimony to this Court is that when you get the

20 question about unpaid -- asking about unpaid wages, you didn't

21 think about the job that you were doing ten hours a day and

22 weren't getting paid for?

23 A    No, I did not consider it because I wasn't receiving

24 income.

25 Q    So there's nowhere else on Schedule A/B that you listed

S. Snyder - Cross/Gaul                    55

1  the $50,000 in unpaid wages?

2  A    No.  It would be here.

3  Q    Flip ahead to Page, it's marked Biros 26 which also has a

4  9 in the lower -- I'm sorry, 10 in the lower right-hand corner.

5  Look again at the bottom of this page, Line 58 which reads

6  "Part 4 Total Financial Assets."  Your total is $225,000?

7  A    You're on Page 10?

8  Q    I am.  Line 58.

9  A    I see $225.

10  Q    Okay.  And your total on Line 62 and 63 for all property

11  on the schedule is $3,925.

12  A    Correct.

13  Q    Let's look again at Page 11.  It's Biros 11 which is the

14  sixth page of this Exhibit.  You're claiming in this Court that

15  by this time, by May of 2018 --

16  A    Excuse me, one second.

17  Q    Sorry.

18  A    Okay.  Yeah, could you give me the page you're on.

19  Q    Sure, it's Biros 11 in the lower right-hand corner.

20  A    Oh, 11.  Okay.

21  Q    Uh-huh.

22  A    Because that says 10.  Okay.  Biros 11.

23  Q    Correct?

24  A    Im having so much trouble reading the numbers.  For one, I

25  have bad eyes and these are like overlapped.  Okay, here I can

S. Snyder - Cross/Gaul                                            56

1    see the words.

2            Okay.  I'm here.

3    Q    Okay.  Now you claim that as of the time you signed this

4    form, you were owed more than $50,000 in wages?

5    A    Correct.

6    Q    And we've seen a reference in these forms to unpaid wages

7    as a financial asset, correct?

8    A    I didn't see it as an asset because I wasn't even

9    considering it.

10   Q    Once again, flipping to Page Biros 23, Page 7, it states,

11   "Other amounts someone owes you unpaid wages."  Right?   Or on

12   the exhibit it says unpaid wages, correct?

13   A    Which number?

14   Q    Down on Number 30.

15   A    30, okay.  I didn't consider it because I didn't consider

16   income and maybe nothing would have ever happened with the

17   property.

18   Q    And flipping back, this is part of -- I'm sorry, flipping

19   back to Page 5 of that schedule, which is Biros 21.  This is

20   all on the section that's captioned "Part 4, Describe your

21   financial assets."  Correct?

22   A    Give me a second to get to it.

23           Okay.  I'm ready.

24   Q    That's what it says at the top of "Part 4, Describe your

25   financial assets."

S. Snyder - Cross/Gaul                    57

1  A    I think I'm on the wrong page.  Oh, I'm on 21.  Sorry.

2       One, two, three, four.  Okay.

3       Okay.  And what number are you on?

4  Q    At the very top where it says "Part 4, Describe your

5  financial assets."  Correct?

6  A    You're saying Part 4 is -- it's on a different page.

7  Biros Page what?

8  Q    Biros Page 21 but it's also Page 5.

9  A    I'm on the wrong page again.  Okay.

10      Okay.  I was on this page.  I think you told me to change

11 the page.

12 Q    Okay.  At the very top of this page, it says, "Part 4,

13 Describe your financial assets," correct?

14 A    Okay.

15 Q    And if you look at that page and the next page and the

16 page after, that includes Question 30 in that section, correct?

17 A    Okay, yes.

18 Q    So we can agree that this form identifies unpaid wages as

19 a financial asset?

20 A    I didn't consider income because I didn't receive any

21 income.

22 Q    The form refers to unpaid wages, correct?

23 A    Excuse me.

24 Q    The form refers to unpaid wages, correct?

25 A    What's the first two words you're saying?

S. Snyder - Cross/Gaul                                    58

1  Q    This form that you filled out --

2  A    Oh, this form.

3  Q    -- Schedule A/B --

4  A    Uh-huh.

5  Q    -- refers to unpaid wages, correct?

6  A    It says unpaid wages, yes.

7  Q    And it does it in a section that asks you to describe your

8  financial assets, correct?

9  A    I would not consider an asset because I didn't receive

10 income.

11 Q    Not the question.  The question is does it do that in a

12 section that says "describe your financial assets."

13 A    Well, I didn't consider it an asset, so I wouldn't list it

14 as an asset.

15 Q    Are we disagreeing about whether that particulate page,

16 Page 21, says at the top "financial assets?"

17 A    No.  That says "financial assets?"

18 Q    We're agreed on that.  And we're agreed that Question 30

19 which is two pages later is part of that section?

20 A    Yes, I'm agreeing that 30 is part of that.

21 Q    And we're agreed that your claim here is that as of May

22 2018, U LOCK owed you more than $50,000?

23 A    Yes.

24 Q    And we're agreed that on the page that's marked Biros 11,

25 which is also identified as Page 6 --

S. Snyder - Cross/Gaul                    59

1   A    Okay.

2   Q    -- when this Court asked you as to how much you estimate

3   your assets to be worth, you checked the box for zero to

4   $50,000?

5   A    Well, I wasn't -- I didn't see any -- any promise in sight

6   that I really was getting paid and I had no income so, yeah, I

7   wouldn't consider it an asset to put on here.

8   Q    We're agreed that that's the box you checked?

9   A    Yes.

10  Q    You are here today as a Creditor, right?

11  A    Yes.

12  Q    Of U LOCK?

13  A    Yes.

14  Q    And as a Creditor, you want to know about U LOCK's assets,

15  correct?

16  A    Yes.

17  Q    Because that information lets you know how much you might

18  expect to get paid on your Claim, correct?

19  A    Well, U LOCK has no money.

20  Q    You'd want to know about the assets -- and you know that

21  because you know about U LOCK's assets, right?

22  A    Well, because I've been in court.

23  Q    I'm sorry.

24  A    I've been in court and there's no assets.

25  Q    So that's what you know about U LOCK's assets?

S. Snyder - Cross/Gaul                              60

1  A    Pretty much, I guess.

2  Q    And that's important to your evaluation as to whether you

3  might get paid on your Claim?

4  A    No, not really, because they don't have any money.  I was

5  willing to reduce my Claim just to have a Claim.

6        MR. GAUL:  Your Honor, I would move to strike that as

7  non-responsive.

8        THE COURT:  Overruled.

9  BY MR. GAUL:

10 Q    Do you understand why in 2018 your Creditors might have

11 wanted to know the truth about your assets?

12 A    I didn't consider it an asset.  And I accidentally didn't

13 put other things in here.  When I had to amend them, it wasn't

14 just U LOCK that I didn't put in there.

15 Q    Do you understand why in 2018 your Creditors might have

16 wanted to know the truth about your assets?

17 A    I didn't consider it an asset.

18 Q    Do you understand why in 2018 your creditors might have

19 wanted to know the truth about your assets?

20 A    Well, I would understand why, yeah.  That's why they asked

21 me to amend the Schedules when it did come to light.

22 Q    Is it fair to say that you don't have any documents with

23 you today that were created while you were working for U LOCK

24 and state that U LOCK owes you for unpaid wages?

25 A    I do not.

S. Snyder - Cross/Gaul                              61

1  Q    It's fair to say that?

2  A    It's fair to say that, yes.

3  Q    Now, again, you're claiming in this proceeding that by May

4  of 2018, you had been working for U LOCK for almost two and a

5  half years?

6  A    No, two years.

7  Q    You started work in January of 2016?

8  A    Yes.

9  Q    And this was by May of 2018, so more than two years?

10 A    Okay.  More than two years.

11 Q    For ten hours a day?

12 A    Yes.

13 Q    So at that time, you were very well aware that you had a

14 job?

15 A    I wouldn't call it a job, like I wouldn't call it -- I

16 wouldn't say, hey, my job if someone asked what do you do, I

17 don't say a job because I wasn't receiving income.  I didn't

18 consider it like that for income.  I was doing it as a favor

19 with a promise to be paid.

20 Q    You were doing something for ten hours a day for which you

21 expected to be paid?

22 A    Yes, eventually.

23 Q    Continue with Exhibit 2, if you can look on the page

24 that's numbered Biros 50 at the bottom.

25 A    50?

S. Snyder - Cross/Gaul                        62

1  Q    5-0.

2  A    Okay.

3  Q    It's also -- you'll see it's also the first page of

4  Schedule I.  Do you see that?

5  A    No, I'm not there yet.  Hold on one second.

6  Q    Okay.

7  A    Okay.  I'm here.

8  Q    Do you see the direction at the top that says, "Be as

9  complete and accurate as possible?"

10 A    Yes.

11 Q    Part 1 it says, "Describe employment."  Do you see that

12 section?

13 A    Yes.

14 Q    Is there any reference in Part 1 of this Schedule I to the

15 amount of your income?

16 A    No.

17 Q    And the employment status that you've checked on this form

18 is not employed, correct?

19 A    Yes, I did that because I didn't consider income.

20 Q    Let's take a look at Exhibit 3 for a moment.  Do you

21 recognize Exhibit 3 as other Schedules that you personally

22 filed with this Court?

23 A    I do.

24 Q    And you filed them == and you filed these Schedules in

25 June of 2018?

S. Snyder - Cross/Gaul                                          63

1   A   Correct.

2   Q   And these are in your own personal bankruptcy?

3   A   Yes.

4   Q   Let's go to the last page of this Exhibit which is, it

5   says Biros 82 at the bottom in the bottom right-hand corner.

6   A   Okay.  Give me a second.

7   Q   It should be right before Tab 4.

8   A   Yes.

9   Q   And that's your signature on that page?

10  A   I'm almost there.  That's my signature, yes.

11  Q   Can you read us the paragraph before or above your

12  signature?

13  A   "The Statement of No Payment Advices."

14  Q   The paragraph in between that and your signature, yes.

15  A   I, Shanni Snyder, declare," that one?

16  Q   That one.

17  A   Uh-huh.  Is that what you want me to read?

18  Q   Please do.

19  A   "Declare under the penalty and perjury that I do not have

20  any payment advices from an employer because I was not employed

21  during 2016, '17, and '18."  Yes, I did sign that.  Yes, that's

22  my signature.

23  Q   So that's two separate instances in which you told this

24  Court in 2018 that you weren't employed.

25  A   I didn't -- I didn't look at that -- it that way.  I just

S. Snyder - Cross/Gaul                          64

1 wasn't thinking of it.  It wasn't income.

2 Q    You weren't thinking of the work you were doing for ten

3 hours a day?

4 A    I didn't think it is as income.  It took till the

5 Department of Labor to tell me that I could collect.

6 Q    And in one of these instances, this one that we're looking

7 at here on Page 82 --

8 A    Uh-huh.

9 Q    -- you told this Court that you hadn't been employed

10 during 2016 or 2017 either.

11 A    Correct.  And when I say employed, like I'm getting a

12 paycheck that there's income.  They're looking for income.  And

13 income and assets when you're in bankruptcy court.

14          MR. GAUL:  Your Honor, I'd move to strike.

15          THE COURT:  Overruled.

16 BY MR. GAUL:

17 Q    Is it fair to say that you don't have any documents with

18 you that were created while you were working for U LOCK and

19 state that you were a U LOCK employee?

20 A    No, I don't.

21 Q    We've already -- oh, I'm sorry.  You mentioned a response

22 to an earlier question that you amended your schedules in the

23 bankruptcy case?

24 A    Correct.

25 Q    When did you do that?

S. Snyder - Cross/Gaul                    65

1  A    Right after the Judge  Taddonio asked me to do it or he

2  said that I had to coordinate with the Trustees, I believe, to

3  -- to amend them.

4  Q    So that was during this case?

5  A    Yes.

6  Q    And that was after your personal bankruptcy from 2018 was

7  terminated and discharged, correct?

8  A    Correct.

9  Q    And that was after you filed your action under the Fair

10  Labor Standards Act across the street in District Court?

11  A    Correct.

12  Q    And that was after you commenced this proceeding here --

13  A    Correct.

14  Q    -- that we're here on today?

15  A    Yes.

16  Q    And after your filed your Proof of Claim?

17  A    Yes.

18  Q    I want to talk a little bit about your knowing who

19  Christine Biros is.  Do you also know that in 2017, she sued U

20  LOCK about the ownership of a piece of real property?

21  A    Yes.

22  Q    And that's the same real property for which you're

23  claiming here to have done security monitoring?

24  A    Correct.

25  Q    And Ms. Biros' lawsuit was in the State Court in

S. Snyder - Cross/Gaul                    66

1  Westmoreland County?

2  A    Correct.

3  Q    You knew about that action shortly after it was filed?

4  A    I don't know when I found out about it.

5  Q    Did you learn back then that Mr. Roth was representing U

6  LOCK?

7  A    I probably knew.  I -- I can't recall when I found out.

8  Q    I'm sorry.

9  A    I can't recall the date I found out or what the situation

10  was, but I knew there was -- I knew there was, you know,

11  turmoil between them.

12  Q    Is it fair to say that you helped out U LOCK with

13  Ms. Biros' case?

14  A    I did not.

15  Q    You did not.  So you had no role in drafting U LOCK's

16  Responses To Discovery Requests?

17  A    No, I did not.

18  Q    And you didn't read Discovery Requests before they were

19  sent to Ms. Biros' attorney?

20  A    No.

21  Q    Now did you attend the trial in the case between Ms. Biros

22  and U LOCK?

23  A    I don't know if I attended, but I think I went to a

24  hearing before.  I don't know if it was a trial or what it was.

25  But I --

S. Snyder - Cross/Gaul                                    67

1  Q     I'm sorry.

2  A     I did attend something.  I can't --

3  Q     Was it a single day?

4  A     I don't know.  I can't remember.

5  Q     You sat in the courtroom, though, right?

6  A     I know I was in the courtroom for something once, yeah.  I

7  can't remember.  I don't know if it was the trial or what it

8  was, if it was motion or what it was.

9  Q     Do you remember bringing your kids along and they stayed

10 in the hall with someone else?

11        MR. LACHER:  Excuse me, Your Honor.  I'm going to

12 object to these questions.  Again, you set a scope of this

13 hearing to find out whether or not Ms. Snyder worked for U LOCK

14 and evidence and questions in that regard.  Maybe I'm dense,

15 but I don't understand what these have to do with the scope of

16 that, so I object to them.

17        THE COURT:  Okay.  Mr. Gaul, do you want to tell me

18 where this is headed?

19        MR. GAUL:  Yeah, Your Honor.  Obviously, relevancy is

20 anything that tends to make a fact more or less probable than

21 it would be without or without the evidence.  Here, there's a

22 critical question as to whether Ms. Snyder actually performed

23 this work.  And one of the things that makes it less likely,

24 frankly, is the existence of an alternate explanation for why

25 all of this happened.

S. Snyder - Cross/Gaul                          68

1           And the alternate explanation when you lay out the

2    timeline of Ms. Snyder's filing the District Court action, Ms.

3    Snyder's commencing this proceeding, Ms. Snyder's taking other

4    actions, it lines up pretty well with events in the case

5    between Ms. Biros and U LOCK and we think diminishes the

6    likelihood that Ms. Snyder's Claims here are true.

7           THE COURT:  I'm going to overrule the objection but

8    caution Counsel that to the extent that there needs to be some

9    inquiry into this area specifically, it can be done a little

10   more expediently than --

11          MR. GAUL:  Fair enough, Your Honor

12          THE COURT:  -- some of the background.

13          MR. GAUL:  Okay.

14   BY MR. GAUL:

15   Q    Now you know that Ms. Biros won the trial in her case

16   against U LOCK, right?

17   A    Yes.

18   Q    And you knew that --

19   A    Well, I don't -- I don't really know if -- you're saying

20   2017.  I don't know if it was a win or lose.  I just -- I don't

21   know.

22   Q    Okay.  You know that the Court in Westmoreland County

23   issued a Decision, correct?

24   A    Yes, I do.

25   Q    And you know that U LOCK took an Appeal from that Decision

S. Snyder - Cross/Gaul                                  69

1  to the Superior Court of Pennsylvania?

2  A    Correct.

3  Q    And did you know about the Appeal when U LOCK took the

4  Appeal?

5  A    I don't know when I found out about it.

6  Q    Do you know that the Superior Court affirmed the decision

7  in favor of Ms. Biros?

8  A    I don't know that for sure exactly how -- how the

9  decision, the ultimate decision actually really was.  Everybody

10 interprets things a little different.

11 Q    But you know -- okay.  You know that the Superior Court

12 affirmed the Decision of the Westmoreland County Court?

13 A    Yes.

14 Q    And would you agree with me if I tell you that the

15 Superior Court affirmed that Decision on May 21st, 2021?

16 A    Well, if you're telling me, then I believe you.  But I

17 can't pull out that date myself.

18 Q    You filed your Complaint in the District Court on July

19 14th, 2021.

20 A    Okay.

21 Q    And that's more than five years after you've told this

22 Court you began to work for U LOCK.

23 A    Okay.

24 Q    Without ever getting paid?

25 A    I didn't get paid, correct.

S. Snyder - Cross/Gaul                          70

1  Q    And less than eight weeks after the Court affirmed the

2  Judgment for Ms. Biros?

3  A    Okay.

4  Q    I'm sorry.

5  A    Okay.

6  Q    And Biros v. U LOCK case, you know that -- you knew that U

7  LOCK asked the Supreme Court of Pennsylvania to review that

8  case?

9  A    Okay.

10 Q    And that Court said no?

11 A    Okay.

12 Q    You know that or you're --

13 A    I'm listening to you.

14 Q    You're aware of that?

15 A    Yes.  Uh-huh.

16 Q    Okay.  And it said that in January of 2022?

17 A    Okay.

18 Q    Can you take a look at Exhibit 9?  Exhibit 9, which is

19 Biros 217 and 218, this is a document that you filed in the

20 Westmoreland County Court of Common Pleas.

21 A    Okay.

22 Q    And it commenced a lawsuit.

23 A    Okay.

24 Q    Im sorry.  Is that correct?

25 A    Correct.

S. Snyder - Cross/Gaul                    71

1  Q    Did you have any assistance in preparing in this document?

2  A    No.

3  Q    You are not a lawyer?

4  A    No, I'm not.

5  Q    You don't have any legal training?

6  A    Well, I've been in Court for the last 15 years, so I'd

7  say, you know, personal experience.

8  Q    If you look at the second page of this, Biros 218, you

9  filed this on March 18, 2022?

10 A    Yes.

11 Q    So about two months after the -- I'm sorry, strike that.

12      How did you decide who to sue?

13 A    Well, that's who owed me the money was U LOCK.

14 Q    So U LOCK, Ms. Biros, the Biros Irrevocable Life Insurance

15 Trust, and then several other executors or administrators of

16 estates.  Correct?

17 A    Yes.

18 Q    And you also sued Judge Smail, the Westmoreland County

19 Recorder of Deeds, and the Attorney General of Pennsylvania?

20 A    Yes.

21 Q    Take a look at Footnote 1 on this Page 218.  Did you write

22 that?

23 A    Well, yeah, I copied and pasted it.

24 Q    From?

25 A    My computer.

S. Snyder - Cross/Gaul                                72

1  Q    But what was the source?

2  A    I made it up and I copied and pasted it and put it here.

3  Q    Okay.  On this document, you ask the Westmoreland County

4  Prothonotary to issue a lis pendens, correct?

5  A    Correct.

6  Q    And you identify a parcel of property?

7  A    Yes.

8  Q    And that property is the property that you're telling this

9  Court you monitored for more than four years?

10 A    Correct.

11 Q    And that's the piece of property that was in dispute

12 between U LOCK and Ms. Biros?

13 A    Correct.

14 Q    And was the issue in the trial that you sat through in

15 2019?

16 A    I didn't say I sat through the trial, and you said I had

17 my children there.  If I had my children there, then I doubt I

18 sat through the trial and kept my children in the hall for the

19 whole thing.

20     I don't know.  I could have, but I mean I could have had

21 them there, but I very highly doubt I sat through the trial

22 with my children there.

23 Q    Can we agree that you went to Court for this case in 20 --

24 in Westmoreland County?

25 A    I do remember bringing my children now that you say it,

S. Snyder - Cross/Gaul                                    73

1  but I don't know if it were that day or not.

2  Q    Okay.

3  A    And it still goes back to I didn't receive income, so I

4  don't care about the U LOCK what happened between them.  I'm

5  here for my income and my Claim only.

6  Q    So you filed a Bankruptcy Petition against U LOCK?

7  A    Yes.

8  Q    And you did that in April of '22?

9  A    Yes.

10 Q    About a month after you filed the document that we just

11 saw as Exhibit 9?

12 A    Correct.

13 Q    And you've involved yourself in Biros' case against --

14 Ms. Biros' case against U LOCK?

15 A    I wouldn't say I did, no.

16 Q    Would you take a look at Exhibit 12?

17 A    Okay.

18 Q    Did you sign this document?

19 A    I did.

20 Q    And the handwriting on this document, is it yours?

21 A    Yes.

22 Q    And it's fair to characterize it as an Entry of Appearance

23 in the case of Christine Biros vs. U LOCK, INC.?

24 A    Correct.

25 Q    You filed it with the Court in Westmoreland County?

S. Snyder - Cross/Gaul                    74

1  A    Yes.

2  Q    Did you do that in person?

3  A    Yes.

4  Q    You took it to Court yourself?

5  A    I think this was the one that you guys are complaining I

6  got stamped there, yeah, I think.

7  Q    Okay.  But you took this --

8  A    But I can't be for sure.

9  Q    And take a look at Exhibit 13.

10  A    Okay.

11  Q    This is a Notice of Appearance that you filed in the case

12  of Christine Biros vs. U LOCK, INC.  Correct?

13  A    Correct.

14  Q    And you identify yourself as a Non-Party Appellant?

15  A    Where does it say that?  What page are you on?

16  Q    Do you see in the left-hand column, it states, "Shanni

17  Snyder, Non-Party Appellant?"

18  A    Oh, yeah, yeah, yeah.  Okay.

19  Q    And you filed this document at the same time that you

20  filed the Entry of Appearance we saw as Exhibit 12?

21  A    Okay.

22  Q    And you filed both of these documents about three weeks

23  after you filed the Bankruptcy Petition against U LOCK?

24  A    Okay.

25  Q    Did Mr. Roth go with you to the courthouse that morning?

S. Snyder - Cross/Gaul                          75

1  A    He lives in Latrobe.  I live in North Huntingdon so, no, I

2  would not go to the courthouse with Mr. Roth.  No.

3  Q    Did you meet him at the courthouse that morning?

4  A    No, I did not.  And to add a little bit to that question,

5  the last three times I was up at the courthouse, Mr. Roth was

6  there.  Then I went to the Magistrate to pay a ticket, traffic

7  ticket, and he was there at the same -- I saw him upstairs and

8  I saw him down.  Mr. Roth is like a permanent fixture at

9  Westmoreland County Courthouse.

10 Q    So you saw him on the day when you went to file your Entry

11 of Appearance and your Notice of Appeal?

12 A    Oh, I don't know if I did or not.  That's your -- I think

13 the clerks were probably lazy at the Prothonotary and just had

14 them in a pile and stamped them all at once.  You'd have to ask

15 the Prothonotary.

16 Q    So, but you'd acknowledge that on Exhibit 14, which is U

17 LOCK INC.'S Notice of Bankruptcy, that was stamped two minutes

18 after your documents were stamped?

19 A    Well, I think it's just coincidental, too.  I think they

20 keep them in a little basket and a little pile and then they

21 stamp them all at once.  I don't know.  You'll have to --

22 that's just speculation, but it had nothing to do with me and

23 Mr. Roth being together.  We were not together, and we did not

24 drive together.

25 Q    I think you mentioned to this Court earlier that Ms. Biros

S. Snyder - Cross/Gaul                                      76

1  was somehow involved with U LOCK?

2  A    Yes.

3  Q    That Ms. Biros sued U LOCK in 2017, correct?

4  A    Correct.

5  Q    And that's less than halfway through the time that you

6  claim you worked for U LOCK?

7  A    Okay.

8  Q    Take a look at Exhibit 10.  And in Section 1B of the first

9  page, which is Biros 219, that states, "Two managing control

10 persons appear to be George Snyder and Kash Snyder."  Did you

11 write that?

12 A    We're on 219 and where does it say George and Kash?

13 Q    Section 1B, Part 1 about 40 percent of the way down the

14 page.  It's a long paragraph, three lines up from the bottom

15 there's a one-line sentence.  It says, "Two managing control

16 persons appear to be George Snyder and Kash Snyder."

17 A    I'm not where you are.  I apologize.  Can you tell me?

18 You're saying --

19 Q    Well, let me ask you a different question.

20 A    Biros 219.

21 Q    Yeah.

22 A    Or Page 1?

23 Q    The first page, yeah.

24 A    I have U LOCK on here.

25 Q    Well, two pages further, it's Page 3 but it's also Biros

S. Snyder - Cross/Gaul                              77

1   221.

2   A     Okay.  Okay.  I'm here.

3   Q     Is that your signature at the bottom of the page?

4   A     Yes, it is.

5   Q     Are you aware of a single document created before 2021

6   that identifies Ms. Biros as a controlling person of U LOCK?

7   A     Well, I -- I know there was like a loan and then, you

8   know, it was supposed to be on like kind of written on a

9   napkin.  And she signed it.  The checks, I guess, came from

10  her.  So --

11  Q     And that's all something that was litigated in the Court

12  of Common Pleas in Westmoreland County as part of the trial?

13  A     Well, you asked if I knew if she was a partner.

14  Q     Yeah, and this is the next question.

15  A     Okay.

16  Q     That was all litigated in the Court of Common Pleas in

17  Westmoreland County as part of the trial?

18  A     I don't know if it was or not.  Like if they determined

19  whose role was what.

20  Q     Let me ask you a little bit about something that

21  Mr. Lacher touched on with you.  Your Claim is that you began

22  this work in January of 2016?

23  A     Correct.

24  Q     For ten consecutive hours every day?

25  A     Yes.

1  Q    Okay.  And this was a monitoring job?

2  A    Correct.

3  Q    And your responsibilities stayed the same throughout this

4  whole time?

5  A    Yes.

6  Q    And you told Mr. Lacher the sorts of things you were

7  looking for on the property?

8  A    Yes.

9  Q    Throughout this period, you have as many as three minor

10 children living with you?

11 A    Yes, I did.

12 Q    And after your twins were born in 2016, they were usually

13 living with you for the rest of that period, correct?

14 A    Most of the time with me, yes.

15 Q    So they were between newborns and four-year-olds while you

16 were doing this work?

17 A    Correct.  They were newborn to four, yes.

18 Q    And your estimate was while they were living some of the

19 time with their father, they were with you at least 40 to 60

20 percent of the time?

21 A    Correct.  Sometimes more.

22 Q    And you didn't have any professional assistance with

23 childcare?

24 A    I did not.

25 Q    Is it fair to say that when a three-year-old needs your

S. Snyder - Cross/Gaul                                        79

1  attention, she needs your attention?

2  A    Well, my kids do get my attention, correct.

3  Q    Yeah.

4  A    Uh-huh.

5  Q    But when they reach out to you and need your attention

6  right then --

7  A    Yeah.

8  Q    -- they need your attention right then?

9  A    Uh-huh.  That's correct, yes.

10  Q    And they need all of your attention right then?

11  A    Well, I give them all my attention, correct.  That's --

12  Q    And when they need your attention, they need your

13  attention pretty much for a three-year-old until they don't on

14  their schedule?

15  A    Well, we're going zero -- zero to four.

16  Q    Yeah.

17  A    So you're going three to four.  But, yes, kids need

18  attention.  They still get my attention.

19  Q    You never had a written employment agreement with U LOCK?

20  A    No, I did not.

21  Q    And you don't have any sort of writing or written

22  agreement that says that you agreed to defer your wages with U

23  LOCK and U LOCK agreed to pay you?

24  A    Can you repeat that one more time?

25  Q    Sure.

S. Snyder - Cross/Gaul                    80

1  A    The end part I didn't hear.

2  Q    You never gave U LOCK a written statement that said you

3  agreed to defer the payment of your wages, did you?

4  A    No, I told them I agreed to defer.

5  Q    And U LOCK never gave you any sort of written statement or

6  you don't have any sort of written statement in which U LOCK

7  tells you that they will pay you at some point in the future?

8  A    Yes.

9  Q    So there's no contract, no written contract?

10 A    No written contract, you're correct.

11 Q    No written promise?

12 A    No written promise.

13 Q    No email about this relationship?

14 A    Well, no, there could have been text messages, but I don't

15 know if he saved them.  I didn't save anything.  I'm on three

16 phones, four phones later.

17 Q    And is it accurate to say that you didn't make any sort of

18 written demand to U LOCK prior to suing U LOCK?

19 A    I made verbal demands.  He knows I wanted money.

20 Q    But you didn't make any sort of written demand?

21 A    No.  Nothing is in writing, no.

22 Q    And you never had a written agreement with U LOCK stating

23 that you were an independent contractor while you were doing

24 this work?

25 A    No.

S. Snyder - Cross/Gaul                    81

1  Q    Again, this property that you were monitoring was in North

2  Huntingdon Township?

3  A    Correct.

4  Q    And during the period in which you claim you were doing

5  this work, you didn't make a single report to the North

6  Huntingdon Police about anything on the property?

7  A    I didn't.

8  Q    Or to the Pennsylvania State Police?

9  A    Not that I recall for both of those answers, no.  I don't

10 think, not that I can recall.

11 Q    Or any other law enforcement agency?

12 A    Not that I can recall.

13 Q    You didn't have any calendars or schedules from 2016 to

14 2020 that show that you were working for U LOCK, correct?

15 A    I don't, no.  I didn't keep anything like that, correct.

16 Q    And if you look at the other binder that's sitting next to

17 you, the smaller one, those are your Exhibits that you brought

18 with you here today?

19 A    Okay.  Should I keep this book, as well, or are we done

20 with this for a little while?

21      Okay.  I'll just put this one here.

22 Q    You might be able to put it aside.

23 A    Okay.

24 Q    They're marked Exhibits A through H.

25 A    Okay.  Yep.

S. Snyder - Cross/Gaul                          82

1  Q    And the oldest of those documents, the one that was

2  created the longest ago is your Complaint against U LOCK which

3  is marked as Exhibit C.

4       Is that accurate?

5  A    Yes.  Uh-huh.

6  Q    Okay.  So you're not prepared to show this Court a single

7  document that was created while you claimed to have worked at U

8  LOCK?

9  A    No, I don't have a single document, correct.

10 Q    I think you told Mr. Lacher you're a reasonably social

11 person?

12 A    I don't know if I ever told him that, no.  My kids --

13 Q    You told him you had a social life.

14 A    Well, when they were 16 or in 2016 to four -- or 2016 to

15 2020, me and their father, we probably -- he's very busy

16 because he works a lot.  But, no, we pretty much put our lives

17 on hold, our personal lives.

18 Q    Did you still have other friends during that period?

19 A    Yes, I have friends.  Yes.

20 Q    And it's fair to say that you can't show us any email from

21 that period in which you mentioned working for U LOCK?

22 A    To my friends?

23 Q    Right.

24 A    No, not that I know of.

25 Q    Or any texts that you might have?

S. Snyder - Cross/Gaul                    83

1  A    Not that I know of.  No.

2  Q    Or any other communications with anybody from during that

3  period?

4  A    Were there any communications about what?

5  Q    I'm sorry, about working for U LOCK that you had with

6  anybody else?

7  A    '20?

8  Q    Before 2020, yeah.

9  A    Like friends?

10 Q    Yeah, or anybody else.

11 A    I'm sure my phone -- I have three different apps on my

12 phone for video cameras.  People get annoyed, my friends get

13 annoyed with my phone ringing all the time.  So it's kind of

14 like maybe a joke, you know, but to discuss the job or working

15 there, my brother's not paying me, I don't think so.  Not that

16 I'm aware of.

17 Q    So no documents?

18 A    No.

19 Q    And your brother George is here today as a witness?

20 A    Well, you called him as a witness.

21 Q    Okay.  And your brother Kash?

22 A    You called him as a witness, I guess.

23 Q    Okay.  So it's fair to say you don't have anybody else

24 here today who's prepared to testify that they saw you doing

25 this work?

S. Snyder - Cross/Gaul                    84

1  A    No, there's no one here other than those two.

2  Q    Even though you did it every evening and every night for

3  more than four years?

4  A    Yes.  Uh-huh.

5         MR. GAUL:  Your Honor, if I can confer with

6  co-counsel?

7         THE COURT:  You may.

8                      (Pause)

9         MR. GAUL:  Your Honor, I have no further questions

10  for Ms. Snyder at this time.

11         Thank you, Ms. Snyder.

12         THE WITNESS:  You're welcome.  Thank you.

13         THE COURT:  Thank you.

14         All right.  Any redirect?

15         MR. LACHER:  No redirect, Your Honor.

16         THE COURT:  Good.

17         Ms. Snyder, thank you very much for your testimony.

18  You may be excused.

19         THE WITNESS:  Okay, you're welcome.  Thank you, Your

20  Honor.  So do I just leave these books here?

21         THE COURT:  You can just leave those right there.

22  Thank you very much.

23         Do you have another witness, Mr. Lacher?

24         MR. LACHER:  I have one more witness,

25  Mr. George Snyder.

85

1          THE COURT:  Okay.  I'm going to suggest that we just

2   take a ten-minute recess and then we can come back on the

3   record and have Mr. Snyder testify.  It will probably make

4   sense to do that at this point since we're in between

5   witnesses.

6          MR. LACHER:  Thank you, Your Honor.

7          THE COURT:  All right.  Very good.  Let's take a

8   ten-minute recess.  We'll come back on the record at 3:20.

9   Thank you, everyone.

10         (Recess at 3:10 p.m./Reconvened at 3:19 p.m.)

11         ECRO:  All rise.

12         THE COURT:  Good afternoon again, everyone.

13         MR. GAUL:  Good afternoon.

14         THE COURT:  Please be seated.

15         Are the parties prepared to continue?

16         MR. LACHER:  Yes, Your Honor.

17         THE COURT:  All right.  We're back on the record on

18  Case Number 22-20823, U LOCK INCORPORATED.  This is the

19  presentation of evidence by the Claimant Snyder.

20         Mr. Lacher, you said you had another witness?

21         MR. LACHER:  Yes, Your Honor.  Mr. George Snyder,

22  please.

23         THE COURT:  All right.  Mr. Snyder, if you could

24  please come forward to the witness stand and raise your right

25  hand to be sworn.

G. Snyder - Direct/Lacher                    86

1       GEORGE SNYDER, MOVANT'S WITNESS, SWORN

2           THE COURT:  Please have a seat.

3                     DIRECT EXAMINATION

4  BY MR. LACHER:

5  Q    Good afternoon, Mr. Snyder.  I want to start by just

6  asking you is it fair to say you and I have never discussed

7  this case?

8  A    Yes.

9  Q    I didn't take your Deposition?

10 A    No.

11 Q    I haven't sent you any letters asking for answers to any

12 questions?

13 A    That's correct.

14 Q    Okay.  Did Shanni work for U LOCK?

15 A    She watched the cameras for those years.

16 Q    Okay.  Did you expect that she'd be paid for the work that

17 she did?

18 A    In some way, shape, or form.  There were lots of people

19 that worked there, a few dozen.  And I was eventually planning

20 on paying everybody.

21 Q    Well, I wanted to ask you that.  The other people that

22 worked there, were they all members of the Snyder family or

23 were there non-family members that worked at U LOCK?

24 A    I think the only couple of people that were the Snyder

25 family were me, my brother Kash, and my sister Shanni.

G. Snyder - Direct/Lacher                          87

1  Q    Uh-huh.

2  A    Then there were several dozen other people that weren't

3  family members that did extensive work for U LOCK over the

4  years.  There were dozens, but I think in my testimony of

5  things before, maybe in my Schedules, I put probably close to a

6  dozen or two names I remembered and things.  Some people worked

7  a lot more than others.  Sometimes someone just worked there

8  for one day, so.

9  Q    Okay.  Thank you.

10      You're aware that Shanni filed a Complaint in the District

11 Court seeking to recover her wages that she earned from U LOCK?

12 You're aware of that Complaint?

13 A    Yes.

14 Q    Was there any agreement between you and Shanni  or to your

15 knowledge anyone from U LOCK and Shanni to not-oppose that

16 Complaint and to -- did you guys collude to make sure she won

17 her case?

18 A    Oh, no, absolutely not.

19 Q    Okay.  What wasn't a Response filed?

20 A    At the time, I -- I went to see Allen Roth and I told him,

21 hey, I said if someone's suing me for, you know, a labor claim,

22 you know, what would you charge to represent -- what would you

23 charge to represent.  And he said it would probably be started

24 at about $10,000.  And I didn't get into detail with him or

25 much more than that.  I don't think I even told him who it was.

G. Snyder - Cross/Gaul                          88

1     And then -- then later, thinking about it, there was --

2   you know, the property was -- we had big plans for the

3   property, and I figured there would be money to pay at the end.

4   You know, I thought if something fell through with the court

5   case and everything with Biros that then there would be no

6   money to pay, so it was kind of a moot point, you know, either

7   way.

8   Q    Understood.  Mr. Snyder, I have no further questions for

9   you.

10  A    Okay.  Thank you.

11  Q    Thank you.

12            THE COURT:  All right.  Thank you.

13            Mr. Gaul, any cross?

14            MR. GAUL:  Your Honor I'd ask leave of the Court to

15  treat Mr. Snyder as a hostile witness.

16            THE COURT:  All right.

17                     CROSS-EXAMINATION

18  BY MR. GAUL:

19  Q    Mr. Snyder, are you aware that this Court has identified

20  you as a principal, operating officer, or a managing director

21  of U LOCK?

22  A    Yes, I'm aware of that.

23  Q    And along with your brother, Kash?

24  A    Yes.

25  Q    You are not aware of this Court's making that same

G. Snyder - Cross/Gaul                                    89

1 determination about anybody else?

2 A    Not -- no, not really.

3 Q    Okay.  Is it fair to say that you were running U LOCK when

4 Ms. Biros sued U LOCK in 2017?

5 A    I was hands on every day.  I was really not the one

6 calling the shots.  The Biros were, mainly Christine and --

7 Christie and John Biros.  But then they weren't calling the

8 shots as much as their father was, so.  He was the --

9 Q    So you were the person who authorized U LOCK to defend

10 against Christine Biros' action, weren't you?

11 A    Yeah, I guess.

12 Q    And you were the person who hired Allen Roth?

13 A    Yes.

14 Q    So we can agree that at least from that point in 2017 when

15 she sued U LOCK onward, Ms. Biros was adverse to U LOCK,

16 correct?

17 A    I wouldn't say that.  I mean as recently as last month,

18 Bob Biros came to my home, we talked for an hour.  Andy Biros

19 came to my home, you know, a month or two ago, very friendly

20 conversation.  He stayed about 45 minutes.  His wife, Tracy,

21 was ill and going through some things.

22      So, no, this whole -- this whole thing, although I was

23 disheartened in the beginning, the court has a way of de-

24 sensitizing, you know, over the past five years, although Your

25 Honor has mentioned sometimes he thinks there's a lot of

G. Snyder - Cross/Gaul                              90

1  animosity between the two of us.  It may be in that direction,

2  but I'm very pragmatic about this.  I exercise my rights and

3  try to defend myself, but it's not personal.  And I -- I moved

4  on from this in my mind a long time ago, so I don't -- I

5  wouldn't call it adverse.  They may say differently.

6  Q    Ms. Biros has been involved in litigation with U LOCK

7  since 2017?

8  A    I believe that's, yeah, when they filed the --

9  Q    And U LOCK took that matter to trial, the first matter to

10  trial in Westmoreland County, correct?

11  A    It ultimately went to -- I think there was a period of

12  time that Christine and John had like paused the lawsuit.  We

13  were still friends and still talking and having lunch and

14  stuff.  And they paused it a little bit because of their

15  Attorney General investigation.  And --

16          MR. GAUL:  Your Honor, I moved to strike as

17  non-responsive.

18          THE WITNESS:  Okay.

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm sorry.  If you ask the question,

21  maybe I can answer it more directly.

22  BY MR. GAUL:

23  Q    Okay.  There was a trial in 2019, right?

24  A    Correct.

25  Q    And you testified at that trial?

G. Snyder - Cross/Gaul                    91

1  A    Yes, I did.

2  Q    Against Ms. Biros?

3  A    Yes.

4  Q    And when Ms. Biros won that trial, you authorized U LOCK

5  to take an Appeal?

6  A    Yes.

7  Q    And, again, you hired Mr. Roth to take the Appeal?

8  A    Yes.

9  Q    And when U LOCK lost that Appeal, you authorized U LOCK to

10 ask the Pennsylvania Supreme Court to review the case?

11 A    Yes.

12 Q    And you, again, hired Mr. Roth to present that to the

13 Supreme Court?

14 A    Yes.

15 Q    And Mr. Roth was still appearing on behalf of U LOCK in

16 that action as recently as last year?

17 A    Yes.

18 Q    And you authorized him to take all those actions?

19 A    I did.

20 Q    On behalf of U LOCK?

21 A    Yes.

22 Q    Okay.  And in this proceeding, who made the determination

23 of who to hire as counsel for U LOCK?

24 A    I'm sorry.

25 Q    Sure.  Who made the determination of who to hire as the

1 attorney for U LOCK in this proceeding?  Was that you?

2 A     This one, the bankruptcy?

3 Q     Yeah.

4 A     Yes, me.

5 Q     Do you know what a Form W-9 is?

6 A     Yeah, I think so, yeah.

7 Q     To your knowledge, is it fair to say U LOCK never

8 collected a W-9 from Ms. Snyder?

9 A     Yes, that's --

10 Q     Do you know what a Form I-9 is?

11 A     We -- we kind of run things very informal, and we didn't

12 -- we didn't do a lot of that stuff we were supposed to do.

13 Q     Yeah.

14 A     So we didn't have any forms for her.

15 Q     Let me ask.  Do you know what a Form I-9 is?

16 A     If you refresh my memory, I do believe I do.

17 Q     It's a form that -- do you know that Form I-9 is a form

18 that concerns citizenship and eligibility to work in the United

19 States?

20 A     I'm a little bit familiar with it.

21 Q     To your knowledge, is it fair to say that U LOCK never

22 collected a Form I-9 for Ms. Snyder?

23 A     Yeah, or none of the other -- other dozens of people

24 worked there.  We didn't do any of those from anybody.

25 Q     To your knowledge, U LOCK never gave Ms. Snyder a Form

G. Snyder - Cross/Gaul                           93

1  W-2?

2  A    Correct.  We didn't issue those for anybody.

3  Q    Or a Form 1099?

4  A    That's -- I believe U LOCK, we did file a 1099 for that

5  tractor sale, I believe, if I'm remembering right.  But as far

6  as anybody who worked there, no -- no one was issued one or

7  filled one out.

8  Q    Not for your sister?

9  A    Pardon me.

10  Q    Not for your sister?

11  A    Correct.

12  Q    Okay.  Do you remember testifying on behalf of U LOCK in

13  the course of these bankruptcy proceedings before this?

14  A    In general, yes.  I don't remember every single thing, but

15  --

16  Q    Yeah.

17  A    Yes.

18  Q    You testified at what was called a 341(a) Meeting of

19  Creditors in September of last year.  Do you remember that?

20  A    Was that on the telephone?

21  Q    I don't know.

22  A    I think so.  I think I remember with Mr. Slone on the

23  telephone.

24  Q    Okay.  Can you -- the thicker of those two binders, can

25  you take a look at Exhibit Number 16?

G. Snyder - Cross/Gaul                        94

1  A     Do you know which one it's in, the --

2  Q     In the thick -- no, the other binder.  The thicker of the

3  two.  And I think the Judge advised Ms. Snyder that it's going

4  to be a little bit easier if you put the document in front of

5  you and between yourself and the monitors.

6  A     And where would you like me to go on this?

7  Q     Exhibit 16.

8  A     Okay.

9  Q     I'm going to represent to you that this is a Transcript of

10 a hearing from September 9th of last year, a 341(a) Meeting.

11 A     Okay.

12 Q     Do you remember participating in a meeting in which your

13 sister was there either in person or on the phone?

14 A     Yes.

15 Q     And you testified at that hearing?

16 A     Yes.

17 Q     And I think you mentioned Mr. Slone before.  He's the

18 United States Trustee in this matter?

19 A     Yes.

20 Q     And you were asked questions about a number of attorneys,

21 correct?

22 A     I believe Mr. Slone and maybe Mr. William Otto.

23 Q     Okay.  If you can take a look at it's called, it's labeled

24 Biros 250 in the lower right-hand corner, but it's the third

25 page of the Exhibit.

G. Snyder - Cross/Gaul                          95

1  A    Okay.

2  Q    There are a number of names there, Examination By, and

3  there are about four names.  Do you remember being asked

4  questions by all four of those people?

5  A    Not necessarily, but I wouldn't dispute that.

6  Q    Okay.  Did you --

7  A    I don't remember Ms. Wenrich questioning me, but maybe she

8  did.

9  Q    Okay.  Do you remember taking an oath before you gave that

10 testimony?

11 A    Yeah, I believe I had to raise my right hand and --

12 Q    The same oath that you gave here today?

13 A    Yes.

14 Q    Can you take a look at Biros 251, but it's Page 15 of the

15 Exhibit.

16 A    Okay.

17 Q    Just go to -- read starting with Line 3, Mr. Slone asked

18 you, "How many employees did the company have when the

19 bankruptcy was filed?"  And you responded, "None."  Am I

20 reading that correctly?

21 A    Yes, you're reading that correctly.

22 Q    And Mr. Slone then asked you, "None?  What's the last time

23 the company had employees?"  And your response was, "Up till

24 recently, we had -- there was always someone helping there,

25 there was always about half a dozen people helping at different

G. Snyder - Cross/Gaul                               96

 1  times, you know, throughout the years.  But just limited, you

 2  know, just a few hours a year."

 3      Did I read that correctly?

 4  A    Yes, you read it correctly.

 5  Q    Now you've told this Court about your understanding of

 6  what Ms. Snyder was doing for U LOCK?

 7  A    Yes.

 8  Q    And would you tell the Court that over the four-plus years

 9  that she claims to have worked for U LOCK, her responsibilities

10  stayed the same?

11  A    Yes.

12  Q    So they were the same at the end of 2018 as they were at

13  the beginning of 2018?

14  A    Yes.

15  Q    And is it fair to say that as of September 2018, U LOCK

16  had never had any employees at all?

17  A    Ask me that again.

18  Q    Sure.  Is it fair to say that as of September 2018, U LOCK

19  had never had any employees at all?

20  A    There were, like I said, dozens.  Actually, if I could

21  clarify on that, and I may have misspoke in the past.  I think

22  I've used the terms I'm noticing here a little inconsistent.

23  I'm using workers, employees.  We've talked about volunteers.

24  We've talked about different things.  So maybe I was using the

25  wrong terminology.

1    When I said there was no employees, I mean there was no --

2    we had no payroll, we had nobody that punched in on a clock

3    this time or that time.  But over the -- well, now it's been,

4    you know, several more years over the past eight years or

5    whatever it's been, we've had I would guess about four dozen

6    people that -- and I'll say helped there.  They weren't

7    employees.  I don't think any of them would have went and

8    filled an application and said, hey, I work at U LOCK.

9        You know, one guy, you know, worked from the motel across

10   the street.  He didn't -- I don't even remember his name, Joe,

11   he didn't have any legs, he came there and he worked for a

12   couple of days for us.  I don't even know his last name.  I

13   don't have his phone number.  And ironically, he had no legs,

14   he was one of the hardest workers we ever had.

15       But, yeah, I certainly wouldn't call him an employee.

16   Q    Okay.  You read things before you sign them, right?

17   A    Well, I probably should.  Some things I do.  All these

18   things we've got 400 pages on an app on a cell phone or

19   something, no, I don't read those.  But -- but if I signed a

20   court document, I probably read it.

21   Q    Why do you read them before you sign them?

22   A    Just to know what I'm signing or that, you know --

23   Q    Take a look at Exhibit Number 4.  I'm going to represent

24   to you that Exhibit 4 is from the Biros v. (indiscernible) but

25   also U LOCK action.  And it states on the front page, "Type of

G. Snyder - Cross/Gaul                                        98

1  Pleading, Defendant U LOCK INC'S Amended Objections And

2  Responses To The Interrogatories, Requests For Admissions, and

3  Request For Production Of Documents."  Did I read that

4  correctly?

5  A    Right, where it says "Type of Pleading?"

6  Q    Yeah.

7  A    Okay.

8  Q    Yeah.

9  A    I'm following you.

10 Q    Let's go to almost to the end of this document to the

11 third from last page which has Biros 000095 in the lower

12 right-hand corner.

13 A    Okay.

14 Q    Do you have that page in front of you?

15 A    Yes.

16 Q    Is that your signature on that page?

17 A    It looks like it.  I'd say yes.

18 Q    And this page is called a Verification?

19 A    Yes.

20 Q    It says, "And now comes George Snyder on behalf of U LOCK

21 INC., who verifies that the facts contained in the foregoing

22 Defendant U LOCK INC.'s Amended Objections And Responses To The

23 Interrogatories, Requests For Admissions, and Request For

24 Production Of Documents are true and correct on her own

25 knowledge, information, and belief.  This Verification is made

G. Snyder - Cross/Gaul                    99

1  subject to the penalties of 18 Pa.C.S. Section 4904 related to

2  Unsworn Falsification To Authorities."

3      Now despite the "her" in there, I read that correctly,

4  didn't I?

5  A    Yes.

6  Q    And did you have a chance to read this before you signed

7  it?

8  A    Most likely.  If not, I would have read it after I signed

9  it.

10 Q    And before you sign something like this, you would have

11 read the Discovery Responses that you were saying were correct,

12 right?

13 A    I would say.

14 Q    Can you take a look at -- let's go back up to the front.

15 Let's go to the page that's Biros 00085 in the lower right-hand

16 corner.

17 A    Okay.

18 Q    And I'm -- do you see in the middle of the page there's a

19 Number 3 --

20 A    Yes.

21 Q    -- that says "Identify all current and former employees of

22 U LOCK.  Provide the dates during which each was employed,

23 their job title, responsibility, and the total compensation

24 paid to each during his or her employment.  Provide the address

25 of the current residence of each."

G. Snyder - Cross/Gaul                    100

1    Did I read that correctly?

2  A    Yes.

3  Q    Could you read U LOCK's response for us?

4  A    "U LOCK states it does not maintain employees and did not

5  maintain employees in the past.  U LOCK operates through

6  officers, volunteers, and contractors."

7  Q    Okay.

8         MR. GAUL:  A moment to confer with co-counsel, Your

9  Honor?

10         THE COURT:  Uh-huh.

11                        (Pause)

12  BY MR. GAUL:

13  Q    One last question.  I hope it's one last question, Mr.

14  Snyder.

15  A    Yes.

16  Q    When Ms. Snyder, when you claim she was performing these

17  services for U LOCK, did U LOCK have workers' compensation

18  insurance for her?

19  A    No, we didn't have -- I don't think we ever had workman's

20  compensation.  We didn't have employees.

21         MR. GAUL:  That's all I have, Your Honor.  Thank you

22  very much.

23         THE COURT:  Thank you.

24         Any redirect?

25         MR. LACHER:  Nothing further, Your Honor.  Thank you.

1          THE COURT:  Mr. Snyder, thank you for your testimony.

2     You may be excused and return to the counsel table.

3          Mr. Lacher, do you wish to call another witness?

4          MR. LACHER:  No, Your Honor.

5          THE COURT:  All right.  Do you have anything else

6     that you wish to add to the record at this point?

7          MR. LACHER:  No, Your Honor.  Thank you.

8          THE COURT:  Thank you.

9          All right.  Mr. Gaul, any additional evidence that

10    you wish to present on behalf of the objecting party?

11         MR. GAUL:  Your Honor, it's already been mentioned we

12    do have Mr. Kash Snyder here under subpoena.  Would the Court

13    mind if I took about two minutes with co-counsel to see whether

14    that's necessary or whether --

15         THE COURT:  No, that's fine.

16         MR. GAUL:  -- we can skin it down a bit?  Thank you,

17    Your Honor.

18                         (Pause)

19         MR. GAUL:  Sorry, Your Honor.  About one more minute.

20    I apologize.

21                         (Pause)

22         MR. GAUL:  Your Honor, I'm afraid I do probably have

23    a few questions for Mr. Kash Snyder.  Would the Court or any of

24    the other parties object to my sticking my head out the door

25    and asking him to come in?

K. Snyder - Direct/Gaul                    102

1          THE COURT:  No, I was going to just direct that.  If

2    he's going to be required for testimony, if someone would

3    please retrieve him and we'll move forward.

4          MR. GAUL:  Fair enough.  Thank you.

5                         (Pause)

6          THE COURT:  All right.  Good afternoon, Mr. Snyder.

7    You've been called as a witness, so if I could ask if you could

8    please come over to the witness stand and stand and raise your

9    right hand and be sworn.

10          KASH SNYDER, OBJECTOR'S WITNESS, SWORN

11          MR. GAUL:  Your Honor, I'd ask --

12          THE COURT:  Before you begin, do you have any gum in

13    your mouth there?

14          THE WITNESS:  I'm sorry.  I do, Your Honor.

15          THE COURT:  Can you -- there might be some tissue

16    over there if you could please remove it.

17          MR. GAUL:  Your Honor, I would also ask permission to

18    treat this witness as hostile.

19          THE COURT:  All right.  Very well.

20                    DIRECT EXAMINATION

21    BY MR. GAUL:

22    Q    Could you state your name for us?

23    A    Kash Snyder.

24    Q    And, Mr. Snyder, you're here today in response to a

25    Subpoena that you received?

K. Snyder - Direct/Gaul                 103

1   A    Correct.

2   Q    And are you aware that this Court has identified you as a

3   principal, operating officer or managing director of U LOCK?

4   A    I wasn't aware of that, but --

5   Q    Is it fair to say that you've already testified on behalf

6   of U LOCK in these proceedings?

7   A    Bankruptcy proceedings?

8   Q    These bankruptcy proceedings, yes.

9   A    I don't recall doing so, but I've testified before for --

10  I didn't know it was bankruptcy, but I've testified regarding U

11  LOCK before.

12  Q    Do you remember testifying at a hearing on January 6th of

13  this year?  It might have been in person --

14  A    Yes.

15  Q    Okay.

16  A    Yes.

17  Q    Okay.  And do you recall testifying at the trial of the

18  case between Christine Biros and U LOCK, correct?

19  A    Christine, U LOCK?

20  Q    Back in 2019.

21  A    It's -- yeah, it's familiar.  I don't remember it really

22  distinctly, but I remember.

23  Q    Okay.  Is it fair to say that you've been affiliated with

24  U LOCK since it was unincorporated?

25  A    Yes.

K. Snyder - Direct/Gaul                    104

1  Q    Are you -- I think we already talked briefly about the

2  trial in 2019.  Are you aware that Christine Biros sued U LOCK

3  back in 2017?

4  A    She sued us, no.  I mean, no, I don't -- I don't recall

5  that.

6  Q    You don't recall her suing --

7  A    Being sued?

8  Q    U LOCK.

9  A    Sorry, I really don't, but if you could refresh my memory

10 on it?  Being sued for what, for an amount of money?

11 Q    You have no recollection of a lawsuit back in 2017?

12 A    I mean for -- not really.  I mean it's sort of -- it's

13 been a long time here, and it's been ongoing.  I thought it was

14 sort of the same thing.

15 Q    Okay.  Do you remember your sister, Shanni, helping out

16 with the preparation for the trial in that matter?

17 A    No.

18 Q    Is it fair to say that if you were called to testify under

19 oath, you would attempt to testify truthfully?

20 A    Sure.

21 Q    I'm going to ask you, there are two binders to your right.

22 I'm going to ask you to take a look at the -- pull the big one,

23 which is on the bottom.  And take a look at Exhibit Number 5.

24 A    All right.

25 Q    You mentioned before that there might be something I could

K. Snyder - Direct/Gaul                    105

1 show you that would refresh your recollection of whether there

2 was a trial.  Do you remember now that there was a case between

3 Christine Biros and U LOCK?

4 A    I mean I'm not saying that I don't remember that there

5 wasn't a case.  I just didn't know.  I thought maybe that was

6 -- I don't remember the details on it.  So this was her trying

7 to get the property, okay.

8 Q    Okay.  So you remember that lawsuit?

9 A    Yes.

10 Q    Okay.  And do you remember testifying at the trial in that

11 action?

12 A    Yes.  And may I?  Did you say 2017?  This is saying 2019.

13 Q    Well, let me help you out a little bit, if I may, Your

14 Honor?  If you take a look at this case, the very first page of

15 Exhibit 5.

16 A    Okay.

17 Q    Do you see where it says on the right-hand column, it says

18 Number 4886 of 2017?

19 A    Okay.

20 Q    Do you see that?

21 A    Yes, I do.

22 Q    Then if you go down below the caption with the little

23 parenthesis, it also says "Heard April 29, 2019."

24 A    Okay.

25 Q    And that's before the Honorable Harry F. Smail, Jr., in

K. Snyder - Direct/Gaul                    106

1  Westmoreland County.

2  A    Okay.

3  Q    Do you remember testifying in front of Judge Smail?

4  A    I don't quite remember.  I don't remember really that

5  good, but I -- I remember Judge Smail, but to be honest with

6  you.  But, yeah, I remember this.

7  Q    Okay.  And you remember that you took an oath during that

8  proceeding?

9  A    Not specifically, but I believe that.

10 Q    Okay.  And if you've been called as a witness, you would

11 have tried to tell the truth?

12 A    Certainly.

13 Q    Sure.  Do you remember Ms. Biros' lawyer?  Do you remember

14 Mr. Otto asking any questions during that?

15 A    I do.

16 Q    Would you take a look at it's a little confusing, but it's

17 within Exhibit 5.  It says 74 on the lower right-hand corner,

18 but immediately next to it, there's a little stamp that says

19 Biros 000171.  Do you see that page?

20 A    Give me one second, please.

21      All right.  Would that be Page 73, I guess?

22 Q    74, actually.  The next page.

23 A    Okay.  Yep.

24 Q    So at the very top it says "Corporation Law."  Do you see

25 that?

1  A    "Corporation Law," yes.

2  Q    Yeah.  Okay.  I'm going to ask if we can go down a few

3  more lines to Line 11.

4  A    All right.

5  Q    Do you see the spot where this is Mr. Otto asking you

6  questions and he says, "Okay.  To your knowledge, did anybody

7  help Mr. Roth with the pleadings and the documents that have

8  been filed?"

9  A    Okay.

10 Q    And your response is, "To my knowledge, no.  I know his

11 paralegal and George and my sister have been helpful."  Did I

12 read that correct?

13 A    That's what it says, yes, sir.

14 Q    And continuing, Mr. Otto asks you, "What involvement did

15 your sister have in all of this."  And your response is, "Just

16 like you said, helping with the documents."

17 A    Yeah, I see that.

18 Q    Okay.

19 A    What context is this in?  To --

20 Q    I just want to know whether you had given that statement

21 before, had said that before.

22 A    Mr. Roth was -- pleadings during what?  That's -- I'm

23 sorry, I'm not understanding the context there.

24 Q    Okay.

25 A    Did anyone help Mr. Roth with pleadings and the documents

K. Snyder - Direct/Gaul                    108

1 that have been filed, okay.  To my knowledge, no.  Okay.  Yeah,

2 I believe this.

3 Q    Okay.  Did you have any awareness at all that Shanni was

4 performing services on behalf of U LOCK between 2016 and 2020?

5 A    Yes.  As -- as far as the camera work, I had limited

6 knowledge to that, but I did know about it.

7 Q    Let me ask you if we can flip to the following page, Page

8 75.

9 A    All right.

10 Q    And you mentioned that you have some troubles with memory

11 sometimes, right?

12 A    No.  Or did I mention that?  I'm saying today, you're

13 saying that?

14 Q    Today you mentioned that.

15 A    Yeah, I'm just -- I'm not having trouble with memories in

16 general, but just things that you're asking me I wasn't

17 remembering.  But, no, I'm really not making that statement.

18 But anyway, go ahead.

19 Q    Can we agree that you're more likely to have remembered

20 things that happened in 2019, back in 2019 than you are today?

21 A    I don't know.  I mean I don't think so.

22 Q    You don't think you've lost any memories at all from that

23 time?

24 A    I mean I do forget things sometimes.  I mean I don't know

25 -- I don't know if it's average or not, but --

K. Snyder - Direct/Gaul                109

1  Q   Okay.  Well, let's continue from where we left off.  Let's

2  switch back to Page 74 and --

3  A   All right.

4  Q   -- immediately after where we left off at Line 20.

5  Mr. Otto asks you, "But she's not a shareholder or director or

6  officer?"  And you respond, "Correct."

7  A   I'm reading that, yes.

8  Q   And Mr. Otto asks, "Is she like the friend to the Court?"

9  And you respond, "No, she's a loved one.  I guess, you know."

10  And Mr. Otto asks, "What's her background?"

11  A   Okay.

12  Q   And continuing on to Page 75, you respond, "Nothing.

13  Nothing legal if that's what you're asking.  She's just a

14  run-of-the-mill layman."

15  A   All right.

16  Q   And on Line 3, Mr. Otto asks you, "What involvement did

17  she have in the company?"  And your response is, "None in the

18  company."  Correct?

19  A   "None in the company," yes, that's my response.

20  Q   We mentioned a hearing in January of this year.  If we can

21  take a look at Exhibit 17 just further down in that same book.

22  A   All right.

23  Q   If you can first take a look at Page 267.

24  A   All right.

25  Q   Do you see on Line 12, do you see that John B. Joyce,

K. Snyder - Direct/Gaul                110

1  Esquire was present for the hearing?

2  A    I do.

3  Q    And so was Robert H. Slone up at the top?

4  A    Excuse me, yes, I see that.

5  Q    Okay.  Mr. Slone is the United States Trustee in this

6  matter?

7  A    All right.

8  Q    You were asked questions by a number of lawyers during

9  this hearing, correct?

10 A    Over the telephone, yes.

11 Q    Yeah.  Let's take a look at Page Biros 269.

12 A    All right.

13 Q    That's Page 8 of the Transcript.

14 A    Yes.

15 Q    At the top of the page, the question to you is, "Did the

16 corporation have employees?"  And your response is, "No, we

17 never had employees.  We always had people helping us but never

18 anything official or long-term or anything like that."

19      Did I read that correctly?

20 A    Yeah.  Yeah, that was -- I would say Shanni fell in that

21 category.

22 Q    The next question is, "Did you have 1099 workers, people

23 that you gave 1099 forms to?"  And your answer is, "No, we

24 never did that."

25 A    That's correct.  I'd say that describes it, as well.

WWW.JJCOURT.COM

K. Snyder - Cross/Lacher                111

1          MR. GAUL:  Your Honor, I don't have any more

2   questions for Mr. Snyder.

3          Mr. Snyder, thank you for coming in today.

4          THE WITNESS:  You're welcome.

5          THE COURT:  Thank you.  Mr. Lacher?

6          MR. LACHER:  I actually have two quick questions.

7                     CROSS-EXAMINATION

8   BY MR. LACHER:

9   Q    Good afternoon, Mr. Snyder.

10  A    Good afternoon.

11  Q    You did not believe Shanni to be an owner, officer, or

12  director of U LOCK.  Is that correct?

13  A    That's correct.

14  Q    But you were aware of her monitoring the cameras for U

15  LOCK?

16  A    I was, yes.

17  Q    Thank you.

18  A    You're welcome.

19          THE COURT:  Any additional questions, Mr. Gaul?

20          MR. GAUL:  No further questions, Your Honor.

21          THE COURT:  All right.  Mr. Snyder, you may be

22  excused.  Thank you very much for your testimony.

23          THE WITNESS:  You're welcome.

24          THE COURT:  And you can return to counsel table if

25  you wish.

112

1              Mr. Gaul, anything further?

2              MR. GAUL:  Nothing further, Your Honor.  Thank you
3    very much.

4              THE COURT:  All right.  Very good.

5              All right, then.  Just to recap, then, I have all of
6    the Exhibits have been admitted, and we have the testimony of
7    the witnesses.  And at this point, the record, the evidentiary
8    record in this matter will be concluded.

9              Any other items that the parties wish to address with
10   the Court at this point?

11             MR. GAUL:  Nothing on behalf of Ms. Biros, Your
12   Honor.

13             THE COURT:  All right.  Mr. Lacher?

14             MR. LACHER:  Same here, Your Honor.

15             THE COURT:  All right.  Very good.

16             Given the level of detail, I think this does warrant
17   some post-trial briefing.  So I'm going to order that
18   Post-Trial Briefs be provided to the Court within 30 days.  And
19   then at that point, the matter will be under submission for the
20   Court's determination.

21             Anything else that we need to address at this stage?

22             MR. GAUL:  Once again, nothing on this side, Your
23   Honor.

24             MR. LACHER:  Agreed again, Your Honor.

25             THE COURT:  Very good.

113

1        All right.  Well, then I will await for those Briefs,

2   and then the Court will issue a Written Decision and from that

3   point on, we'll have a resolution of this matter.  I do

4   appreciate the parties working on doing an efficient

5   examination of the witnesses today and getting done by 4:00.

6   So kudos to you in getting that done.  And, like I said, I will

7   consider what's been offered at this point and look to issue a

8   Decision rather promptly shortly after we have those Post-Trial

9   Briefs.

10        With that, that concludes the matters that are

11  presently set before the Court at this time.  The Court will

12  stand in recess, and we will close the record.  I wish you all

13  a very pleasant and safe weekend.  Thank you very much,

14  everyone.

15        MR. LACHER:  Thank you, Your Honor.  Same to you.

16        (Proceedings adjourned at 3:59 p.m.)

17              * * * * *

18

19

20

21

22

23

24

25

114

# C E R T I F I C A T I O N

1

2          I, DIPTI PATEL, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   electronic sound recording of the proceedings in the above-

5   entitled matter and to the best of my ability.

6

7   /s/ Dipti Patel

8   DIPTI PATEL, CET-997

9   J&J COURT TRANSCRIBERS, INC.    DATE:  July 26, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**