FILED
6/24/24 5:13 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : Case No. 22-20823-GLT |
| | : Chapter 7 |
| **U LOCK, INC.,** | : |
| | : |
| *Debtor*. | : Related to Dkt. Nos. 278, 298, 299, 301, 303 |
| | : |

| | |
|---|---|
| Robert S. Bernstein, Esq. | Robert H. Slone, Esq. |
| Lara S. Martin, Esq. | Mahady & Mahady |
| Bernstein Berkley, P.C. | Greensburg, PA |
| Pittsburgh, PA | *Chapter 7 Trustee* |

William E. Otto, Esq.
The Law Firm of William E. Otto
Murrysville, PA
*Attorneys for Christine Biros*

## <u>MEMORANDUM OPINION</u>

The most basic tenet of the Bankruptcy Code[1] is the inviolability of the bankruptcy estate.[2]  Yet prior to a scheduled auction under section 363(b), most of the scheduled tangible assets of the debtor U Lock, Inc. disappeared from its business premises (the "Property").   Further proceedings, including on-site inspections, revealed that both George Snyder (U Lock's principal) and creditor Christine Biros (the owner of the Property) gained possession of estate assets.  Their actions appearing to be willful violations of the automatic stay, an *Order to Show Cause* followed.[3]  After considering the responses filed by Mr. Snyder and Ms.

---

[1]     Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2]     <u>See</u> 11 U.S.C. §§ 541(a), 362(a).

[3]     <u>See</u> *Order to Show Cause*, Dkt. No. 249, <u>superseded by</u> *Amended Order to Show Cause*, Dkt. No. 278.

Biros,[4] the Court finds that his removal and possession of estate assets was authorized by the chapter 7 trustee ("Trustee"), but hers was not.  In fact, Ms. Biros' offers only post-facto justifications as a smokescreen to distract from her willful overreach after the Court denied her greater relief.  Therefore, the Court will release the *Order to Show Cause* as to Mr. Snyder and require Ms. Biros to pay damages as outlined below.

## I.    BACKGROUND

Narrow as the *Order to Show Cause* might appear, it is inextricably linked to the broader dispute between the Snyder and Biros families over the Property's fate.  For this reason, the litigation history and the parties' conduct prior to the alleged stay violations are relevant to assessing their knowledge and willfulness.  Importantly, Mr. Snyder and Ms. Biros have personally attended every hearing, though he appears pro se while she is accompanied by both bankruptcy counsel and her state court counsel, Attorney William E. Otto.

### A.    Prologue: U Lock and the Property

The Property is essentially a junkyard located on Route 30 in North Huntingdon, Pennsylvania with a run-down self-storage building.[5]  Though U Lock ostensibly ran a small self-storage business there, it was formed by Mr. Snyder and others to acquire and commercially develop the Property for profit.[6]  Mr. Snyder believed that Ms. Biros and her brother John were

---

[4]    See *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301; see also *Debtor U Lock's Reply to the Response of Christine Biros (Entry 298) to the Amended Order to Show Cause*, Dkt. No. 299; *Reply to the Response of Christine Biros (Entry 298) RE Show Cause*, Dkt. No. 303.

[5]    In re U Lock, Inc., No. 22-20823-GLT, 2023 WL 308210, at *1 (Bankr. W.D. Pa. Jan. 17, 2023) ("The Property is essentially a junkyard on Route 30, littered with construction debris, scrap piles, tire mounds, collapsed trailers, and inoperable vehicles. It contains two structures: a large, free-standing garage/warehouse and a rundown, single-story self-storage building. The Property is also subject to environmental contamination and was the site of a literal garbage fire post-petition.").

[6]    See generally, Biros v. U Lock Inc., 2021 PA Super 104, 255 A.3d 489, 492 (2021), re-argument denied (July 28, 2021), appeal denied, 271 A.3d 875 (Pa. 2022).

partners in the real estate venture.[7]  She loaned the funds to purchase the Property while Mr.

Snyder and his brother Kash operated U Lock.[8]  According to Mr. Snyder, Ms. Biros was also to

fund the Property's development, but the project was in a "holding pattern" because the Biroses

were then under indictment.[9]  As is, U Lock only generated minimal revenue through the self-

storage facility on the Property.[10]

Two years later, Ms. Biros sued U Lock in the Court of Common Pleas of

Westmoreland County ("Trial Court") to recover the Property on account of the unpaid loan.[11]

Ultimately, the Trial Court imposed a constructive trust on the Property in favor of Ms. Biros due

to U Lock's insolvency, rendering her the equitable owner from the start.[12]  The Snyders'

appeals failed,[13] effectively cutting them out of the project before any benefits were realized.

They maintained this outcome was unfair because everyone agrees that the Property is worth at

least double the amount of Ms. Biros' loan.[14]

---

[7]  Id.

[8]  Id.  The Trial Court found the Snyders did not expect Ms. Biros to request a purchase-money repayment agreement just prior to Property's closing but nonetheless agreed.  Id.  The handwritten note signed by U Lock provided that if repayment terms were not mutually established within a month, Ms. Biros could set them unilaterally.  Snyder v. Biros (In re U Lock, Inc.), 652 B.R. 456, 460 (Bankr. W.D. Pa. 2023).  As a practical matter, this afforded her the ability to trigger a default at any time by imposing terms beyond U Lock's capacity.

[9]  See In re U Lock, Inc., No. 22-20823-GLT, 2024 WL 878464, at *2 (Bankr. W.D. Pa. Feb. 29, 2024).

[10]  Id. ("The statement of financial affairs reflects prepetition gross revenue ranging from $8,400 to $13,200 in the previous three years, which George testified was consistent with prior operations as well.") (footnotes omitted).

[11]  Biros v. U Lock Inc., 255 A.3d at 492.  Before commencing litigation, Ms. Biros sent a letter to Mr. Snyder increasing the principal amount of the loan and demanding, among other things, 9% interest, a mortgage, personal guarantees, and a five-year repayment period.  Id.; In re U Lock, Inc., 652 B.R. at 460.

[12]  Id.; see also In re U Lock, Inc., 652 B.R. at 461 ("The accompanying order therefore states that 'Plaintiff Christine Biros is the equitable owner of the Subject Property' and directs the execution of the appropriate deeds to her.") (emphasis in original).

[13]  Biros v. U Lock Inc., 255 A.3d at 496-97; see also Biros v. U Lock Inc., 271 A.3d 875 (Pa. 2022) (denying leave to appeal).

[14]  See, e.g., In re U Lock, Inc., 652 B.R. at 462 (Ms. Snyder asserting that Ms. Biros valued the Property between $700,000 and $900,000); In re U Lock, Inc., 2023 WL 308210, at *1 (Debtor estimating the value of the Property in 2022 as $1.9 million).

When Ms. Biros was poised to gain possession of the Property, Shanni Snyder, Mr. Snyder's sister, filed an involuntary chapter 7 petition against U Lock in April 2022.[15] Unbeknownst to the Court at the time, the involuntary petition was part of a scheme to continue the litigation and recover the Property through an avoidance action.[16] As the Court later found, Ms. Snyder fraudulently obtained a default judgment against U Lock to cloud the title to the Property and establish a claim to commence the involuntary.[17]

Given this backdrop, it is unsurprising that this case has been unreasonably contentious and driven by personal animosity. That said, there are no angels here. Every party played a role in transforming an otherwise simple chapter 7 case that should have been fully administered within a few months into an endless slog of litigation.

B.    U Lock's Bankruptcy and Limited Stay Relief

From the get-go, Ms. Biros sought expedited dismissal of the involuntary or, in the alternative, stay relief.[18] Though she disputed Ms. Snyder's claim and asserted that the petition was filed in bad faith, she primarily wanted unfettered possession of the Property.[19] Before the hearing on her motion, Ms. Biros obtained a writ of possession from the Trial Court permitting her to, among other things, levy and sell U Lock's property.[20] And, in what proved to

---

[15]    In re U Lock, Inc., 2024 WL 878464, at *3-4.

[16]    Id. at *17.

[17]    Id. Ms. Snyder's claim has since been disallowed. Id. at *19.

[18]    See *Emergency Motion for Entry of an Order (I) Dismissing the Case and for Sanctions Against the Peitioning [sic] Creditor, or in the Alternative (II) Making a Determination that the Automatic Stay is Inapplicable to the State Court Action Pursuant to 11 U.S.C. § 362(b)(10), or in the Alternative (III) Granting Relief from the Automatic Stay to the Movant in Relation to the Movant's Property and the State Court Case, or in the Alternative (IV) Abandoning the Movant's Property* ("Motion to Dismiss"), Dkt. No. 14.

[19]    Id.

[20]    *Motion to Dismiss*, Dkt. No. 14 at ¶ 78; see also *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 8:13-19,11:22-12:1.

be an apt metaphor for subsequent proceedings, there was a literal garbage truck fire on the Property.[21]

The Court conducted an initial hearing in June 2022. It declined to consider dismissal until after U Lock answered the involuntary petition, noting that consent to an order for relief would seemingly moot Ms. Biros' challenges.[22] As to the writ of possession, Ms. Biros acknowledged that the Trial Court entered it post-petition with knowledge of the automatic stay.[23] Yet rather than admit the defect, she argued that the writ was valid because the Property was not property of the estate to which the stay applied.[24] Emphasizing the distinction between title and possession, as well as the writ of possession's authorization to levy and sell estate property, the Court held that it was void.[25] The Court reserved the question of the willfulness of the stay violation for another day.[26]

Undeterred, Ms. Biros urged the Court to grant her stay relief to dispossess U Lock from the Property and begin immediate environmental remediation.[27] In addition to the alleged soil contamination from the garbage truck fire, she cited the general features of the

---

[21]    See *Exhibit Disclosing Police Report*, Dkt. No. 27.

[22]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 32:10-33:6.

[23]    Id. at 6:17-7:17, 9:14-23.

[24]    Id. at 10:8-15.

[25]    See id. at 7:15-17, 10:16-11:2, 33:19-21; see also *Order*, Dkt. No. 143.

[26]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 33:24-34:3. Rather than wait for the Trustee to assess the claim, U Lock filed a complaint seeking damages for the alleged stay violation, which Ms. Snyder sought to join. See generally *U Lock, Inc. v. Biros*, Adv. Pro. No. 22-2048. Given their lack of standing, the Court dismissed it without prejudice and observed they likely violated the stay by usurping the estate's rights. See *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 27:16-23, 31:5-11. Both U Lock and Ms. Snyder have appealed that decision to the United States Court of Appeals for the Third Circuit after the United States District Court for the Western District of Pennsylvania affirmed. See U Lock, Inc. v. Biros, 2:22-cv-1222-NBF, Dkt. No. 15 (W.D. Pa. June 21, 2023). The Trustee has not since pursued any stay violations. See *Status Report*, Dkt. No. 173.

[27]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 17:15-18:3.

junkyard, such as "broken down cars," tires, and other debris as environmental concerns.[28]   U

Lock maintained that the emergency was overstated and professed a desire to continue its own

clean-up efforts towards developing the Property despite the Trial Court's orders.[29]   Regardless,

the Court found that limited stay relief was appropriate to address what appeared to be "a

festering environmental issue."[30]   With the parties agreeing in principle that remedial efforts

should move forward, the Court gave them a chance to cooperate on a draft form of order.[31]

Unfortunately, a joint proposed order proved unworkable given Ms. Biros' desire

for exclusive possession of the Property and U Lock's refusal to accept the finality of her

ownership.[32]   The Court drafted its own order ("Limited Stay Relief Order") adopting the

parties' terminology and focus.[33]   It authorized Ms. Biros to begin environmental remediation

subject to the following caveats: (1) she could not restrict the access of U Lock or its tenants to

the Property;[34] (2) she was not to interfere with U Lock's ongoing operations;[35] (3) she could not

remove "any U Lock property that [did] not impede the environmental remediation efforts;"[36]

---

[28]    Id. at 5:19-6:16, 12:24-15:6.

[29]    See *Alleged Debtor U Lock's Response to the Emergency Motion Filed by Christine Biros*, Dkt. No. 22 at ¶ 2; *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 23:10-26:19.  U Lock contended that the Property's condition had not substantially changed since the purchase.  Id. at 27:16-18.

[30]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 28:19-29:3, 31:17-32:7, 33:7-19.

[31]    Id.

[32]    See *Notice of Partial Non-Objection to Limited Relief from the Stay*, Dkt. No. 28; *Response to Notice of Partial Non-Objection to Limited Relief from the Stay*, Dkt. No. 29; *Reply to Response to Statement of Non-Objection*, Dkt. No. 32.

[33]    See *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36.  This point bears mentioning because the Court's understanding of the relevant issues stemmed entirely from the parties' representations and descriptions.

[34]    Id. at ¶ 1.

[35]    Id. at ¶¶ 1, 10.

[36]    Id. at ¶ 10.

and (4) nothing in the order was to be construed as an ejectment of U Lock.[37]  As to abandoned cars and trailers on the Property, the *Limited Stay Relief Order* expressly provided:

> U Lock shall remove all vehicles and trailers from the Property on or before the earlier of: (a) June 24, 2022, or (b) ten (10) days after the date the police place "tags" on the subject vehicles.  To the extent U Lock requires additional time, it may make a reasonable request for an extension from Ms. Biros that shall not be unreasonably denied.
>
> Any vehicles or trailers remaining on the Property after June 24, 2022 (or such additional time as agreed by Ms. Biros) may be removed and disposed of by Ms. Biros at her convenience.[38]

Similar removal provisions applied to tires and certain storage tanks,[39] but no other tangible material was specifically identified.

Ultimately, U Lock did not contest the involuntary petition so an *Order for Relief Under Chapter 7* entered two weeks later and the Trustee was appointed.[40]  Thereafter, Mr. Snyder completed schedules on U Lock's behalf.[41]  In terms of tangible assets, U Lock only listed about ten items consisting of inoperable trucks, trailers, and heavy equipment (including excavators and front loaders).[42]  Notably, their descriptions were fairly rudimentary and, in some cases, nonspecific.[43]  The Trustee, in consultation with a professional auctioneer, determined the scheduled assets had minimal salvage value for the estate consistent with Mr. Snyder's estimates.[44]  An individual named Glenn Mowry also informally claimed ownership of many (if

---

[37]   Id.

[38]   Id. at ¶¶ 5-6 (paragraph numbers omitted).

[39]   Id. at ¶¶ 7-8.

[40]   See *Order for Relief Under Chapter 7*, Dkt. No. 42; *Notice of Appointment of Trustee*, Dkt. No. 49.

[41]   See Dkt. Nos. 59-66.

[42]   See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 3, 5, 9.

[43]   For example, *Schedule A/B* lists "4 trailers," a "GMC Flatbed," and a "Blue Ford with Snow Plow." *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 5.

[44]   *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 5:22-6:4.

not all) of these items.[45]  He never filed a proof of claim or appeared in this case, but his alleged interests have been co-opted by various parties whenever it suits them.  Further complicating matters, the Property, as both a self-storage facility and *de facto* junkyard, contained a plethora of un-inventoried tangibles whose value and ownership were uncertain.[46]  The takeaway is that it was unclear exactly what U Lock owned, but *Schedule A/B* represented the only itemization of its personal property interests.  And given the lack of perceived value of the tangibles (both scheduled and not), no one expended the effort to define them with greater certainty.

The Court held several continued hearings in July and August 2022.  Much of it concerned bickering among U Lock, Mr. Snyder, and Ms. Biros regarding compliance with the *Limited Stay Relief Order* and whether greater relief was appropriate.  U Lock and Mr. Snyder argued that she was exceeding the limited relief granted and allegedly destroying valuable assets,[47] though apparently none that had been scheduled.[48]  Meanwhile, Ms. Biros accused him of impeding her access and "dumping" personal property,[49] both of which he denied.[50]  She repeatedly pressed for unconditional stay relief, asserting "it's difficult for her to want to invest funds . . . while U Lock remains in possession."[51]

Despite the histrionics, the Court maintained that the *Limited Stay Relief Order* appropriately balanced the estate's interests with Ms. Biros' immediate needs.  The Trustee first

---

[45]   See id. at 6:22-7:4; but see *Declaration of George Snyder in Reference to Certain Equipment*, Dkt. No. 108 at ¶¶ 6-11 (disputing Mr. Mowry's ownership).

[46]   As if to illustrate the adage that "one man's trash is another man's treasure," whether certain personal property was worthless garbage or valuable scrap was likely in the eyes of the beholder.

[47]   See *Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 86; *Declaration of George Snyder*, Dkt. No. 100; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 11:11-14.

[48]   See *Trustee's Response to Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 96 at ¶ 1; *Response to Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 97 at ¶¶ 6-8.

[49]   See *Transcript of July 6, 2022 Hearing*, Dkt. No. 88 at 7:22-9:12.

[50]   Id. at 12:9-17, 13:10-14:16; see also *Status Report*, Dkt. No. 55.

[51]   See *Transcript of July 6, 2022 Hearing*, Dkt. No. 88 at 35:5-15.

required an opportunity to investigate the estate[52] and provide notice to U Lock's tenants, for which there were few records.[53] Then, having received offers, he needed time to liquidate the estate's assets, including the estate's right to any claims or causes of action regarding the Property (i.e., an avoidance action).[54] Accordingly, the Court denied Ms. Biros' request for dismissal without prejudice,[55] declined to enter broader stay relief, and advised her to work with the Trustee in the interim.[56]

###### C.      The Sale and Renewed Bid for Possession

The sale process was needlessly protracted. After receiving multiple offers, the Trustee ultimately moved to sell the estate's tangible and intangible assets to Ms. Biros in late September 2022.[57] Her bid included a cash component, a partial waiver of post-petition rent, and an assumption of environmental liabilities backstopped by a substantial bond.[58] U Lock and the Snyders objected, citing deficiencies in the sale notice and criticizing the use of disputed claims

---

[52]     See id. at 10:8-22, 40:7-13, 43:16-45:2; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 33:13-22.

[53]     See *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 6:5-14.

[54]     *Transcript of August 25, 2022 Hearing*, Dkt. No. 139 at 4:15-5:2; see also *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 35:2-8 (stating that Ms. Biros would like an opportunity to purchase any assets or potential claims of the estate).

[55]     See *Text Order*, Dkt, No. 73. The Court also denied U Lock's motion to convert to chapter 11, finding, *inter alia*, that a plan would merely pursue a tenuous claim to the Property rather than reorganize the existing business. *Text Order*, Dkt. No. 110; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 20:25-25:12.

[56]     See *Transcript of August 25, 2022 Hearing*, Dkt. No. 139 at 13:18-14:20.

[57]     *Trustee's Motion for Sale of All Tangible and Intangible Personal Property of the Estate*, Dkt. No. 175. This sale motion replaced two separate motions that had been filed a month earlier.

[58]     Id. at ¶ 13. Ms. Biros also demanded that other bidders obtain a second $25,000 bond to reimburse her for the cost of disposing of any tangible assets not removed from the Property within 30 days. Id. at ¶ 14. The Court struck that term from the sale. See *Amended Order*, Dkt. No. 213 at¶ 5(b)(v).

and unnecessary bonds to artificially inflate the offer's perceived value.[59]  Ms. Biros disputed their allegations and standing.[60]

Roughly two weeks before the sale hearing, Ms. Biros and the Trustee filed a *Stipulated Order for Relief from Stay* ("Stipulated Order") under a Certification of Counsel.[61] "In order to efficiently facilitate the transfer of possession of the Property from the Estate to Biros," they agreed that she "shall have sole and legal possession of the Property" no later than 10 days following entry of the *Stipulated Order*.[62]  In other words, Ms. Biros wanted exclusive possession of the Property and the ability to exclude parties even before the sale was completed. The *Stipulated Order* also contemplated Ms. Biros unilaterally moving or disposing of the contents of the storage units.[63]  Predictably, U Lock and the Snyders objected.[64]

The Court heard both matters in early November 2022.  From the start, there is little doubt that Ms. Biros was trying to buy an end to the litigation with the Snyders and the estate's occupation of the Property.  And in the Trustee's haste to complete that sale (and the estate's administration), he neglected to provide adequate notice of what he was actually selling. Indeed, since fully defining the estate's property interests was impractical, the Trustee purported to sell them, whatever they were, without warranties or representations.  But the sale notice neither captured that nuance nor grounded the abstraction in something definitive like *Schedule*

---

[59]   *Debtor U Lock Inc.'s Objections to Trustee's Motion for Sale of All Tangible and Intangible Personal Property of the Estate*, Dkt. No. 183; *Petitioning Creditors Objection to the Motion for Sale*, Dkt. No. 184; *Objections of George Snyder to Motion for Sale*, Dkt. No. 185.

[60]   *Reply to Objection to Sale Motion and to Verification of Connections of Shanni Snyder*, Dkt. No. 202.

[61]   *Stipulated Order for Relief from Stay*, Dkt. No. 189-1.

[62]   <u>Id.</u> at ¶ 12(a).

[63]   <u>Id.</u> at ¶ 12(b)-(c).  The *Stipulated Order* states Ms. "Biros will cause the contents . . . to be evaluated," but that appears to be just a legalistic way of saying she will decide what to do with them.

[64]   *U Lock Inc.'s Objections to the Settlement and Certification of Counsel Regarding Stipulated Order for Relief from Stay*, Dkt. No. 200; *Petitioning Creditor's Objection to Consent Order*, Dkt. No. 205; *Objections of George Snyder to Consent Order*, Dkt. No. 206.

*A/B,* so it lacked sufficient detail to inform competitive third-party bidders.[65]   Thus, over Ms. Biros' protest,[66] the Court directed the Trustee to re-notice the sale with "a schedule of assets subject to the sale [compiled] from the best available information."[67]   The Court also established an on-site due diligence period for prospective bidders to evaluate the tangible assets and the environmental liabilities.[68]   An in-court auction was scheduled for December 1, 2022.[69]

Like Ms. Biros' prior attempts to gain possession of the Property through stay relief, the *Stipulated Order* was denied in favor of maintaining the status quo.[70]   The Court found that it was procedurally defective without the consent of all parties and an inappropriate delegation of the Trustee's authority to Ms. Biros.[71]   It also seemed premature to enter any storage units as the Trustee continued to accept rental payments.[72]   Between the perceived overreach and "troublesome comments" about the alleged destruction and removal of tangibles,[73] the Court entered an order reiterating the scope of the *Limited Stay Relief Order.*[74]   Specifically, the Court observed that:

> [Ms.] Biros was authorized to remove

---

[65]   See *Amended Order*, Dkt. No. 213 at 3.

[66]   See *Audio Recording of November 10, 2022 Hearing* at 12:58:38-1:00:47 p.m.  Ms. Biros argued that despite the conceptual complexities, the sale was simplistic because the Snyders were the only other interested parties and should have had enough information to formulate bids.

[67]   *Amended Order*, Dkt. No. 213 at ¶ 1.

[68]   Id. at ¶ 4.

[69]   Id. at ¶ 6.

[70]   *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211.

[71]   Id. at ¶ 1.  "By filing a [Certification of Counsel], attorneys or unrepresented parties represent to the Court that the revised or agreed form of order has been reviewed and approved by all parties affected by the order."  See W.PA.LBR 9013-8(b).

[72]   See *Audio Recording of November 10, 2022 Hearing* at 1:40:25-1:45:04 p.m.  Without records or lease agreements, the rent checks were in some cases the only way to identify tenants.  This also raised the question of whether the payment was meant to satisfy an arrearage or represented a prospective rent.

[73]   Id. at 1:06:55-1:07:25 p.m.

[74]   *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211 at ¶ 2(a).

(i) "vehicles or trailers" (remaining after June 24, 2022);

(ii) "tires" (remaining after June 17, 2022 and with notice); and

(iii) "tanks identified as waste" (remaining after June 24, 2022 and with notice).

The Court further directed that "nothing in this order shall . . . be construed as an ejectment of U Lock [or] authorize the removal of any U Lock property that does not impede the environmental remediation efforts.  Based on the foregoing, and after review of its docket, *the Court finds nothing in the record that authorizes [Ms.] Biros to remove or destroy any items other than those listed above*.[75]

The Court also admonished the Trustee to not take direction from Ms. Biros in the execution of his statutory duties.

D.     The Failed Auction and On-Site Inspections

On December 1, 2022, the parties reconvened for a properly noticed auction of U Lock's assets.[76]  Ms. Snyder submitted the only other qualified bid, though her offer was limited to the intangible assets.[77]  As expected, the Snyders and U Lock renewed their objections to Ms. Biros' bid but also leveled a new accusation: Ms. Biros removed most tangible assets from the Property prior to the inspection period.[78]  At the hearing, the Trustee confirmed that scheduled assets he had observed on the Property in August could not be located during the on-site inspections in October and November.[79]

---

[75]   Id. (emphasis added, footnotes omitted).

[76]   See *Trustee's Amended Motion for Sale of Tangible and Intangible Personal Property of the Estate under 11 U.S.C. Section 363(f) Free and Clear of All Liens, Claims, and Encumbrances*, Dkt. No. 217.

[77]   *Exhibit A*, Dkt. No. 224-1 at ¶¶ A, D.

[78]   See *Objections of George Snyder to Motion for Sale*, Dkt. No. 225 at 1-2; *U Lock's Objections to Motion for Sale*, Dkt. No. 226 at ¶¶ 7-9; *Shanni Snyder's Objection to Trustee's Amended Motion for Sale of Tangible and Intangible Personal Property of the Estate Under 11 U.S.C. Section 363(f) Free and Clear of All Liens, Claims, and Encumbrances*, Dkt. No. 227 at ¶¶ 19-20.

[79]   *Audio Recording of December 1, 2022 Hearing* at 10:22:11-10:24:14 a.m.

When the Court directly asked whether Ms. Biros removed assets from the Property, her bankruptcy counsel provided a meandering, yet affirmative response:

> These are serious allegations, obviously, taking assets from a bankrupty estate.  For the purposes of today's hearing, Ms. Snyder has made an offer to buy intangibles, not personal property. Ms. Biros has made an offer that buys tangible personal property also.  We understand that there may be things that the Trustee thought were in the sale which are not in the sale because somebody moved them.  Ms. Biros is prepared to go forward notwithstanding these fuzzy issues about where property is.  I think Ms. Snyder is not interested in buying the personal property, so it should be less of an issue for her today.  Notwithstanding, Ms. Biros tells me . . . the property that she has removed has been moved to storage. . . .[80]

At first, Ms. Biros asserted that she acted with the Trustee's blessing in furtherance of her clean-up efforts,[81] though he insisted that he only consented to moving things *within* the Property.[82] She then asserted it was necessary to secure the assets because "things kept disappearing off-site," while the Trustee noted that some tenants removed their property with his permission.[83] As a last-gasp, Ms. Biros argued that the estate had no legal right to be on the Property before she was reminded that her post-petition writ of possession was void.[84]

Asked the same question, Mr. Snyder acknowledged that he removed two scheduled water tanks from the Property prepetition but had removed nothing post-petition.[85]  In

---

[80] Id. at 10:26:28-10:27:35 a.m.

[81] Id. at 10:27:45-10:27:56 a.m.

[82] Id. at 10:28:03-10:28:17 a.m.

[83] Id. at 10:29:10-10:30:46 a.m.

[84] Id. at 10:59:20-10:59:53 a.m.

[85] Id. at 10:31:50-10:32:35 a.m.

fact, he maintained that Ms. Biros had barred him from the Property, even during the due diligence period.[86]

Although Ms. Biros originally pressed to complete the sale, she reversed course when the Court suggested severing the tangible assets and proceeding to auction only the intangibles.[87]   The objecting parties also opposed moving forward for a variety of reasons. Stymied, the Court undertook two measures to resolve all doubts as to the location of the scheduled tangible assets.   First, it ordered Ms. Biros, Mr. Snyder, and Ms. Snyder to immediately file sworn statements signed under 28 U.S.C. § 1746 identifying: (1) any assets they removed from the Property; (2) the current location of any removed assets; and (3) the authority by which the assets were removed.[88]   Second, the Court scheduled on-site inspections of each disclosed location the next day to confirm the whereabouts and existence of the sale assets.

Consistent with their in-court disclosures, both Ms. Biros and Mr. Snyder filed affidavits admitting they were in possession of scheduled estate assets, while Ms. Snyder swore that she was not.[89]   The Court, accompanied by staff and a mandatory security escort, then traveled to three sites with all parties in attendance.   The first, located in McKeesport, Pennsylvania (approximately seven miles from the Property), was controlled by the Biros family and was notably adjacent to a scrap recycling center ("McKeesport Property").[90]   During the McKeesport Property inspection, the parties observed eight pieces of scheduled heavy equipment—one more than Ms. Biros had admitted to relocating.   Next, the Court viewed the

---

[86]   Id. at 10:45:11-10:45:25 a.m.   Mr. Snyder also alleged that Ms. Biros destroyed his personal property, which, even if true, is not relevant to the matters before the Court.

[87]   Id. at 10:58:07-11:01:29 a.m.

[88]   Text Order, Dkt. No. 237.

[89]   See Affidavit of Shanni Snyder, Dkt. No. 230; Verification of Christine Biros, Dkt. No. 231; Declaration of George Snyder in Reference to Certain Equipment, Dkt. No. 233; Supplemental Declaration of George Snyder in Reference to Certain Equipment, Dkt. No. 234.

[90]   See Status Report with Address for December 2, 2022 Site Meeting, Dkt. No. 236.

Property, where additional scheduled assets were found, albeit with some difficulty.[91]  Finally, the Court went to Mr. Snyder's site (located a half mile from the Property) and observed two scheduled water tanks.[92]

      E.      <u>The Order to Show Cause</u>

A sale of the tangible and intangible assets was finally completed on December 15, 2022, with Ms. Snyder as the prevailing bidder.  Comparing her initial bid for just the intangibles and her final bid for both, the scheduled assets added no more than $6,500 of value to the sale.[93]  A day later, the Court ordered Ms. Biros and Mr. Snyder to show cause why sanctions should not be imposed against them for exercising control over property of the estate in violation of the automatic stay and for interfering with the sale of estate assets.[94]  Both filed timely responses.[95]  The Court conducted a hearing on the *Order to Show Cause* in late January 2023, at which time Mr. Snyder, Ms. Biros, the Trustee, and Attorney Otto testified.

Contrary to his prior representation, Mr. Snyder's written response and testimony revealed that he had removed estate assets from the Property post-petition after all.[96]  The catch, he explained, was that the *Limited Stay Relief Order* required him to do so.[97]  Mr. Snyder

---

[91]    For example, the "Ford F250 Custom Green and Red" identified on *Schedule A/B* turned out to be blue and orange and was located at the base of an embankment in the rear of the Property on what appeared to be an overgrown fire trail.

[92]    <u>See</u> *Declaration of George Snyder in Reference to Certain Equipment*, Dkt. No. 233 at ¶ 6(b).

[93]    <u>See</u> <u>In re U Lock, Inc.</u>, 2023 WL 308210, at *2 ("A sale of the tangible and intangible assets for $70,000 closed on December 28, 2022. As a practical matter, the tangible assets—which again, consisted largely of scrap—seemingly had only a modest impact on the ultimate sale price, as the prevailing bidder's initial bid of $63,500 excluded them." (footnotes omitted)).

[94]    *Order to Show Cause*, Dkt. No. 249, <u>superseded by</u> *Amended Order to Show Cause*, Dkt. No. 278.  The initial order neglected to set a deadline for written responses.  Given the severity of the circumstances, the Court did not wait for the Trustee to initiate proceedings himself.

[95]    <u>See</u> *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301.

[96]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 73:7-74:5.

[97]    <u>Id.</u>; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 3-5, 12.

testified that he took the two water tanks and some unauthorized vehicles in early June because U Lock was directed to remove them by June 24, 2022.[98]  Upon the Trustee's appointment,  Mr. Snyder disclosed the water tanks' location to him and turned over the salvage proceeds of the unauthorized vehicles.[99]  The Trustee not only confirmed Mr. Snyder's account, but testified that he instructed Mr. Snyder to "leave [the water tanks] where they are."[100]  Mr. Snyder also admitted to removing his personal property, including the trailers referenced in the *Limited Stay Relief Order*, with the Trustee's knowledge.[101]

In comparison, Ms. Biros' defense presented as a series of after-the-fact justifications.  First, she contended that she could not have violated the automatic stay by relocating scheduled assets because they belonged to Mr. Mowry, not the estate.[102]  Second, Ms. Biros asserted that she understood the *Limited Stay Relief Order* to authorize her to remove things from the Property in furtherance of a "wider clean-up."[103]  Third, she argued that she reasonably secured the scheduled assets from Mr. Snyder after the Trustee failed to act as Attorney Otto urged.[104]

The Trustee denied knowledge that Ms. Biros moved anything off-site until he read her declaration.[105]  Ms. Biros contests this.  She testified that Attorney Otto spoke to him

---

[98]    Id.; *see Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶¶ 3-8.

[99]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 75:19-76:7.

[100]    Id.

[101]    *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 4, 6-11.

[102]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 77:2-78:10.  In support, she offered seven exhibits purporting to establish Mr. Mowry's ownership of the assets she removed.  See *Bench Exhibits*, Dkt. No. 308.  The Trustee provided these documents to Ms. Biros long before the sale to disclose the scheduled assets' contested ownership.  See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 85:6-86:10, 93:7-19.

[103]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 78:11-79:1.

[104]    Id. at 79:2-5; 82:13-83:10.

[105]    Id. at 93:2-6.

and believed "[the Trustee] knew I was moving [the scheduled assets] to another site" because "[i]t was the only way I could secure it."[106]  For his part, Attorney Otto insisted he told this to the Trustee many times and even offered to return the assets to the Property if necessary.[107]  He did not, however, tell the Trustee their location.[108]  Attorney Otto also recalled that the "Trustee told [Mr. Mowry] to go ahead and take his stuff off the site,"[109] which seems at odds with the Trustee's apparent sale efforts.  In contrast, Ms. Biros testified that Mr. Mowry was not given the same opportunity to collect his personal property as other tenants.[110]

When asked why Ms. Biros, knowing that the scheduled assets were gone, silently allowed the Court to schedule a futile due diligence period for bidders in November, her bankruptcy counsel suggested:

> The only answer I can give is that the process has been so messy because of all of the accusations and moving things and being unclear whose is what, that it just, *Ms. Biros just didn't feel that that was a clarification that needed to be made*.[111]

During his testimony, Attorney Otto added:

> The only thing I can say about a failure to disclose it in November when we had that discussion, was that there was a focus on the site and since there was only at the time either Mr. Snyder or Ms. Snyder were going to bid on it and they, obviously, knew that the equipment existed.[112]

Ms. Biros did not address this point during her testimony, leaving her counsels' statements as the only answer to the Court's inquiry.

---

[106]  Id. at 84:14-17.

[107]  Id. at 83:4-10.

[108]  *Exhibit C*, Dkt. No. 298-3 at 1.

[109]  *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 82:23-83:1.

[110]  Id. at 86:11-87:9.

[111]  Id. at 80:1-5 (emphasis added).

[112]  Id. at 83:13-17.

Ultimately, Ms. Biros acknowledged that her actions "inconvenienced" everyone and caused "difficulty and confusion," but otherwise insisted the estate and sale process were unharmed.[113]  At the end of the hearing, the Court took the matter under advisement.

Although the *Order to Show Cause* was fully briefed and argued some time ago, the Court prioritized resolving the steady flow of substantive matters impeding the administration of the estate.  This has afforded the Court added perspective.  At present, the estate is administratively insolvent,[114] though that may change.[115]  In addition to the Trustee's fees and Mr. Snyder's *de minimis* claim for insurance reimbursement, Ms. Biros holds an allowed administrative expense of $18,000 for post-petition rent.[116]  The Snyders' general unsecured claims have been disallowed,[117] and Ms. Biros' unsecured claims seeking roughly half a million dollars were withdrawn without prejudice given the dim prospect of a distribution.[118]  The only other claimant is the Internal Revenue Service, asserting a claim for estimated corporate income taxes.[119]  At this point, the administration of the estate is all but complete, subject to the outcome of the various pending appeals and any derivative proceedings.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States

---

[113]    Id. at 79:5-9, 80:9-12.

[114]    See *Status Report*, Dkt. No. 477 at ¶¶ 1-3.

[115]    Following the denial of Ms. Snyder's claim, the Court ordered her to show cause why it should not impose monetary sanctions against her for asserting a fraudulent claim and lying under oath.  See *Order to Show Cause*, Dkt. No. 561.  This matter is stayed indefinitely pending the exhaustion of Ms. Snyder's appellate rights.

[116]    See *Order*, Dkt. No. 523 at ¶ 2(A).

[117]    See In re U Lock, Inc., 2024 WL 878464, at *1; *Order of Court*, Dkt. No. 366.

[118]    See *Motion to Withdraw Claims Without Prejudice or, in the Alternative, to Continue Hearings on Objections Indefinitely, Until Further Order of Court*, Dkt. No. 530; *Order of Court*, Dkt. No. 552.

[119]    See *Clam No. 6-2*.

District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.   DISCUSSION

### A.   The Automatic Stay

As recognized by the United States Court of Appeals for the Third Circuit, "[t]he automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code."[120] The automatic stay is a series of statutory injunctions codified in section 362(a) which arise automatically—that is, without a formal order—upon the commencement of a bankruptcy case.[121] In general, these injunctions are broad[122] and collectively bar acts to "obtain property of the debtor or property of the bankruptcy estate."[123] "It is designed to effect an immediate freeze of the *status quo*"[124] to, among other things, "replace the 'unfair race to the courthouse' with [an] orderly liquidation that treats all creditors equally."[125]

Pertinent here, section 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or *to exercise control over property of the estate*."[126] This provision prevents the "'dismemberment' of the bankruptcy estate until the bankruptcy process permits either a financial reorganization of the debtor or an

---

[120]   Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1074 (3d Cir. 1992) (citing Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Dev. Corp.), 901 F.2d 325, 327 (3d Cir. 1990)).

[121]   11 U.S.C. § 362(a)(1)-(8).

[122]   ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006).

[123]   Wingard v. Altoona Reg. Health Sys. (In re Wingard), 382 B.R. 892, 899 (Bankr. W.D. Pa. 2008).

[124]   Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993).

[125]   In re Univ. Med. Ctr., 973 F.2d at 1074. (citing United States v. Nicolet, Inc., 857 F.2d 202, 207 (3d Cir. 1988)).

[126]   11 U.S.C. § 362(a)(3) (emphasis added).

orderly liquidation of the assets of the bankruptcy estate."[127]  "Property of the estate," in turn, broadly encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case."[128]

Under section 362(k), "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees."[129]  Under Third Circuit precedent, an "individual" includes a corporate debtor and a bankruptcy trustee operating in a representative capacity for the estate.[130]  A stay violation is "willful" if the creditor commits an intentional act that violates the stay with knowledge that a bankruptcy petition has been filed.[131] No specific intent to violate the stay is required.[132]  Thus, to recover damages under section 362(k), one must establish three elements by a preponderance of the evidence: (1) a stay violation occurred; (2) the act giving rise to the violation was willful; and (3) the violation caused injury.[133]

---

[127]   Allentown Ambassadors, Inc. v. NE. Am. Baseball, LLC (In re Allentown Ambassadors, Inc.), 361 B.R. 422, 435–36 (Bankr. E.D. Pa. 2007); see In re Trump Ent. Resorts, Inc., 534 B.R. 93, 102 (Bankr. D. Del. 2015).

[128]   11 U.S.C. § 541(a)(1); see United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad."); Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 241 (3d Cir. 2001) ("§ 541(a)'s legislative history demonstrates that the language of this provision was intended to sweep broadly . . . .").

[129]   11 U.S.C. § 362(k)(1).  This provision was previously codified as section 362(h) but re-codified in 2005 as section 362(k)(1) as part of BAPCPA.  Because the provisions are identical, prior caselaw regarding section 362(h) is remains relevant to the application of section 362(k)(1).  In re Wingard, 382 B.R. at 900 n.5.

[130]   In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329; Roberts v. Vara (In re Roberts), No. 21-20618-JAD, 2024 WL 2050561, at *11 n.11 (Bankr. W.D. Pa. May 8, 2024); AUA Private Equity Partners, LLC v. Kind Operations, Inc. (In re Pa Co-Man, Inc.), 654 B.R. 92, 96 (Bankr. W.D. Pa. 2023); Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.), 571 B.R. 105, 143 n. 220 (Bankr. W.D. Pa. 2017); Böhm v. Howard (In re Howard), 428 B.R. 335, 338 (Bankr. W.D. Pa. 2010), aff'd, No. 2:10CV962, 2011 WL 578777 (W.D. Pa. Feb. 9, 2011).

[131]   Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 320 n.8 (3d Cir. 2003); In re Univ. Med. Ctr., 973 F.2d at 1088.

[132]   In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329 (quoting Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir. 1989)).

[133]   In re Prithvi Catalytic, Inc., 571 B.R. at 143; In re Wingard, 382 B.R. at 900.

Section 362(k) also authorizes an award of punitive damages "in appropriate circumstances."[134]    "[P]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes."[135]    They "are especially appropriate when a party has acted in 'arrogant defiance' of the Bankruptcy Code."[136]    And because stay "[v]iolations . . . threaten the foundation of the protections afforded by the Bankruptcy Code,"[137] the need to deter others from similarly outrageous conduct in the future is a valid consideration.[138]    "The decision whether to award punitive damages is left to the sound discretion of the bankruptcy court,"[139] but is typically informed by: "(1) the defendants' conduct; (2) their motives; (3) any provocation by the debtor; and (4) each individual defendant's ability to pay."[140]    While "an award of punitive damages must bear some reasonable relationship to the amount of harm suffered,"[141] there are "no rigid benchmarks that a punitive damages award may

---

[134]    11 U.S.C. § 362(k)(1).

[135]    In re Howard, 2011 WL 578777, at *13 (quoting Wagner v. Ivory (In re Wagner), 74 B.R. 898, 903 (Bankr. E.D. Pa. 1987)); see Lansaw v. Zokaites (In re Lansaw), No. 06-23936-TPA, 2015 WL 224093, at *12 (Bankr. W.D. Pa. Jan. 14, 2015), aff'd sub nom. Zokaites v. Lansaw, No. 2:15CV404, 2016 WL 1012597 (W.D. Pa. Mar. 15, 2016), aff'd sub nom. In re Lansaw, 853 F.3d 657 (3d Cir. 2017); Iskric v. Commonwealth Fin. Sys., Inc. (In re Iskric), 496 B.R. 355, 365 (Bankr. M.D. Pa. 2013); Frankel v. Strayer (In re Frankel), 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008).

[136]    In re Frankel, 391 B.R. at 275; see In re Howard, 2011 WL 578777, at *13; In re Lansaw, 2015 WL 224093, at *12; Curtis v. LaSalle Nat'l Bank (In re Curtis), 322 B.R. 470, 486 (Bankr. D. Mass. 2005); Walker v. Midland Mortg. Co. (In re Medlin), 201 B.R. 188, 194 (Bankr. E.D. Tenn. 1996).

[137]    Slaughter v. VA Pittsburgh Emp. Fed. Credit Union (In re Slaughter), No. 09-20221-GLT, 2014 WL 4960881, at *10 (Bankr. W.D. Pa. Sept. 30, 2014).

[138]    See In re Iskric, 496 B.R. at 365; In re Frankel, 391 B.R. at 275.

[139]    In re Lansaw, 2015 WL 224093, at *13.  Appeals courts "consider three guideposts" when reviewing punitive damage awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases."  In re Lansaw, 853 F.3d at 671 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417, 123 S. Ct. 1513, 1520, 155 L. Ed. 2d 585 (2003)).

[140]    In re Howard, 2011 WL 578777, at *13.

[141]    In re Lansaw, 2015 WL 224093, at *13.

not surpass."[142]    Higher ratios of punitive-to-actual damages may be necessary "where 'a particularly egregious act has resulted in only a small amount of economic damages.'"[143]

Yet "a stay violation is not just a private injury. It strikes at the entire bankruptcy system and all parties for whom it was designed."[144]    Since the automatic stay is an "injunction with the force of an order," a stay violation "may give rise to civil contempt."[145]    Bankruptcy courts are empowered to remedy civil contempt through section 105(a) and the court's inherent power.[146]    Proof of civil contempt requires: "(1) that a valid court order existed; (2) that the alleged contemnor knew of the order; and (3) that the contemnor disobeyed the order."[147]    "A finding of civil contempt must be supported by clear and convincing evidence."[148]    The standard is generally objective, though subjective intent may be relevant to determining an appropriate sanction for the contemptuous conduct.[149]    In other words, "good faith is not a defense to civil contempt."[150]

---

[142]    State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425

[143]    Id. (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 582, 116 S. Ct. 1589, 1602, 134 L. Ed. 2d 809 (1996)).

[144]    Rushing v. Green Tree Serv., LLC (In re Rushing), 443 B.R. 85, 97–98 (Bankr. E.D. Tex. 2010).

[145]    Patti v. Fred Ehrlich, PC, 304 B.R. 182, 187 (E.D. Pa. 2003); see In re Stephen W. Grosse, P.C., 84 B.R. 377, 383–84 (Bankr. E.D. Pa. 1988), aff'd sub nom. In re Grosse, 96 B.R. 29 (E.D. Pa. 1989), aff'd sub nom. Dubin v. Jakobowski, 879 F.2d 856 (3d Cir. 1989), and aff'd sub nom. In re Stephen W. Grosse, P.C., 879 F.2d 857 (3d Cir. 1989); see also Walker v. Got'cha Towing & Recovery (In re Walker), 551 B.R. 679, 692 (Bankr. M.D. Ga. 2016) ("a violation of the automatic stay constitutes contempt of the court").

[146]    See Minech v. Clearview Fed. Credit Union (In re Minech), 632 B.R. 274, 280 (Bankr. W.D. Pa. 2021); Winnecour v. Ocwen Loan Serv. (In re Ransom), 599 B.R. 791, 802 (Bankr. W.D. Pa. 2019); Englert v. Ocwen Loan Serv., LLC (In re Englert), 495 B.R. 266, 271 (Bankr. W.D. Pa. 2013); Walsh v. Free (In re Free), 466 B.R. 48, 57 (Bankr. W.D. Pa. 2012).

[147]    In re Minech, 632 B.R. at 280; see F.T.C. v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010); Harris v. City of Phila., 47 F.3d 1311, 1326 (3d Cir. 1995).

[148]    Harris v. City of Phila., 47 F.3d at 1321.

[149]    Taggart v. Lorenzen, 139 S. Ct. 1795, 1802, 204 L. Ed. 2d 129 (2019).

[150]    Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994).

Sanctions for civil contempt must be either remedial or coercive.[151]  As explained by the Third Circuit:

> Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience. Coercive sanctions, in contrast, look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.[152]

In contrast, punitive sanctions that serve "to vindicate the authority of the court" are criminal in nature[153] and beyond the contempt power of the bankruptcy court.[154]

## B.   Mr. Snyder

On this record, the Court finds that Mr. Snyder did not violate the automatic stay, let alone willfully or contemptuously.  The analysis starts from the simple premise that the stay only applies to property of the estate.[155]  Debtors identify their property interests by filing a schedule of assets,[156] which U Lock did, listing less than a dozen tangible items in which it asserted an interest.[157]  Of those *scheduled assets*, it is undisputed that Mr. Snyder was in

---

[151]   See In re Free, 466 B.R. at 58.

[152]   Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO, 545 F.2d 1336, 1344 (3d Cir. 1976) (footnotes omitted).

[153]   Id. at 1343 (citing, e.g., United States v. United Mine Workers of Am., 330 U.S. 258, 302, 67 S. Ct. 677, 700, 91 L. Ed. 884 (1947)).

[154]   See Burtch v. Masiz (In re Vaso Active Pharms., Inc.), 514 B.R. 416, 421 (Bankr. D. Del. 2014); Matter of Kennedy, 80 B.R. 673, 674 (Bankr. D. Del. 1987).

[155]   See 11 U.S.C. § 362(a).

[156]   See 11 U.S.C. § 521(a)(1)(B)(i); Fed. R. Bankr. P. 1007(b)(1)(A).

[157]   See Schedule A/B: Assets – Real and Personal Property, Dkt. No. 60 at 3, 5, 9.

possession of only two water tanks.[158]   Therefore, whatever else he may have taken from the Property is simply irrelevant to the automatic stay and the *Order to Show Cause*.[159]

Next, the Court must consider why Mr. Snyder was in possession of scheduled assets since acts to obtain possession or control over property of the estate violate the stay.[160]   He contends that he merely complied with the *Limited Stay Relief Order*.   Specifically, it directed that "[a]ll unused and salvageable tanks located on the Property *shall be removed by U Lock* on or before June 24, 2022."[161]   Upon review, the Court agrees that the stay was modified under that provision to not only permit but *require* Mr. Snyder's relocation of the water tanks.   After that, he promptly disclosed their existence and location to the Trustee, who instructed him to "just leave them there where they are."[162]   Mr. Snyder's compliance with the Trustee's mandate obviously cannot be viewed as possession or control of estate property in a manner inconsistent with the stay.   Accordingly, the Court will release the *Order to Show Cause* against him.

C.     Ms. Biros

Despite Ms. Biros' protests, the Court finds that she willfully and contemptuously violated the automatic stay by removing scheduled assets from the Property.   Again, the Court

---

[158]     See *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 3-5, 12.

[159]     Ms. Biros complains that Mr. Snyder removed nearly all the "trailers and containers" from the Property without proving his ownership.   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 6-7.   She misses the point, however, because U Lock did not assert an interest in those assets. Moreover, the *Limited Stay Relief Order* required U Lock to remove all trailers from the Property to facilitate Ms. Biros' environmental remediation.   See *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 3.

[160]     See 11 U.S.C. § 362(a)(3).

[161]     *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 8.   Although the trailers and unauthorized vehicles were not scheduled assets, Mr. Snyder also removed them as required by the *Limited Stay Relief Order* and turned over salvage proceeds to the Trustee.

[162]     *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 75:19-76:1.   In hindsight, if the Trustee knew the water tanks were at Mr. Snyder's property rather than at the Property, the sale notice should have said so.

emphasizes that the stay only applies to property of the estate,[163] so any other tangible property she may have removed or destroyed is not relevant to the *Order to Show Cause*.

There is no dispute that Ms. Biros removed scheduled assets from the Property, yet she denies that they were property of the estate subject to the stay.  Instead, Ms. Biros argues that Mr. Mowry indisputably owned all the items she relocated to the McKeesport Property.[164] Not so.  U Lock asserted an interest in all tangible assets listed on *Schedule A/B*, including the ones she relocated.[165]  And the Trustee, despite receiving some documentation from Mr. Mowry, opted to sell those interests (albeit without representations) rather than allow Mr. Mowry to recover his alleged property.[166]  Mr. Mowry (and Ms. Biros) may dispute the estate's interests, but he neither pressed a claim, nor objected to the sale, nor appeared and testified at any hearing.[167]  So Mr. Mowry's alleged interest in the scheduled assets is neither undisputed nor proven.  But even if the estate's interests were subject to a bona fide dispute, the stay would apply to the scheduled assets pending its resolution.[168]

---

[163]     See 11 U.S.C. § 362(a).

[164]     *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 19.

[165]     See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 3, 5, 9.

[166]     See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 83:7-25.

[167]     For this reason, the exhibits purporting to demonstrate Mr. Mowry's ownership of the scheduled assets are hearsay.

[168]     See In re Grooms, 599 B.R. 155, 165 (Bankr. W.D. Okla. 2019) ("There has developed a doctrine that the stay should continue to apply when the ownership of the estate property is in *bona fide* dispute."); In re Stringer, 586 B.R. 435, 443–44 (Bankr. S.D. Ohio 2018), aff'd, No. 2:18-CV-563, 2019 WL 13259280 (S.D. Ohio Sept. 12, 2019), aff'd sub nom. Squire v. Stringer, 820 F. App'x 429 (6th Cir. 2020) ("But the law is clear that a belief that property is not included in the bankruptcy estate does not obviate compliance with § 362."); Franco v. Franco (In re Franco), 574 B.R. 730, 736 (Bankr. D.N.M. 2017) ("where the estate's ownership of property is in bona fide dispute, it is reasonable to hold that the stay applies, pending resolution of the dispute."); In re Daya Medicals, Inc., 560 B.R. 855, 858 (Bankr. S.D. Fla. 2016) ("a dispute as to a debtor's property rights does not obviate the effect of the automatic stay. To the contrary, where it is unclear whether a debtor in bankruptcy has an interest in property, parties must act with caution."); In re Pickel, 487 B.R. 289, 295 (Bankr. D.N.M. 2013) ("where, as here, the debtor has demonstrated a bona fide dispute with a creditor regarding whether property is property of the estate, it seems reasonable to hold that the stay applies."); In re Levenstein, 371 B.R. 45, 47 (Bankr. S.D.N.Y. 2007) ("Where the debtor claims an interest in property, the secured creditor may not make its own, unilateral determination of property rights after the debtor has invoked the jurisdiction of the Bankruptcy Court and

Next, Ms. Biros contends that her possession and control of the scheduled assets was authorized.  She points to paragraph six of the *Limited Stay Relief Order*,[169] which permits her to "remove[] and dispose[]" of "[a]ny vehicles or trailers remaining on the Property after June 24, 2022."[170]   Ms. Biros, however, moved *heavy equipment*, not vehicles or trailers. Context matters.  At the hearing preceding the *Limited Stay Relief Order*, the parties' focus was abandoned "broken down cars,"[171] which is why it refers to the police "tagging" unauthorized vehicles.[172]  Given that background, and the fact that the Court used their proposed terminology, there is no objective basis to read "vehicles" so broadly.  The Court also notes that the *Limited Stay Relief Order* entered prior to the *Order for Relief* and *Schedule A/B*.  As such, it is unreasonable to construe limited relief in a manner that would permit the removal and destruction of estate property before it was identified by the debtor.

Alternatively, Ms. Biros argues that she reasonably acted to protect the estate with the express or implied authority of the Trustee.[173]  As an affirmative defense, it was incumbent upon her to establish that the Trustee's blessing was plainly given.  Of course, there is no documentary evidence of either express or implied permission, which is notable given how many attorneys were involved.[174]  All Ms. Biros points to is a timeline of contacts between Attorney

---

with it the protection of the automatic stay. It is for the Bankruptcy Court, not the secured creditor, to determine whether the debtor has a sufficient interest in property to implicate the automatic stay, even if the debtor's claimed interest in property may turn out to be groundless.").

[169]   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 10.

[170]   *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 6.

[171]   *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 12:24-14:7, 27:24-28:4, 29:9-15, 30:10-23, 31:3-4.

[172]   *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 4-5.

[173]   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 11-13.

[174]   After all, it is common practice to memorialize important verbal discussions or agreements by a follow-up letter or email to create a "paper trail."

Otto and the Trustee.[175]   Attorney Otto's testimony largely described one-sided expressions of concern about securing the Property without suggesting anything the Trustee said or did that implied assent to Ms. Biros' actions.[176]   It is undisputed that Attorney Otto did not tell the Trustee where the scheduled assets were relocated,[177] and the Court does not believe that he clearly informed the Trustee that scheduled assets had been moved off-site.[178]   The relocation of nearly all estate assets is out of the ordinary and therefore memorable, particularly when coupled with an equally unusual offer to return them if necessary.[179]   But the Trustee denied all of it and has no reason to lie.[180]   Accordingly, the Court finds that Ms. Biros has not shown that her conduct was cloaked with any express or implied authority.

Having dispensed with those contrivances, moving scheduled assets to an undisclosed location and restricting access are obviously prohibited acts to obtain possession and exercise control over property of the estate.[181]   As was concealing it.   There is also no doubt that Ms. Biros' conduct was willful because she intentionally removed the scheduled assets from the Property with knowledge of the automatic stay.   Indeed, her knowledge of the stay is patent from the months she spent seeking relief.   Therefore, the next question under section 362(k) is whether Ms. Biros' willful stay violation caused an in injury.[182]

---

[175]    See *Exhibit C*, Dkt. No. 298-3.

[176]    See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 82:13-83:10.

[177]    *Exhibit C*, Dkt. No. 298-3 at 1 ("I did not tell him where it was, but I told him it was on property owned by the Biros family and he could either see it or have it returned any time.").

[178]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 83:4-10.

[179]    Id.

[180]    The Trustee already admitted that he knew the water tanks were at Mr. Snyder's facility even though he did not disclose it in the sale notice.

[181]    See 11 U.S.C. § 362(a)(3).

[182]    See 11 U.S.C. § 362(k)(1).

As Ms. Biros sees it, moving the scheduled assets to "a safer location in McKeesport" protected them from dissipation at no cost to the estate.[183]  In the Court's view, any purported benefit is speculative because it assumes the scheduled assets would have been stolen prior to the sale.[184]  Beyond that, she argues that her stay violation ultimately did not impact the outcome of the December 15, 2022 auction.[185]  On this last point the Court agrees, which is why the sale was approved.  Still, Ms. Biros ignores the obvious: *the auction should have taken place two weeks earlier without the need for site visits.*

To be clear, Ms. Biros' removal and concealment of the scheduled assets caused more than just inconvenience and delay.  That implies the auction merely happened later than originally scheduled.  The reality is that Ms. Biros caused the unnecessary expenditure of additional time and resources.  The on-site due diligence was worthless without the scheduled assets on the Property.  As a result, she not only thwarted efforts to resolve outstanding objections to the sale but prompted new ones.  The December 1, 2022 sale hearing then devolved into a lengthy waste of time as the Court charted a path forward.  And but for Ms. Biros' actions (including her incomplete disclosure), the Court, Trustee, and parties would not have spent hours traveling to three sites in a quest to find the scheduled assets.  "Time," as they say, "is money," so professional fees and costs are real economic losses attributable to her conduct.  And though neither the Court nor the U.S. Marshal are "individuals" under section 362(k)(1), the Court observes that both were forced to incur extraordinary costs to facilitate the site inspections.  Put simply, Ms. Biros' willful stay violation resulted in injuries.

---

[183]   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 6, 11-12, 17.

[184]   The Court is thoroughly unimpressed with Ms. Biros' offer not to seek an administrative expense for the cost of relocating and preserving the scheduled assets.  It should go without saying that a creditor who takes possession of estate property in violation of the automatic stay cannot seek the costs of preserving those assets.

[185]   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 14-16.

While specific intent to violate the stay is not required under section 362(k), a party's conduct and motive are relevant considerations to an award of damages. Ms. Biros applies a positive gloss to her stay violation, grossly mischaracterizing her conduct as reasonable and beneficial to the estate. A more accurate assessment is that she, in a stunning display of overreach, usurped the authority of the Trustee and unilaterally exercised control over property of the estate. Even viewed in the best light possible, Ms. Biros supplanted the Trustee's judgment with her own because he purportedly failed to heed her warnings about tangibles disappearing from the Property. It is also difficult to see past the hypocrisy of her preemptively snatching the scheduled assets (apparently worth no more than $6,500) to prevent them from being pilfered by Mr. Snyder.[186]

Of course, the Court has already found that Mr. Snyder did not remove any estate assets from the Property without authorization and notice to the Trustee. In fact, the suspicious activity that Ms. Biros cites in her written response—the removal of cars and trailers in June 2022—was mandated by the *Limited Stay Relief Order*.[187] Obviously, lobbing accusations over measures explicitly allowed by a court order undermines her credibility and indicates how carefully she and counsel read it. The Court also notes that other "disappearances" might have been attributable to tenants removing their personal property as instructed by the Trustee, which would explain his lack of concern. And notably, the Trustee did not dispute Mr. Snyder's ownership of the personal property he took and openly stored essentially across the street.

---

[186]   See Section III.B, *supra*. In this vein, Ms. Biros seemingly borrows the plot line from the film, *National Treasure,* where the protagonist, Benjamin Franklin Gates concludes that "the only way to protect the Declaration [of Independence] is to steal it." NATIONAL TREASURE (Walt Disney Pictures, November 19, 2004).

[187]   See *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 11(a)-(b).

Ultimately, the Court finds Ms. Biros' "estate protection" justification nothing more than an effort to muddy the waters and create a false equivalence for her transgressions.

Frankly, the Court is unconvinced that Ms. Biros was motivated by altruism. Viewing the record of this case as a whole, her actions have all been in service of one goal: expediting the commercial development of the Property.  Ms. Biros aggressively sought unfettered possession of the Property from the start, often beyond what was reasonable or permissible under the circumstances.  Recall that she asserted the validity of a writ of possession obtained post-petition in violation of the automatic stay.  And impatient with the speed of the bankruptcy process, Ms. Biros then repeatedly demanded unconditional stay relief prior to the administration of the estate.  From this perspective, the Court is confident that her motivation in acquiring any tangibles was simply to end the estate's use of the Property and remove impediments to its development.[188]  Therefore, the Court concludes that Ms. Biros improperly removed the scheduled assets to accelerate her efforts to clean-up the Property.[189]

Ms. Biros removed the scheduled assets from the Property sometime between August and early November 2022.  As explained above, it was not objectively reasonable to believe the *Limited Stay Relief Order* gave her blanket authority over scheduled estate property. And considering that Ms. Biros clings to ambiguities in the order to defend her conduct yet ignores those plain terms covering Mr. Snyder's actions, she demonstrates a remarkable indifference to the provisions of the order.  The Court infers that she "jumped the gun," assuming

---

[188]   The Court's conclusion is supported by the contradictory positions articulated in Ms. Biros' written response.  On the one hand, she professed concern that Mr. Snyder's alleged removal of assets would erode the value of the estate and diminish the benefit of her future purchase.  Id. at ¶ 7.  On the other, she asserted that Mr. Mowry's claim to the scheduled assets was undisputed.  Id. at ¶ 19.  Put together, Ms. Biros wanted to purchase things she thought the estate did not own and could not transfer.  It seems far more likely that the scheduled assets were physically in the way of her efforts.

[189]   It is strangely coincidental that the scheduled assets, which consisted of scrap, were moved to a location adjacent to a scrap recycling center.

that her bid for the estate's assets (amply cushioned with substantial bonds and assumed environmental liabilities) would prevail.  The *Stipulated Order* reflected a similar premature sense of victory by proposing to grant Ms. Biros exclusive possession of the Property and authority over the tenants' belongings before a completed sale.

Ms. Biros doubled-down on her stay violation at the hearing in early November 2022.  When the Court scheduled on-site due diligence for prospective bidders, she knew or should have known that the Court and parties expected the scheduled assets to be on the Property.  Yet Ms. Biros said nothing even though she knew that most scheduled assets were already relocated to the McKeesport Property.[190]  Her silence is telling, as is her decision to not explain it.  Ms. Biros could not have reasonably believed at that point that the removal of the scheduled assets was proper.  And lest there were any lingering doubts, the Court reiterated the scope of the *Limited Stay Relief Order* in denying the *Stipulated Order*: "the Court finds nothing in the record that authorizes [Ms.] Biros to remove or destroy any items other than [(i) "vehicles or trailers"; (ii) "tires"; and (iii) "tanks identified as waste"]."[191]

It is surprising that Ms. Biros did not undertake any remedial measures—even disclosure—before the on-site due diligence window opened since the scheduled assets' absence would be noticed.  After all, Ms. Snyder was allowed on the Property to view them even though Mr. Snyder was not.  Ms. Biros probably figured that her stay violation still had a chance of escaping detection.  The Court also suspects she was emboldened by her substantial claims, her

---

[190]    It is now apparent that Attorney Otto was aware in early November that Ms. Biros relocated the scheduled assets.  Because Attorney Otto was not ordered to show cause, the Court is currently not in a position to examine whether his silence during the Court's scheduling of a futile due diligence period is compatible with his duty of candor.  See Pa. Rules of Prof'l Conduct 3.3(a).  "[W]hen an attorney learns that a client has engaged in fraudulent or unauthorized conduct, they must take reasonable remedial measures, including, if necessary, disclosure to the tribunal."  In re Bush, No. 22-10043-GLT, 2023 WL 6543194, at *6 (Bankr. W.D. Pa. Oct. 6, 2023).

[191]    *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211 at ¶ 2(a) (footnotes omitted).

view that she was the only legitimate creditor, and the likelihood that she would prevail at auction.  In fact, Ms. Biros only came clean when the Court directly asked whether she had removed scheduled assets from the Property.

In sum, the Court finds by clear and convincing evidence that Ms. Biros' conduct not only willfully violated the stay but did so in "arrogant defiance" of the Code.  For all the same reasons, the Court necessarily finds that she is in contempt of the automatic stay.  To repeat: the stay is "an injunction with the force of an order," Ms. Biros was aware of it, and knowingly violated it.[192]  And finally, independent of the stay violation, the Court also finds that her willful and contemptuous conduct knowingly interfered with the sale process and the administration of the estate.[193]

As explained above, section 362(k) requires the Court to award actual damages, including attorneys' fees and costs, to any individual injured by a willful stay violation.[194]  In terms of actual damages, Ms. Biros' willful stay violation unnecessarily increased the estate's administrative burden.  Therefore, those costs must be shifted to her to make the estate whole.

By delaying the auction (and therefore the sale's closing), Ms. Biros forced the estate to remain in possession of the Property and incur additional use charges to her.  Had this not occurred, she could have obtained unconditional stay relief by the end of December 2022, rather than January 2023.  Since the Court previously awarded her an $18,000 administrative expense for nine months of post-petition use, a $2,000 reduction is appropriate to account for the delay she caused.

---

[192]     Patti v. Fred Ehrlich, PC, 304 B.R. at 187.

[193]     See, e.g., In re Primel, 629 B.R. 790, 802 (Bankr. W.D. Pa. 2021).

[194]     11 U.S.C. § 362(k)(1).

Next, Ms. Biros' removal and concealment of the scheduled assets unnecessarily multiplied the proceedings and the estate should not be burdened by the resulting professional fees and costs.  Time wasted at the on-site due diligence, the early December sale hearing, and the Court-supervised site inspections are *solely* attributable to her conduct.  Notwithstanding the brief visit to Mr. Snyder's land, his possession of only two estate assets was known and authorized by the Trustee.  In contrast, Ms. Biros' unauthorized removal of the scheduled assets from the Property and subsequent incomplete disclosure when called to account created the need to locate them.  The Court estimates approximately 6.5 hours was misspent on these activities.

The Trustee, who serves as his own counsel, bills "attorney time" at $425 per hour.[195]  Nevertheless, the Court is mindful that "trustee time" is not compensated that way.  To prevent him from individually suffering any out-of-pocket loss recoverable under section 362(k), the Court will apply his attorney rate for the entire period.  This is warranted given that Ms. Biros' violation was not only willful, but arrogantly defiant.  This results in an award of $2,762.50 in fees, which the Court will round up to $2,800 for reasonable costs.  To prevent any undue benefit as an administrative creditor, Ms. Biros will be required to pay this directly to the Trustee rather than the estate.

Beyond the Trustee, the Court declines to award professional fees to any other parties.  Mr. Snyder incurred none.  U Lock, however, lacked standing to object to the sale, casting doubt on the reasonableness of any fees.  Ms. Snyder may have incurred modest attorneys' fees, but the Court cannot ignore her bad faith in filing this involuntary.[196]  Her provocation and unclean hands are valid considerations in this context.  Thus, the Court finds

---

[195]     See *Application for Unpaid Administrative Fees*, Dkt. No. 583 at ¶ 12.

[196]     See In re U Lock, Inc., 2024 WL 878464, at *14-19.

that Ms. Snyder has forfeited any right to attorneys' fees stemming from Ms. Biros' stay violation.

The Court reiterates that both it and the U.S. Marshals needlessly incurred extraordinary expenses related to the site inspections. Though not "individuals" entitled to reimbursement under section 362(k), the Court may use civil contempt powers to redress these injuries with a compensatory sanction. Accordingly, the Court will order Ms. Biros to pay $1,000 to the U.S. Marshals to reimburse the cost of the security escort. The Court will also impose a $500 fine payable to the Clerk of Court to both cover needless costs arising from the inspections and to discourage future disobedience with Court orders.

Given Ms. Biros' outrageous conduct and her arrogant defiance of the Code, the bankruptcy process, and orders of this Court, these modest compensatory awards are inadequate. Especially so as she may have factored these foreseeable damages into her calculus and decided to nonetheless "take the foul." A larger coercive sanction is unavailable at this late stage because there is no longer an opportunity to repeat this conduct or meaningfully interfere with the administration of the estate. That said, the Court may award punitive damages to the estate under section 362(k) without the need for criminal contempt powers.[197]

The egregiousness of Ms. Biros' contemptuous interference with estate property and its sale requires a penalty that will be felt despite her significant administrative expense and unsecured claims. Punitive damages must "bear some reasonable relationship" to the actual damages,[198] but "particularly egregious act[s]" resulting in only a small economic harm justify a higher ratio of punitive-to-actual damages.[199] Here, the Court awarded compensatory damages

---

[197]   See 11 U.S.C. § 362(k)(1).

[198]   In re Lansaw, 2015 WL 224093, at *13.

[199]   State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425.

totaling $6,300, though the actual damages are probably slightly higher since the Court equitably denied Ms. Snyder her attorneys' fees. The Court concludes a punitive award of $15,000 payable to the estate without setoff is justified. This represents roughly a 2-to-1 ratio between the punitive and actual damages, which is in line with what has been approved in other cases.[200]

## IV.    CONCLUSION

In light of the foregoing, the Court will release the *Order to Show Cause* against Mr. Snyder and order Ms. Biros to pay damages as outlined above. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: June 24, 2024

GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
George Snyder

---

[200]    See id.; see also In re Lansaw, 853 F.3d at 671.

35